1   RODERICK G. DORMAN (SBN 96908)
    rdorman@mckoolsmithhennigan.com
2   LAWRENCE M. HADLEY (SBN 157728)
    lhadley@mckoolsmithhennigan.com
3   MIEKE K. MALMBERG (SBN 209992)
    mmalmberg@mckoolsmithhennigan.com
4   MCKOOL SMITH HENNIGAN, P.C.
    865 South Figueroa Street, Suite 2900
5   Los Angeles, California 90017
    Telephone:      (213) 694-1200
6   Facsimile:      (213) 694-1234

7   Attorneys for Plaintiff
    GOLDEN BRIDGE TECHNOLOGY, INC.

8

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12

13   GOLDEN BRIDGE TECHNOLOGY, INC.,        )   Case No. CV-12-04882-PSG
                                            )
14                            Plaintiff,    )   **PLAINTIFF'S OPENING CLAIM
                                            )   CONSTRUCTION BRIEF**
15            vs.                           )
                                            )   **HEARING DATE:   JUNE 26, 2013**
16   APPLE INC.,                            )   **TIME:           10:00 A.M.**
                                            )   **COURTROOM:      5**
                              Defendant.    )
17                                          )   **MAGISTRATE JUDGE:  HON. PAUL
                                            )   SINGH GREWAL**
18                                          )
                                            )
19   AND RELATED COUNTERCLAIM.              )
                                            )
20   _____)

21

22

23

24

25

26

27

28

McKool Smith Hennigan, P. C.
Los Angeles, California

# TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................. 1

II.     BACKGROUND................................................................... 2

        A.      THE TECHNOLOGY OF THE '793 PATENT................................. 3

        B.      DR. SCHILLING'S INVENTION IN THE '793 PATENT ............... 5

        C.      PATENT OFFICE PROCEEDINGS....................................... 6

III.    CLAIM CONSTRUCTION LEGAL STANDARDS................................... 7

IV.     TERMS WITH AGREED UPON CONSTRUCTION BY THE
        PARTIES.......................................................................... 8

V.      DISPUTED TERMS AND PROPOSED CONSTRUCTIONS.................... 9

        A.      "MULTICHANNEL-SPREAD-SPECTRUM TRANSMITTER"....... 9

        B.      "DATA CHANNEL".................................................... 11

        C.      "SPREAD-SPECTRUM DATA CHANNEL"................................. 13

        D.      "SPREAD-SPECTRUM HEADER CHANNEL"............................. 13

        E.      "CHIP SEQUENCE SIGNALS" AND "PARALLEL CHIP
                SEQUENCE SIGNALS"................................................ 13

        F.      "PRODUCT DEVICES" ................................................ 15

        G.      "SYNCHRONIZING THE PLURALITY OF DATA
                CHANNELS" .......................................................... 15

        H.      "SPREAD SPECTRUM MEANS…" ................................... 16

        I.      "COMBINER MEANS…"................................................ 18

McKool Smith Hennigan, P. C.
Los Angeles, California

i

J.      "CARRIER MEANS…"...................................................................... 19

K.      "MEANS FOR GENERATING THE PLURALITY OF CHIP
        SEQUENCE SIGNALS" .................................................................. 20

VI.  CONCLUSION .............................................................................. 21

McKool Smith Hennigan, P.C.
los angeles, california

Case No. CV-12-04882-PSG                                    GBT'S OPENING CLAIM CONSTRUCTION BRIEF
885824

## **TABLE OF AUTHORITIES**

CASES

*ACTV, Inc. v. Walt Disney Co.,*
   346 F.3d 1082 (Fed. Cir. 2003) ................................................................19

*Alloc, Inc. v. International Trade Commission,*
   342 F.3d 1361 (Fed. Cir. 2003) .................................................................9

*Bell Atlantic Network Servs., Inc. v. Covad Communications Grp.,*
   262 F.3d 1258 (Fed. Cir. 2001) .................................................................9

*Callicrate v. Wadsworth Mfg.,*
   427 F.3d 1361 (Fed. Cir. 2005) ...............................................................22

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
   460 F.3d 1349 (Fed. Cir. 2006) .................................................................9

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,*
   34 F.3d 1048 (Fed. Cir. 1994) .................................................................10

*Laitram Corp. v. NEC Corp.,*
   163 F.3d 1342 (Fed. Cir. 1998) ...............................................................10

*Mangosoft, Inc. v. Oracle Corp.,*
   525 F.3d 1327 (Fed. Cir. 2008) ...............................................................10

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996) ..................................................................................9

*Old Town Canoe Co. v. Confluence Holdings Corp.,*
   448 F.3d 1309 (Fed. Cir. 2006) ...............................................................10

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................9, 10, 12

*Versa Corp. v. Ag-Bag International Ltd.,*
   392 F.3d 1325 (Fed. Cir. 2004) ...............................................................22

*Vitronics Corp. v. Conceptronic,*
   90 F.3d 1576 (Fed. Cir. 1996) .............................................................9, 10

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*
   239 F.3d 1225 (Fed. Cir. 2001) .........................................................passim

STATUTES

35 U.S.C. 112(6)..............................................................................18, 20, 21, 22

McKool  Smith  Hennigan,  P. C.
Los Angeles, California

iii

35 U.S.C. § 112 .................................................................................................... 18

35 U.S.C. § 112(6) ............................................................................................... 10

Code Division ......................................................................................................... 4

