1   COOLEY LLP
    TIMOTHY S. TETER (171451) (teterts@cooley.com)
2   LOWELL D. MEAD (223989) (lmead@cooley.com)
    Five Palo Alto Square
3   3000 El Camino Real
    Palo Alto, CA  94306-2155
4   Telephone:    (650) 843-5000
    Facsimile:     (650) 849-7400
5
    Attorneys for Defendant
6   Apple Inc.

7

8                       UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12   Golden Bridge Technology Inc.,        Case No.  5:12-cv-04882-PSG

13                 Plaintiff,               APPLE'S RESPONSIVE CLAIM
                                            CONSTRUCTION BRIEF
14         v.

15   Apple Inc.,

16                 Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................... 1

II. THE '793 PATENT ..................................................................................................... 2

    A.    The '793 Patent Imagines a Problem With the Prior Art And Presents an Obvious Solution to It ................................................................................... 2

    B.    The PTO Allowed the '793 Claims Without Considering The Relevant Prior Art Or Making Any Rejections, and GBT Forgot About the Patent ............ 5

    C.    Asserted '793 Claims 5, 6, and 7 ................................................................ 6

III. DISPUTED CLAIM LIMITATIONS ........................................................................ 7

    A.    "Multichannel-spread-spectrum transmitter" ............................................ 7

        1.    In an effort to avoid downlink prior art, GBT argues against the ordinary and customary meaning of "transmitter." ....................... 7

        2.    The specification does not limit the transmitter to user equipment ........... 9

        3.    GBT's "claim differentiation" argument fails ............................. 9

        4.    GBT's expert, Dr. Vojcic, does not offer a relevant opinion ......... 11

    B.    "Data Channel" and "Spread-Spectrum Data Channel" .......................... 13

        1.    In an effort to avoid anticipating art, GBT argues that a "channel" should be defined as a continuous stream of data ...................... 13

        2.    The '793 patent recites the ordinary definition of "channel" ............ 14

        3.    The '793 patent does not disclaim non-continuous data transmission or define "channel" as limited to continuous transmissions ................. 15

    C.    "Spread-spectrum header channel" ........................................................... 17

    D.    "Chip sequence signal" and "Parallel chip sequence signals" ................. 18

    E.    "Product devices" ..................................................................................... 19

    F.    "Synchronizing the plurality of data channels" ....................................... 19

    G.    "Spread spectrum means" ......................................................................... 20

    H.    "Combiner means" .................................................................................... 22

    I.    "Carrier means" ........................................................................................ 23

    J.    "Header" (Now Undisputed) ..................................................................... 25

IV. CONCLUSION ........................................................................................................ 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

i.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

# TABLE OF AUTHORITIES

**Page**

CASES

*Biomedino LLC v. Waters Technologies Corp.*
490 F.3d 946 (Fed. Cir. 2008)..................................................................................... 24

*Golden Bridge Tech., Inc. v. Motorola, Inc.*
547 F.3d 266 (5th Cir. 2008)......................................................................................... 1

*Golden Bridge Tech., Inc. v. Nokia, Inc.*
527 F.3d 1318 (Fed. Cir. 2008)..................................................................................... 1

*i4i Ltd. P'ship v. Microsoft Corp.*
598 F.3d 831 (Fed. Cir. 2010)..................................................................................... 15

*Liebel-Flarsheim Co. v. Medrad, Inc.*
358 F.3d 898 (Fed. Cir. 2004)..................................................................................... 16

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*
344 F.3d 1205 (Fed. Cir. 2003)................................................................................... 24

*Noah Systems, Inc. v. Intuit Inc.*
675 F.3d 1302 (Fed. Cir. 2012)................................................................................... 24

*Omega Eng'g, Inc v. Raytek Corp.*
334 F.3d 1314 (Fed. Cir. 2003)................................................................................... 21

*Thorner v. Sony Computer Entertainment Am. LLC*
669 F.3d 1362 (Fed. Cir. 2012)............................................................................... 8, 9

*Valmont Indus., Inc. v. Reinke Mfg. Co.*
983 F.2d 1039 (Fed. Cir. 1993)................................................................................... 24

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996)....................................................................................... 8

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*
239 F.3d 1225 (Fed. Cir. 2001)................................................................................... 10

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

ii.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

## I. INTRODUCTION

For over seven years, plaintiff Golden Bridge Technology, Inc. ("GBT") has pursued a series of federal lawsuits around the country, demanding payment for GBT's alleged contributions to the 3G WCDMA standard. GBT's first three cases related to the WCDMA standard's "Common Packet Channel" (CPCH) and "Random Access Channel" (RACH). GBT argued in Texas federal court that (1) the 3GPP standards group violated the antitrust laws by removing CPCH from the WCDMA standard, and (2) one of GBT's patents was essential to the RACH process. In an effort to bolster its antitrust case, GBT proclaimed that the CPCH technology was the core of GBT's portfolio, and that GBT's other patents were "virtually valueless." GBT lost the antitrust and RACH patent cases at summary judgment, with the Eastern District of Texas finding that GBT's asserted claims were anticipated by two separate prior art references. After losing the appeals in both cases,[1] GBT filed a third case in the Central District of California, naming Apple as a defendant and asserting WCDMA RACH-related claims. When GBT learned of the judge assignment, it dismissed the complaint and refiled it in Delaware, but the Delaware Court granted summary judgment of non-infringement for Apple.

After losing its first three WCDMA cases, GBT argues in this Court that one of its "virtually valueless" patents, U.S. Patent 6,075,793, is essential to practice the WCDMA's "High Speed Uplink Packet Access" (HSUPA) feature. Contrary to GBT's arguments, the '793 patent is not essential to any part of the WCDMA standard, and numerous prior art references anticipate it. After filing the application, the '793 patent's lead inventor, Dr. Schilling, did not give the alleged invention a second thought, much less conclude that it is essential to HSUPA. To the contrary, when Dr. Schilling offered an expert opinion in 2006 regarding the value of GBT's patents and HSUPA, the '793 patent did not come to mind.

Although the inventors forgot about the '793 patent long ago, GBT recently hired a series of attorneys and advisors to rummage through GBT's portfolio and prepare it for sale. GBT ultimately sold most of its patents in a package deal to a third-party, but held on to the '793 patent

---

[1] *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318 (Fed. Cir. 2008); *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008).

to take one last run at litigation.  At claim construction, GBT now seeks to thread the needle and narrow the '793 claims in an effort to avoid the prior art, while hoping to ensnare HSUPA.  For example, in an attempt to dodge early 3G proposals and the 2G IS-95 CDMA standard—one of the references that invalidated GBT's RACH patent in its E.D. Texas case—GBT contends that the term "transmitter" has a special meaning in the '793 patent, limited to "user equipment" that operates only in the *uplink* to a base station.  Nothing in the intrinsic or extrinsic evidence supports such a definition, which contradicts the plain and ordinary meaning of the term.  Similarly, in an effort to avoid prior art patents and publications developed in Japan, GBT argues that a "channel" has a special meaning in the '793 patent, requiring a *continuous data stream* during a frame.  Nothing in the record supports such a definition.  GBT's other efforts to avoid the prior art are similarly flawed.  Apple's proposed constructions are correct, and the Court should adopt them in their entirety.

