# APPLE'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF MR. KARL J. SCHULZE CPA

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   COOLEY LLP
    TIMOTHY S. TETER (171451) (teterts@cooley.com)
2   LOWELL D. MEAD (223989) (lmead@cooley.com)
    Five Palo Alto Square
3   3000 El Camino Real
    Palo Alto, CA  94306-2155
4   Telephone:    (650) 843-5000
    Facsimile:    (650) 849-7400
5
    Attorneys for Defendant
6   Apple Inc.

7

8                      UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11

12   Golden Bridge Technology Inc.,          Case No.  5:12-cv-04882-PSG

13              Plaintiff,                    APPLE'S NOTICE OF MOTION AND
                                             MOTION TO EXCLUDE THE
14         v.                                OPINIONS AND TESTIMONY OF MR.
                                             KARL J. SCHULZE, CPA
15   Apple Inc.,
                                             Date:   March 4, 2014
16              Defendant.                    Time: 10:00 a.m.
                                             Courtroom: 5, 4th Floor
17                                           Judge: The Hon. Paul S. Grewal

18                                           ███████████████

19                                           ████████████████████████

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................. 1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................ 3

III.    FACTUAL BACKGROUND ................................................... 4

    A.    In 2005, GBT Admitted that the '793 Patent-In-Suit Was "Virtually Valueless" and that Others Patented HSUPA. ................................ 4

    B.    In 2009, GBT Offered ███████████████████████ ███ ....................................................................... 5

    C.    In 2012, ████████████████████████████████ Settlements in the Delaware RACH Cases. ............................... 5

    D.    The GTT Group Suggested that GBT Argue that the '793 Patent is Essential. ........................................................................ 6

    E.    Even Under GBT's New Theory, the Alleged Invention is at Most a Small Fraction of an Optional Chip-Level Feature. ............................. 6

        1.   The Smallest Saleable Unit is the Baseband Chipset. ............... 6

        2.   GBT Targets a Tiny Portion of Optional Baseband Functionality— the Placement of at Most Four Bits out of Thousands. ............... 7

        3.   The '793 Patent is not Essential to HSUPA, Much Less Essential to Operate on the AT&T Network. ....................................... 9

IV.     MR. SCHULZE'S FLAWED METHODOLOGY .......................... 10

    A.    The Royalty Base:  Mr. Schulze Used Entire Market Value, but Made No Effort to Show that the Invention Drives Demand. ..................... 10

    B.    The Royalty Rate:  Mr. Schulze Adopted GTT's Running Royalty Concept and Did Not Perform Any Analysis Tied to the Facts of This Case. ..... 11

        1.   Mr. Schulze Used an Inapplicable "Cumulative Royalty" ......... 11

        2.   Mr. Schulze Asked GBT's Lawyer to Provide an Imaginary Per Patent "Rate" Based on Nuisance Settlements for the RACH Patents. ...................................................................... 13

V.      ARGUMENT ................................................................... 13

    A.    Legal Standard .............................................................. 13

    B.    The Royalty Base:  Mr. Schulze Improperly Uses the Entire Market Value of the Accused Products. ............................................... 14

        1.   Mr. Schulze Admits that the '793 Patent does not Drive Demand. ......... 14

        2.   Mr. Schulze's Unsupported "Industry Practice" Exception to the Entire Market Value Rule Is Contrary to the Law and the Record. ......... 16

        3.   Apple Has Not Endorsed Mr. Schulze's Entire Market Value Theory. ........................................................................ 17

    C.    The Royalty Rate:  Mr. Schulze's Ends-Oriented Rate Calculation is Unreliable. ................................................................... 19

**Table of Contents**
**(continued)**

Page

    1.    Mr. Schulze's Unreliable Theory Has No Connection to the Facts of this Case. ........................................................................................................ 19

    2.    Apple Did Not Agree with Mr. Schulze's Theory. ................................... 20

    3.    Attorney O'Brien's Imaginary Royalty Rate Per Patent Calculation Is Inadmissible. ...................................................................................... 21

D.    Mr. Schulze's Recitation of the *Georgia-Pacific* Factors Does Not Immunize His Analysis. .................................................................................. 22

E.    Mr. Schulze's Attempt to Convert GBT's ▮▮▮▮ Offer into a $27 Million FRAND Rate and his Recitation of the GTT Group's Entire Portfolio Valuation Are Unreliable and Groundless. ............................................... 22

F.    Mr. Schulze's Erroneous Assumption that the '793 Patent Is Essential to HSUPA and the AT&T Network Renders his Opinions Unreliable and Inadmissible. ........................................................................................... 23

VI.    MR. SCHULZE SHOULD NOT BE ALLOWED TO SUBMIT A REPLACEMENT REPORT. ........................................................................... 23

VII.    CONCLUSION ............................................................................................ 24

Cooley LLP
Attorneys At Law
Palo Alto

Case No.  5:12-cv-04882-PSG

ii.

APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

# TABLE OF AUTHORITIES

Page(s)

CASES

*Cornell v. Hewlett-Packard*
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ................................................................ 15

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993) ............................................................................... passim

*Dynetix Design Solutions v. Synopsys*
2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ............................................ 14, 15

*ePlus v. Lawson Software*
700 F.3d 509 (Fed. Cir. 2012) ...................................................................... 18

*General Elec. Co. v. Joiner*
522 U.S. 136 (1997) ................................................................................ 13, 16

*Golden Bridge Tech. v. Motorola, Inc.*
547 F.3d 266 (5th Cir. 2008) ........................................................................... 5

*Golden Bridge Tech. v. Nokia, Inc.*
527 F.3d 1318 (Fed. Cir. 2008) ....................................................................... 5

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) ...................................................................................... 13

*LaserDynamics v. Quanta*
694 F.3d 51 (Fed. Cir. 2012) .............................................................. 14, 15, 19

*Lighting Ballast Control v. Philips Elecs.*
2011 WL 7575006 (N.D. Tex. June 10, 2011) ............................................... 16

*Lucent v. Gateway*
580 F.3d 1301 (Fed. Cir. 2009) ..................................................................... 14

*Network Protection Sciences v. Fortinet*
2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) (Alsup, J.) ............................. 24

*Rembrandt Social Media v. Facebook*
2013 WL 6327852 (E.D. Va. Dec. 3, 2013) .................................................. 24

*ResQNet v. Lansa*
594 F.3d 860 (Fed. Cir. 2010) ........................................................... 3, 18, 22

*Uniloc v. Microsoft*
632 F.3d 1292 (Fed. Cir. 2011) .............................................................. 16, 19

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

iii.

APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Whitserve v. Computer Packages*
   694 F.3d 10 (Fed. Cir. 2012)................................................................................. 22

*Wordtech Sys v. Integrated Networks Solutions*
   609 F.3d 1308 (Fed. Cir. 2010).............................................................................. 18

**OTHER AUTHORITIES**

Fed.R.Evid. 403 .................................................................................. 3, 22, 23, 24

Fed.R.Evid. 702 ......................................................................................... 13

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG                    iv.                    APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

1

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 4, 2014 at 10:00 a.m., or as soon thereafter as the

3

4

matter may be heard before the Honorable Paul S. Grewal, Magistrate Judge of the United States

District Court for the Northern District of California, Defendant Apple Inc.'s ("Apple") Daubert

5

6

Motion to Exclude the Opinions and Testimony of Mr. Karl J. Schulze, CPA will be heard.

