1   COOLEY LLP
TIMOTHY S. TETER (171451) (teterts@cooley.com)

2   LOWELL D. MEAD (223989) (lmead@cooley.com)
Five Palo Alto Square

3   3000 El Camino Real
Palo Alto, CA 94306-2155

4   Telephone: (650) 843-5000
Facsimile: (650) 849-7400

5

6   Attorneys for Defendant
Apple Inc.

7

8               UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

| 12 | Golden Bridge Technology Inc., | Case No.  5:12-cv-04882-PSG |
|---|---|---|
| 13 | Plaintiff, | **APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** |
| 14 | v. | |
| 15 | Apple Inc., | **Date: March 4, 2014** |
| 16 | Defendant. | **Time: 10:00 a.m.**<br>**Courtroom: 5, 4th Floor**<br>**Judge: The Hon. Paul S. Grewal** |
| 17 | | ██████████████████████ |
| 18 | | |

19

20     REDACTED/PUBLIC VERSION OF DOCUMENT SOUGHT TO BE SEALED

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

PAGE

RELIEF REQUESTED ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED .................................................. 3

III.  STATEMENT OF FACTS ................................................................................... 4

      A.    The '793 Patent Claims a Specific Type of Multi-Channel Transmitter that
            Creates a Spread-Spectrum Header Channel. ......................................... 4

      B.    GBT Abandoned its Infringement Theory After the Close of Discovery. ............. 5

            1.    GBT's October 2012 Contentions Narrowly Defined the Case. ............... 5

            2.    GBT's Infringement Expert, Dr. Vojcic, Offered No Support for
                  GBT's Theory and Attempted to Raise a New One Instead. ..................... 6

IV.   LEGAL STANDARDS........................................................................................ 8

V.    ARGUMENT ......................................................................................................... 9

      A.    The Accused Products Do not Concatenate the DPCCH to the DPDCH to
            Generate a Header Frame. ......................................................................... 9

      B.    ████████████████████████████████████████████
            ████████████████████████. ........................................................ 10

            1.    As GBT Argued, the Claimed Processor Must Synchronize Data
                  Channels Using Timing Data *From the Header*. ................................... 10

            2.    ████████████████████████████████████████████
                  ███████████████████████. ................................................... 12

      C.    ████████████████████████████████████████████
            ██████████████. ...................................................................... 16

            1.    ████████████████████████████████████████████
                  ████████████████. ......................................................... 16

            2.    The Court Should Reject GBT's New and Erroneous Claim
                  Construction Argument........................................................................ 17

      D.    The Court Should Grant Summary Judgment of Noninfringement Under
            the Doctrine of Equivalents........................................................................ 21

      E.    Apple Is Not Liable For Indirect Infringement. .................................................. 23

            1.    Apple Has Not Induced Infringement. .................................................... 23

            2.    Apple Has Not Contributed To Infringement. ........................................ 24

VI.   CONCLUSION ................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

APPLE'S MSJ OF NONINFRINGEMENT

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)........................................................................................ 15

*American Calcar, Inc. v. American Honda Motor Co.*,
   651 F.3d 1318 (Fed. Cir. 2011)........................................................................................ 22

*Amgen Inc. v. Hoechst Marion Roussel*,
   314 F.3d 1313 (Fed. Cir. 2003)........................................................................................ 15

*Arthur A. Collins v. N. Telecom*,
   216 F.3d 1042 (Fed. Cir. 2000)........................................................................................ 13

*In re Bill of Lading*,
   681 F. 3d 1323 (Fed. Cir. 2012)....................................................................................... 23

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998)........................................................................................ 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................................................ 8

*Chalumeau Power Sys. LLC v. Alcatel-Lucent*,
   No. 11-1175-RGA, 2012 WL 6968938 (D. Del. July 18, 2012)..................................... 23

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
   2013 WL 4537838 (N.D. Cal. Aug. 22, 2013).................................................................. 22

*Exigent v. Atrana Solutions*,
   442 F.3d 1301 (Fed. Cir. 2006)................................................................................ 8, 9, 15

*Global-Tech Appliances, Inc. v. SEB SA*,
   131 S. Ct. 2060 (2011)................................................................................................ 23, 24

*Golden Bridge Technology v. Apple*,
   937 F. Supp. 2d 504 (D. Del. 2013).......................................................................... 5, 17

*Golden Bridge Technology v. Apple*,
   Case 1:10-cv-00428-SLR-MPT Dkt 319 at 11 (April 9, 2013) ................................. 5, 17

*Intellectual Science v. Sony*,
   589 F.3d 1179 (Fed. Cir. 2009).................................................................................. 13, 15

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
   287 F.3d 1062 (Fed. Cir. 2002)........................................................................................ 20

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3

*Network Commerce, Inc. v. Microsoft Corp.*,
    422 F.3d 1353 (Fed. Cir. 2005)..................................................................... 22

4

5

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    No.12-CV-1067, 2013 WL 444642 (S.D. Cal. Feb. 5, 2013) ................................ 23

6

*Phillips v. AWH Corp.*,
    415 F. 3d 1303 (Fed. Cir. 2005)..................................................................... 18

7

*Pixion. v. Citrix Systems*,
    887 F. Supp. 2d 881 (N.D. Cal. 2012), *aff'd per curiam*, 500 Fed.Appx. 954, 2013 WL
    1150188 (Fed. Cir. Mar. 19, 2013) ............................................................. 13, 15

8

9

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc).......................................................... 20

10

11

*Techsearch v. Intel*,
    286 F. 3d 1360 (Fed. Cir. 2002)..................................................................... 13

12

13

*Vasudevan Software, Inc. v. TIBCO Software Inc.*,
    No. C 11-6638 RS, 2012 WL 1831543 (N.D. Cal. May 18, 2012) ........................ 23

14

15

STATUTES

16

35 U.S.C.
    § 271(b) ................................................................................................... 23
    § 271(c) ................................................................................................... 24

17

18

OTHER AUTHORITIES

19

Fed. R. Civ. P. 56 (c)...................................................................................... 8

20

Gibson, ed., *The Mobile Communications Handbook* (2002) at 15-1, 15-13 ............................. 20

21

Patent Rule
    3-1 ......................................................................................................... 2
    3-1(d)-(e) ......................................................................................... 6, 22, 23
    3-6 ....................................................................................................... 23

22

23

Pickholtz et al., "Theory of Spread-Spectrum Communications—A Tutorial" (1982) at
    855 ........................................................................................................ 20

24

25

Richardson, *WCDMA Design Handbook* (2005) at 72 ................................................ 21

26

Schilling et al., "Spread Spectrum for Mobile Communications" (1991) at 313-14 ................... 20

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

**APPLE'S MSJ OF NONINFRINGEMENT**

1   PLEASE TAKE NOTICE that on March 4, 2014 at 10:00 a.m., or as soon thereafter as the

2   matter may be heard before the Honorable Paul S. Grewal, Magistrate Judge of the United States

3   District Court for the Northern District of California, there will be a hearing on Defendant Apple

4   Inc.'s ("Apple") motion for summary judgment of noninfringement of the asserted claims of U.S.

5   Patent No. 6,075,793.

6                              **RELIEF REQUESTED**

7   Apple requests that the Court enter summary judgment that Apple has not infringed claims

8   5, 6, and 7 of the '793 patent, directly or indirectly, literally or under the doctrine of equivalents.

9                **MEMORANDUM OF POINTS AND AUTHORITIES**

10  **I.    INTRODUCTION**

11  Plaintiff Golden Bridge Technology, Inc. ("GBT") did not develop or contribute to the

12  optional High-Speed Uplink Packet Access ("HSUPA") feature that it accuses of infringement.