**OTHER AUTHORITIES**

U.S. Patent No. 5,166,951 ...................................................................................... 6

U.S. Patent No. 6,075,793 ............................................................................. passim

McKool  Smith  Hennigan,  P.C.
los angeles, california

1    **I.      INTRODUCTION**

2             Plaintiff Golden Bridge Technology, Inc. ("GBT") filed this action against Apple, Inc., for

3    infringement of U.S. Patent No. 6,075,793 ("the '793 patent") entitled "High Efficiency Spread

4    Spectrum System and Method." (Declaration of Jeffrey Huang, Ex. 1).  GBT asserts that Apple

5    infringes claims 5, 6 and 7 of the '793 patent.  In accordance with the Court's Case Management

6    Order, GBT submits its opening claim construction brief and evidence supporting its constructions

7    of the disputed claim terms and phrases of the asserted claims.  With regard to those claim terms that

8    remain in dispute, as required by *Phillips* and its progeny, GBT has proposed constructions (where

9    necessary) that are amply supported by the language of the claims and specification, as one skilled

10   in the art would have understood those terms at the time the patent application was filed.

11            The disputed terms are as follows:

12            1.      The "multichannel-spread-spectrum transmitter" used in claims 5-7 is properly

13   limited to a transmitter in a mobile handheld device -- *i.e.*, the user equipment that transmits an

14   uplink signal to a base station.  This is clear from the context of claims 5-7, which based on the

15   claim language and other limitations does not include transmitters that send a downlink signal from

16   a base station to mobile user equipment.

17            2.      The asserted claims in '793 patent use a number of terms to describe various

18   "channels" that make up the invention.  These terms include "data channel," "spread-spectrum-data

19   channel," and "spread-spectrum-header channel."  The usage of these terms is apparent from the

20   claim language and the specification.  Accordingly, GBT and Apple generally agree on the inputs

21   that create these channels.  Rather than dispute how the channels are created, the dispute on these

22   terms centers on whether the channels describe continuous data streams during a frame, or whether

23   the channels can include idle intervals where no data is transmitted.  Such idle intervals, which are

24   neither disclosed in the specification nor shown in any figures of the '793 patent, are inconsistent

25   with the stated purpose of the invention of reducing overhead and improving capacity.

26            3.      The "chip sequence signals" and "parallel chip sequence signals" as used in the

27   asserted claims are processed with data-sequence signals to generate spread-spectrum channels.

28

McGOO, SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

1

1   They also are orthogonal to one another.  This is plain from the specification and claim language.

2   Since these signals perform this precise function, they should be construed as such.

3          4.      GBT agrees with Apple's construction of "product device" as "a device that performs

4   a multiplication operation."  Both the claim language and the specification expressly state that such

5   a multiplying device can be made from "EXCLUSIVE-OR" gates.  Accordingly, a product device

6   should be defined as Apple proposes, but with the inclusion of "EXCLUSIVE-OR" gates as follows:

7   "a device, including EXCLUSIVE-OR gates, that performs a multiplication operation."

8          5.      The asserted claims recite that a processor is used for "synchronizing" multiple data

9   channels.  According to the specification, the processor generates control and timing signals for

10  synchronizing the data channels to the header in one channel.  Contrary to Apple's construction,

11  synchronizing in this manner refers to more than just timing, and uses more than just the header.

12  Rather, it refers to the use of the processor for aligning the channels in time.

13         The remaining terms for construction all use "means plus function" language.  With one

14  exception, the parties agree on the function to be performed by the recited means.  The disputes

15  center on what structures from the specification, and their equivalents, perform those functions.  In

16  short, Apple reads into the means far more structure than needed to perform the functions.

17  **II.     BACKGROUND**

18         GBT was founded in 1995 to develop wireless telecommunication solutions, including those

19  employing Wideband Code Division Multiple Access (W-CDMA) technology.  Such solutions

20  allow mobile wireless stations ("MS"), such as cellular phones, to transmit information to a fixed

21  base station ("BS").  Over the years, a number of technologies have been developed that both

22  increase the number of mobile devices that can communicate with a single BS and the speed (or data

23  rate) at which the devices can communicate.  CDMA technology allows several users to transmit

24  information over a single communication channel and share a band of frequencies. (Declaration of

25  Branimir R. Vojcic, Ph.D., ("Vojcic Decl.") ¶ 16).  The BS communicates with a controller that

26  routes the information for transmission to the intended recipient. Codes are used by each MS to

27  allow multiple users to transmit over the same channel to a BS.  The BS is able to identify which

28  MS sent the information based upon the code used.  This allows for increased capacity on a cellular

McKool Smith Hennigan, P.C.
los angeles, california

2

1   communication system. *Id.*

2   In the mid 1990s, various regional organizations and committees formed standards setting

3   groups with the purpose of creating a third generation (3G) wireless communications system. In

4   about 1998, a standards setting organization known as the Third Generation Partnership Project

5   ("3GPP"), which was formed under the International Telecommunication Union, selected spread

6   spectrum W-CDMA for its 3G standard.