## II.   THE '793 PATENT

### A.   The '793 Patent Imagines a Problem With the Prior Art And Presents an Obvious Solution to It.

In 1997, GBT was based in Long Branch, New Jersey.  The two '793 inventors, Dr. Schilling and Dr. Garodnick, had recently left Interdigital, and though they were friends with fellow Interdigital alum and GBT founder Elmer Yuen, neither of them were GBT employees.  Dr. Schilling lived in Florida, but as a favor to Mr. Yuen, Dr. Schilling, spent one day a month as an unpaid advisor to GBT.  (Declaration of Timothy S. Teter ("Teter Decl.") Ex. 1, Schilling Tr. 20:14-21:24.)  The rest of the time Dr. Schilling worked on his golf and tennis games and wrote books, just "taking it easy."  (Teter Decl. Ex. 1, Schilling Tr. 20:14-21:24.)  His friend, Dr. Garodnick, signed a one-year consulting contract with GBT, agreeing to work part-time for the company.  Dr. Garodnick commuted to GBT from his Massachusetts home for two or three days a week, taking the rest of the week off.  (Teter Decl. Ex. 2, Garodnick Tr. 36:24-39:16.)

Enjoying their time off after Interdigital, neither Dr. Schilling nor Dr. Garodnick followed the efforts to develop the new 3G standards in Europe and Japan.  However, they were familiar with GBT's proposal for a 3G system, called WIMS, and Dr. Schilling used his connections to

1    help GBT join the TR46 committee.   GBT was new to the standard-setting process, and

2    Dr. Garodnick believed that GBT's WIMS proposal would be particularly inefficient at

3    transmitting data in the uplink, as (he believed) it would allegedly send redundant, extraneous

4    "header" on every channel.  (Teter Decl. Ex. 2, Garodnick Tr. 58:20-59:6.)  The alleged problem

5    would not have been any trouble if GBT kept up with developments in the field, as numerous

6    prior art authors already knew not to waste bandwidth sending "redundant" or "extraneous"

7    header information on multiple channels from a single transmitter.  Thus, the prior art proposals

8    in the United States, Europe, and Japan did not have the alleged problem or waste bandwidth—

9    they proposed sending header on only one of the channels.

10        Nonetheless, Dr. Garodnick proceeded to address what he perceived to be a flaw in

11   WIMS, and instructed GBT's patent attorney, Dr. David Newman, to prepare the patent

12   application that ultimately became the '793 patent.  Without identifying WIMS by name, the '793

13   patent observes that multichannel spread spectrum transmitters were known, but claims that they

14   were woefully inefficient.  The '793 patent suggests that multichannel transmitters wasted 50% of

15   *every* channel on redundant header information, limiting the overall efficiency to 50%.  The '793

16   patent states:

17            Another method offered by prior art is to use parallel spread-
              spectrum channels, with each channel defined by a different chip-
18            sequence signal.  In this method, by using multiple correlators or
              matched filters, orthogonal codes are sent simultaneously, thereby
19            increasing the data rate while still enjoying the advantage of a high
              processing gain. The multiple spread-spectrum channels merely
20            behave as multiple users to a single location. However, the
              efficiency remains at 50%.
21

22   ('793 col. 1:54-63.)

23        Having imagined a problem with the WIMS prior art, the '793 patent purports to solve it.

24   A transmitter does not need to send redundant "header" (pilot) on every channel.  One channel

25   out of many channels could include the "header," and the receiver could use that header to receive

26   and demodulate all of the channels.  As Dr. Garodnick testified, the idea was simple:  remove "a

27   lot of extraneous information that wasn't needed" on every channel.   (Teter Decl. Ex. 2,

28   Garodnick Tr. 58:16-19.)  Thus, as the '793 Abstract states, the alleged invention is:

1

> A multichannel-spread-spectrum system for communicating a
> plurality of data-sequence signals from a plurality of data channels
> using parallel chip-sequence signals *in which fewer than all of the*
> *channels include header information*. A header device concatenates
> a header to a first data-sequence signal on a first channel. *Data-*
> *sequence signals in parallel channels are sent without a header,*
> *and are timed from the header in the first channel.*

2

3

4

5   ('793 Abstract (emphasis added); *see also* '793 Summary of the Invention, col. 1:65-2:63.)

6       The '793 patent declares that the '793 patent achieves "increased efficiency" over the

7   unidentified prior art "by including header information in fewer than all the channels":

8

> With the present invention, *increased efficiency is obtained by*
> *including header information in fewer than all the channels.*
> Effectively, instead of replicating the frame format shown in FIG. 1
> for each spread-spectrum channel, *only one frame contains headers*
> *while the other spread-spectrum channels sent in parallel with*
> *different chip-sequence signals devote the entire time for data, as*
> *shown in FIG. 2.* The remaining spread-spectrum channels are
> synchronized to the first channel by a processor. Therefore, the
> efficiency is increased. *One or more spread-spectrum channels, but*
> *less than the total number of spread-spectrum channels, could have*
> *a header for synchronization.* The use of one spread-spectrum
> channel with a header, however, would be more efficient.

9

10

11

12

13

14

15   ('793 col. 3:21-42 (emphasis added).)

16       Figures 1 and 2 of the '793 patent respectively show an alleged prior art channel (with

17   header symbols occupying much of the channel capacity) and the multiple channels of the

18   invention, only one of which has header information.  In both the alleged prior art (FIG. 1) and in

19   the multichannel description (FIG. 2, Code 1) the header symbols are concatenated with the data

20   information (Fields 1, 2 … 31).  The alleged invention is thus not the idea of multiple channels or

21   concatenating header and data—that was all indisputably well-known in the art—but rather, the

22   idea of including header information on fewer than all of the channels sent by a multichannel

23   transmitter.

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

4.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF



| '793 FIG 1 – The Alleged Prior Art Header Information in *Every* Channel | '793 FIG 2 – The Alleged Invention Header Information in *Fewer than All of the* Channels |
|---|---|

FIG. 3 shows the transmitter structure as follows. The "Header Device," 46, receives a data stream $d_1(t)$ and concatenates that with header information. The other N-1 channels carry data.