7

8

**RELIEF REQUESTED**

Apple seeks an order striking the opinions and testimony of GBT's damages expert,

9

10

Mr. Karl J. Schulze, CPA.

**MEMORANDUM OF POINTS AND AUTHORITIES**

11

**I.    INTRODUCTION**

12

13

This case is the latest in a series of lawsuits that plaintiff Golden Bridge Technology, Inc.

("GBT") has pursued relating to the 3GPP WCDMA standards.  GBT's first three cases related to

14

15

the WCDMA standard's "Common Packet Channel" (CPCH) and "Random Access Channel"

(RACH).  In its first case, GBT argued that the 3GPP standards group violated the antitrust laws

16

17

by removing CPCH from the WCDMA standard thus rendering GBT's patent portfolio "virtually

valueless."  In its second and third cases, GBT argued that two of its patents (not the patent-in-

18

suit in the present case) were essential to the RACH process.

19

20

GBT lost all three cases at summary judgment.  After rummaging through its portfolio and

hiring new consultants, GBT came up with yet another theory.  GBT argues that one of the

21

22

patents it deemed "virtually valueless," U.S. Patent No. 6,075,793, is essential to practice an

optional feature in the WCDMA standard, called "High Speed Uplink Patent Access" (HSUPA).

23

24

GBT consistently licensed and offered its entire portfolio on a fully paid-up basis for a lump sum.

Nonetheless, GBT's damages expert, Karl J. Schulze, CPA, argues that GBT is entitled to a

25

26

running royalty and ██████████ in past damages alone, using the entire market value of the

accused iPhones and iPads as a royalty base, and a royalty rate that has no connection to the facts

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

1.

**APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE**

of this case. Because Mr. Schulze uses an improper and unreliable methodology, his opinions should be excluded in their entirety.

*First*, although GBT accuses only a tiny portion of an optional feature in the baseband chipset (which in turn is only one of numerous features and components in the accused iPhones and iPads), Mr. Schulze uses an entire market value royalty base. Before submitting his damages report, Mr. Schulze reviewed the Federal Circuit's entire market value rule authority and realized that he could not show that the '793 patent drives demand for the accused iPhones and iPads. Nonetheless, Mr. Schulze argued that he could apply an exception to the entire market value rule, on the grounds that "industry custom" supposedly allows the entire market value to be used as the royalty base so long as the patent-in-suit is alleged to be essential to an optional feature in a standard. But Mr. Schulze's "custom" is a pure fabrication. It is not an exception to Federal Circuit authority, and Mr. Schulze failed to identify any comparable license (much less any license involving the '793 patent, GBT, or Apple) that supports it.

*Second*, Mr. Schulze used a prohibited methodology to determine a royalty rate. Mr. Schulze admits that he did not even attempt to determine a royalty rate specific to the technology in the '793 patent. He set aside the undisputed evidence of ███████████

████████████████████████████████████████████████████████

████████████████████████ He ignored the undisputed evidence that the '793 patent has a negligible impact on performance, even under GBT's infringement theory. He ignored the availability of noninfringing alternatives, such as Verizon's CDMA2000 network. He ignored that handsets can operate on the AT&T network without performing HSUPA. Instead, Mr. Schulze collected third-party articles that predicted an alleged entire market value "cumulative royalty rate" that the industry as a whole (not any handset maker) would pay for standards-essential patents, assumed that the '793 patent is essential to operate on the AT&T network, and then simply declared that the '793 patent entitles GBT to a running percentage of the entire market value of Apple's iPhones and iPads. Mr. Schulze's rate calculation has no basis in any real-world license and no connection whatsoever to the facts of this case.

**Third**, Mr. Schulze asked GBT's outside counsel, Bill O'Brien of One LLP, to provide per patent royalty "rates" from eight ███████████ settlements in GBT's RACH cases. Attorney O'Brien is not an accountant or economist; he is an advocate for GBT.  He did not submit an expert report and his "royalty rates" are pure fiction.  ████████████ ██████████████████████████████████████████████████████████ ██████████████████.  Attorney O'Brien would not tell Mr. Schulze the market shares or sales of the licensees, and GBT does not offer any evidence that the licensees practiced the accused optional HSUPA feature or valued the '793 patent at all.  *ResQNet* precludes Mr. Schulze from offering any opinion based on the eight nuisance settlements.

**Fourth**, Mr. Schulze argues that GBT's 2009 offer to Apple of ████████████ ████████████ should be inflated by a factor of four.  Mr. Schulze's analysis turns logic on its head.  The offer to Apple included far *more* than the hypothetical negotiation here, and thus, should be adjusted downwards.  GBT offered ████████████████████████ ██████████████████████████████████████████████████████████.  Mr. Schulze makes no attempt to account for those differences, declaring that he can *inflate* GBT's rejected offer to calculate an equivalent "FRAND royalty of ████████████."  His opinion is unreliable and inadmissible under *ResQNet*.

**II.    STATEMENT OF ISSUES TO BE DECIDED**

1.    Whether Mr. Schulze uses an improper and unreliable methodology in choosing the entire market value as the base for his reasonable royalty damages calculation.

2.    Whether Mr. Schulze uses an improper and unreliable methodology in choosing a rate for his reasonable royalty damages calculation.

3.    Whether Mr. Schulze's entire opinion and testimony should be excluded under *Daubert* and Fed.R.Evid. 403.

III.    **FACTUAL BACKGROUND**

A.    **In 2005, GBT Admitted that the '793 Patent-In-Suit Was "Virtually Valueless" and that Others Patented HSUPA.**

GBT filed the application for the '793 patent in 1998.  At the time, GBT focused on a different technology, the "Common Packet Channel" (CPCH), which was GBT's "main contribution" to the WCDMA standardization efforts.  (Teter Decl. Ex. 1, Yuen Tr. 68:6-20.)  The early versions of the WCDMA standard included CPCH as an optional feature, and GBT lobbied the industry to use CPCH and license GBT's portfolio.  The industry never used CPCH.  (Teter Decl. Ex. 1, 138:14-16.)  Instead, the 3GPP group decided to standardize a different uplink technology, "High Speed Uplink Packet Access" (HSUPA).  GBT did not participate in HSUPA's standardization.  (Teter Decl. Ex. 1, 141:24-142:2.)  To the contrary, GBT viewed HSUPA as a threat, believing that the industry "███████████████████████████████████████."  (Teter Decl. Ex. 1, 142:14-143:2.)

The optional HSUPA feature first appeared in WCDMA Release 6, in 2004, four years after the '793 patent issued.  With HSUPA available and without any industry demand for CPCH, the 3GPP group removed the CPCH feature from the standard.  GBT sued several members of the 3GPP standards group for alleged antitrust violations, arguing that CPCH was the core of GBT's portfolio, and that with CPCH out of the standard, GBT's patents were "virtually valueless."  (Teter Decl. Ex. 2, ¶3.)  GBT also filed suit against Nokia in Texas for alleged patent infringement, alleging that other GBT patents were essential to the WCDMA RACH process.