13  (Teter Decl. Ex. 1, Yuen Tr. 141:24-142:2.)   GBT focused its efforts on a different optional

14  feature, the Common Packet Channel ("CPCH"), which was GBT's ▮▮▮▮▮▮▮▮▮ to the

15  WCDMA standardization efforts.  (Teter Decl. Ex. 1, Yuen Tr. 68:6-20.).  The early versions of

16  the WCDMA standard included CPCH as an optional feature, and GBT lobbied the industry to

17  use CPCH and license GBT's portfolio.  But GBT's efforts failed, and the industry never used

18  CPCH.  (Teter Decl. Ex. 1, Yuen Tr. 138:14-16.)

19  GBT believed that the industry ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮  (Teter Decl. Ex. 1, Yuen Tr. 142:14-143:2.)  In 2005, after the 3GPP standards body

21  elected to remove CPCH from the 3G WCDMA standard, GBT sued the standards body

22  participants for alleged antitrust violations and for rendering GBT's technology—including the

23  '793 patent that issued in 2000—"virtually valueless."  (Teter Decl. Ex. 2, Complaint ¶3.)  GBT

24  retained one of the '793 inventors, Dr. Schilling, to support GBT's antitrust claims.  Dr. Schilling

25  performed searches for patents relating to CPCH and HSUPA.  He opined that the 3GPP

26  defendants removed a technology over which GBT had patents (CPCH) in favor of technology

27  that the antitrust defendants (not GBT) developed and patented (HSUPA).  (Teter Decl. Ex. 3,

28  Schilling Tr. 194:3-197:6; Teter Decl. Ex. 4, Schilling Antitrust Tr. 219:5-220:2 ("those patents

1  in HSUPA were owned by the major companies…this is what this whole lawsuit is about—that

2  you opted for a technique that you all own the patents on, rather than on the technique where the

3  patents are owned by someone else."). Neither GBT nor Dr. Schilling alleged that GBT had *any*

4  patents covering HSUPA. Dr. Schilling did not even mention the '793 patent, which did not

5  come to mind: "Didn't even think about it, probably." (Teter Decl. Ex. 3, Schilling Tr. 191:12-

6  197:6.)

7       Years later, after losing its antitrust case and two patent infringement litigations that

8  targeted other WCDMA features, GBT changed course. GBT now argues that the '793 patent is

9  essential to HSUPA. Contrary to GBT's shifting infringement theories, the '793 patent does not

10  cover HSUPA, and the Accused Products do not infringe any claim of the '793 patent. Summary

11  judgment of noninfringement is appropriate for three independent reasons.

12       **First,** GBT has abandoned the only infringement theory in its Patent Rule 3-1 contentions,

13  conceding that it cannot prove infringement under its original theory. GBT had no choice, as no

14  reasonable jury could have found infringement under that theory. As Apple explained to GBT in

15  its discovery responses, the Accused Products do not have ████████████████████████

16  ████████████████████████████████████████  Thus, summary judgment of

17  noninfringement is required.

18       **Second,** summary judgment of noninfringement is appropriate even under GBT's new

19  infringement theory, because the Accused Products do not have ████████████████████

20  ████████████████████████████████. GBT agreed that the processor

21  must synchronize the data channels using *timing data from the header*, and the Court construed

22  the claims accordingly. Thereafter, GBT's expert, Dr. Vojcic, admitted that the accused HSUPA

23  standard does not require a processor that synchronizes data channels using timing data from the

24  header, and neither he nor GBT's source code expert ████████████████████████

25  ████████████. Although GBT bears the burden, Apple's experts analyzed the code ████

26  ████████████████████████████████████. Thus, summary

27  judgment of noninfringement is required.

28       **Third,** even under GBT's new infringement theory, the Accused Products do not create

the claimed "*spread-spectrum* header channel" from the accused narrowband DPCCH signal.  As the '793 patent indicates and as Dr. Acampora explains, the "spread-spectrum" requirement is critical to the '793 invention, enabling the header to perform its functions.  The drafters of the WCDMA standard chose to take a different approach, and did *not* spread the narrowband DPCCH signal.    Instead, the WCDMA standard requires extra circuitry and a complex scrambling operation that the '793 patent neither describes nor claims.  Unable to dispute the fundamental difference between WCDMA and the '793 patent, Dr. Vojcic offers a belated new claim construction argument, contending that GBT's stipulated constructions of "spreading" and "spread spectrum" are "outdated" and should not govern here.  The Court should reject GBT's belated new infringement theory and erroneous claim construction argument.  Summary judgment is required.

The Court should also enter summary judgment that the Accused Products do not infringe under the doctrine of equivalents.  GBT did not assert the doctrine of equivalents in its Infringement Contentions, and although Dr. Vojcic mentions the doctrine in his report, he does not provide the necessary analysis.  Finally, the Court should enter summary judgment that Apple has not indirectly infringed the '793 patent.  GBT's Infringement Contentions do not assert indirect infringement, and Dr. Vojcic fails to provide any basis for a jury to conclude that Apple knew about the '793 patent, much less intended to induce or contribute to any infringement.

## II.   STATEMENT OF ISSUES TO BE DECIDED

1.     Whether GBT has substantial evidence to support a finding that the Accused Products concatenate the DPCCH to the DPDCH, where GBT's expert would not support the theory, and Apple's experts conclusively rebutted it.

2.     Whether GBT has substantial evidence to support a finding that the Accused Products have the claimed processor that synchronizes/times the accused E-DPDCH data channels *using timing data from the header*, where ████████████████████████████ ████████████████████████████████████████████████████████ ██████ .

3.     Whether GBT has substantial evidence to support a finding that the Accused

1   Products generate a "spread-spectrum header channel", where the accused narrowband DPCCH

2   signal is indisputedly *not* spread.

3        4.    Whether GBT has substantial evidence to support a finding that the Accused

4   Devices infringe under the doctrine of equivalents, where GBT failed to raise the theory in its

5   contentions and failed to support it with any expert analysis or proof.

6        5.    Whether GBT has substantial evidence to support a finding that Apple induced or

7   contributed to infringement, where Apple had no notice of the patent, even GBT did not believe

8   the patent covered HSUPA, and the Accused Products have substantial noninfringing uses.

9   **III.   STATEMENT OF FACTS**

10       **A.    The '793 Patent Claims a Specific Type of Multi-Channel Transmitter that
             Creates a Spread-Spectrum Header Channel.**

11

12       GBT contends that Apple infringes '793 patent claims 5, 6, and 7.  The asserted claims

13  recite a "transmitter for communicating a plurality of data-sequence signals from a plurality of

14  data channels." (Dkt. No. 273-1, Ex. 1 ('793 patent claims 5-7).)  The claims recite structures for

15  generating, processing, and spreading a plurality of channels  (*Id.*)  Each asserted claim requires:

16    • "a header device, coupled to a first data channel of said plurality of data
        channels, for concatenating a header to a first data-sequence signal to
        generate a header frame";

17

18    • "a processor, coupled to the header device and to the plurality of data
        channels, for synchronizing the plurality of data channels";

19

20    • Processing the header frame to generate multiple "spread-spectrum . . .
        channels," including a "spread-spectrum header channel" ("spread-
        spectrum means" element in claims 5-6; "plurality of product devices"
        element in claim 7).