7   **A.   The Technology Of The '793 Patent**

8   The '793 patent is directed to an advanced "spread spectrum" CDMA mobile

9   communications technology. (Vojcic Decl., ¶ 16). This type of spread spectrum CDMA technology

10   is called direct-sequence spread-spectrum ("DS SS"). *Id.*, ¶ 17. With DS SS transmissions, a data

11   signal (which consists of a sequence of pulses denoted as a "symbol") is multiplied by a "spreading

12   code," which consists of a sequence of shorter pulses called "chips." The signal resulting from the

13   product of the data signal and the spreading code chips is a spread spectrum data signal. The

14   number of chips of spreading code per data symbol interval is usually referred to as the "spreading

15   factor." *Id.* ¶ 19. When multiplied by the spreading code, the pulses of the resulting spread

16   spectrum data signal change at the same rate as the spreading code. Accordingly, the bandwidth

17   spread spectrum data signal is same as the bandwidth of the spreading code. *Id.* This has the effect

18   of both increasing the bandwidth of the data signal and reducing the power of individual data

19   signals. *Id.*

20   In commercial CDMA systems, a primary purpose of spreading is to distinguish signals from

21   different mobile users. In such systems, two spreading operations take place. The first includes

22   application of a channelization code. This is used to distinguish CDMA signals (channels) from the

23   same source. The second includes application of a scrambling code, which is used to distinguish

24   CDMA signals from different sources. "Orthogonal" channelization codes are used so that the

25   codes of the same length do not cause interference with each other. *Id.* ¶ 21-22.

26   Dr. Schilling, GBT's former Chairman and the co-inventor of the '793 patent, was one of the

27   pioneers in the development of spread spectrum CDMA technologies. In the early 1990, Dr.

28   Schilling invented a high capacity spread spectrum channel, which resulted in U.S. Patent No.

McKool Smith Hennigan, P.C.
los angeles, california

3

5,166,951 ("the '951 patent"). (Huang Decl., Ex. 2). The '951 patent discloses Dr. Schilling's invention of a "multicode" spread spectrum CDMA channel. Prior to Dr. Schilling's multicode invention, spread spectrum CDMA systems were limited to a single communications channel, and did not work well for communicating high capacity information in a "fading" environment (*e.g.*, for high volume communications between a MS and BS). ('951, 1:30-34). Solving the volume limitations by communicating at higher data rates resulted in lower processing gain, channel degradation, and interference. (*Id.* at 1:48-53). Accordingly, Dr. Schilling recognized a need for a high capacity spread-spectrum channel, which did not result in lower processing gain and degradation of performance, but still provided the benefits of a CDMA system (*i.e.*, increased capacity on a cellular network with reduced interference). (*Id.* 1:66-2:10).

To solve this problem, Dr. Schilling invented a "multicode" channel in which message data is "de-multiplexed" into a number of individual data signals. Each individual data signal is then spread using message-chip-codes. Since the spreading codes are orthogonal, the resulting individual spread data signals are synchronized to each other. Then, the individual spread spectrum signals are combined into a single "multi-level" signal for transmission at a carrier frequency as illustrated below:

McKool Smith Hennigan, P.C.
los angeles, california

Case No. CV-12-04882-PSG
885824

GBT'S OPENING CLAIM CONSTRUCTION BRIEF



*FIG. 2*

(*Id*. Fig. 2 and 2:30-64). This multicode process of demodulating and spreading, then combining before transmission, results in higher processing gain and less signal degradation, while keeping all capacity benefits of CDMA.

**B.     Dr. Schilling's Invention in the '793 Patent**

While Dr. Schilling's multicode spread spectrum invention enjoyed widespread success, Dr. Schilling and Dr. Joseph Garodnick recognized an inherent disadvantage as they developed advanced wireless telecommunication solutions at GBT. With multicode (also called multichannel) spread spectrum systems, the amount of channel space needed for header information appended to each data packet is multiplied by the number of individual data channels. To compound the problem, CDMA systems used for mobile communications require relatively large headers because the headers must include not only information about the message package, but also "pilot" bits, which provide synchronization information to the receiver. ('793, 1:27-62, 3:64-4:9; Figs. 1 and 2). This large overhead for header information substantially limits the space available for data.

In the '793 patent, Drs. Schilling and Garodnick determined that data capacity could be substantially increased in a multicode spread spectrum CDMA system by dedicating at least two

5

McKool Smith Hennigan, P.C.
los angeles, california

1  channels to data only with all header information dedicated to at least one "header" channel. (*Id.*,

2  2:3-40).  Accordingly, in the invention, some of the parallel spread-spectrum channels will have no

3  header information.  Besides using orthogonal spreading codes, data packets on dedicated data

4  channels in the invention are synchronized with header information on a header channel through

5  control and timing signals generated by a processor, as illustrated below:



**FIG. 3**

19  (*Id.*, Fig. 3 and 2:23-25, 6:17-23, 8:27-30).

20  **C.      Patent Office Proceedings**

21        Drs. Schilling and Garodnick filed the application for their invention on February 6, 1998.

22  On January 31, 2000, the Patent Office allowed the claims in the original application in a first office

23  action.  In a statement of reasons for allowance, the Examiner stated that "none of the references of

24  record alone or in combination disclose or suggest the combination of limitations specified in the

25  independent claims, especially a processor, for synchronizing the remaining plurality of data

26  channels to the header in the first data channel, as specified in claims 1, 5, and 7.  The invention

27  includes *headers in fewer than all of the channels*." (Huang Decl., Ex. 3) (emphasis in original).