**B.   The PTO Allowed the '793 Claims Without Considering The Relevant Prior Art Or Making Any Rejections, and GBT Forgot About the Patent.**

GBT cited only three references to the PTO (two of which were Dr. Schilling's own patents), and the Examiner allowed the claims without any substantive rejections. Thereafter, GBT put the '793 patent in its files and forgot about it. When the 3GPP group removed the CPCH feature from WCDMA, GBT sued several members of the 3GPP standards group for alleged antitrust violations, arguing that CPCH was the core of GBT's portfolio, and that with CPCH out of the standard, GBT's patents were "virtually valueless." (Teter Decl. Ex. 3, ¶3.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

5.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

1  GBT retained Dr. Schilling to support GBT's antitrust claims, and Dr. Schilling performed

2  searches for patents relating to CPCH and HSUPA.  He opined that the 3GPP defendants

3  removed a technology over which GBT had patents (CPCH) in favor of technology that the

4  antitrust defendants (not GBT) developed and patented (HSUPA).  (Teter Decl. Ex. 1, Schilling

5  Tr. 194:3-197:6; Teter Decl. Ex. 4, Schilling Antitrust Tr. 219:5-220:2 ("those patents in HSUPA

6  were owned by the major companies…this is what this whole lawsuit is about—that you opted for

7  a technique that you all own the patents on, rather than on the technique where the patents are

8  owned by someone else.").  Neither GBT nor Dr. Schilling alleged that GBT had *any* patents

9  covering HSUPA.  Dr. Schilling did not even mention the '793 patent, which did not come to

10 mind:  "Didn't even think about it, probably."  (Teter Decl. Ex. 1, Schilling Tr. 191:12-197:6.)

11        **C.**      **Asserted '793 Claims 5, 6, and 7.**

12        GBT asserts three claims in the instant case, independent claims 5 and 7, and dependent

13 claim 6.  Independent '793 Claim 5 recites a multichannel spread-spectrum transmitter.  The

14 claimed transmitter uses a plurality of data channels, and "concatenates" a "header" to a "first

15 data-sequence signal."  The claimed transmitter processes data-sequence signals by chip-sequence

16 signals to generate a plurality of spread-spectrum channels, including at least one "spread-

17 spectrum-header channel" and at least two "spread-spectrum-data channels."

18          5. A multichannel-spread-spectrum transmitter for communicating a
19          plurality of data-sequence signals from a plurality of data channels using
             parallel chip-sequence signals, comprising:

20          a header device, coupled to a first data channel of said plurality of data
21          channels, for concatenating a header to a first data-sequence signal to
             generate a header frame;

22          a processor, coupled to the header device and to the plurality of data
23          channels, for synchronizing the plurality of data channels;

24          spread-spectrum means, coupled to the plurality of data channels, for
             spread-spectrum processing the plurality of data-sequence signals by a
25          plurality of chip-sequence signals, respectively, thereby generating a
             plurality of spread-spectrum channels, the plurality of spread-spectrum
26          channels including a spread-spectrum-header channel generated by
             processing the header frame with a first chip-sequence signal, and a
27          plurality of spread-spectrum-data channels;

28          combiner means, coupled to said spread-spectrum means, for algebraically
             combining the plurality of spread-spectrum channels as a multichannel-

1    spread-spectrum signal; and

2    carrier means, coupled to said combiner means, for transmitting the
     multichannel-spread-spectrum signal over a communications channel at a
3    carrier frequency.

4        Independent claim 7 is very similar to independent Claim 5.  The claims do not specify

5    whether the transmitter is used for the uplink or the downlink.  In fact, the claims are not limited

6    to a mobile system at all.

7    **III.    DISPUTED CLAIM LIMITATIONS**

8        **A.    "Multichannel-spread-spectrum transmitter"**

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "multichannel-spread-spectrum transmitter" (claims 5, 7) | User equipment that uplinks multichannel-spread spectrum signals to a base station. | No construction necessary.<br><br>Alternatively, "a transmitter for communicating a multichannel spread-spectrum signal." |

13       **1.    In an effort to avoid downlink prior art, GBT argues against the**
14       **ordinary and customary meaning of "transmitter."**

15       GBT argues that the Court should narrow the generic term "multichannel-spread-spectrum

16   transmitter" to require "user equipment" that transmits signals only on an "uplink" "to a base

17   station."  GBT's construction is a thinly veiled effort to avoid the prior art, including the 2G IS-95

18   standard and early 3G proposals from the FRAMES group.  *See, e.g.,* Teter Decl. Ex. 5, *FRAMES*

19   *Multiple Access scheme proposal for the UMTS Radio Interface – SMG2 workshop on UMTS*

20   *Radio Interface Technologies* ETSI STC SMG2#20 (Dec. 16-20, 1996) (hereinafter "FRAMES

21   '96").  For example, FRAMES '96 describes a multichannel-spread-spectrum transmitter for

22   communicating a plurality of data-sequence signals from a plurality of data channels using

23   parallel chip-sequence signals.

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No. 5:12-cv-04882-PSG

7.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

Figure 4. Downlink frame structures.

(Teter Decl. Ex. 5, FRAMES '96 at 27.)

GBT cannot dispute that the ordinary and customary meaning of "multichannel spread-spectrum transmitter" includes any transmitter that transmits in *either* direction.   As GBT's expert, Dr. Vojcic concedes, the ordinary meaning of "multi-channel spread spectrum transmitter" "is *not* limited to up or downlink."   (Teter Decl. Ex. 6, Vojcic Tr. 17:5-18:7 (emphasis added).)   Similarly, Apple's expert, Dr. Acampora, also testified that the ordinary meaning of a "transmitter" or "multi-channel spread-spectrum transmitter" is not limited to a device that can transmit only in the uplink (mobile-to-base station) direction.   (Acampora ¶¶57-58 (D.I. 273-3).)

To overcome the ordinary and customary meaning of "transmitter" and "multichannel spread-spectrum transmitter," GBT must show that either (1) the patentee "sets out a definition and acts as his own lexicographer," or (2) the patentee "disavows the full scope of a claim term either in the specification or during prosecution."   *Thorner v. Sony Computer Entertainment Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012), citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1580 (Fed. Cir. 1996).   Neither exception applies here.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

8.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

2.     **The specification does not limit the transmitter to user equipment.**

GBT's expert, Dr. Vojcic, reviewed the '793 patent and found no disavowal of the downlink:  "I don't recall any explicit disavowal of for regarding this term that, in other words, excludes, the base station side of the transmitter."  (Teter Decl. Ex. 6, Vojcic Tr. 21:5-23.)  Nonetheless, GBT argues that the inventor "acted as his own lexicographer" in the specification by allegedly "defin[ing] the system" as limited to user equipment.  (D.I. 273 at 9-10.)  However, the specification passage that GBT cites as an alleged definition states that uplink transmission from a user to the base station is merely one preferred embodiment, illustrated "by way of example" in the disclosure:

> The present invention is for a multichannel spread-spectrum link which, *in a preferred embodiment*, is from a user to the base station. The present invention is *illustrated*, *by way of example*, with a multichannel spread-spectrum transmitter transmitting the multichannel spread-spectrum signal to a multichannel spread-spectrum receiver.