GBT retained one of the '793 inventors, Dr. Schilling, to support GBT's antitrust claims.  Dr. Schilling performed searches for patents relating to CPCH and HSUPA.  He opined that the 3GPP defendants removed a technology over which GBT had patents (CPCH) in favor of technology that the antitrust defendants (not GBT) developed and patented (HSUPA).  (Teter Decl. Ex. 3, Schilling Tr. 194:3-197:6; Teter Decl. Ex. 4, Schilling Antitrust Tr. 219:5-220:2 ("those patents in HSUPA were owned by the major companies…this is what this whole lawsuit is about—that you opted for a technique that you all own the patents on, rather than on the technique where the patents are owned by someone else.").  Neither GBT nor Dr. Schilling

alleged that GBT had *any* patents covering HSUPA.  Dr. Schilling did not even mention the '793 patent, which did not come to mind:  "Didn't even think about it, probably."  (Teter Decl. Ex. 3, 191:12-197:6.)

GBT lost both the antitrust case and the Texas RACH case on summary judgment, and lost the appeals in both cases.[1]

**B.    In 2009, GBT Offered ███████████████████████████████.**

Shortly before the date of the hypothetical negotiation in this case, GBT offered Apple a ███████████████████████████████████████████████████████████████ ████████████████████.  (Teter Decl. Ex. 5.)[2] █████████████████████ ██████████████████████, but found no takers.  (Teter Decl. Exs. 6-14.)

**C.    In 2012, GBT Included the '793 Patent in Eight Lump-Sum Nuisance Settlements in the Delaware RACH Cases.**

In May 2010, GBT filed a third case in the Central District of California, naming Apple as a defendant and asserting WCDMA RACH-related patent claims.  When GBT learned of the judge assignment, it dismissed the complaint and refiled it in Delaware.  GBT filed cases against numerous other parties in Delaware for alleged infringement of the RACH patents.  GBT did not assert the '793 patent in the Delaware case.

The Delaware Court held a mediation, at which eight defendants entered into ███████████ ████████████████████████████████████.  GBT never alleged that any of the licensees practiced the optional HSUPA feature accused in this case, much less practiced the '793 patent.  GBT did not know the sales volumes of any of the eight settling parties, ███████ █████████████████████████████ ████████████████████████████ ███████████████████

---

[1] *Golden Bridge Tech. v. Nokia, Inc.*, 527 F.3d 1318 (Fed. Cir. 2008); *Golden Bridge Tech. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008).
[2] In an effort to justify ██████████████████, GBT wrote to Apple ███████ ████████████████████████████████████████████████████████████████ ██████████████  (Teter Decl. Ex. 5.)  GBT's statement was highly misleading if not a flat falsehood— █████████████████████████████████████████████████████████████████ █████████████████

Apple and GBT did not settle at the mediation.  Instead, Apple filed a motion for summary judgment of non-infringement, which the Delaware Court granted.  GBT filed a motion for reconsideration and when the Court denied that, a motion for reconsideration of the motion for reconsideration.  The district court denied that motion, and GBT appealed.

### D.    The GTT Group Suggested that GBT Argue that the '793 Patent is Essential.

Having failed at litigation and licensing, GBT hired a consulting firm, The GTT Group, to sift through GBT's patents and help GBT sell its assets.  The GTT Group arranged to sell of the majority of GBT's patents to Google, but Google declined GBT's offer of the '793 patent.

The GTT Group suggested that GBT argue that the '793 patent was essential to HSUPA.  The argument was a substantial change in position.  GBT and '793 inventor Schilling had argued in the antitrust case that *other* companies owned all of the HSUPA patents, rendering GBT's technology (including the '793 patent) virtually valueless.  Moreover, GBT had argued that the '793 patent covered the *downlink* connection (base station to mobile), not the uplink.  (Teter Decl. Ex. 15 (█████████████████████████████████████████████████████████ █████████" including asserted '793 claims 5-7 here).)[3]

GBT took the advice, filing suit in the Central District of California against Apple and fourteen other entities for alleged infringement of the '793 patent.

### E.    Even Under GBT's New Theory, the Alleged Invention is at Most a Small Fraction of an Optional Chip-Level Feature.

#### 1.    The Smallest Saleable Unit is the Baseband Chipset.

GBT's complaint alleged that a diverse group of companies, each with unrelated products, infringed the '793 patent and could be joined in a single case.  In an effort to justify its *en masse* filing, GBT argued that the "infringing instrumentality resides in the Baseband Processor" which was common to each of the defendants:

> Since *the infringing instrumentality resides in the Baseband Processor*, the Qualcomm witnesses and documents will be the

---

[3] During the claim construction briefing, GBT argued that no person of skill could possibly believe that the '793 patent and claims covered the downlink.  (Dkt. Nos. 273 at 8-11, 275 at 1-4.) GBT did not inform the Court that its argument directly contradicted GBT's representations to potential licensees.

central focus of this case, along with GBT's witnesses and documents.

(Dkt. 189 at 16 (emphasis added); *id.* at 1 ("[A]ll the Defendants in this case sell 3G wireless communication devices that contain the same accused product, *i.e.*, a transmitter consisting of the same identically sourced component, a Baseband Processor provided by southern California based Qualcomm Corporation.").)  GBT argued that the customers were involved in "selling of the same accused product." (Dkt. 189 at 9; *id.* at 1 ("joinder of all Defendants is proper based on their use and sale of the same accused product involving the Qualcomm Baseband Processor…").[4]  GBT also argued that any differences between the accused mobile devices sold by the baseband customers was "unrelated" to the '793 claims:

> Since all Defendants incorporate the identically sourced Qualcomm Baseband Processor into their devices, and *any differences in Defendants' mobile devices are unrelated to the limitations in the claim of the '793 patent*, under Federal Circuit law they are essentially the same accused product.

(Dkt. 189 at 13 (emphasis added).)  GBT's infringement expert, Dr. Vojcic, agrees that the '793 invention resides in the chipset (if anywhere).  In his infringement report, he expressly opined that the accused "transmitter" is the baseband chipset (baseband chip and RF transceiver chip):



(Teter Decl. Ex. 16, Vojcic Rep. ¶76; ¶95 (same); Exhibit A at 2 (same); Exhibit A at 9 (same).)

### 2. GBT Targets a Tiny Portion of Optional Baseband Functionality-the Placement of at Most Four Bits out of Thousands.

Even under Dr. Vojcic's new infringement theory, the '793 patent is at most a tiny part of the baseband functionality.[5]  GBT does not claim to have invented any of the distinguishing

---

[4]  Because the accused functionality resides in the baseband chipset, GBT argues that every company that purchased those chipsets is part of the same transaction or occurrence and (allegedly) infringes the '793 patent in the same way.  GBT originally named fifteen separate entities as defendants, including:  (1) Apple, (2) Motorola, (3) Amazon, (4) Barnes & Noble, (5) Hewlett-Packard, (6) HTC, (7) LG Electronics, (8) Lenovo, (9) Palm, (10) Pantech, (11) Research in Motion (Blackberry), (12) Samsung, (13) Sierra Wireless, (14) Sony, and (15) ZTE.
[5]  A few days before opening expert reports were due, GBT abandoned its original infringement

1   features of the iPhone and iPad, including its unique and innovative design, operating system

2   (iOS), user interface, and features and functionality.   GBT does not claim to have invented

3   CDMA or multichannel uplink CDMA transmission.   Instead, Dr. Vojcic argues that Apple

4   infringes because the WCDMA standard requires the mobile to place up to four bits of feedback

5   (FBI) and power control (TPC) information in the dedicated control channel (DPCCH).   (Teter

6   Decl. Ex. 17, Acampora Rep. (Dec. 23, 2013) ¶¶182-84; Teter Decl. Ex. 24, Vojcic Tr. 146:15-

7   25.)   GBT does not argue that it invented the idea of FBI and TPC bits.   Instead, GBT relies