21

22       The Court held that "concatenating" means "linking together two or more items in a single

23  chain or series," and that "header frame" means a "header followed by data in a frame, which

24  may include multiple headers interspersed with fields of data."  (Dkt. No. 282 at 2.)[1]

25       With GBT's encouragement, the Court construed "synchronizing the plurality of data

26  channels" to mean "timing the two or more data channels *using timing data from the header* and

27  _____

28  [1] The Court construed "header" to mean "A sequence of bits or symbols, which include a pre-
    defined sequence of bits or symbols (pilot)."  (*Id.*)

1    timing and control signals from the processor." (Dkt. No. 282 at 2 (emphasis added).)

2         The parties did not present any dispute regarding the meaning of "spread-spectrum" or

3    "spread spectrum . . . channel." To the contrary, in another litigation involving a CDMA patent

4    filed a year after the '793 patent, the parties stipulated that that "spread spectrum" means "a

5    communication technique wherein the transmitted information is *spread in bandwidth* prior to

6    transmission over the channel and then de-spread in bandwidth by the same amount at the

7    receiver." *Golden Bridge Technology v. Apple*, Case 1:10-cv-00428-SLR-MPT Dkt. 319 at 11

8    (April 9, 2013) (emphasis added). The parties further agreed that "spreading" a signal means

9    "increasing the bandwidth of the" signal. *Golden Bridge Technology v. Apple*, 937 F. Supp. 2d

10   504, 514 (D. Del. 2013).

11        Throughout fact discovery and claim construction, GBT did not suggest that "spread-

12   spectrum" or "spreading" should have a different meaning in this case. Rather, GBT

13   acknowledged that the '793 patent teaches that a "spread-spectrum signal" occupies the full

14   bandwidth. (Teter Decl. Ex. 9, June 26, 2013 Tr. at 140:15-141:5.)

15        **B.     GBT Abandoned its Infringement Theory After the Close of Discovery.**

16             **1.     GBT's October 2012 Contentions Narrowly Defined the Case.**

17        As discussed further below and in Apple's pending motion to strike (Dkt. No. 296),

18   GBT's October 2012 Infringement Contentions narrowly framed the case. First, GBT argued that

19   the claimed "header frame" corresponds to a *combination* of the DPDCH data channel and the

20   DPCCH control channel. (Teter Ex. 5 at pp. 2-7 and 43-48.) GBT contended:

21             The DPCCH contains header information including pilot bits, TPC
               commands, feedback information, and an optional transport format
22             combination indicator. The E-DPDCHs contain only data
               information. The E-DPCCH contains control information. The
23             header device is required to concatenate the header information to
               the DPDCH to generate the header slot shown in 25.211.5.2.1.
24

25   (Teter Ex. 5 at pp. 7, 48.)

26        Second, because GBT argued that the header was the *combination* of the DPCCH and the

27   DPDCH, GBT did not identify any individual channel as the claimed "spread-spectrum header

28   channel" generated by processing the header frame. (Teter Ex. 5 at pp. 2-7, 43-48.) Instead,

GBT relied on the *combination* of the DPDCH and DPCCH.

Third, GBT did not contend that the Accused Products contain a processor that synchronizes the data channels *using timing data from the header*.  (Teter Ex. 5 at pp. 7-9, 48-51.)  GBT offered no basis to believe that the Accused Products used "timing data from the header" in any way.

Fourth, GBT did not assert infringement under the doctrine of equivalents or indirect infringement under Patent Rules 3-1(d)-(e).  (*Id.* at 1-5.)

### 2.   GBT's Infringement Expert, Dr. Vojcic, Offered No Support for GBT's Theory and Attempted to Raise a New One Instead.

GBT's infringement expert, Dr. Vojcic, did not use GBT's infringement contentions in creating his infringement report.  (Teter Decl. Ex. 6, Vojcic Tr. 163:7-12 ("I don't think I did.").)  He did not cite GBT's contentions in his report, and did not recall using it as a roadmap.  (Teter Decl. Ex. 6, Vojcic Tr. 163:20-164:3 ("I said I didn't cite it, I probably didn't use it.").)  Rather than adhere to GBT's infringement theory, Dr. Vojcic created a new and different approach.  First, he did not offer any support for GBT's theory that the Accused Devices "concatenate" the DPDCH to the DPCCH.  Instead, he argued that the DPCCH control channel contains *both* "header" and "data", and argued that the required "concatenation" occurs when the Accused Devices create the DPCCH—*not* when they combine the DPCCH and the DPDCH.  In particular, Dr. Vojcic argued that when the Accused Devices generate the DPCCH, they concatenate alleged "header bits (pilot and TFCI)" with alleged "data bits (FBI and TPC)":

> As explained earlier, the DPCCH channel, i.e. the header channel, contains header bits (Pilot and TFCI) and data bits (FBI and TPC) that are concatenated in a DPCCH frame. See e.g. 3GPP TS 25.211 V6.9.0 at 5.2.1.1.  The accused devices must necessarily have a header device that would concatenate pilot, TFCI, TPC and FBI bits into a DPCCH frame.

(Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 77, 96); *see also id.*, Ex. A at 2, 9 (similar discussion).)  Accordingly, Dr. Vojcic argues that the DPCCH, alone, is the claimed "header channel."  (*Id.*)

Second, Dr. Vojcic argued that the DPCCH is the claimed "spread-spectrum header channel" created by multiplying an Orthogonal Variable Spreading Factor ("OVSF") channelization code by the DPCCH.  (Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 81, 100.)  But Dr. Vojcic

1   did not apply the agreed construction of "spread spectrum" to that operation.  He neglected to

2   mention that the DPCCH signal is a *narrowband* signal, and that the OVSF code applied to it,

3   Walsh 0, is a special case.  Unlike the other Walsh codes, Walsh 0 does *nothing* at all to the

4   narrowband signal—it simply multiplies the signal by "+1", which has no effect whatsoever.

5   Thus, applying Walsh 0 cannot create a "spread-spectrum header channel."

6           At his deposition, Dr. Vojcic admitted that using Walsh 0 does not change the bandwidth

7   of the narrowband DPCCH signal, and thus, does not "spread" under the stipulated construction

8   from the *GBT 1* case.  That should have been the end of the GBT's new theory, but Dr. Vojcic

9   unveiled a new argument at his deposition, contending that the stipulated construction of

10  "spreading" from the *GBT 1* case was wrong and "outdated."

11          Q.   Do you feel that your view that you just expressed here is
12          consistent with the view that you expressed about spreading in the
            GBT 1 case in Delaware?

13          A.   *It's not consistent* to the extent that I had to use definition
14          Court's claim construction in that other case and that claim
            construction actually by the Court assumed, I believe, previous
15          construction from Texas case that explicitly said that spreading
            increases the bandwidth.  So I had to -- I advised counsel what was
16          the right definition, but I was told I had to use Court's definition.

17          Q.   So in your view the definition in the GBT 1 case, that
            spreading increases the bandwidth of a signal, that definition was
18          not correct; is that fair to say?

19          A.   In my opinion, that's correct.  I think that was too -- well, how
            would I say -- not narrow, *outdated definition*.

20  (Teter Decl. Ex. 6, Vojcic Tr. 26:5-24 (emphasis added).)  Dr. Vojcic's new argument—that the

21  stipulated definition was "outdated"—did not appear anywhere in his expert report.  To the

22  contrary, Dr. Vojcic's report included examples showing that spreading increases the bandwidth.

23  (Teter Decl. Ex. 6, Vojcic Tr. 28:7-15.)

24          Dr. Vojcic conceded that his new infringement theory depends on his new claim

25  construction argument.  He admitted that the OVSF code applied to the DPCCH, Walsh 0, does

26  *not* change the bandwidth or "spread" under the stipulated construction.