28

McKool  Smith  Hennigan,  P.C.
los angeles, california

III.    **CLAIM CONSTRUCTION LEGAL STANDARDS**

The Court is solely responsible for determining, as a matter of law, the scope and meaning of patent claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Patents and their claims are addressed to persons of ordinary skill in the pertinent art, and therefore a court interprets claim terms as they would have been understood by such persons at the time of the invention, *i.e.*, the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc), *quoting, Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

Generally, claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006) (*quoting, Phillips*, 415 F.3d at 1312-13). When construing claims, the Court must always consult the patent specification, so that the claims are "construed so as to be consistent with the specification, of which they are a part." *Phillips*, 415 F.3d at 1316 (*quoting Merck & Co. v. Tea Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)); *see also, Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

Where the inventor has acted as his own lexicographer, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316; *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). The inventor acts as his own lexicographer when he defines a claim term in the specification expressly, or implicitly by "consistently and clearly us[ing] a term in a manner either more or less expansive than its general usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the patent claims." *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Bell Atlantic Network Servs., Inc. v. Covad Communications Grp.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).

While the Federal Circuit has instructed courts to consult the specification to ascertain the meaning of the claim to a person of ordinary skill in the art and to construe terms consistent with the

McKool Smith Hennigan, P.C.
los angeles, california

1   specification, the Federal Circuit has also cautioned courts that "it is improper to read limitations

2   from the written description into a claim." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d

3   1225, 1237 (Fed. Cir. 2001); *see also Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d

4   1048, 1054 (Fed. Cir. 1994). "[I]t is the claims, not the written description, which define the scope

5   of the patent right." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).

6       In construing a means-plus-function limitation under 35 U.S.C. § 112(6), a court must

7   identify both the claimed function and the corresponding structure in the written description for

8   performing that function. *Wenger*, 239 F.3d at 1233. A court may not import functional limitations

9   that are not recited in the claim, or structural limitations from the written description that are

10  unnecessary to perform the claimed function. *Id.* The claim is construed to cover the corresponding

11  structure, material, or acts described in the specification and equivalents thereof. 35 U.S.C. §

12  112(6).

13      When construing claim terms, courts may also consult extrinsic evidence, including expert

14  testimony and dictionaries. *See Phillips*, 415 F.3d at 1319. Extrinsic evidence, however, should

15  only be used to help the court come to the proper understanding of the claims; the ultimate

16  construction given to the claims should be grounded in the intrinsic evidence *Vitronics Corp.*, 90

17  F.3d at 1584; *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1329-30 (Fed. Cir. 2008); *Old Town

18  Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006).

19  **IV.   TERMS WITH AGREED UPON CONSTRUCTION BY THE PARTIES**

20      In this action, GBT asserts that Apple infringes claims 5, 6, and 7 of the '793 patent. The

21  parties have agreed to the following terms and constructions:

22

| Term or Claim Limitation | Agreed Construction |
|---|---|
| "header"<br>Claims 5, 6, 7 | "A sequence of bits or symbols, which include a pre-defined sequence of bits or symbols (pilot)." |
| "header frame"<br>Claims 5, 6, 7 | "A header followed by data in a frame, which may include multiple headers interspersed with fields of data." |

McKool Smith Hennigan, P.C.
los angeles, california

8

| Term or Claim Limitation | Agreed Construction |
|---|---|
| "data-sequence signal"<br><br>Claims 5, 6, 7 | "A signal that may be derived from data, or an analog signal converted to data, signaling information, or other source of data symbols or bits." |
| "a header device"<br><br>Claims 5, 6, 7 | "A device that concatenates a header to a first data-sequence signal on a first channel." |
| "concatenating"<br><br>Claims 5, 7 | "Linking together two or more items in a single chain or series." |
| "EXCLUSIVE-OR gate"<br><br>Claim 6 | "A digital logic gate that performs the Boolean operation of nonequivalence, where the output of two compared values is only true if both inputs have different values." |

## V.   DISPUTED TERMS AND PROPOSED CONSTRUCTIONS

### A.   "multichannel-spread-spectrum transmitter"

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "multichannel-spread-spectrum transmitter"<br><br>Claims 5, 7 | "User equipment that uplinks multichannel-spread spectrum signals to a base station." | No construction necessary.<br><br>Alternatively, "a transmitter for communicating a multichannel spread-spectrum signal." |

The '793 patent describes what is meant by the term "multichannel spread-spectrum transmitter" in the preamble of claims 5 and 7. It is the user equipment, such as a mobile phone, that uplinks multichannel-spread spectrum signals to a base station. The specification describes a multichannel spread-spectrum link, which in the preferred embodiment sends a signal from a user to a base station. (3:50-52).[1] The specification goes on to define the system as a "multichannel spread-spectrum transmitter transmitting the multichannel spread-spectrum signal" (the user equipment that uplinks the multichannel spread-spectrum signals), "to a multichannel spread-spectrum link" (the base station). (3:52-55). The multichannel spread-spectrum system is further illustrated by Figures 3 and 4, where Figure 3 is a block diagram of the multichannel spread-spectrum transmitter (3:8-9),

---

[1] All citations in the remainder of this memorandum are to column and line numbers, or figures, of the '793 patent unless otherwise noted.