('793 col. 3:50-56 (emphasis added).)   Nothing in the cited language "clearly express[es] an intent" to re-define the ordinary word "transmitter" to mean "user equipment" or clearly disavows all transmitters that are not "user equipment."  *Thorner*, 669 F.3d at 1365-66; Acampora ¶¶ 58-61.  To the contrary, the '793 specification makes clear that the exemplary "multichannel spread-spectrum transmitter" is *not* defined by its location or direction, but is merely a system component for transmitting data:  "The terms 'multichannel spread-spectrum transmitter' and 'multichannel spread-spectrum receiver', as used herein, denote the overall system components for transmitting and receiving, respectively, data."  ('793 col. 4:39-42.)  The '793 patent further argues against any implicit definitions, contending that "it is intended that the present invention cover modifications and variations of the high efficiency spread spectrum packet system provided they come within the scope of the appended claims and their equivalents."  ('793 col. 9:43-47.)

3.     **GBT's "claim differentiation" argument fails.**

Without any disclaimer or definition, GBT argues that "claim differentiation" limits the scope of independent claims 5 and 7 in view of the "header-matched filter" independent claim 1.  (D.I. 273 at 10.)  Claim differentiation does not apply here for several reasons.  First, the "header-

1    matched filter" recited in claim 1 is not limited to the base station as GBT argues.  (*Id*.)  GBT

2    appears to argue that the "header-matched filter" in claim 1 must be at a base station, because the

3    specification includes a comment that "the header-matched filter at a base station can detect the

4    header embedded in the multichannel spread-spectrum signal from all users, since the chip-

5    sequence signal for the header and data is common to all users."  (D.I. 273 at 10 (citing '793 col.

6    7:41-44).)  Contrary to GBT's argument, nothing in the specification or in claim 1 states that the

7    claimed "header-matched filter" must *always* be at a base station or disclaims header-matched

8    filters that are not at a base station.  A header-matched filter can be included at either side.

9         Second, even if the header-matched filter in claim 1 was solely a base-station component

10   (which it is not), that would not change anything about the "multichannel spread-spectrum

11   transmitter" separately recited in claims 5-7.  Claim 1 does not recite a "multichannel spread-

12   spectrum transmitter" and claims 5-7 do not recite a header-matched filter.  Claim differentiation

13   is merely a presumption that "each claim in a patent is presumptively different in scope."  *Wenger*

14   *Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (citation omitted).

15   The doctrine does not apply here because claim 1 has a substantially different scope from claims

16   5 and 7 irrespective of the "header-matched filter."  Claims 5 and 7 are generally directed toward

17   a transmitter.  (*See* '793 claims 5-7 preambles ("transmitter…comprising: . . .").)  By contrast,

18   claim 1 is directed to an overall "system" including *both* transmitter and receiver functionality.

19   (*See* '793 claim 1 ("system" comprising "transmitting system" for "transmitting" "over a

20   communications channel," "translating device" for translating the received signal, "receiver

21   processor").)  Claim 1 recites numerous limitations that claims 5-7 do not recite, such as a

22   "translating device" for translating a received signal and a "receiver processor."  Thus, claim

23   differentiation does not support GBT's construction.

24        GBT also argues, without citing any evidence, that the "transmitter" in claims 5-7 cannot

25   "encompass both" the uplink transmitter and the downlink transmitter.  (D.I. 273 at 10.)

26   However, a "multichannel spread-spectrum transmitter" can exist and be used in *either* the uplink

27   or downlink direction – nothing in the claims or the specification precludes its use in either

28   direction.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG                    10.                    APPLE'S RESPONSIVE CLAIM
                                                                     CONSTRUCTION BRIEF

4.      **GBT's expert, Dr. Vojcic, does not offer a relevant opinion.**

Unable to cite any re-definition or disclaimer in the intrinsic record, GBT resorts to an opinion by its claim construction expert Dr. Vojcic.  (D.I. 273 at 10.)  Rather than apply the correct standard for claim construction, Dr. Vojcic simply declared which of the two constructions he deemed "more appropriate":

> Q  In preparing your declaration in this case and your opinion on multi-channel spread spectrum transmitter, what standard did you apply in order to determine the proper meaning of that term?
>
> A  Well, I was providing an opinion how persons of ordinary skill in the art would understand these and-- these terms, and whether, you know, one or the other construction, I guess, would be more appropriate in that context. I don't -- *I don't recall that I was presenting any -- presented any standard, specifically for claim construction*.  But I understand general standards.

(Teter Decl. Ex. 6, Vojcic Tr. 20:6-20 (emphasis added).)

In his declaration, Dr. Vojcic concluded that the claims must be limited to the uplink, because "the patent would be non-sensical if the base station transmitter is encompassed by the claim term because in a multichannel spread-spectrum system carrying signals to multiple user devices on the downlink the headers may be user specific which would preclude the inventive aspect of transmitting the header on only one of the spread-spectrum channels."  (Vojcic Decl. ¶42.)  At his deposition, Dr. Vojcic backed away from his sworn declaration.  He acknowledged that contrary to his declaration, the invention is *not* limited to "transmitting the header on *only one* of the spread-spectrum channels."

> I just had in mind I guess the figure [Fig. 2], but I don't think that patent limits only one.  It is I think it is probably – I think even it says somewhere that it is on less than all channels or something.  *I had figure here in mind and said only one but it is not necessarily only one, but had to be less than all.*

(Teter Decl. Ex. 6, Vojcic Tr. 35:23-36:8 (emphasis added).)  Nonetheless, Dr. Vojcic argued that the '793 patent should be limited to the uplink because "privacy concerns" would discourage persons of ordinary skill in the art from making a system in which multiple users listened to a single header frame.  According to Dr. Vojcic, if the invention is used on the downlink, "the privacy of that first data sequence would be lost because all users will decode all data on that --

1   on that first chip sequence code.  So I don't think anyone would -- would think of even designing

2   a system where other users could read data of user X together with all header information of all

3   users."  (Teter Decl. Ex. 6, Vojcic Tr. 22:22-23:14.)

4       Dr. Vojcic's alleged "privacy concern" is a red herring for several reasons.  First, it is the

5   most tangential of extrinsic evidence, and is not even remotely relevant to claim construction.