8   entirely on the *placement* of those FBI and TPC bits when the handset is performing the *optional*

9   HSUPA standard.   The placement of those four bits (out of thousands that can be transmitted in a

10  frame) is essential to GBT's infringement theory, but it is a minor issue of convenience and

11  standardization, not performance.  (Teter Decl. Ex. 17, ¶¶182-84.)  As Dr. Acampora explains:

12          [E]ven under Dr. Vojcic's theory of infringement, the '793 patent
            would be trivial. The FBI and TPC bits that Dr. Vojcic opines are
13          the "data" in the DPCCH are a very small percentage of the total
            bits transmitted, and consume a very small portion of the overall
14          uplink capacity. The placement of those FBI and TPC bits is a
            matter of housekeeping and convenience, not a matter of
15          performance….Dr. Vojcic's infringement theory, and the alleged
            invention, involves the placement of 4 bits out of nearly 4,000 bits
16          sent when 4 EDPDCH channels are in use. Persons of ordinary skill
            in the art would recognize that the placement of these 4 FBI and
17          TPC bits does not have a significant impact on performance, and is
            simply not a significant contributor to the performance of HSUPA.
18          The placement of those bits is determined by the standard, but as I
            have just explained, that is purely housekeeping.
19
20  (Teter Decl. Ex. 17, ¶184.)[6]

21          GBT admits that other CDMA-based cellular standards achieved high uplink speeds

22  without using the alleged invention.  (Teter Decl. Ex. 25, Acampora Rep. (Nov. 22, 2013) ¶447.)

23  For example, GBT admits that Verizon-only smartphones, which use CDMA2000 rather than

24  WCDMA and HSUPA, do not infringe.   (Teter Decl. Ex. 19, GBT Resp. to Request for

    Admission 17; Teter Decl. Ex. 25, ¶447.))
25

26

27  theory and raised a new theory without leave of Court, which Apple is moving to strike.
    [6] The accused functionality involves only a tiny fraction of the baseband design.  (Teter Decl. Ex.
28  18, Chase Rep. at 32.)

### 3. The '793 Patent is not Essential to HSUPA, Much Less Essential to Operate on the AT&T Network.

GBT's damages expert, Mr. Schulze, assumes that HSUPA cannot be implemented without practicing the '793 patent. (*E.g.*, Teter Decl. Ex. 20, Schulze Rep. at 3, 12, 18.) Mr. Schulze also assumes that Apple needs the '793 patent to operate on the AT&T network. (Teter Decl. Ex. 21, Schulze Tr. 41:12-42:1 ("Apple wouldn't want to eliminate an entire large network by going exclusively with Verizon.").)

Neither assumption is correct or has any basis in the record. First, GBT's infringement expert, Dr. Vojcic, testified that HSUPA can be implemented without practicing the '793 patent. (Teter Decl. Ex. 24, Vojcic Tr. 98:18-100:8, 101:20-24.) In particular, the asserted claims, as construed, require a processor for synchronizing data channels "using timing data from the header." (Dkt. No. 282 at 2.) Dr. Vojcic admits that the "standard does not dictate how the timing and synchronization must be accomplished." (Teter Decl. Ex. 16, ¶78.) The standard specifies only that uplink channels should be frame-aligned, leaving open how that could be accomplished. In addition, as Dr. Acampora explains, HSUPA permits a mobile station to use one, two, or four enhanced data channels (E-DPDCHs). (Teter Decl. Ex. 17, Acampora Rep. ¶346.) Although HSUPA does not require a mobile device to use four channels, Dr. Vojcic's infringement theory applies only to that optional four channel case. (*Id.*)

Second, HSUPA is not essential to operate on the AT&T network. When Apple first introduced the iPhone 4, the accused HSUPA feature "wasn't yet supported by the carriers." (Teter Decl. Ex. 20, at 24.) Even today, the AT&T network does not require a device to support HSUPA; for example, users can continue to use earlier iPhone models on the AT&T network, such as the iPhone 3GS.

Thus, GBT focuses on an inconsequential aspect of an optional feature that is one of thousands of features that a baseband chipset can perform.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No. 5:12-cv-04882-PSG                    9.

APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

IV.   **MR. SCHULZE'S FLAWED METHODOLOGY**

    A.   **The Royalty Base: Mr. Schulze Used Entire Market Value, but Made No Effort to Show that the Invention Drives Demand.**

Although ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████. (Teter Decl. Ex. 1, Yuen Tr. 144:18-23.) Nonetheless, GBT's expert, Mr. Schulze, argues that the hypothetical negotiation would have resulted in a running royalty that is a percentage of handset sales. (Teter Decl. Ex. 20, at 37.)

    The smallest salable unit is the baseband chipset, but Mr. Schulze elected to use the entire market value of the accused iPhones and iPads as his royalty base. He reviewed the Federal Circuit's entire market value rule authority before preparing his report, but chose not to follow it and attempt to show that the patent-in-suit drives demand.

    Q. Have you ever read the federal circuit cases or looked at the standard for the entire market value rule?

    A. I have.

    Q. You have. And you looked at that before you did your report in this case, right?

    A. Yes.

    Q. And in your report in this case *you did not present any analysis attempting to show that the '793 patent drives demand for iPhones or iPads*, correct?

    A. *We're not in any way making that assertion*, no.

(Teter Decl. Ex. 21, 56:24-57:11 (emphasis added).) Mr. Schulze admitted that "driving demand is not a component of our analysis." (Teter Decl. Ex. 21, 58:13-59:4.)

    You did not perform a separate analysis to show that the '793 patent drives demand for the accused products and thus the entire market value rule applies, correct?

    A. No, *we're not in any way asserting that the '793 patent in any way is responsible for driving ultimate demand* in -- in and of itself for the final product, no.

(Teter Decl. Ex. 21, 55:14-21 (emphasis added).)

Mr. Schulze admitted that iPhones able to operate only on the Verizon network would not infringe the '793 patent.  (*Id.* at 34:13-22.)  Nonetheless, Mr. Schulze admitted that he made no effort to evaluate the reasons why a customer would choose the accused AT&T iPhones over the non-accused Verizon iPhones:

> Q.  So sitting here today, you have no opinion as to why a potential iPhone customer would select a Verizon iPhone versus an AT&T iPhone or vice versa, correct?
>
> A.  Again, people have many reasons for choosing a carrier so, no, *I have not parsed those reasons down to the impact of HSUPA on that decision.*
>
> Q.  What's the uplink speed that CDMA 2000 would provide on the Verizon network?
>
> A.  I don't know.
>
> Q.  How does it compare to HSUPA?
>
> A.  I don't know that.  That's a technical question.

(Teter Decl. Ex. 21, 36:9-21 (emphasis added).)

> Q.  And did you do any comparison of the demand for Verizon iPhones that practiced just the CDMA 2000 standard?  Did you do any comparison of the demand for those iPhones versus the demand for iPhones that could operate on the AT&T network and use HSUPA?
>
> A.  No.  Since the claim only related to the ones that used the standard that's at issue and the -- I just used the accused products and that was it.  *I didn't do a comparison of the demand for the two* or the sales levels of each.  I used the sales that I was provided with.

(Teter Decl. Ex. 21, 35:15-36:1 (emphasis added).)