27          Q.   That doesn't change the bandwidth; correct?

28          A.   I have to think about that.  Yeah.  It doesn't change the

bandwidth.

> Q.  It does not change the bandwidth; correct?

> A.  Correct.

(Teter Decl. Ex. 6, Vojcic Tr. 26:5-24.)

> Q.  And my question was just focusing on the definition from GBT 1, increasing the bandwidth.  If we use that definition here then you would agree that Walsh code 0 does not spread; correct?

> A.  I would agree that Walsh code 0 doesn't spread in the sense of increasing the bandwidth; correct.

(Teter Decl. Ex. 6, Vojcic Tr. 31:1-8.)

Dr. Vojcic tracked GBT's original contentions in one respect.  Like GBT's contentions, Dr. Vojcic did not present any evidence that the Accused Products ██████████████ ████████████████████████████████ (*Id*. ¶¶ 78-80, 97-99.)  Instead, Dr. Vojcic simply argued that the Accused Products have a "processor" and that various channels are frame-aligned.  But the claims, as construed by the Court, require much more than that.  The claims require the processor to time the data channels *using timing data from the header*, and on that element, Dr. Vojcic and GBT's source code expert, Dr. Huan Liu, ████████ Apple's experts, Dr. Acampora and Dr. Goldberg, analyzed the record and the source code thoroughly ██ ████████████████████████████████████████████████████████████ ████████████████████████████.

Finally, Dr. Vojcic made passing references to the doctrine of equivalents and to indirect infringement, but failed to provide the analysis and proof that the Federal Circuit requires.

## IV.   LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Where "the nonmovant bears the burden of proof . . . the movant need not 'produce evidence' showing the absence of a genuine issue of material fact in order to properly support its summary judgment motion."  *Exigent v. Atrana Solutions*, 442 F.3d 1301,

1307-08 (Fed. Cir. 2006) (affirming summary judgment of noninfringement), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Exigent*, 442 F.3d at 1308.

## V.   ARGUMENT

### A.   The Accused Products Do not Concatenate the DPCCH to the DPDCH to Generate a Header Frame.

Claims 5, 6, and 7 each recite "a header device, coupled to a first data channel of said plurality of data channels, for concatenating a header to a first data-sequence signal to generate a header frame." The Court held that "concatenating" means "linking together two or more items in a single chain or series," and "header frame" means "a header followed by data in a frame, which may include multiple headers interspersed with fields of data." (Dkt. No. 282 at 2.)[2] The '793 patent specification describes "multiple headers interspersed with fields of data." ('793 col. 2:16-18.) The following annotated excerpt of '793 patent Figure 2 shows header (red) concatenated with fields of data (blue)



('793 patent, Fig. 1.)

In its October 2012 infringement contentions, GBT alleged that a "header device" concatenated the DPCCH control channel *to the DPDCH data channel*. (Teter Ex. 5 at 2-7 and 43-48.) To prevail on that theory, GBT needed to show that the DPDCH and the DPCCH were "link[ed] together … in a single chain or series," thus creating a "header followed by data in a frame." (Dkt. No. 282 at 2.)

As discovery closed, GBT was unable to find any evidence or witness to support its overreaching theory, because the DPDCH and the DPCCH are sent simultaneously and in

---

[2] The Court also adopted constructions for "header device," "data channel," "header," "data-sequence signal," and "header frame." (*Id.* at 1-2.)

*parallel*. As Apple's expert Dr. Acampora explains, the DPCCH channel is not "concatenated" to the DPDCH. (Teter Decl. Ex. 8, Acampora Rep. at pp. 123-125, 174.) They are not "link[ed] together … in a single chain or series," thus creating a "header followed by data in a frame." As Dr. Acampora explained, the "W-CDMA standard illustrates how the DPCCH and the DPCCH are transmitted *in parallel*, rather than being concatenated." (Teter Decl. Ex. 8, Acampora Rep. ¶269.)



Figure 1: Frame structure for uplink DPDCH/DPCCH

(Teter Decl. Ex. 8, Acampora Rep. at ¶269 (TS 25.211, Fig. 1).)

GBT offered no contrary evidence and as a result, essentially conceded the point. Consequently, GBT's October 2012 infringement theory thus fails as a matter of law, and summary judgment of noninfringement is required.

**B.** ████████████████████████

### 1. As GBT Argued, the Claimed Processor Must Synchronize Data Channels Using Timing Data *From the Header.*

The Court construed "synchronizing the plurality of data channels" to mean "timing the two or more data channels *using timing data from the header* and timing and control signals from the processor," in view of the intrinsic evidence and GBT's own arguments and admissions.[3]

---

[3] *See, e.g.*, Dkt. No. 273 at 15-16 (GBT's opening *Markman* brief emphasizing that the data channels are timed "*[f]rom timing the data from the header*" and thus must "be synchronized *to* the header") (emphasis in original). The Court declined to adopt GBT's proposal that the claimed "synchronizing" requires only "aligning in time" the data channels, with no reference to the header. (*See* Dkt. No. 268 at 6.)

GBT did not object to that construction—to the contrary, GBT affirmatively agreed with it in an effort to avoid the prior art that Apple revealed in its invalidity contentions.  At the hearing, GBT emphasized the following passage from the specification, which teaches that a processor synchronizes data channels *using timing data from the header*:

> The header device 46 concatenates the header with data using a first data channel of a plurality of data channels.  *The header device 46 is necessary for timing of data* from different data channels.  *From timing the data from the header* in a single channel*, data in all channels are timed*.  A plurality of synchronization devices, which may be embodied as buffer memories 32-38, receive timing and control signals from the processor 27 to *synchronize the plurality of data channels to the header* on the first data channel.

('793 col. 6:14-22 (emphasis added).)  The Court asked, and GBT confirmed, that the passage above makes clear that "it's the timing data from the header that's used here":

> THE COURT: Isn't the first underlined portion though make clear that *it's the timing data from the header that's used here*?
>
> MR. HADLEY: *It is*. So there's a difference between what does the timing and the -- and the synchronization versus what information is used for that purpose. It's -- the processor does -- controls the -- the synchronization. And the issue well, what does synchronization mean?
>
> And the processor does that by sending timing and control information to all of these channels, and then from that information *the header then is used as the, you know, basically the reference signal from which the other channels are aligned and/or timed and aligned*, and I'll get into that distinction in a minute.

(Teter Decl. Ex. 9, June 26, 2013 Tr. at 121:2-15 (emphasis added).)  Later in the argument, GBT further emphasized that the timing information "does come from the header":

> And *that particular timing information does come from the header* based on a signal received from the processor, but that header and all the other channels receive more than just that timing information. They receive the timing and the control signal from the processor, and that is what does the synchronizing.

(Teter Decl. Ex. 9, June 26, 2013 Tr. at 125:6-11 (emphasis added).)  As GBT's expert Dr. Vojcic explained:  "In the invention, 'timing is keyed from the header.'"  (Teter Decl. Ex. 7, Vojcic Rep. ¶ 62, quoting the '793 patent Summary of the Invention at col. 2:18).)

Figure 3 of the '793 patent, annotated in Dr. Acampora's report, shows the synchronization function.  In the first annotation, the processor receives timing data from the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**APPLE'S MSJ OF NONINFRINGEMENT**

header via the header device.  In the second annotation, the processor sends signals to the sync blocks to time the data channels.



(Teter Decl. Ex. 8, Acampora Rep. ¶91.)