9

McKool Smith Hennigan, P.C.
los angeles, california

and Figure 4 is a block diagram of the multichannel spread-spectrum receiver (3:10-11).  Where, as here, the inventor has acted as his own lexicographer, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

Furthermore, under the doctrine of claim differentiation, each claim in a patent is presumptively different in scope.  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (*citing Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187, 48 U.S.P.Q.2D (BNA) 1001, 1005 (Fed. Cir. 1998)).  Here, independent Claim 1 recites a "multichannel spread-spectrum system" which includes limitations for both the transmitter and base station.  Specifically, Claim 1 recites the limitation of the "header-matched filter" which the specification discloses as existing at the base station to detect the embedded headers from all users. (7:41-44).  Thus, the term "multichannel spread-spectrum transmitter" in independent Claims 5 and 7 cannot also encompass both the uplink (transmitter) and downlink (base station); instead, "multichannel spread-spectrum transmitter" is just the uplink portion of the "multichannel spread-spectrum system."

Finally, the testimony of Dr. Vojcic supports GBT's construction.  According to Dr. Vojcic, a person of skill in the art would have understood the transmitter recited in claims 5 and 7 to include only the mobile station transmitter, and not a transmitter at a base station, because "in a multichannel spread-spectrum system carrying signals to multiple user devices on the downlink the headers may be user specific which would preclude the inventive aspect of transmitting the header on only one of the spread-spectrum channels."  (Vojcic Decl., ¶ 42).

Thus, the meaning "multichannel spread-spectrum transmitter" as used in the claims in light of the specification is "user equipment that uplinks multichannel-spread spectrum signals to a base station."

Apple's proposed construction cannot be correct because it would encompass both the user equipment uplink transmitter and the base station downlink transmitter.  Apple's expert, Dr. Anthony Acampora, argues that the transmitter recited in claims 5 and 7 include both the mobile station transmitter and the base station transmitter because a base station transmitter generally "may, in fact, transmit header on fewer than all of the downlink channels."  (Declaration of Anthony

10

McKool Smith Hennigan, P. C.
los angeles, california

1  Acampora ("Acampora Decl.") ¶¶ 57, 60-62).  But, independent Claims 5 and 7 both recite "a

2  header device, coupled to a first data channel of a plurality of data channels…"  As Dr. Vojcic

3  points out, a base station transmitter would have to carry signals to multiple user devices, making

4  the base station transmitter incompatible with the claim language and precluding the inventive

5  aspect of the claims.  (Vojcic Decl., ¶ 42.)  Thus, Apple's proposed construction should be rejected.

6  **B.**     **"data channel"**

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "data channel"<br><br>Claims 5, 6, 7 | "a continuous data stream during a frame, that carries a data-sequence signal" | "A communication channel able to carry data." |

11  GBT's proposed construction for "data channel" follows directly from Figure 2, which

12  shows multiple spread-spectrum channels:



**FIG. 2**

Case No. CV-12-04882-PSG                                        GBT'S OPENING CLAIM CONSTRUCTION BRIEF

885824

McKool  Smith  Hennigan, P.C.
los angeles, california

1

2      As shown in Figure 2, aside from the first channel carrying the header frame, in each of the

3   spread-spectrum channels is a continuous data stream during the frame.  Because the spread-

4   spectrum channels hold spread-spectrum signals, which are generated by multiplying a respective

5   data-sequence signal, carried by a data channel (2:3-6), by a respective chip-sequence signal (Figure

6   3; 6:37-39), any breaks or idle periods during the frame in the data-sequence signal would

7   necessarily be manifested in the spread-spectrum channel.  Thus, the term "data channel" as used in

8   the '793 patent excludes channels containing breaks or idle periods, and must mean "a continuous

9   data stream during a frame, that carries a data-sequence signal."

10      Apple agrees that a data channel carries a data signal, but Apple's definition of data channel

11   as "a communications channel able to carry data" is much too broad in the context of the '791

12   patent.  If adopted, Apple's proposed construction would encompass carrying anything, including

13   header information, or not carrying anything, such as idle intervals.  In conflict with Apple's

14   proposed construction, the invention specifically requires the data channels to *not* carry header

15   information.  This exclusion of header information in data channels is expressly stated in the claims.

16   For example, Claim 5 recited that a "header device" is "*coupled* to a first data channel …. for

17   *concatenating* a header to a first data-sequence signal…"  *See also* Figure 3, 46 and $d_1(t)$; (6:14-15);

18   Vojcic Decl. ¶ 44 ("Apple's construction is too broad and vague in that the data channel may

19   include other thing such as header and/or idle intervals.")

20      Apple's expert, Dr. Acampora does not address the incompatibility of Apple's over-broad

21   proposed construction with the specification and claim language, but instead asserts that a data

22   channel, in the abstract, can include idle periods.  (Acampora Decl. ¶¶ 34-37.)  Although the prior

23   art may have disclosed idle periods within data channels, Figure 2 of the '791 patent, which should

24   guide claim construction here, shows a continuous data stream.  Moreover, the entire purpose of the

25   invention is to increase data transmission efficiency over the prior art.  (1:6-2:2).  Introducing idle

26   intervals with a discontinuous data stream, as Dr. Acampora suggests the invention includes, would

27   defeat the data transmission efficiency of the invention.  (*See* Vojcic Decl. ¶ 45.)  Because Apple's

28   proposed construction would impermissibly broaden the term "data channel," and is inconsistent

12

McKool Smith Hennigan, P.C.
los angeles, california

with the stated object of the invention, Apple's proposed construction should be rejected.