6   The '793 patent nowhere teaches that its claims must be interpreted narrowly to avoid unspecified

7   "privacy concerns."  To the contrary, it purports to cover all "modifications and variations . . .

8   within the scope of the appended claims and their equivalents." ('793 col. 9:43-47.)

9       Second, even if the Court considers Dr. Vojcic's "privacy concern," the Court should

10  dismiss it.   As inventor Dr. Schilling testified, nothing in the '793 patent requires the

11  multichannel spread spectrum transmitter to send signals simultaneously to multiple users—a

12  base station could send signals in a time-division manner, sending all of the channels to one user

13  in one time slot, and all the channels to another user in a following slot.  (Teter Decl. Ex. 1,

14  Schilling Tr. 104:22-105:20.)

15      Third, Dr. Vojcic's alleged "privacy concern" could be easily resolved within the scope of

16  the claimed invention.  The '793 patent allows the transmitter to send multiple header frames,

17  each of which could be directed to a different user, as shown in the demonstrative below from Dr.

18  Vojcic's deposition.



| '793 FIG. 2 (ONE HEADER DEVICE SHOWN) | EX. 29 FROM VOJCIC'S DEPOSITION:  MULTIPLE HEADER DEVICES ARE COVERED BY CLAIMS (TETER DECL. EX. 7) |
|---|---|

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

12.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

In fact, as Dr. Vojcic testified, "there is nothing in the claim that could preclude another header device," (Teter Decl. Ex. 6, Vojcic Tr. 38:3-17), and if each header is directed to a different user, Dr. Vojcic's "privacy concern" disappears.   Thus, even if the Court considers Dr. Vojcic's opinion – even though it is tangential extrinsic evidence at best—the claims cover *either* the uplink or the downlink, and the Court should reject GBT's construction.

**B.** **"Data Channel" and "Spread-Spectrum Data Channel"**

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "data channel" (claims 5-7) | A continuous data stream during a frame, that carries a data-sequence signal. | A communication channel able to carry data. |
| "spread-spectrum data channel" (claims 5-7) | A continuous data stream during a frame, generated by processing a data-sequence signal (other than a header frame) with a chip-sequence signal. | A channel, without a header, that is generated by processing a data-sequence signal by a respective chip-sequence signal. |

**1.    In an effort to avoid anticipating art, GBT argues that a "channel" should be defined as a continuous stream of data.**

The ordinary meaning of a "channel" is well-known in the art of wireless communications.   For example, a "channel" is a frequency in a FDMA system, the combination of a frequency and a timeslot in a TDMA system, and a frequency band and a code in a CDMA system.   The '793 patent expressly adopts the ordinary, well-known definition, "with each channel defined by a different chip-sequence signal." ('793 col. 1:55-57.)

In an attempt to avoid anticipating prior art, GBT argues that the ordinary meaning of "channel" does not apply to the '793 patent.   Instead, GBT urges the Court to confuse the concept of a "channel" with what the channel is capable of carrying, arguing that a "channel" must be a *continuous stream of data*.   GBT's proposed construction is a thinly-veiled effort to elude anticipating prior art such as U.S. Patent 5,896,374 to NTT DoCoMo, which shows header (pilot) concatenated with data (control) and transmitted on fewer than all of the channels.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

13.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

(Teter Decl. Ex. 8, '374 Patent FIG. 27.)

GBT apparently intends to argue that the "transmission channels" shown in the '374 patent are not "channels" at all, because they do not show *continuous* data being sent over the *entire slot*. The Court should reject GBT's proposed construction.

### 2. The '793 patent recites the ordinary definition of "channel".

GBT's proposed construction erroneously confuses a channel with the information that a channel carries. A channel is a conduit or pathway that carries something. A data channel is not the data itself; rather, a data channel can carry data. (Acampora ¶¶ 34-37.) The '793 patent clearly equates a channel with the *conduit*, rather than the data itself. Information is carried "on" or "in" the channel. ('793 col. 3:21-26, 5:63-65, 6:16-18.) For example, the '793 patent notes that a channel that carries only 50% data is "only 50% efficient." ('793 col. 1:41-43.) The '793 patent expressly recites the ordinary, well-known definition in the CDMA context, "with each channel defined by a different chip-sequence signal." ('793 col. 1:55-57.) The '793 patent further states that according to the invention:

> A second spread-spectrum *channel is defined by* a second chip sequence signal, which is generated from a second code (code 2). Similarly, a third spread-spectrum *channel is defined by* a third chip-sequence signal, which is generated from a third code (code 3).

('793 col. 4:15-20 (emphasis added).) Even GBT's claim construction brief lapses into the ordinary meaning, equating the term "channel" with a conduit, rather than the information the

conduit carries.  For example, GBT states that "channels hold" signals, signals are "carried by a data channel," and "a data channel carries a data signal."  (D.I. 273 at 12.)

### 3. The '793 patent does not disclaim non-continuous data transmission or define "channel" as limited to continuous transmissions.

Although the ordinary meaning of "channel" is well-known, GBT argues that the ordinary meaning is "much too broad." (D.I. 273 at 12.)  GBT confuses the different claim limitations, stating that "the invention specifically requires the data channels to *not* carry header information" and "[t]his exclusion of header information in data channels is expressly stated in the claims." (D.I. 273 at 12 (emphasis original).)  GBT's argument has nothing to do with the issue in dispute, which is whether the data stream must be *continuous* for a channel to exist.[2]

Similarly, nothing in the specification or file history disavows non-continuous data transmission or otherwise limits a data channel to a channel carrying a *continuous* data stream. The specification does not use the word "continuous" anywhere in describing the invention or the preferred embodiments,[3] and the word "stream" does not appear anywhere in the specification. Nonetheless, GBT argues that it limited the claims to one exemplary embodiment shown in Figure 2 that allegedly shows a continuous data stream.  (D.I. 273 at 11-12.)  Even if Figure 2 described what GBT says it describes (which it does not), that would not limit the claims.  "[A] claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction.'" *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir.

---

[2] Under the constructions proposed by both parties, the "spread-spectrum-data-channel" limitation is the element that excludes header.  The concept of a "data channel" is broader and can include header – as the specification states:  "The header device 46 *concatenates the header with data using a first data channel* of a plurality of data channels," resulting in a "*header on the first data channel.*" ('793 col. 6:14-22 (emphasis added).)  Thus, the ordinary term "data channel" does not exclude header information as GBT argues.

[3] The only place the specification uses the word "continuous" is in its background section.  ('793 col. 1:19-23.)  That usage runs counter to GBT's proposal because it recognizes that data may be transmitted either as a "continuous signal" or alternatively in "packet" form, which is typically a "bursty," non-continuous form of data transmission.  (Acampora Decl. ¶ 37.)