**B.      The Royalty Rate:  Mr. Schulze Adopted GTT's Running Royalty Concept and Did Not Perform Any Analysis Tied to the Facts of This Case.**

**1.      Mr. Schulze Used an Inapplicable "Cumulative Royalty".**

Mr. Schulze admits that his royalty rate is not based on any analysis specific to the '793 patent-in-suit or to the hypothetical negotiation in this case.  He admitted that he did not attempt to determine the inherent technological value of the '793 patent and did not know where to begin:

> Q.  Did it ever occur to you to try to determine the inherent technological value of the technology in the '793 patent itself separate and apart from standards to determine the value of that in and of itself to the handsets and then try to calculate a royalty based

1        on that?

2            A.  I don't think that's doable.

3            Q.  Why isn't it doable?

4            A.  I can't imagine how you would go about doing that.

5    (Teter Decl. Ex. 21, 191:16-25.)

6        Instead, Mr. Schulze calculated his rate based on unverified assumptions that have no

7    bearing whatsoever on the patent-in-suit or the hypothetical negotiation in this case.  Mr. Schulze

8    assumed that the '793 patent is "essential," and relied on a handful of third-party papers that

9    predict a "cumulative" royalty burden from various wireless standards.  None of the papers

10   mention Apple, the accused products, GBT, the '793 patent, or the accused feature in this case.

11   Moreover, Mr. Schulze admitted that his assumed "cumulative rate" is not a royalty rate

12   negotiated or actually paid by any party, much less Apple or any comparable handset maker.

13   Rather, the "cumulative rate" is merely his guess based on third-party predictions about the

14   overall royalties that are paid by a variety of different parties along the supply chain, as

15   Mr. Schulze testified:

16           It's happening at stages as the components that make up that final
             product come together.  *So the ultimate seller of the device and*
17           *assembler may pay only a portion of that directly.*  But resident in
             that phone, in that device, is a cumulative royalty rate and that's
18           where others -- these individuals and groups who wrote these
             articles and did these studies -- gathered that data.  *No one licensee*
19           *is going to say, yes, that's what I paid because they're not paying it*
             *directly.*
20
21   (Teter Decl. Ex. 21, 153:2-22 (emphasis added).)

22       After attempting to determine a "cumulative" percentage royalty burden for a generic

23   phone, Mr. Schulze attempted to apply that rate to the entire market value of Apple's accused

24   iPhones and iPads.  However, he did not consider how much value Apple brought to the table

25   through its own patents, trade secrets, and design implementations:  "I've done no separate

26   analysis on -- on that."  (Teter Decl. Ex. 21, 102:21-24.)

27

28

2. **Mr. Schulze Asked GBT's Lawyer to Provide an Imaginary Per Patent "Rate" Based on ███████████ for the RACH Patents.**

Mr. Schulze also relies on eight ██████ settlements from GBT's RACH cases, which resulted in ████████████████████████████████████████████████████████ ████████████████ Mr. Schulze admits that ████████████████████ arose in a litigation involving only different patents, and he does not offer any opinion that any of the licensees ever practiced HSUPA, much less cared about the '793 patent. He admits that ████████████████ ████████████ do not specify a royalty rate for the '793 patent, and he admits that he does not have the revenues of the products at issue. Nonetheless, Mr. Schulze asked GBT's litigation counsel in the GBT Delaware to infer a royalty "rate" from those ████████████████████ and then relies on that rate to assess damages.

## V. ARGUMENT

### A. Legal Standard

Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony. . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). As the proponent of Mr. Schulze's expert testimony, GBT must show by a preponderance of the evidence that (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the expert has reached his conclusions employing a reliable methodology; and (3) the testimony assists the trier of fact to understand the evidence or to determine a fact in issue through the application of scientific, technical, or specialized expertise. *Kumho Tire,* 526 U.S. at 141. Courts should exclude testimony where "there is simply too great an analytic gap between the data and opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (the trial court may strike "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

As set forth below, Mr. Schulze's opinion falls far short of meeting *Daubert's* requirements. GBT has entered into ████████████████████████████████ ████████████   ████████████████████████████████████████████████

1  ██████████████   GBT has never requested, much less received, a running royalty for the

2  '793 patent.  Nonetheless, Mr. Schulze argues that the hypothetical negotiation in this case would

3  have resulted in a running royalty.  He also uses the entire market value rule without providing

4  any opinion whatsoever that the claimed invention drives demand for the accused products, and

5  applies an unsupported rate to that improper base.

6       **B.    The Royalty Base:  Mr. Schulze Improperly Uses the Entire Market Value of the Accused Products.**

7

8       If a patentee seeks to use the "entire market value" of the accused product as its royalty

9  base, "the patentee must prove that 'the patent-related feature is the 'basis for customer

10  demand.'" *Lucent v. Gateway*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).  *Lucent* struck a damages

11  award based on the "entire market value" of the accused product, Microsoft Outlook, where there

12  plaintiff failed to establish that the allegedly infringing smaller-component, the date-picker tool,

13  was the basis for consumer demand for Outlook.  *Lucent*, 580 F.3d at 1337-38.  As this Court

14  observed in *Dynetix*, "*Lucent* thus stands for the proposition that, in the absence of evidence that

15  the infringing feature drives demand, the royalty base must be somehow apportioned to reflect the

16  value of the patent-related feature in the absence of the non-infringing features." *Dynetix Design

17  Solutions v. Synopsys*, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013) (citing *Lucent*, 580

18  F.3d at 1337-38.)  Mr. Schulze used the entire market value for his royalty base, but failed to

19  satisfy *Lucent*'s strict requirements.

20       **1.    Mr. Schulze Admits that the '793 Patent does not Drive Demand.**

21       Mr. Schulze admitted that "we're not in any way asserting that the '793 patent in any way

22  is responsible for driving ultimate demand in -- in and of itself for the final product," and thus,

23  admits that his analysis fails the *Lucent* requirements.   (Teter Decl. Ex. 21, 55:14-21.)

24  Nonetheless, Mr. Schulze argued that he did not need to use the smallest salable unit because

25  Apple sells iPhones and iPads, not baseband chipsets.  (Teter Decl. Ex. 21, 114:12-115:2.)  As

26  this Court previously observed, the Federal Circuit rejected that logic in *LaserDynamics v.

27  Quanta*, 694 F.3d 51 (Fed. Cir. 2012).

28
       [T]he court specifically addresses LaserDynamics' argument that
       defendant Quanta was in the business of marketing and selling only

1
2
3
4

> entire computers, rather than the independent purportedly infringing feature called "ODD," and thus the entire computer was the only product for which accurate market data was available. The court rejected this argument, concluding that if the smallest salable unit was in fact the entire computer, "the exceedingly difficult and error-prone task of *discerning the ODD's value relative to all other components* in the laptop remains."

5   *Dynetix*, 2013 WL 4538210, at *3 (emphasis original) (discussing *LaserDynamics*, 694 F.3d 51).

6   *See also Cornell v. Hewlett-Packard*, 609 F. Supp. 2d 279, 287-90 (N.D.N.Y. 2009) (holding that

7   the patentee must determine the "smallest salable infringing unit with close relation to the

8   claimed invention," which, in that case, was the processor containing the infringing component).

9        Mr. Schulze simply used the entire market value of the accused products, without making

10   any effort to satisfy the entire market value rule.  He made no effort to determine the value or the

11   impact of Apple's numerous non-patented features on sales.  He did not consider the value that

12   Apple created through its own patents, trade secrets, and design implementations:  "I've done no

13   separate analysis on -- on that."  (Teter Decl. Ex. 21, 102:21-24.)