The header channel (the top channel in Figure 3) does not need a sync block, because the header has its own timing and the data channels (the other three channels) are synchronized to the header.  (Teter Decl. Ex. 8, Acampora Rep. at ¶¶88-91.)  In other words, the '793 patent describes and claims a specific way to synchronize data channels—the processor, coupled to the header device, synchronizes the channels using timing data from the header.

**2.** 

GBT's experts do not even opine, let alone provide evidence, that the Accused Products contain a processor, coupled to a header device, for timing data channels *using timing data from the header*.  The Accused Products simply do not contain the structure that the asserted claims require.  Dr. Vojcic cites the 3GPP standard, but admits that the standard "does not dictate how the timing and synchronization must be accomplished."  (Teter Decl. Ex. 7, Vojcic Rep, ¶¶ 77, 87, Ex. A at 2-3, 9-10.)  He then provides only the following opinions, reproduced here in full:



(*Id.* at ¶¶ 79-80, 98-99, Ex. A at 2-3, 10.)

As a result, GBT's infringement expert thus does not even state an opinion—much less demonstrate with evidence—that the Accused Products contain any ███████████ ████████████████████████████████████████████████████████████████████ ██████████ On this basis alone, summary judgment is proper:

> To satisfy the summary judgment standard, a patentee's expert must
> set forth the factual foundation for his infringement opinion in
> sufficient detail for the court to be certain that features of the
> accused product would support a finding of infringement under the
> claim construction adopted by the court, with all reasonable
> inferences drawn in favor of the non-movant.

*Intellectual Science and Tech. v. Sony*, 589 F.3d 1179, 1183 (Fed. Cir. 2009), citing *Arthur A. Collins v. N. Telecom*, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000).  For the Qualcomm basebands, Dr. Vojcic opines only ███████████████████████████████████████████ ████████████████████████. (Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 79, 98.)  Likewise for the Intel basebands, Dr. Vojcic opines ██████████████████████████████████████ ████████████████████████████████████████████████████████ (Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 80, 99.)

Dr. Vojcic's conclusory proclamation that Apple infringes cannot defeat summary judgment, or substitute for proof of █████████████████████████████████████ ████████████████.  *Intellectual Sci.*, 589 F.3d at 1183-84 (affirming summary judgment where patentee's expert did "not pinpoint where those elements are found in the accused devices;" an "opaque identification is not enough to permit any reasonable juror to make that leap"); *Techsearch v. Intel*, 286 F.3d 1360, 1371-75 (Fed. Cir. 2002) (affirming summary judgment

1   where patentee "failed to provide evidence to explain how" accused products infringe); *Pixion. v.*

2   *Citrix Sys.*, 887 F. Supp. 2d 881, 888-90 (N.D. Cal. 2012) (summary judgment where patentee's

3   expert provided no "description of an element of [defendant]'s technology that describes basing

4   the provided data on 'client or server information examined' during the conference"), *aff'd per*

5   *curiam*, 500 Fed.Appx. 954, 2013 WL 1150188 (Fed. Cir. Mar. 19, 2013).

6        GBT's source code expert, Dr. Liu, also does not provide any opinion or evidence ████

7   ████████████████████████████████████   Dr. Liu did not opine on the issue of

8   infringement, does not know or apply the Court's claim constructions, and was not tasked with

9   assisting Dr. Vojcic, with whom he has never communicated.  (Teter Decl. Ex. 10, Liu Tr. 9:11-

10  11:1, 20:7-21:18.)[4]  Dr. Liu merely describes how the Qualcomm and Intel basebands ████

11  ████████████████████████████████████   (Teter Decl. Ex. 11, Liu Rep. ¶¶ 23-24, 40-

12  42.)  Dr. Liu does not ████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████.  (*Id.*)[5]

16       **b.**   ████████████████████████████████

17  ████████████████████████████

18       Apple's experts offer unrebutted, uncontradicted evidence that the Accused Products do

19  not infringe.  Apple's code expert, Dr. Goldberg, investigated the Qualcomm and Intel baseband

20  code and determined ████████████████████████████████████

21  ████████████████████   Teter Decl. Ex. 12, Goldberg Rep. ¶¶17, 29.) Dr. Goldberg went

22  even further, reviewing the code determine ████████████████████████████

23

---

24  [4] Dr. Liu testified at deposition that he was not aware that another expert had cited and relied
    upon his report, does not know who Dr. Vojcic is, has not read Dr. Vojcic's report, does not know

25  how Dr. Vojcic might interpret and use the terms "processor," "synchronizing," and "data," and
    has no opinion on what might or might not be considered "header" in the accused products.

26  (Teter Decl. Ex. 10, Liu Tr. 9:11-11:1, 22:18-25:8, 25:10-27:22.)

27  [5] Dr. Vojcic and Dr. Liu cite Qualcomm and Intel documents, but fail to allege that any of them
    show any timing data from the alleged header (pilot and TFCI) being used to time any data

28  channels.

1  ████████████████████████████████████ and determined to a

2  certainty ████████████████████████████████████████████

3  ██████████████████████████████ (Teter Decl. Ex. 14, Goldberg Tr. 64:20-65:14.)

4  Dr. Goldberg's findings are undisputed.[6]  *See Pixion*, 887 F. Supp. 2d at 890 (defendant's

5  "evidence stands uncontradicted").  As Dr. Acampora further explains, Dr. Goldberg's findings

6  prove that the Accused Products do not infringe—in contrast to the claimed '793 patent, ██

7  ████████████████████████████████████████████████████

8  ████████████████████.  (Teter Decl. Ex. 8, Acampora Rep. pp. 125-137.)

9       GBT has presented no evidence—not even a conclusory opinion, let alone substantial

10  evidence—that the Accused Products contain █████████████████████████

11  ████████████████████  GBT encouraged the Court to include the "timing data from

12  the header" requirement in the claim construction, and cannot avoid summary judgment by

13  applying one standard for validity (that the processor must use timing data from the header) and

14  another for infringement (that timing data from the header does not need to be used).  "It is

15  axiomatic that claims are construed the same way for both invalidity and infringement."  *Amgen*

16  *Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1330 (Fed. Cir. 2003); *see also Amazon.com, Inc.*

17  *v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Because the claims of a

18  patent measure the invention at issue, the claims must be interpreted and given the same meaning

19  for purposes of both validity and infringement analyses."); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157

20  F.3d 1340, 1363 (Fed. Cir. 1998) ("Claims must be interpreted the same way for determining

21  infringement as was done to sustain their validity.").

22       Thus, the record is undisputed.  GBT has no evidence to support an element of all of its

23  claims, and summary judgment of noninfringement is required.  *Exigent*, 442 F.3d at 1308;

24  *Intellectual Science*, 589 F.3d at 1183-84.

[6] GBT's code expert, Dr. Liu, reviewed Dr. Goldberg's expert report and deposition transcript during the expert discovery period (which closed January 24, 2014), and did not provide any opinions disputing Dr. Goldberg's findings that the basebands do not time or synchronize any data channels using any timing data from the DPCCH.  (Teter Decl. Ex. 10, Liu Tr. 11:2-12:19, 72:1-7.)

**APPLE'S MSJ OF NONINFRINGEMENT**

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**C.** ████████████████████████████████████████

     **1.**  ██████████████████████████████████████**.**

The Accused Products also do not infringe because ████████████████████ ██████████████████████  The claims specifically require the device to generate a plurality of "spread-spectrum . . . channels," including a "spread-spectrum header channel" and a plurality of spread-spectrum data channels.[7]  Thus, the device must have structure that generates a "*spread spectrum*" header channel.  (Teter Decl. Ex. 8, Acampora Rep. pp. 137-151.)