C.   "spread-spectrum data channel"

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "spread-spectrum-data channel"<br><br>Claims 5, 6, 7 | "A continuous data stream during a frame, generated by processing a data-sequence signal (other than a header frame) with a chip-sequence signal." | "A channel, without a header, that is generated by processing a data-sequence signal by a respective chip-sequence signal." |

GBT's proposed construction for the term "spread-spectrum data channel" follows directly from its proposed construction of "data channel." Both GBT and Apple agree that a "spread-spectrum-data channel" excludes header information and is generated by processing a data-sequence signal with a chip-sequence signal. This meaning is well supported in the specification. (Figure 3; 2:3-6, 6:37-39). Thus, the dispute between the parties centers on whether the data stream on the channel is continuous during a frame. It must for the same reasons a "data channel" as used in the '791 patent must.

D.   "spread-spectrum header channel"

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "spread-spectrum-header channel"<br><br>Claims 5, 6, 7 | "A continuous data stream during a frame, generated by processing the header frame with a first chip-sequence signal." | "A channel generated by processing the header frame with a first chip-sequence signal." |

Like the other channel terms, the parties' dispute regarding "spread-spectrum header channel" centers on whether the data stream on the channel is continuous during a frame. Apple's broad construction, which conceivably could include idle intervals where no data is transmitted, should be rejected because it is inconsistent with the entire purpose of the invention. (*See* Vojcic Decl. ¶ 46.)

E.   "chip sequence signals" and "parallel chip sequence signals"

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "chip sequence signals" and "parallel chip sequence signals"<br><br>Claims 5, 6, 7 | **chip sequence signals:**<br>"Signals or codes, which are orthogonal to other signals or codes, processed with a data- | **chip sequence signal:**<br><br>A signal that is a sequence of chips. |

McKool Smith Hennigan, P. C.<br>los angeles, california

13

| | | |
|---|---|---|
| | sequence signal to generate a spread-spectrum channel" | **parallel chip sequence signals:** |
| | **parallel chip sequence signals:** No construction necessary due to the GBT's proposed construction of "chip-sequence signals," and because "parallel" has an ordinary and customary meaning. | "Chip-sequence signals that can be used to distinguish channels from each other." |
| | However, if construed: "Signals or codes, which are orthogonal to other signals or codes, processed with data-sequence signals to generate a spread-spectrum channels that can each be sent simultaneously." | |

The "chip sequence signals" and "parallel chip sequence signals" used in the asserted claims are processed with data-sequence signals to generate spread-spectrum channels. This is expressly recited in Claim 5. Each chip sequence signal is generated from a respective code out of a series of codes. (4:14-20). They also are orthogonal to one another. Specifically, each "chip sequence signal" among a plurality of chip-sequence signals is defined by the specification as being "orthogonal to other chip-sequence signals of the plurality of chip-sequence signals." (2:21-23). Thus, the meaning of "chip sequence signal," in light of the specification and claim language, is "signals or codes, which are orthogonal to other signals or codes, processed with a data-sequence signal to generate a spread-spectrum channel."

Apple's proposed construction is vague and unhelpful to understand how the chip sequence signal is generated and used. It is so broad that it would essentially cover any sequence of bits. Thus, it would be less helpful than no construction at all.

If the Court adopts GBT's proposed construction of "chip sequence signal," then "parallel chip sequence signals," does not need construction. The word "parallel" is well understood and not specific to the '791 patent. If the Court were to determine that construction of this term is necessary, GBT's proposed construction follows directly from its proposed construction of "chip sequence

14

McKool Smith Hennigan, P.C.
los angeles, california

McKool Smith Hennigan, P.C.
los angeles, california

signal." The invention increases data transmission efficiency by sending data through parallel spread-spectrum channels so that the spread-spectrum channels can be sent in parallel using different chip sequence signals. (1:66-2:2; 3:28-31). Thus, if construed, the meaning of the term "parallel chip sequence signal," in light of GBT's proposed construction for "chip sequence signal" and the specification, is "signals or codes, which are orthogonal to other signals or codes, processed with data-sequence signals to generate a spread-spectrum channels that can each be sent simultaneously."

**F.    "product devices"**

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "product device(s)" Claim 7 | "a device, including EXCLUSIVE-OR gates, that performs a multiplication operation" | "A device that performs a multiplication operation." |

The specification states that the "the plurality of product devices 51-58, for example, may be embodied as a plurality of EXCLUSIVE-OR gates..." (6:31-32). Therefore, with the addition of "EXCLUSIVE-OR gates," GBT agrees with Apple's proposed construction of this term.

**G.    "synchronizing the plurality of data channels"**

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "synchronizing the plurality of data channels" Claims 5, 7 | "aligning in time two or more data channels" | "Timing the two or more data channels using the header." |

GBT's proposed construction for "synchronizing the plurality of data channels" follows directly from the specification: "*[f]rom timing the data from the header* in a single channel, *data in all channels are timed*" and from receiving the timing and control signals from the processor, the plurality of data channels are synchronized "*to the header* on the first data channel." (6:17-22) (emphasis added). Because the data channels are synchronized, or timed, *to* the header on the first data channel, each of the data channels are *aligned* (in time) to the header on the first data channel. Therefore, the meaning of "synchronizing the plurality of data channels," read in light of the specification, is "aligning in time two or more data channels." *See* Vojcic Decl. ¶ 48.