Cooley LLP
Attorneys At Law
Palo Alto

Case No. 5:12-cv-04882-PSG

15.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

2010), quoting *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 907-08 (Fed. Cir. 2004). There are no such words of manifest exclusion or restriction here.

To the contrary, Figure 2 is merely a high-level illustration of the sole point of alleged novelty—the use of header information in fewer than all data channels.  Figure 2 shows that the contents of the data channels are open-ended, with each including an ellipsis ("…") that was intended to give persons of skill in the art wide latitude about what to include in the data channels:



FIG. 2

Dr. Garodnick, one of the co-inventors, testified that Figure 2 does not restrict the invention, allowing persons of ordinary skill to put whatever they wanted in the data channels:

> Q.  Well, in figure 2 I see one big rectangle with data, "plus FEC, plus CRC, plus APC, plus '…,'"" we don't know what "..." means; right?
>
> A.  Yeah.  But it was -- it was -- *the idea was not to be restricted to anything associated with data or anything you decide to put in there*.
>
> Q.  Right.  You can put in whatever you want; right?
>
> A.  Right.  You can put control information in there.

(Teter Decl. Ex. 2, Garodnick Tr. 170:3-12 (emphasis added).)  GBT's expert, Dr. Vojcic, did not know what the ellipses meant, testifying that "I don't know what – the patentee had in mind there."  (Teter Decl. Ex. 6, Vojcic Tr. 31:25-32:22.)  Dr. Schilling similarly testified that he did not "understand what was going on in Figure 2"—"I would have to really think about it for a long time, which I'm not going to do."  (Teter Decl. Ex. 1, Schilling Tr. 58:16-24.)

Nonetheless, GBT argues that the claimed "data channel" should be limited to continuous data streams because "the entire purpose of the invention is to increase data transmission efficiency," and "idle intervals with a discontinuous data stream" would allegedly "defeat the data transmission efficiency of the invention." (D.I. 273 at 12.) GBT's argument is baseless. Under GBT's flawed logic, every term in these claims—and in any patent whose goal is "efficiency"—should be limited to only the most efficient embodiment of the claimed subject matter, under some unspecified criteria. In any event, as the prior art clearly teaches, the decision whether to transmit data when header (pilot) information is being transmitted is a matter of design choice, which may depend on the level of interference between the channels and whether the pilot symbols may be reliably received, even when data is transmitted simultaneously. As one prior art reference explains:

> Particularly, it is so arranged that a transmitting data is not transmitted by other channel in a pilot transmitting period. Or again, it is so arranged that the transmitting data is transmitted by other channel in the pilot transmitting period to the extent that reliability of the pilot symbols is not damaged largely (within a limit tolerable for practical use).

(Teter Decl. Ex. 9, U.S. Patent 6,175,558 Col. 3:1-6.) In short, the '793 patent did not disclaim any claim scope, or redefine the term "channel." The plain and ordinary meaning applies, and the Court should reject GBT's proposed construction.

### C.     "Spread-spectrum header channel"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "spread-spectrum header channel" (claims 5-7) | A <u>continuous data stream during a frame</u>, generated by processing the header frame with a first chip-sequence signal. | A <u>channel</u> generated by processing the header frame with a first chip-sequence signal. |

GBT offers no basis to limit the claimed "spread-spectrum header channel" to a "continuous data stream during the frame." Nothing in the intrinsic record disavows a header channel that can carry information with some idle periods. (Acampora ¶ 40.) Moreover, GBT's construction is inherently self-contradictory and erroneous. GBT contends that the "header channel" is a "continuous *data* stream," but that is foreclosed by the patent, which requires "header"—which is not "data" in this context—to be *concatenated* with data to form a header

frame. GBT's expert, Dr. Vojcic testified that "data is normally considered user data" and opined that the '793 patent teaches that "the data that is concatenated with the header in the header must be user data."  (Teter Decl. Ex. 6, Vojcic Tr. 26:7-27:11.)  GBT's construction would thus conflict with the claim language and exclude *all* of the embodiments in the '793 patent, which show that the "spread-spectrum header channel" is *not* a continuous data stream, but rather, contains the result of *concatenating* data with header.  Thus, GBT's construction, which would require "continuous *data*" is necessarily incorrect, and the Court should reject it.

### D.    "Chip sequence signal" and "Parallel chip sequence signals"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "chip sequence signal" (claims 5-7) | Signals or codes, which are orthogonal to other signals or codes, processed with a data-sequence signal to generate a spread-spectrum channel. | A signal that is a sequence of chips. |
| "parallel chip sequence signals" (claims 5-7) | No construction necessary because "parallel" has an ordinary and customary meaning. Alternatively, "signals or codes, which are orthogonal to other signals or codes, processed with data-sequence signals to generate a spread-spectrum channels that can each be sent simultaneously." | Chip-sequence signals that can be used to distinguish channels from each other. |

In an effort to avoid prior art that uses channelization signals that are not perfectly orthogonal, GBT argues that the ordinary meaning of "chip sequence signal" is allegedly "vague and unhelpful to understand how the chip sequence signal is generated and used."  (D.I. 273 at 14.)  GBT's argument is a red herring.  The claims separately recite "how the chip sequence signal is generated and used" in the context of the claimed inventions.  The claims expressly recite whether, and when the signals must be orthogonal.  For example, claim 7 recites:  "a chip-sequence generator for generating a plurality of chip-sequence signals, *each of said plurality of chip-sequence signals being orthogonal to other chip-sequence signals* within the plurality of chip-sequence signals."  ('793 claim 7 (emphasis added).)  The claim language confirms that a chip-sequence signal by itself—such as recited in claim 5—is not necessarily required to be orthogonal to other chip sequence signals.

GBT cites a description of an exemplary embodiment "with each chip-sequence signal orthogonal to the other chip-sequence signals of the plurality of chip-sequence signals."  ('793

col. 2:21-24.)  Nothing in this description or anywhere else in the specification defines the term "chip sequence signal" to limit it to orthogonal signals or disavows chip sequence signals that are not perfectly orthogonal to other such signals.  To the contrary, the specification makes clear that orthogonal chip-sequence signals is only a preferred embodiment: "Each of the chip-sequence signals . . . is *preferably* orthogonal to the other chip-sequence signals."  ('793 col. 6:24-30 (emphasis added).)  Similarly, the concept of "parallel" channel or chip sequences does not require perfect orthogonality, as GBT's construction implies.