14        Mr. Schulze did not make any attempt to value the HSUPA feature.  He admitted that

15   Nokia was first to the U.S. market with HSUPA handsets, but could not "speculate" why

16   consumers purchased iPhones rather than Nokia handsets:

17
18

> Q.   Why were Apple sales so much stronger than Nokia sales given that Nokia was using HSUPA?

19
20
21

> A.   Again, there can be many factors.  I don't want to speculate. Obviously marketing power and size might be one.  Nokia is a large company but I'm not sure what their marketing budget was in the U.S.   Design is certainly a feature.  Apple's handsets have traditionally been very appealing design and use wise.

22   (Teter Decl. Ex. 21, 79:20-80:3.)   Mr. Schulze admitted that "part of it is market appeal,

23   appearance.  Other features could be contributory, I don't know."  (Teter Decl. Ex. 21, 80:20-22.)

24   Mr. Schulze did not attempt to determine the percentage of the chip that allegedly performs the

25   '793 patent:  "That's way beyond my scope.  I'm not a technical expert."  (Teter Decl. Ex. 21,

26   113:16-20.)

27
28

1

2. **Mr. Schulze's Unsupported "Industry Practice" Exception to the Entire Market Value Rule Is Contrary to the Law and the Record.**

2

3

Unable to show that the '793 patent drives demand, Mr. Schulze argued that "it appears to

4

be universal that the appropriate base for calculating a royalty for a standards-essential patent is

5

the entire handset." (Teter Decl. Ex. 21, 54:23-55:11.)  Mr. Schulze's "industry practice"

6

argument is not an excuse for violating the entire market value rule.  To provide an entire market

value opinion in a given case, a patent damages expert must show that the patent-in-suit drives

7

demand for the accused product, something that Mr. Schulze admittedly did not do.  *See, e.g.,*

8

*Lighting Ballast Control v. Philips Elecs.*, 2011 WL 7575006, at *5-6 (N.D. Tex. June 10, 2011)

9

(rejecting patentee's argument that the expert "does not actually use the entire market value

10

theory, rather he uses the entire sales base as the royalty base for his hypothetical license, because

11

the licenses he relies upon do the same").

12

In addition, Mr. Schulze offers no support for the alleged "industry practice."  He argues

13

that in 1999, over a decade before the hypothetical negotiation in this case, a group called the

14

UMTS Intellectual Property Association discussed a cumulative royalty that would presumably

15

apply to the entire market value of a handset.  (Teter Decl. Ex. 20, at 27-28.)  Mr. Schulze

16

suggests that GBT was part of the group, but CEO Yuen testified that ▉▉▉▉▉▉▉▉▉▉

17

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉."  (Teter

18

Decl. Ex. 1, Yuen Tr. 118:14-25 (emphasis added).)

19

Even if Mr. Schulze had a basis to believe that an industry practice exists, he made no

20

effort to connect that practice to the facts of this case.  He admitted that entire market value is *not*

21

always used whenever a patent is alleged to be essential:  "nothing is without exception." (Teter

22

Decl. Ex. 21, 59:23-61:6.)  He did not explain how the alleged industry practice in 1999 applies to

23

the hypothetical negotiation in this case—a 2010 license to a single patent for an optional feature,

24

which at most covers the placement of four bits in a single channel in a baseband chipset.  *Uniloc*,

25

632 F.3d at 1313, 1315 (excluding expert testimony that "fails to tie a reasonable royalty base to

26

the facts of the case at issue").  Mr. Schulze's "industry practice" exception is nothing more than

27

*ipse dixit*, which the Court should exclude under *Daubert*.  *General Elec. Co.,* 522 U.S. at 146

28

1   (the trial court may strike "opinion evidence that is connected to existing data only by the *ipse*

2   *dixit* of the expert").

3           **3.      Apple Has Not Endorsed Mr. Schulze's Entire Market Value Theory.**

4           At his deposition, Mr. Schulze argued that using the entire market value is "the practice of

5   Apple."  (Teter Decl. Ex. 21, 59:23-61:6.)  Mr. Schulze cites an October 10, 2012 letter titled

6   "Apple Remarks for ITU Patent Roundtable," but ignores what Apple said.  In remarks to the

7   ITU, Apple stated:

8                   We believe the base should be common as between the parties and
                    should bear the closest possible relationship to the actual
9                   functionality covered by the standard.

10                  Several courts and regulatory agencies call this the "smallest
                    saleable patent practicing unit." This legal doctrine seeks to avoid
11                  unjust enrichment by focusing parties on the component that
                    practices all or substantially all of the standardized technology. *In*
12                  *the context of cellular SEPs, the smallest saleable unit would most*
                    *likely be the baseband chip.*
13
                    Opponents of this approach argue the base should be the end user
14                  product ASP.  *However, the ASP approach wrongly permits the*
                    *patent holder to collect value unassociated with its contribution to*
15                  *the standard -like the end product's materials composition,*
                    *operating system, unique industrial design, and component choices*.
16                  Using the ASP of the end user product as the royalty base has the
                    effect of distorting the value of essential patents and discriminating
17                  against companies with high value products, like Apple.

18  (Teter Decl. Ex. 22, Apple Remarks for ITU Patent Roundtable (Geneva, Switzerland Oct. 10,

19  2012) (emphasis added).)  Apple's 30(b)(6) designee on Apple's licensing policy confirmed that

20  the royalty here should be tied to the chipset, not the entire handset.

21                  The W-CDMA is a cellular functionality and the closest component
                    of the phone that contains that functionality is the chipset, therefore,
22                  royalty base should be in some way tied to that chipset, not to the
                    price of the phone.  That is what we believe.
23
24  (Teter Decl. Ex. 23, Maghame Tr. 48:2-7; 52:25-53:2 (explaining that the royalty "has to reflect

25  that functionality and be tied to the item that actually embodies that functionality.   In this

26  instance, we were talking about the chipset.").)  GBT's infringement expert reads the '793 claims

27  only on the baseband chipset, not on the entire iPhone or iPad.  *See* §III(E), *supra*.

28          At his deposition, Mr. Schulze suggested that Apple's own licenses support his use of the

entire market value as a base.  But Mr. Schulze failed to identify a *single* Apple license ███████

██████████████████████████████████████████████████████████████████████████

██s.  To the contrary, Mr. Schulze's report and summary of Apple licenses, even if accepted as

accurate,[7] states only ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████  No Apple license supports Mr. Schulze's entire market value argument.

In fact, Mr. Schulze went to great lengths to distinguish the Apple licenses as *non-comparable*, for the simple reason that none of the agreements would have supported GBT's exorbitant damages demand.  Mr. Schulze argued that "none of the Apple licensing agreements are informative as to a royalty rate that would have been negotiated between GBT and Apple as of June 2010."  (Teter Decl. Ex. 20, at 18.)  He noted that the Apple licenses were ██████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████  (Teter Decl. Ex. 20, at 18.)  Mr. Schulze noted that some of the licenses were cross-licenses, and stated that "it would be speculative at best to attempt to derive value of Apple's patents in order to attempt to determine the entire value of the licensee's portfolio."  (Teter Decl. Ex. 20, at 18.)  He argued that ██████████████████ to determine the value of a WCDMA patent "would be conjecture" because "[e]ach standard is characterized by its own unique features and benefits."  (Teter Decl. Ex. 20, at 18-19.)