The experts agree that the device must create the "spread-spectrum channels" *before* the combiner.  As Dr. Vojcic admits, "spreading in the patent was defined or described in product devices . . . prior to combiner."  (Teter Decl. Ex. 13, Vojcic Tr. (5/25/13) 70:9-18.)

According to Dr. Vojcic, the WCDMA standard requires every WCDMA handset to have the claimed structure to create the "spread-spectrum header channel," because the standard states that the narrowband DPCCH signal is multiplied by an OVSF code.  But Dr. Vojcic failed to mention that the standard indicates that Walsh Code 0 is used for the DPCCH, and Walsh Code 0 is a very special case.  Unlike other Walsh Codes, Walsh Code 0 is nothing more than a series of +1 values.  As a result, Walsh Code 0 does *nothing whatsoever* to the narrowband DPCCH signal.  As Dr. Goldberg explained, "applying the OVSF code to the DPCCH is a special case [that] simply preserves the DPCCH data."  (Teter Decl. Ex. 12, Goldberg Rep. ¶23.)  In other words, Walsh Code 0 "is the identity, so you're getting the same values…within a given cycle the input of that XOR and the output of that XOR *will be the same*."  (Teter Decl. Ex. 14, Goldberg Tr. 56:20-57:2, 58:21-10.)

Because the narrowband DPCCH channel is not changed by Walsh Code 0, the Accused Products do not have the required structure for creating the "spread-spectrum header channel."

---

[7] *See* '793 claim 5: "spread-spectrum means . . . generating a plurality of spread-spectrum channels . . . including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal"; claim 7: "plurality of product devices . . . generating a plurality of spread-spectrum channels . . . including . . . spread-spectrum-header channel generated by multiplying the header frame with a first chip-sequence signal".

**APPLE'S MSJ OF NONINFRINGEMENT**

1  (Teter Decl. Ex. 8, Acampora Rep. ¶306 (█████████████████████████████████

2  ████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████

5  ██████████████

6          As his deposition, Dr. Vojcic conceded the point, admitting that the multiplying the

7  DPCCH signal by Walsh 0 does *not* change the bandwidth or "spread" under the stipulated *GBT1*

8  construction.

9          Q.  And my question was just focusing on the definition from GBT
           1, increasing the bandwidth.  If we use that definition here then you
10          would agree that Walsh code 0 does not spread; correct?

11          A.  *I would agree that Walsh code 0 doesn't spread in the sense of
           increasing the bandwidth; correct.*

12  (Teter Decl. Ex. 6, Vojcic Tr. 31:1-8 (emphasis added); (Teter Decl. Ex. 6, Vojcic Tr. 26:5-24.)

13  Thus, summary judgment is required.

14
15          **2.      The Court Should Reject GBT's New and Erroneous Claim
                    Construction Argument.**

16          Unable to argue that the Accused Products convert the narrowband DPCCH signal into a

17  "spread-spectrum header channel," GBT attempts to raise a new claim construction argument.

18  Throughout this case, GBT did not raise any dispute regarding "spread spectrum" or "spreading."

19  Rather, as the parties stipulated in the *GBT1* case, to create a "spread-spectrum" signal from a

20  narrowband header signal, the bandwidth of the signal must be increased.[8]   At the claim

21  construction hearing, GBT essentially confirmed its use of the *GBT1* definition, explaining to the

22  Court that the '793 patent takes a signal that is not spread and spreads it to the full bandwidth,

23  with more than just a "dumb switch OR gate":

24          So *you don't have a spread spectrum signal coming in*. You do the

25  _____
[8]  *Golden Bridge Technology v. Apple*, Case 1:10-cv-00428-SLR-MPT Dkt. 319 at 11 (April 9,
26  2013) (noting that the parties agreed that "spread spectrum" means "a communication technique
   wherein the transmitted information is *spread in bandwidth* prior to transmission over the channel
27  and then de-spread in bandwidth by the same amount at the receiver") (emphasis added); *GBT 1*,
   937 F. Supp. 2d at 514 (D. Del. 2013) (noting that the parties stipulated that "spreading" means
28  "increasing the bandwidth" of the signal).

1    multiplication through an EXCLUSIVE-OR gate in the preferred
     embodiment and *coming out you have a spread spectrum channel*
2    *so --*

3    THE COURT: It's more than just a dumb switch OR gate?

4    MR. HADLEY**:** *Correct.* It's actually what does the spreading, and
     it's a -- in this preferred embodiment it's – it's described as a
5    plurality of exclusive OR gates that performs a multiplication
     process. And when the chip -- when a is signal from the chip
6    sequence generator is multiplied with *an incoming data signal that*
     *is spread to the full  bandwidth, and the output then is your spread*
7    *spectrum signal.*

8    So we think it's pretty clear from this language that it is the product
     devices 51 through 58 that actually does the spreading and hence is
9    the spread spectrum means.

10   (Teter Decl. Ex. 9, June 26, 2013 Tr. at 140:15-141:5 (emphasis added).)

11           GBT made those statements when it was operating under its old infringement theory,

12   which Dr. Vojcic would not support.  In an effort to salvage GBT's new infringement theory,

13   Dr. Vojcic now argues that the agreed definition of "spreading" is an "outdated definition."

14   (Teter Decl. Ex. 6, Vojcic Tr. 26:5-24.)   His new argument does not appear anywhere in his

15   expert report.   To the contrary, Dr. Vojcic's report suggests that he *agreed* with the stipulated

16   *GBT1* definition, as it includes several examples showing that "spreading" increases the

17   bandwidth and that "spread-spectrum" signals are wideband.  (Teter Decl. Ex. 6, Vojcic Tr. 28:7-

18   15; Teter Decl. Ex. 7, Vojcic Rep. ¶¶36-39 and Figure 5 ("Thus, one could say that the bandwidth

19   of the data signal is spread.").)

20           Even if the Court entertains GBT's attempt to change its infringement theory and reopen

21   claim construction,[9] the Court should rejected GBT's new claim construction argument and grant

22   summary judgment of noninfringement.   Claim terms are presumptively construed according to

23   their "ordinary and customary meaning," which "is the meaning that the term would have to a

24   person of ordinary skill in the art in question *at the time of the invention.*"  *Phillips v. AWH Corp.*,

25   415 F.3d 1303, 1313 (Fed. Cir. 2005) (emphasis added).   GBT filed the patent-in-suit a year

26

27   [9] The Court should not entertain GBT's new claim construction argument, but rather, should
     strike GBT's untimely new infringement theory, which would moot the claim construction
28   question entirely.  (Dkt. No. 296 (moving to strike GBT's untimely new infringement theory).)

1    *before* the RACH patent at issue in *GBT1*.  Thus, the definition of "spreading" and "spread

2    spectrum" that GBT embraced for the patent in *GBT1* cannot possibly have been "outdated" for a

3    patent filed a year earlier.

4            The ordinary meaning of "spread spectrum" when the '793 patent was filed is a

5    communication technique that *increases the bandwidth* of the signal.  (Teter Decl. Ex. 8,

6    Acampora Rep. ¶¶53, 103 ("In the CDMA context, spreading, at a minimum, must increase the

7    bandwidth of the data.").)  As Dr. Acampora explains, a person of ordinary skill in the art would

8    have recognized that the header channel must be spread in order to perform its functions – and the

9    '793 patent illustrates that the "spread-spectrum header channel" is generated by multiplying the

10   header channel by the spreading code.  (Teter Decl. Ex. 8, Acampora Rep. pp. 106-107.)  The

11   '793 patent does not show any example where a *narrowband* header channel is *not* spread, and a

12   person of ordinary skill in the art would understand that in the '793 patent, "spreading of the

13   header channel is critical" for the invention to work.  (Teter Decl. Ex. 8, Acampora Rep. ¶¶106-

14   108.)