Apple's proposed construction is too broad to make any sense. Simply "timing the two or

Case No. CV-12-04882-PSG
885824

GBT'S OPENING CLAIM CONSTRUCTION BRIEF

1   more data channels using the header" would encompass the situation where the data channels are not

2   timed (aligned) *to* the header. It also would cover the situation where the data channels are not even

3   timed (aligned) to one another. Apple's proposed construction only requires that the two or more

4   data channels be timed, in some fashion, without regard to how, by using the header, which leaves

5   open the possibility that the data channels each have their own timing and are not aligned with one

6   another at all. Because the specification requires the header information, which includes

7   information for synchronization of the data channels, to be in less than all of the data channels, and

8   the specification further requires that the data channels without header information be synchronized

9   in time *to* the header in the first data channel, Apple's proposed construction should be rejected.

10      **H.      "spread spectrum means…"**

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "spread spectrum means coupled to the plurality of data channels for spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively thereby generating a plurality of spread spectrum channels the plurality of spread spectrum channels including a spread spectrum header channel generated by processing the header frame with a first chip sequence signal and a plurality of spread spectrum data channels"<br><br>The parties agree that this claim term should be governed by 35 U.S.C. 112(6)<br>Claim 5 | *Function*: spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively. (Disputed)<br><br>*Corresponding Structure*: "Product devices 51-58 and equivalents thereof." | *Function:* spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal, and a plurality of spread-spectrum-data channels. (Disputed)<br><br>*Corresponding Structure:* Chip sequence generator 39, product devices 51, 52, 53, and 58, processor 27, sync blocks 32, 33, and 38, header device block 46, and lines connecting them. |

25          The parties disagree as to both the recited function and the structure of this means-plus-

26   function limitation. Under the rules for construing terms governed by 35 U.S.C. § 112, the precise

27   claim language in question must be examined to determine the appropriate means and function.

28   "Correctly identifying the claimed function is critical, because 'an error in identification of the

McKool Smith Hennigan, P.C.
los angeles, california

1  function can improperly alter the identification of the structure . . . corresponding to that function.'"

2  *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1087 (Fed. Cir. 2003) (internal citations omitted).

3      GBT's identification of the recited function follows the claim language.  In contrast, Apple

4  wrongly seeks to include more than the recited function.  *See Wenger*, 239 F.3d at 1233.  Claim 5

5  recites a spread-spectrum means for "spread-spectrum processing the plurality of data channels by a

6  plurality of chip sequence signals."  Apple seeks to include within the function not only what the

7  spread spectrum means processes, but also what the result of that processing generates -- namely, a

8  plurality of spread-spectrum data channels.  Apple also seeks to include how the spread-spectrum

9  header channel is generated.  The result of the processing is not part of spread-spectrum processing

10  itself.  Thus, it is not appropriately part of the recited function of the spread-spectrum processing

11  means.

12      By reciting the incorrect function, Apple necessarily includes much more structure

13  corresponding to the recited means than needed.  As the specification states, the spread-spectrum

14  means is illustratively shown in Figure 3 as a plurality of product devices 51-58.  (5:43-45).  Thus,

15  the structure for just processing the plurality of data channels by a plurality of chip sequence signals

16  is limited to "product devices 51-58 and equivalents thereof."

17      Apple seeks to include a laundry list of additional structure for processing the data-sequence

18  signals by the chip-sequence signals, including the chip sequence generator 39, processor 27, sync

19  blocks 32, 33, and 38, header device block 46, and lines connecting them.  But these structures do

20  not perform the recited function of processing the plurality of data sequence signals by a plurality of

21  chip sequence signals.  Rather, most of these blocks are used for creating the chip-sequence signals,

22  which is recited as a separate means in dependent claim 6.  Likewise, the processor, sync blocks,

23  and header device block are all components for ***providing*** the data sequence signals, not for spread-

24  spectrum ***processing*** the data sequence signals.  As the Figure 3 and the specification show, the

25  function of spread-spectrum processing the data sequence signals by the chip sequence signals is

26  performed by the product devices 51-58.

27      Finally, in addition to all the extraneous components, Apple seeks to further include "the

28  lines connecting them" as additional structure.  However, this is improper because "the lines" do not

17

McKool  Smith  Hennigan,  P.C.
los angeles, california

perform the recited *function*, instead "the lines" merely illustrate how the product devices 51-58

obtain their inputs and where the outputs are sent.  Apple's proposed construction should be

rejected.

## I.      "combiner means…"

| *Claim Term* | *GBT's Proposed Construction* | *Apple's Proposed Construction* |
|---|---|---|
| "combiner means coupled to said spread spectrum means for algebraically combining the plurality of spread spectrum channels as a multichannel spread signal"<br><br>The parties agree that this claim term should be governed by 35 U.S.C. 112(6)<br><br>Claim 5 | *Function*: algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum signal.  (Agreed)<br><br>*Corresponding Structure*: "A combiner 45 and equivalents thereof." | *Function:* algebraically combining the plurality of spread-spectrum channels as a multichannel-spread-spectrum signal.  (Agreed)<br><br>*Corresponding Structure:* Lines from product devices 51, 52, 53, 58 to combiner block 45, and line to product device 48. |

The parties agree that this disputed claim phrase includes a means-plus-function component

that has the recited function of "algebraically combining the plurality of spread spectrum channels as

a multichannel spread spectrum signal."  The specification states that the combiner 45 of Figure 3

algebraically combines the plurality of spread-spectrum channels, and outputs the combined signal

as a multichannel-spread-spectrum signal.  (6:54-56).  Thus, the corresponding structure to perform

the recited function, read in light of the claim language and specification, is "a combiner 45 and

equivalents thereof."