### E.   "Product devices"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "product device" (claim 7) | A device, including EXCLUSIVE-OR gates, that performs a multiplication operation. | A device that performs a multiplication operation. |

GBT seeks to inject a limitation from an exemplary embodiment, to require that a product device must include an "EXCLUSIVE-OR gate."  (D.I. 273 at 15.)  The specification describes only that the product devices in an illustrative embodiment "*for example*, *may be* embodied as a plurality of EXCLUSIVE-OR gates."  ('793 col. 6:31-32 (emphasis added).)  When the inventors wanted to claim EXCLUSIVE-OR gates, they did so expressly.  (*See* '793 claim 6.)

### F.   "Synchronizing the plurality of data channels"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "synchronizing the plurality of data channels" (claims 5, 7) | Aligning in time two or more data channels. | Timing the two or more data channels using the header. |

In another transparent effort to avoid the prior art, GBT argues that "synchronizing" should be limited to "aligning" the data channels with the header.  GBT does not explain the basis or reason for its construction, and does not explain exactly what "aligning in time" is supposed to mean.  Presumably, GBT plans to argue that prior art such as U.S. Patent 5,896,374 to NTT DoCoMo (Teter Decl. Ex. 8) does not anticipate because it allegedly does not "align" the data channels with the header, even though it clearly synchronizes them.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

19.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

The intrinsic record does not support GBT's construction.  The specification does not use the word "align" at all.  Rather, the specification repeatedly equates "synchronizing" with "timing" the channels, as reflected in Apple's proposed construction.  ('793 col. 2:18-22, 4:60-62, 5:36-38, 6:14-22.)  "Synchronizing" does not require the start of the header bits and the start of the data bits to be "aligned" as GBT's vague and ambiguous construction might imply.  Rather, "synchronizing" is based on "timing the data from the header," and the processor works "to synchronize the plurality of data channels to the header," as GBT acknowledges.  (D.I. 273 at 15; '793 col. 6:17-22.)  The processor "generates control and timing signals from the detected header [which] are used for controlling sequences and timing *of the invention*."  ('793 col. 5:36-38 (emphasis added).)  In short, "[t]iming is keyed from the header."  ('793 col. 2:18.)

G.    "Spread spectrum means"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "spread spectrum means coupled to the plurality of data channels for spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively thereby generating a plurality of spread spectrum channels the plurality of spread spectrum channels including a spread spectrum header channel generated by processing the header frame with a first chip sequence signal and a plurality of spread spectrum data channels" (claim 5) | *Function*:<br>spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively. (Disputed)<br><br>*Corresponding Structure*:<br>"Product devices 51-58 and equivalents thereof." | *Function:*<br>spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal, and a plurality of spread-spectrum-data channels.  (Disputed)<br><br>*Corresponding Structure:*<br>Chip sequence generator 39, product devices 51, 52, 53, and 58, processor 27, sync blocks 32, 33, and 38, header device block 46, and lines connecting them. |

The parties dispute the function recited for the "spread spectrum means."  (*See* D.I. 273 at 16-17.)  Apple identifies the recited function as the function the claim plainly recites—the spread spectrum means is for "spread spectrum processing" the recited signals, thereby "generating" a

1  plurality of channels according to the recited limitations.  This is the recited function for this

2  element, which the patent sets forth as a unitary means-plus-function claim element.

3      GBT seeks to truncate the recited function to omit its recited "generating" function.  As

4  the Federal Circuit has cautioned, "[w]hen construing the functional statement in a means-plus-

5  function limitation, we must take great care not to impermissibly limit the function by adopting a

6  function different from that explicitly cited in the claim."  *Omega Engineering, Inc v. Raytek*

7  *Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) (citation omitted).  Here, GBT excludes the

8  functional limitation of "generating a plurality of spread spectrum channels" that the claim

9  expressly recites.  There is no basis to exclude this part of the recited function.

10      GBT argues that Apple's identification of function includes "not only what the spread

11  spectrum means processes, but also what the result of that processing generates."  (D.I. 273 at

12  17.)  That is incorrect.  The claim expressly recites a functional limitation of "generating"—not

13  just a result or outcome, but a functional activity that the recited "means" performs.

14      Under either identification of the function, the corresponding structure includes the

15  components Apple identifies.  GBT's identification of corresponding structure is incomplete

16  because the described product devices, alone, could not achieve the recited function including

17  "spread spectrum processing" and generating multiple spread spectrum channels with the specific

18  recited characteristics.  The recited function is performed by components including the chip

19  sequence generator 39, product devices 51-58 (depicted in Figure 3 as product devices 51, 52, 53,

20  and 58), processor 27, synchronization devices, and header device 46.  The specification teaches

21  how these devices work together to perform the recited function—processing data sequence

22  signals with chip sequence signals and generating channels including a header channel and

23  spread-spectrum data channels.  (*See* '793 col. 6:8-52.)

24      Figure 3 additionally depicts the lines connecting these components.  (*See* '793 Fig. 3.)

25  GBT argues that the lines "merely illustrate how the product devices 51-58 obtain their inputs and

26  where their outputs are set." (D.I. 273 at 17-18.)  To the contrary, the lines are necessary for

27  communication between the structures so that they can perform the recited function.

28

GBT argues that "most of these blocks are used for creating the chip-sequence signals, which is recited as a separate means in dependent claim 6." (D.I. 273 at 17.)  GBT does not cite the specification to support its assertion.   Contrary to GBT's argument, only one of these structures—the chip-sequence generator—is described as creating the chip-sequence signals, and it is thereby necessary to and involved in the recited function of processing the chip-sequence signals. ('793 col. 6:23-25; Fig. 3.)  Similarly, GBT asserts that "the processor, sync blocks, and header device block are all components for providing the data sequence signals," not for "processing" them. (D.I. 273 at 17.)  That is incorrect, and GBT again does not cite any support in the specification.  The processor 27, synchronization devices, and header device 46 all process the data sequence signals.  The synchronization devices "receive timing and control signals from the processor 27 to synchronize the plurality of data channels to the header on the first data channel," and "header device 46 concatenates the header with data using a first data channel of a plurality of data channels." ('793 col. 6:14-22.)