Mr. Schulze did not identify any Apple license that followed the structure he proposes here:  A straight patent license in exchange for an uncapped percentage of the entire market value of Apple's iPhones or iPads.  *See Wordtech v. Integrated Networks Solutions*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (emphasizing that "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them") (quoting *ResQNet v. Lansa*, 594 F.3d 860, 873 (Fed. Cir. 2010).).  *See also ePlus v. Lawson Software,* 700 F.3d 509, 522-23 (Fed. Cir. 2012) (upholding exclusion of expert testimony that relied upon "lump-sums

---

[7] Mr. Schulze mischaracterizes and misunderstands the Apple licenses, but that is beside the point.  Both experts agree that none of the cited Apple licenses are comparable, and thus, the Court should exclude them.

1    received for multiple patents and cross-licensing deals").

2         In all, Mr. Schulze's analysis fell far short of the "higher degree of proof that must exist to

3    support an entire market value rule theory." *LaserDynamics*, 694 F.3d at 68.  The Court should

4    exclude his testimony in its entirety.

5         **C.      The Royalty Rate:  Mr. Schulze's Ends-Oriented Rate Calculation is
         Unreliable.**

6

7              **1.      Mr. Schulze's Unreliable Theory Has No Connection to the Facts of
                   this Case.**

8         In 2011, the Federal Circuit in *Uniloc* struck down a $388 million damages award that

9    was not "tied to the relevant facts and circumstances of the case at issue" and the "hypothetical

10   negotiations that would have taken place...at the relevant time." *Uniloc v. Microsoft*, 632 F.3d

11   1292, 1315, 1318 (Fed. Cir. 2011).  In the instant case, Mr. Schulze made no effort to tie his

12   opinion to the facts of this case.  Although ███████████████████████████████████

13   ██████████████████████  Mr. Schulze attempted to calculate a percentage royalty rate that he could

14   apply to the entire handset.  His staff collected third-party papers that predicted "cumulative

15   royalty rates" years before the hypothetical negotiation.  After surveying the predicted rates,

16   Mr. Schulze decided to use an industry-wide 12% (per handset) "cumulative royalty" for

17   WCDMA patents that, he admits, nobody pays.  (Teter Decl. Ex. 21, 153:2-22 ("No one licensee

18   is going to say, yes, that's what I paid because they're not paying it directly.").)  Nonetheless, Mr.

19   Schulze then simply assumed that the '793 patent is essential, assumed that Apple could not sell

20   handsets for the AT&T network without it, and then used the 12% rate to determine the running

21   royalty rate that he applied in this case.  Mr. Schulze acknowledged that his chosen royalty rate is

22   linked to the improper entire market value royalty base—in other words, if Mr. Schulze could not

23   use the entire market value as a base, he would have changed the rate to try to reach the same

24   "ultimate number … the same dollar value."  (Teter Decl. Ex. 21, 155:15-158:14.)

25        Mr. Schulze not only failed to tie his opinion to the facts of this case, he did not even read

26   the materials he cited, much less verify that their assumptions and analyses could have any

27   bearing on a reasonable royalty for the '793 patent in 2010.  For example, Mr. Schulze relied on a

28   July 2005 article from *IP Law and Business*, which he did not read.  (Teter Decl. Ex. 21, 169:22-

170:4.)  He had "no idea what was the basis for IP Law and Business' statement in July of 2005." (Teter Decl. Ex. 21, 170:13-24.)  Mr. Schulze argued that he did not need to review his source material:  "obviously I can't go back and opine on the -- the reputation of every single cite -- source cited by these authors."  (Teter Decl. Ex. 21, 169:15-21.)  Mr. Schulze also relied on an article by Mallinson, which in turn cited another Report that predicted cumulative royalties in 2005.  But Mr. Schulze did not even have a copy of the 2005 Report, much less read it.  "Again, I don't have that.  I'm just relying on Mallinson's cites here."  (Teter Decl. Ex. 21, 175:16-176:1; 177:6-19.)  Mr. Schulze admitted that he did not know the basis for the prediction in the 2005 Report, "other than the fact that it is related to WCDMA."  (Teter Decl. Ex. 21, 177:14-19.)

Similarly, Mr. Schulze relied on an article by Eric Stasik regarding 4G royalties (not 3G or HSUPA royalties), who stated that "it's hard to imagine a comprehensive calculation of LTE [4G] royalty rates which would produce an upper limit for the aggregate cumulative royalty of less than 25 to 30 percent."  (Teter Decl. Ex. 21, 180:6-181:4.)  Mr. Schulze's staff used Mr. Stasik's "hard to imagine" comment as a concrete fact, and attempted to infer a rate for 3G technology.  Although Mr. Schulze relied on Mr. Stasik's "imagination," he did not know who Mr. Stasik is or know anything about him:  "I can't speak to his background."  (Teter Decl. Ex. 21, 134:15-135:10.)  He assumed that the Stasik article used "other sources that are presumably reasonably credible" but did not look them up.  (Teter Decl. Ex. 21, 135:11-136:2.)[8]  In short, Mr. Schulze's cumulative royalty rate theory is unreliable, unsupported, and has no connection to the facts of this case.

## 2.   Apple Did Not Agree with Mr. Schulze's Theory.

Unable to provide any support for his approach, Mr. Schulze argues that "Apple has expressed a similar view."  (Teter Decl. Ex. 20, at 35.)  Apple has done no such thing.  First, as noted above, Apple disagrees that with GBT and Mr. Schulze regarding the royalty base.

---

[8] Mr. Schulze also relied on the third-party position statement published in 1999 by the "UMTS IP Association," over a *decade* before the 2010 hypothetical negotiation in this case.  (Teter Decl. Ex. 20, at 34-35.)  Apple was not a member of the UMTS IP Association, and as noted above, GBT viewed it as a "flash in the pan"—"we might have entertain it for a while, but then this was going nowhere….the whole thing collapsed in one of the meetings."  (Teter Decl. Ex. 1, 118:14-119:8.)

1   Consistent with the law, Apple maintains that the smallest saleable unit (the baseband), not the

2   entire market value, is appropriate here.

3        Second, even when the appropriate royalty base is used, Apple does not agree that every

4   patent alleged to be essential, no matter how unimportant or insignificant, is automatically

5   entitled to a strict pro rata share—particularly when the patent is not, in fact, essential at all.  As

6   Apple's 30(b)(6) designee testified, ███████████████████████████████████

7   ██████████████ (Teter Decl. Ex. 23, Maghame Tr. 52:19-20; Tr. 53:8-10 ███████████

8   ████████████████████████████████████████████████████████████

9   ████████).)[9]  Apple's 30(b)(6) designee testified that determining an appropriate rate involves a

10  "case-by-case determination" evaluating strength, essentiality, and other factors for the specific

11  patent(s) at issue.  (Teter Decl. Ex. 23, Maghame Tr. 40:19:-42:19.)

### 3.   Attorney O'Brien's Imaginary Royalty Rate Per Patent Calculation Is Inadmissible.

14       Mr. Schulze also asked GBT's outside counsel, Bill O'Brien of One LLP, to provide per

15  patent royalty "rates" from eight ████████████ settlements from GBT's RACH cases.