15           At both of his depositions, Dr. Vojcic undercut his new claim construction argument.  In

16   May 2013, he stated that the different channels in the '793 patent "would all use the same

17   bandwidth."  (Teter Decl. Ex. 13, Vojcic Tr. (5/25/13) 72:20-12.)  In January 2014, he admitted

18   that a person of ordinary skill in the art would understand that the spread-spectrum header

19   channel ultimately uses the *same bandwidth as the other channels.*  (Teter Decl. Ex. 6, Vojcic Tr.

20   75:25-76:23 ("I think that persons of ordinary skill in the art would understand that header

21   channel in the end would use the same bandwidth as the other channels.  That would be normal

22   assumption.").)  In other words, Dr. Vojcic agreed that the claimed "spread spectrum header

23   channel" must be *spread* as claimed, just like the other channels.  That simply does not take place

24   in the Accused Devices.  As Dr. Acampora explains, the Accused Devices do not spread the

25   DPCCH; applying Walsh 0 to the narrowband DPCCH has no effect:

26           Walsh Code 0 is a special case because multiplying data by Walsh
             Code 0 does not spread the data. In the CDMA context, spreading,
27           at a minimum, must increase the bandwidth of the data. Multiplying
             data by Walsh Code 0 does not increase the bandwidth of the data.
28           Because the data is multiplied by all 1s, the bandwidth of the data

1
2
3
4

> remains unchanged, that is, the data is multiplied by 1, the result of which is just the data itself. In fact, although many textbooks on CDMA show a multiplier to multiply the data by a sequence of all 1s corresponding to Walsh Code (n,0), in fact such a multiplier is unnecessary and is included in these drawings for conceptual understanding only, that is, to show that a bank of orthogonal codes are used to create a corresponding number of parallel channels.

5

(Teter Decl. Ex. 8, Acampora Rep. ¶53.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Furthermore, although the time for new claim construction theories has long since passed, the extrinsic evidence overwhelmingly supports the stipulated *GBT1* construction.  (Teter Decl. Ex. 15 (Schilling et al., "Spread Spectrum for Mobile Communications" (1991) at 313-14 ("The idea behind spread spectrum is to transform a signal with bandwidth *B*ss into a noise-like signal of much larger bandwidth *B*ss"; "a spread spectrum system . . . requires . . . signal spreading by means of a code."); Teter Decl. Ex. 16, Gibson, ed., *The Mobile Communications Handbook* (2002) at 15-1, 15-13) ("Spread spectrum is a communication technique wherein the transmitted modulation is *spread* (increased) in bandwidth prior to transmission over the channel and then *despread* (decreased) in bandwidth by the same amount at the receiver. . . ."); Teter Decl. Ex. 17, Buehrer, *Code Division Multiple Access (CDMA)* (2006)) at 23 ("Spread spectrum can be defined as any modulation technique that uses a bandwidth that is well beyond what is necessary for the data rate being transmitted and uses a pseudo-random signal to obtain the increased bandwidth."); Teter Decl. Ex. 19 (Pickholtz et al., "Theory of Spread-Spectrum Communications—A Tutorial" (1982) at 855 ("Spread spectrum is a means of transmission in which the signal occupies a bandwidth in excess of the minimum necessary to send the information; the band spread is accomplished by means of a code which is independent of the data, and a synchronized reception with the code at the receiver is used for despreading and subsequent data recovery.").

23

24

25

26

27

Without any support in the record, Dr. Vojcic argues that the claims should be construed with reference to the accused WCDMA standard.  At his deposition, he argued that the accused standard refers to "two stages of spreading", and thus, persons of ordinary skill in the art would view the OVSF codes as "spreading" codes.  (Teter Decl. Ex. 6, Vojcic Tr. 27:6-28:6.)  The Court should reject Dr. Vojcic's new argument for three reasons.

28

First, "claims may not be construed with reference to the accused device."  *NeoMagic*

1    *Corp. v. Trident Microsystems, Inc.,* 287 F.3d 1062, 1074 (Fed. Cir. 2002) (citing *SRI Int'l v.*

2    *Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc)).  In contrast to

3    WCDMA, which uses a complex scrambling process, the '793 patent spreads the header channel

4    before any combination, without any further scrambling or spreading step.  (Teter Decl. Ex. 8,

5    Acampora Rep. ¶55).  Thus, although creating a "spread spectrum header channel" is "critical" to

6    the '793 patent, WCMDA simply omitted that feature.  (Teter Decl. Ex. 8, Acampora Rep. ¶¶106-

7    108.)  The '793 claims cannot be construed with respect to an architecture that the '793 patent

8    does not describe.

9        Second, Dr. Vojcic's new argument flies in the face of the intrinsic evidence, including

10   the claim language and common sense.  If nothing spreads a narrowband signal, that signal does

11   not become a "spread-spectrum" signal.  (Teter Decl. Ex. 8, Acampora Rep. ¶¶104-108; Teter

12   Decl. Ex. 6, Vojcic Tr. 28:7-15; Teter Decl. Ex. 7, Vojcic Rep. ¶¶36-39 and Figure 5.)

13       Third, persons of ordinary skill in the art recognize that Dr. Vojcic's argument (referring

14   to Walsh Code 0 as a "spreading" code) is not valid.  As the *WCDMA Handbook* explains:

15           Here and throughout the remainder of this section the term
             'spreading' is used to define the procedure of taking a data
16           sequence and a channelisation code and producing a sequence of
             chips. *This definition, however, is not completely valid. The term*
17           *'spreading' comes from the physical manipulation of the spectrum*
             *of the transmitted data signal. The problem is that some of the*
18           *channelisation codes that are allowable have little if no effect on*
             *the data spectrum*, whilst other codes can expand the spectrum
19           considerably, all of this independent of the commodity spreading
             factor.
20

21   (Teter Decl. Ex. 18 (Richardson, *WCDMA Design Handbook* (2005) at 72 (emphasis added);

22   Teter Decl. Ex. 8, Acampora Rep. ¶53 (Walsh 0 "is included in these drawings for conceptual

23   understanding only, that is, to show that a bank of orthogonal codes are used to create a

24   corresponding number of parallel channels").  Accordingly, the Court should reject GBT's new

25   claim construction argument, and enter summary judgment of noninfringement.

26       **D.    The Court Should Grant Summary Judgment of Noninfringement Under the
                 Doctrine of Equivalents.**

27       GBT has not substantiated any theory of infringement under the doctrine of equivalents

28   ("DOE").  To survive summary judgment on the issue of DOE,

> [A] patentee must . . . provide particularized testimony and linking argument as to the "insubstantiality of the differences" between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. Such evidence must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) (affirming summary judgment of no DOE over conclusory testimony) (citation omitted). *See also*, *e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318 (Fed. Cir. 2011) (same).

GBT does not present a viable DOE theory. GBT's Infringement Contentions expressly do not assert DOE under Patent Rule 3-1(e), suggesting only that GBT "reserves the right" to move for leave to raise DOE after *Markman*. (Teter Decl. Ex. 5 at 4.) The Court conducted *Markman* in June 2013, and GBT did not seek leave to raise DOE.

GBT's expert, Dr. Vojcic, does not express any substantive DOE opinion, and the Patent Rules would prohibit him from newly raising DOE at this late stage. *See*, *e.g.*, *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, 2013 WL 4537838, *1-2 (N.D. Cal. Aug. 22, 2013) (excluding DOE theory and late-disclosed infringement theories). Dr. Vojcic offers a generic conclusion that the Accused Products infringe "both literally and under the doctrine of equivalents" and "all limitations of claim 5 [6, and 7] of the '793 patent are met either literally or if not literally, under the doctrine of equivalents." (Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 15, 84, 93, 103.) However, Dr. Vojcic does not express any opinion that the Accused Devices infringe under DOE, on a limitation-by-limitation basis. To the contrary, Dr. Vojcic states: "For the avoidance of doubt, unless I indicate that I am opining that the Accused Devices infringe on the basis of the doctrine of equivalents, my opinion is that the Accused Devices literally infringe the asserted claims." (Teter Decl. Ex. 7, Vojcic Rep. ¶ 74.) When discussing each claim limitation, he does not provide any DOE opinion at all, let alone a substantial, particularized opinion. (*Id.*, *passim*.)

1  Dr. Vojcic's cursory remarks are insufficient as a matter of law.  He does not provide the

2  requisite "particularized testimony and linking argument," "on a limitation-by-limitation basis,"

3  required to withstand summary judgment.  *Network Commerce*, 422 F.3d at 1363.

4  **E.    Apple Is Not Liable For Indirect Infringement.**

5  **1.    Apple Has Not Induced Infringement.**

6  GBT's operative Infringement Contentions do not allege indirect infringement under

7  Patent Rule 3-1(d).  (Teter Decl. Ex. 5, at 1-5.)  GBT did not move for leave to amend its

8  contentions under Patent Rule 3-6, and has no good cause to raise indirect infringement after the

9  close of fact discovery.  Even if GBT were permitted to raise indirect infringement, summary

10  judgment is proper because there is no evidence to support a finding of indirect infringement.

11  First, "[t]here can be no inducement or contributory infringement without an underlying

12  act of direct infringement."  *In re Bill of Lading*, 681 F. 3d 1323, 1333 (Fed. Cir. 2012) (citation

13  omitted).  As set forth above, there is no evidence that the Accused Products infringe, and thus no

14  evidence that any user or other party has directly infringed.

15  Second, GBT presents no evidence whatsoever that Apple had actual knowledge of the

16  '793 patent.  GBT never notified Apple of alleged infringement of the '793 patent before filing

17  suit in May 2012, and GBT cites no evidence that Apple has induced acts since that time that

18  Apple knew would cause infringement.  *See Vasudevan Software, Inc. v. TIBCO Software Inc.*,

19  No. C 11-6638 RS, 2012 WL 1831543, at *2 (N.D. Cal. May 18, 2012); *Chalumeau Power Sys.

20  LLC v. Alcatel-Lucent*, No. 11-1175-RGA, 2012 WL 6968938, at *1 (D. Del. July 18, 2012);

21  *Pacing Techs., LLC v. Garmin Int'l, Inc.*, No.12-CV-1067, 2013 WL 444642, at *2 (S.D. Cal.

22  Feb. 5, 2013).  GBT presents no evidence that Apple has specifically induced any acts that it

23  knows constitute infringement.  "[I]nduced infringement under § 271(b) requires knowledge that

24  the induced acts constitute patent infringement."  *Global-Tech Appliances, Inc. v. SEB SA*, 131 S.

25  Ct. 2060, 2068 (2011).

26  Third, Apple cannot have had the mental state for inducement when even GBT and the

27  inventor, Dr. Schilling, did not believe that the '793 patent covers HSUPA.  In 2005, GBT

28  announced in Federal Court that the '793 and the rest of GBT's portfolio was "virtually

1  valueless."  (Teter Decl. Ex. 2, Complaint ¶3.)  Dr. Schilling opined that the 3GPP defendants

2  removed a technology over which GBT had patents (CPCH) in favor of technology that the

3  antitrust defendants (not GBT) developed and patented (HSUPA).  (Teter Decl. Ex. 3, Schilling

4  Tr. 194:3-197:6; Teter Decl. Ex. 4, Schilling Antitrust Tr. 219:5-220:2.)

5       Fourth, GBT offers nothing more than a conclusory opinion that "[i]t is my understanding

6  that Apple has knowingly made and sold the Accused Devices for use in compliance with the

7  standard and knew of the Patent-in-Suit since at least August 2012."  (Teter Decl. Ex. 7, Vojcic

8  Rep. ¶¶ 93, 104.)  But the only basis he cites for his "understanding" is three Apple user guides

9  from 2009-2011, none of which show any intent by Apple to infringe the '793 patent.  (*Id*.)

10      Fifth, the functionality GBT accuses is only a small part of baseband chipsets, and Apple

11  did not design or develop the basebands.  GBT argues the '793 patent is standard-essential, but

12  Dr. Vojcic admits the standard "does not dictate how channel timing and synchronization are to

13  be accomplished," with respect to the claimed "processor . . . for synchronizing" claim element.

14  (Teter Decl. Ex. 7, Vojcic Rep. ¶¶ 78, 97, Ex. A at 2-3, 9-10.)

15            **2.      Apple Has Not Contributed To Infringement.**

16      Contributory infringement requires both (1) direct infringement, and (2) specific

17  knowledge that a provided material or apparatus is especially made or adapted to infringe.  35

18  U.S.C. § 271(c); *Global-Tech*, 131 S. Ct. at 2067-68.  For the same reasons set forth above, there

19  is no evidence of any direct infringement, and no evidence sufficient to find that Apple "knew"

20  that its Accused Products would infringe.

21      Furthermore, GBT cannot contest that the accused iPhones and iPads have a "substantial

22  noninfringing use."  35 U.S.C. § 271(c).  Dr. Vojcic argues that the Accused Products "have no

23  substantial non-infringing uses," with no basis whatsoever.  (Teter  Decl. Ex. 7, Vojcic Rep. ¶¶

24  93, 104.)  The accused iPhones and iPads, and their accused baseband chipsets, indisputably have

25  substantial non-infringing uses.  The accused HSUPA functionality is only one of several optional

26  baseband functions for uplinking (uploading) data in a 3G cellular network.  It is undisputed that

27  the accused products can provide full functionality, including cellular uplink functionality, in an

28  area *without* HSUPA support (i.e., the iPhones and iPads can uplink using either legacy 3G

channels or advanced 4G LTE channels).  In addition, Dr. Acampora identifies other substantial non-infringing uses, such as: (1) functions unrelated to 3G wireless communication, such as listening to music, taking and viewing photos and movies, and clock and calendar functions; and (2) functions that do not involve HSUPA, such as sending and receiving data and browsing the Web over Wi-Fi and all data downlink (downloading) functionality.  (Teter Decl. Ex. 8, Acampora Rep. ¶¶ 396-398.)  Summary judgment is required.

## VI.  CONCLUSION

GBT abandoned its original theory, and has no basis to allege infringement.  The operation of the products is not in dispute and no reasonable jury could find for GBT. Accordingly, the Court should grant summary judgment of noninfringement.

Dated: January 30, 2014

/s/ Timothy S. Teter
Timothy S. Teter (171451)
teterts@cooley.com
Lowell D. Mead (223989)
lmead@cooley.com
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:    (650) 843-5000
Facsimile:     (650) 849-7400

*Attorneys for Defendant Apple Inc.*

1

### **CERTIFICATE OF SERVICE**

2

   The undersigned certifies that counsel of record who are deemed to have consented to

3

electronic service are being served on January 30, 2014, with a copy of this document via the

4

Court's CM/ECF system per Local Rules.  Any other counsel will be served by electronic mail,

5

facsimile, overnight delivery and/or first class mail on this date.

6

7

                                          By:   */s/ Timothy S. Teter*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28