Apple's contends that the structure in the specification corresponding to the "combiner

means" includes additional structure *not* tied to the function of algebraically combining the plurality

of spread spectrum channels as a multichannel spread signal.  *See Wenger*, 239 F.3d at 1233.

Apple's further errs in listing the structure because the structure it identifies does not perform the

recited function.  Instead, Apple points to structure that includes only the *lines* from the product

devices to the correct structure (*i.e.*, the combiner block), *and the line* to another product device.  As

such, Apple only identifies "*lines*" as the structure in the specification for performing the combining

function.  Plainly, lines do not combine anything.  To the extent Apple seeks to further import the

1   extraneous structures of product devices 51, 52, 53, 58, and 48, along with the correct structure

2   (namely, combiner 45), those extraneous components do not perform the recited function, and again

3   merely serve as inputs and outputs from the combiner 45. *See Wenger*, 239 F.3d at 1233. Thus,

4   Apple's proposed construction should be rejected.

5       **J.**    **"carrier means…"**

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "carrier means coupled to said combiner means for transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency"<br><br>The parties agree that this claim term should be governed by 35 U.S.C. 112(6)<br><br>Claim 5 | *Function*: transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency. (Agreed)<br><br>*Corresponding Structure*: "A transmitter-carrier subsystem 50 and equivalents thereof." | *Function:* transmitting the multichannel-spread-spectrum signal over a communications channel at a carrier frequency. (Agreed)<br><br>*Corresponding Structure:* Transmitter-carrier subsystem 50 comprised of oscillator 49 and multiplier device 48 for shifting a signal to a carrier frequency, a filter 58 for filtering the shifted signal, a power amplifier 59, and antenna 60. |

15         The parties agree that this disputed claim phrase includes a means-plus-function component

16   that has the recited function of "transmitting the multichannel spread spectrum signal over a

17   communications channel at a carrier frequency." The specification identifies the structure for

18   performing this function as a transmitter-carrier subsystem 50.

19         Apple agrees that the transmitter-carrier subsystem 50 performs the carrier function, but also

20   seeks to limit the subsystem to a particular configuration "comprised of oscillator 49 and multiplier

21   device 48 for shifting a signal to a carrier frequency, a filter 58 for filtering the shifted signal, a

22   power amplifier 59, and antenna 60." The specification states that the transmitter-carrier subsystem

23   means is embodied as a transmitter-carrier subsystem 50. (5:66-6:1). That "the transmitter-carrier

24   subsystem 50 *may* include an oscillator 49 and multiplier device 48 for shifting a signal to carrier

25   frequency, a filter 58 for filtering the shifted signal, and a power amplifier 59 *and/or other circuitry*

26   *as is well known in the art for transmitting a signal over a communications channel.*" (6:1-6).

27   Furthermore, the specification states that "[t]he transmitter-carrier subsystem 50 of the multichannel

McKool Smith Hennigan, P.C.
los angeles, california

spread-spectrum transmitter includes appropriate filters, power amplifiers and matching circuits coupled to antenna 60." (6:61-67). Thus, the specification does not require the particular configuration, and should not be limited as Apple proposes. *See Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (holding that district court improperly interpreted "cutting means" to be restricted to the preferred "pivotally mounted cutting mechanism" instead of also including "scissors and hand-held razors" and other disclosed structures); *Versa Corp. v. Ag-Bag International Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004) (reaffirming that "when multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments").

### K.   "means for generating the plurality of chip sequence signals"

| Claim Term | GBT's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "means for generating the plurality of chip-sequence signals"<br><br>The parties agree that this claim term should be governed by 35 U.S.C. 112(6)<br><br>Claim 6 | *Function*: generating the plurality of chip-sequence signals. (Agreed)<br><br>*Corresponding Structure*: "A chip sequence generator and equivalents thereof." | *Function*: generating the plurality of chip-sequence signals. (Agreed)<br><br>*Corresponding Structure*: Chip sequence generator 39 and lines carrying signals to product devices 51, 52, 53, 58. |

The parties agree that this phrase includes a means-plus-function component that has the recited function of "generating the plurality of chip-sequence signals." Similar to the dispute for the claim terms "spread-spectrum means…" and "combiner means…," the dispute here is whether the corresponding structure in the specification for performing this function includes "lines carrying signals to product devices 51, 52, 53, 58." The additional "lines" structure proposed by Apple does *not* perform the recited function of generating the plurality of chip-sequence signals. Indeed, the "lines carrying signals to [the] product devices" are not even inputs or outputs to the chip sequence generator. *See* Figure 3. Thus, including the "lines" as part of the corresponding structure would be error. *See Wenger*, 239 F.3d at 1233.

McKool Smith Hennigan, P.C.
los angeles, california

1   **VI.   CONCLUSION**

2          For the foregoing reasons, GBT respectfully requests that the Court adopt GBT's proposed

3   claim constructions.

4   DATED:      May 10, 2013                    MCKOOL SMITH HENNIGAN, P.C.

5

6

7

8                                              By  /s/ Lawrence M. Hadley
                                                     Lawrence M. Hadley
9
                                               Attorneys for Plaintiff, GOLDEN BRIDGE
10                                             TECHNOLOGY, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKool Smith Hennigan, P.C.
los angeles, california

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 10, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.


_/s/ Lawrence M. Hadley_

McKool Smith Hennigan, P.C.
los angeles, california

Case No. CV-12-04882-PSG                    GBT'S OPENING CLAIM CONSTRUCTION BRIEF
885824