## H.    "Combiner means"

| Claim Term | GBT's Proposal | Apple's Proposal |
|---|---|---|
| "combiner means coupled to said spread spectrum means for algebraically combining the plurality of spread spectrum channels as a multichannel spread signal" (claim 5) | ***Function***: algebraically combining the plurality of spread spectrum channels as a multichannel spread signal.  (Agreed)<br><br>***Corresponding Structure***: A combiner 45 and equivalents thereof." | ***Function:*** algebraically combining the plurality of spread-spectrum channels as a multichannel-spread-spectrum signal.  (Agreed)<br><br>***Corresponding Structure:*** Lines from product devices 51, 52, 53, 58 to combiner block 45, and line to product device 48. |

GBT's proposed structure is nothing more than a box labeled "combiner."  Without more, GBT's proposed structure did not provide sufficient information to understand what the "combiner" performs.  Apple proposed including the lines to the combiner block, which would suggest to a person of skill in the art that the "combiner" operation is neither concatenation nor complex multiplication.  GBT's expert, Dr. Vojcic, agreed and clarified GBT's understanding, testifying that the "combiner" 45 is an *adder*, which neither concatenates nor complex multiplies the signals.  (Teter Decl. Ex. 6, Vojcic Tr. 70:9-72:10.)  Apple agrees with Dr. Vojcic on that

1   point, and thus, GBT has no basis for disputing Apple's construction.[4]

2   **I.   "Carrier means"**

| Claim Term | GBT's Proposal | Apple's Proposal |
| --- | --- | --- |
| "carrier means coupled to said combiner means for transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency" (claim 5) | **Function**: transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency. (Agreed)<br><br>**Corresponding Structure**: A transmitter-carrier subsystem 50 and equivalents thereof. | **Function:** transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency. (Agreed)<br><br>**Corresponding Structure:** Transmitter-carrier subsystem 50 comprised of oscillator 49 and multiplier device 48 for shifting a signal to a carrier frequency, a filter 58 for filtering the shifted signal, a power amplifier 59, and antenna 60. |

10   GBT's identification of corresponding structure for the "carrier means" is incomplete

11   because the "transmitter-carrier subsystem 50" mentioned in the '793 patent is not the

12   corresponding structure by itself.  Rather, it is a label for a group of components or devices that

13   perform the function.  As depicted in Figure 3, subsystem 50 is a dotted line around a group of

14   components including oscillator 49, multiplier device 48, filter 58 (labeled in the figure as "158"),

15   and power amplifier 59:



21   ('793 FIG. 3 (excerpt).)  The specification describes that the same components depicted within

22   the subsystem 50 box in Figure 3, together with antenna 60, are the structures for "transmitting"

23   the multichannel signal at a carrier frequency:

25   > The transmitter-carrier means is embodied as a transmitter-carrier subsystem 50. The transmitter-carrier subsystem 50 may include an oscillator 49 and multiplier device 48 for shifting a signal to a carrier frequency, a filter 58 for filtering the shifted signal, and a power amplifier 59 and/or other circuitry as is well known in the art

27   ─────────────────

28   [4] Apple is willing to agree with GBT's proposed structure for "means for generating the plurality of chip-sequence signals." (claim 5)

Cooley LLP
Attorneys At Law
Palo Alto

Case No.  5:12-cv-04882-PSG                    23.

**APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF**

for transmitting a signal over a communications channel.  The
signal is transmitted using an antenna 60.

('793 col. 5:66-6:7.)

GBT notes that this passage says the transmitter-carrier subsystem "may" include these components.  (D.I. 273 at 19-20.)  But these are the only specific structures the specification discloses for performing the recited function.  Under the "quid pro quo" of means-plus-function claiming, the claim element is limited to the corresponding structures the specification actually discloses.  "In exchange for being able to draft a claim limitation in purely functional language, '[t]he applicant must describe in the patent specification some structure which performs the specified function.'"  *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012), quoting *Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1042 (Fed. Cir. 1993).  "Thus, in return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means."  *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2008).  "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1211 (Fed. Cir. 2003).

GBT also notes the specification states that instead of the components the specification discloses, the transmitter-carrier means could be embodied in "other circuitry as is well known in the art for transmitting a signal over a communications channel" or could "include[] appropriate filters, power amplifiers and matching circuits coupled to antenna 60."  ('793 col. 6:4-6, 6:61-67.)  Such vague statements do not disclose any corresponding structure.  The Federal Circuit has specifically held that where "the specification simply recites that a claimed function can be performed by known methods or using known equipment," the specification does not disclose corresponding structure.  *Biomedino*, 490 F.3d at 951-53 (specification reference to "known differential pressure, valving and control equipment" does not disclose corresponding structure).  The '793 patent's "statement that known techniques or methods can be used does not disclose

structure." *Id*. at 953.  *See also Med. Instrumentation*, 344 F.3d at 1212 ("It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure.").

**J.     "Header" (Now Undisputed)**

| Claim Term | GBT's Original Proposal | Apple's Proposal |
| --- | --- | --- |
| "header" (claims 5-7) | A sequence of bits or symbols that contains information about the message, which include a pre-defined sequence of bits or symbols (pilot). | A sequence of bits or symbols, which include a pre-defined sequence of bits or symbols (pilot). |

In an effort to avoid prior art that showed pilot information concatenated with other information on a control channel, GBT originally argued that "header" necessarily "contains information about the message."  (D.I. 268 (JCCS).)  GBT then changed course, stating that it agrees with Apple's construction of the term "header."  (D.I. 273 at 8.)  To be clear and to avoid dispute about the meaning of the agreed construction, the '793 patent describes and defines "header" only as a sequence of bits that necessarily includes pilot information.  (Acampora Decl. ¶¶41-56.)  Apple's construction distinguishes between "header" (which must include pilot) and "data" (which must be concatenated with header).  As the '793 patent makes clear, "header" must (1) have pilot information, and (2) be *different* than, and concatenated with, "data."  If a sequence of bits does *not* include the pilot, then that sequence of bits is not "header" as the '793 patent defines the term.  (*Id.*)[5]

**IV.   CONCLUSION**

GBT overreached during prosecution and did not disclose the relevant prior art.  The result was a patent that GBT forgot and declared to be "virtually valueless."  GBT now seeks to rewrite the claims in a futile attempt to avoid the prior art, but the law is clear.  The Court should reject GBT's proposed constructions, and adopt Apple's constructions in their entirety.

---

[5] In addition, even if a sequence of bits includes a pilot, the claims require the "header" to be concatenated with data – thus, under the agreed construction, the claimed "header frame" must have pilot concatenated with data.

1

2   Dated: May 31, 2013

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Timothy S. Teter
Timothy S. Teter (171451)
teterts@cooley.com
Lowell D. Mead (223989)
lmead@cooley.com
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:     (650) 843-5000
Facsimile:      (650) 849-7400

*Attorneys for Defendant Apple Inc.*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

26.

APPLE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF

1

**CERTIFICATE OF SERVICE**

2       The undersigned certifies that counsel of record who are deemed to have consented to

3   electronic service are being served on May 31, 2013, with a copy of this document via the Court's

4   CM/ECF system per Local Rules.  Any other counsel will be served by electronic mail, facsimile,

5   overnight delivery and/or first class mail on this date.

6

7                                   By:  */s/ Timothy S. Teter*_____

8

9

10

11

12   1136645 v7/HN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
Attorneys At Law
Palo Alto

Case No.  5:12-cv-04882-PSG                    1.                         **CERTIFICATE OF SERVICE**