16  (Teter Decl. Ex. 20, at 11-18.)  Attorney O'Brien is not an accountant or economist; he was an

17  attorney advocate for GBT.  He did not submit an expert report, and his imaginary "royalty rates"

18  do not exist in any agreement.  They are an inadmissible fiction.  The ██████ settlements did

19  not specify or set any royalty rate, much less a rate for the '793 patent.  Attorney O'Brien would

20  not tell Mr. Schulze the market shares or sales of the licensees:  "I can't know the revenues or

21  volume of each of these entities but Mr. O'Brien does and I relied on him."  (Teter Decl. Ex. 21,

22  86:19-21.)  Neither Attorney O'Brien nor Mr. Schulze offer any evidence that the licensees

23  practiced the accused optional HSUPA feature, or any evidence that the licensees valued the '793

24  patent at all.

25       A patentee may not rely on licenses that have "no relationship to the claimed invention" or

---

[9] Mr. Schulze cites Apple's letter to the ITU Roundtable, which notes that a party's *pro rata* ownership should be considered as a "common starting point."  (Teter Decl. Ex. 20, at 35; Ex. 22 at 2.)  That letter addresses *essential* patents, and the '793 patent is not essential here.  To the contrary, it is (at most) one way to practice an optional feature in HSUPA.

are not "commensurate with" the accused infringement.  *ResQNet.com v. Lansa*, 594 F.3d 860, 868, 872 (Fed. Cir. 2010).  Basing a royalty rate on portfolio licenses "unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet*, 594 F.3d at 869.  Neither Attorney O'Brien nor Mr. Schulze performed any "comparison of the features and functionality" of the iPhones and iPads with the licensed products.  (Teter Decl. Ex. 21, 116:22-118:4.)  *ResQNet* and Fed.R.Evid. 403 preclude Mr. Schulze from offering any opinion based on the eight █████████████.

### D.   Mr. Schulze's Recitation of the *Georgia-Pacific* Factors Does Not Immunize His Analysis.

Without any basis to support his entire market value base and his guessed royalty rate, Mr. Schulze argues that he is following the approved *Georgia-Pacific* factors.  However, reciting the *Georgia-Pacific* factors does not inoculate a damages analysis that fails to include the necessary analysis:  "This type of superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks, can not support the jury's verdict."  *Whitserve v. Computer Packages*, 694 F.3d 10, 31 (Fed. Cir. 2012).

### E.   Mr. Schulze's Attempt to Convert GBT's ███████████████ into a $27 Million FRAND Rate and his Recitation of the GTT Group's Entire Portfolio Valuation Are Unreliable and Groundless.

As an afterthought, Mr. Schulze provides another inadmissible calculation in his report, based on GBT's 2009 offer to Apple of a fully paid-up, portfolio wide license for ████████  The offer to Apple included far *more* than the hypothetical negotiation here, and thus, should be adjusted downwards.   GBT offered ████████████████████████████████ ██████████████████████████████████████████████████████████.  Mr. Schulze makes no attempt to account for those differences, declaring that he can *inflate* GBT's rejected offer to calculate an equivalent "FRAND royalty of over $27 Million." (Teter Decl. Ex. 20 at 10-11.)  His opinion is unreliable and inadmissible under *ResQNet* and Fed.R.Evid. 403.  Similarly, the Court should preclude Mr. Schulze from reciting The GTT Group's inflated valuations for the entire GBT portfolio, (Teter Decl. Ex. 20 at 35-36), which have no connection to the hypothetical negotiation in this case and are inadmissible under *ResQNet* and Fed.R.Evid. 403.

**F.      Mr. Schulze's Erroneous Assumption that the '793 Patent Is Essential to HSUPA and the AT&T Network Renders his Opinions Unreliable and Inadmissible.**

Finally, Mr. Schulze's opinions should be excluded for yet another independent reason. Rather than analyzing the intrinsic value of the '793 patent (*see* Teter Decl. Ex. 21, 191:16-25), Mr. Schulze's opinions are based entirely on the assumption that the '793 patent is "essential" to implement HSUPA and essential to operate on the AT&T network.   As set forth above, Mr. Schulze's opinions have no foundation.  It is undisputed that:  (1) Dr. Vojcic admits that the '793 patent is not essential to HSUPA, (2) GBT accuses only an optional part of HSUPA, and (3) the AT&T network continues to support handsets that do not support HSUPA.  *See* §III(E), *supra*. The Court should exercise its gatekeeping role and exclude Mr. Schulze's opinions in their entirety.  *Daubert*, 509 U.S. at 579 (trial judge must ensure that expert testimony "rests on a reliable foundation"); Fed. R. Evid. 403.

## VI.      MR. SCHULZE SHOULD NOT BE ALLOWED TO SUBMIT A REPLACEMENT REPORT.

Mr. Schulze read the Federal Circuit's entire market value rule authority before submitting his report, but chose to ignore it.  Instead, he relied entirely on a prohibited methodology to calculate both a rate and base, offering no alternative calculation.  The Court's scheduling order was not a suggestion or date for Mr. Schulze and GBT to provide their opening bid.   The Northern District of California has made clear in other cases that when a plaintiff in a patent case presents an overreaching, clearly inadmissible damages theory, that plaintiff will bear the consequences.

> This leaves the follow-on question of whether NPS should be permitted an opportunity to have a second bite at the apple.  Over the course of many years and more than a dozen patent trials, the undersigned judge has concluded that giving a second bite simply encourages overreaching on the first bite (by both sides).  *A second bite may be appropriate where the expert report can be salvaged with minimal disruption to an orderly trial, but where the report is not even close, there is a positive need to deny a second bite in order to encourage candor in the first place ....* Possibly, plaintiff can cobble together a royalty case based on other disclosed witnesses and evidence. Possibly not. If not, it is a problem clearly of plaintiff's own overreaching and it will not be allowed a second bite at the apple.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No.  5:12-cv-04882-PSG

23.

APPLE'S MOTION TO EXCLUDE
OPINIONS OF MR. SCHULZE

1    *Network Protection Sciences v. Fortinet*, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) (Alsup,

2    J.).  *See also Rembrandt Social Media v. Facebook*, 2013 WL 6327852 (E.D. Va. Dec. 3, 2013)

3    (striking damages opinion without leave to supplement).  The Court should exclude Mr. Schulze's

4    opinions in their entirety, and preclude GBT from offering any expert damages testimony at trial.

5    **VII.    CONCLUSION**

6         Mr. Schulze used a prohibited entire market value base and an unreliable rate that is not

7    connected to the facts of this case.  His opinions are a textbook example of what *not* to do in a

8    patent case, and fall far short of meeting *Daubert*.  This is not a case where a vigorous cross-

9    examination will suffice; Mr. Schulze's opinions and testimony has no probative value

10   whatsoever and would be highly prejudicial.  The Court should exclude his opinions in their

11   entirety under *Daubert* and Fed.R.Evid. 403.

12                                              */s/ Timothy S. Teter*
                                               Timothy S. Teter (171451)
13   Dated: January 28, 2014                   teterts@cooley.com
                                               Lowell D. Mead (223989)
14                                             lmead@cooley.com
                                               Cooley LLP
15                                             Five Palo Alto Square
                                               3000 El Camino Real
16                                             Palo Alto, CA  94306-2155
                                               Telephone:     (650) 843-5000
17                                             Facsimile:      (650) 849-7400

18                                             *Attorneys for Defendant Apple Inc.*

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on January 28, 2014, with a copy of this document via the Court's CM/ECF system per Local Rules.  Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or first class mail on this date.

By:  */s/ Timothy S. Teter*

1208134 v10/HN

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO