COOLEY LLP
TIMOTHY S. TETER (171451) (teterts@cooley.com)
LOWELL D. MEAD (223989) (lmead@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

Attorneys for Defendant
Apple Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Golden Bridge Technology Inc., | Case No.  5:12-cv-04882-PSG |
| Plaintiff, | **APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |
| v. | |
| Apple Inc., | **Date: March 4, 2014** |
| Defendant. | **Time: 10:00 a.m.**<br>**Courtroom: 5, 4th Floor**<br>**Judge: The Hon. Paul S. Grewal** |

**Table of Contents**

Page

I. INTRODUCTION .................................................................................................. 1

II. STATEMENT OF ISSUES TO BE DECIDED ...................................................... 2

III. STATEMENT OF FACTS ...................................................................................... 2

    A. The '793 Patent Purports to Improve Efficiency by Removing Header from Some Data Channels ......................................................................................... 2

    B. GBT's Conception Story—Dr. Garodnick had only a "Top Level" "Starting Point" to Include Header in Fewer than All of the Channels. .............. 4

        1. Dr. Garodnick Testified that GBT's WIMS Proposal Included Header in Every Channel ......................................................................... 4

        2. Dr. Garodnick Testified He Conceived only of the "Starting Point of the Invention" for a "Receiver" in August 1997 ................................... 4

    C. The Inventors Handed the Idea to GBT's Patent Prosecutor, Who Produced No Documents and Is Not a Witness in this Case ................................................. 5

    D. The Prosecution—GBT Cited only Three References, Including Dr. Schilling's '951 Patent, and the PTO Allowed the Claims without Rejection ........................................................................................................... 6

    E. The Matsushita '558 Patent Discloses the Alleged '793 Invention, Including Header in Fewer than All of the Channels.............................................. 7

IV. LEGAL STANDARDS ........................................................................................... 9

V. ARGUMENT ........................................................................................................... 9

    A. There Is No Material Dispute about the Level of Ordinary Skill in the Art ......... 9

    B. The '793 Patent Is Not Entitled to a Pre-Filing Priority Date............................ 10

        1. GBT Does Not Have Corroborated Evidence of Prior Conception .......... 10

            a. The Garodnick Document Is Not Independently Corroborated .................................................................................... 10

            b. The Garodnick Document Does Not Disclose The Complete Invention Including The Claimed Processor For Synchronizing ...................................................................... 11

        2. GBT Has No Evidence of Continuous Diligence to a Reduction to Practice ................................................................................................... 12

    C. Matsushita '558 Invalidates the Asserted Claims ............................................. 14

        1. Matsushita '558 Discloses a Multichannel Spread Spectrum Transmitter (Claims 5-7)......................................................................... 14

        2. Matsushita '558 Discloses the Header Device for Concatenating Header and Data to Generate a Header Frame (Claims 5-7) .................... 14

        3. Matsushita '558 Discloses Claimed Processor for Synchronizing Using Timing Data from the Header (Claims 5-7) .................................. 16

        4. Matsushita '558 Discloses the Claimed Spread-Spectrum Means (Claims 5-6) and Plurality of Product Devices (Claim 7)........................ 19

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**Table of Contents**
**(continued)**

Page

5.   Matsushita '558 Discloses the Claimed Combiner (Claims 5-7)............. 21

6.   Matsushita '558 Discloses the Carrier Subsystem (Claims 5-7)............. 21

7.   Matsushita '558 Discloses the Means for Generating Chip-Sequence Signals (Claim 6) and Chip-Sequence Generator (Claim 7) .......................................................................................................... 22

8.   Matsushita '558 Discloses the Remaining Limitations of Dependent Claim 6 ................................................................................................... 22

D.   GBT Offers No Evidence of Secondary Considerations of Non-Obviousness ........................................................................................... 23

VI.   CONCLUSION ........................................................................................... 23

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basmadjian v. Landry,*
    54 U.S.P.Q.2d 1617 (Pat. App. 2000) ................................................................... 13

*Coleman v. Dines,*
    754 F.2d 353 (Fed. Cir. 1985) ............................................................................... 10

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004) ............................................................................. 13

*Environ Prods., Inc. v. Furon Co.,*
    215 F.3d 1261 (Fed. Cir. 2000) ............................................................................. 13

*Graham v. John Deere Co. of Kansas City,*
    383 U.S. 1 (1966) ...................................................................................................... 9

*Griffith v. Kanamaru,*
    816 F.2d 624 (Fed. Cir. 1987) ............................................................................... 13

*Hybritech v. Monoclonal Antibodies,*
    802 F.2d 1367 (Fed. Cir. 1986) ............................................................................. 11

*Illumina v. Complete Genomics,*
    2013 WL 1282977 (N.D. Cal. Mar. 26, 2013) ............................................... 10, 13

*In re Nelson,*
    420 F.2d 1079 (C.C.P.A. 1970) ............................................................................ 13

*KSR v. Teleflex,*
    550 U.S. 398 (2007) ..................................................................................... 9, 19, 20

*Liang v. Borger,*
    214 U.S.P.Q. 368 (Bd. Pat. App. & Int. 1981) ..................................................... 13

*Martek Biosciences v. Nutrinova,*
    579 F.3d 1363 (Fed. Cir. 2009) ....................................................................... 10, 11

*Medichem v. Rolabo,*
    437 F.3d 1157 (Fed. Cir. 2006) ............................................................................. 11

*Monsanto Co. v. Mycogen Plant Sci., Inc.,*
    261 F.3d 1356 (Fed. Cir. 2001) ............................................................................. 13

*Naber v. Cricchi,*
    567 F.2d 382 (C.C.P.A. 1977) .............................................................................. 13

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Case No. 5:12-cv-04882-PSG         iii.         APPLE'S MSJ OF INVALIDITY

*Singh v. Brake,*
    317 F.3d 1334 (Fed. Cir. 2003).................................................................. 10

*Stern v. Trs. of Columbia Univ.,*
    434 F.3d 1375 (Fed. Cir. 2006).................................................................. 12

**STATUTES**

35 U.S.C. § 102 ......................................................................................... 1, 9

35 U.S.C. § 103(a) .................................................................................... 1, 9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 (c).................................................................................... 9

PLEASE TAKE NOTICE that on March 4, 2014 at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Paul S. Grewal, Magistrate Judge of the United States District Court for the Northern District of California, there will be a hearing on Defendant Apple Inc.'s ("Apple") motion for summary judgment that the asserted claims of U.S. Patent No. 6,075,793 are invalid.

## RELIEF REQUESTED

Apple requests that the Court enter summary judgment that claims 5, 6, and 7 of the '793 patent are invalid under 35 U.S.C. §§ 102-103.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **INTRODUCTION**

The '793 patent is directed to a multichannel CDMA transmitter that transmits a header channel (which carries a pilot signal) and multiple data channels. Multichannel CDMA systems were well-known in the prior art, and GBT did not claim to have invented them. Rather, GBT argued that it invented the idea of "concatenating" header and data in only one channel, while at least two of the other channels carry only data. GBT cited only three references during prosecution and obtained the '793 patent, but numerous prior art references that the PTO did not consider, including the Matsushita '558 patent, disclose the alleged invention.

GBT cannot raise any genuine issue of fact precluding summary judgment of invalidity in view of the '558 patent. First, the '558 patent is prior art. GBT does not have legally sufficient evidence of prior conception and diligent reduction to practice, and therefore, is limited to the filing date. Second, the '558 patent discloses every element of each of the asserted claims, either expressly or inherently. In discovery responses, GBT argued that the Matsushita '558 patent does not disclose the claimed "processor" for synchronizing data channels using timing data from the header. However, GBT's expert, Dr. Vojcic, admitted that a person of ordinary skill in the art would understand that timing data in the '558 header channel (the RU and RD data) would be used to time or synchronize the data channels. Thus, GBT and Dr. Vojcic argue that instead of using a "processor," the '558 patent could have used a "pre-wired" circuit to achieve the synchronization function. The argument is a red herring. The '793 patent does not draw a

distinction between a processor that is "pre-wired" and one that is not. To the contrary, the '793 patent simply depicts a rectangular box labeled "processor." In any event, even if the word "processor" literally excludes "pre-wired" circuitry, using a processor would have been a matter of design choice, well within the grasp of a person of ordinary skill in the art. GBT presents no evidence to the contrary and no evidence of secondary considerations of non-obviousness. Summary judgment is required.

## II. STATEMENT OF ISSUES TO BE DECIDED

1. Whether the asserted '793 claims are limited to the February 6, 1998 filing date, where GBT does not have corroborated evidence of prior conception or continuous diligence to a reduction to practice.

2. Whether Matsushita '558 (alone or in combination with the knowledge of a person of ordinary skill) invalidates the asserted claims.

## III. STATEMENT OF FACTS

### A. The '793 Patent Purports to Improve Efficiency by Removing Header from Some Data Channels.

GBT filed the '793 patent application on February 6, 1998, naming inventors Donald Schilling and Joseph Garodnick. According to the '793 patent, multichannel spread spectrum transmitters were known, but in one embodiment in the prior art, each channel would include 50% header, so the efficiency remains 50% for each channel (*i.e.*, the header consumes 50% of the bandwidth in the '793 patent example). The '793 patent states:

> Another method offered by prior art is to use parallel spread-spectrum channels, with each channel defined by a different chip-sequence signal. In this method, by using multiple correlators or matched filters, orthogonal codes are sent simultaneously, thereby increasing the data rate while still enjoying the advantage of a high processing gain. The multiple spread-spectrum channels merely behave as multiple users to a single location. However, the efficiency remains at 50%.

(Mead Decl. Ex. 1, '793 col. 1:54-63 (emphasis added).)

The '793 purports to solve the alleged problem by including header information in fewer than all of the channels. The '793 "Summary of the Invention" states:

SUMMARY OF THE INVENTION

> A general object of the invention is to increase data transmission efficiency by sending data through parallel spread-spectrum channels while *including headers in fewer than all of the channels.*

('793 Summary of the Invention, col. 1:65-2:2 (emphasis added).)   To achieve the alleged advance over the prior art, the '793 patent states that "the header device" "concatenates a header to a first data-sequence signal on the first data-sequence channel to generate a header frame."

> The present invention broadly includes a multichannel-spread-spectrum system for communicating a plurality of data-sequence signals from a plurality of data channels, over a communications channel. The multichannel-spread-spectrum system includes, at a transmitter, a header device, a processor, a chip-sequence generator, a plurality of product devices, a combiner, and a transmitter subsystem. At a receiver, the system may further include a translating device, a header-matched filter, a receiver processor, and a plurality of data-matched filters.

> *At the transmitter, the header device concatenates a header to a first data-sequence signal on the first data-sequence channel to generate a header frame.*

('793 Summary of the Invention, col. 2:3-15 (emphasis added).)

Figures 1 and 2 of the '793 patent, reproduced below, show an alleged prior art channel (with header symbols occupying much of the channel capacity) and the multiple channels of the invention, only one of which has header information.  In both the prior art (FIG. 1) and in the multichannel description (FIG. 2, Code 1) the header symbols are concatenated with the data information (Fields 1, 2 … 31).  The alleged invention is thus not the idea of concatenating header and data—that was known in the art—but rather, the idea of doing so on fewer than all of the channels sent by a multichannel transmitter.

| '793 FIG 1 – The Prior Art<br>Header Information in *Every* Channel | '793 FIG 2 – The Claimed Invention<br>Header Information in *Fewer than All of the* *Channels* |
|---|---|



Figure 3 shows the transmitter structure, including the "header device" that concatenates header to data to form the header frame. ('793 Fig. 3.)

**B.     GBT's Conception Story—Dr. Garodnick had only a "Top Level" "Starting Point" to Include Header in Fewer than All of the Channels.**

**1.     Dr. Garodnick Testified that GBT's WIMS Proposal Included Header in Every Channel.**

Dr. Garodnick testified that he conceived of the invention as an improvement to the "Wireless Multimedia and Messaging Services (WIMS)" proposal that GBT submitted to a standardization working group. (Mead Decl. Ex. 4, Garodnick Tr. 54:4-20, 58:8-59:6.) According to Dr. Garodnick, WIMS provided that multiple channels could be used on the uplink and the same frame structure—with headers in each channel—would be used for every channel. (*Id*.) Thus, Dr. Garodnick believed that GBT's WIMS proposal was inefficient. (Mead Decl. Ex. 4, Garodnick Tr. 65:13-66:9.)

**2.     Dr. Garodnick Testified He Conceived only of the "Starting Point of the Invention" for a "Receiver" in August 1997.**

Dr. Garodnick testified that he conceived of the idea of the '793 patent invention around August 1997. (Mead Decl. Ex. 4, Garodnick Tr. 91:14-21.) He produced a document that he testified was a Microsoft Word document that he stated has an electronic "creation date" of August 1, 1997. (Mead Decl. Ex. 4, Garodnick Tr. 94:17-96:13; Mead Decl. Ex. 5, Deposition Exhibit 27.) The cover page states "United States Patent Application" for a spread spectrum

"RECEIVER"—not a "transmitter," as claimed in the '793 asserted claims. (Mead Decl. Ex. 6, Schilling Tr. at 1.) The next page is entitled "The Problem" and discusses that certain header transmission techniques would be inefficient. (*Id*. at 2.) The next page is titled "The Solution" and provides the following text, plus a figure similar to '793 patent Figure 2:

> The improvement offered by this invention is to use parallel codes but instead of replicating the frame format shown above for each code, only one frame contains headers while the other frames sent in parallel with different codes devote the entire time for data. Therefore, the efficiency is increased. For example, a system constructed for 384kbps data rate, FEC rate ½ convolutional coding, 25.6 kbps maintenance channel (for power control, CRC, etc.), Processing Gain of 192, utilizes 16 parallel codes and yields a 96.9% efficiency.

(*Id*. at 3.)

Dr. Garodnick testified the Word Document was only a "starting point of the invention," to begin the process of discussion with GBT's patent prosecutor David Newman:

> Q. Were you finished? Was the invention all done?
>
> MR. HADLEY: Objection. Form.
>
> A. This is the method that we used. We -- *this would be the starting point of the invention.* Come up with the idea, describe it, describe the problem, describe the solution; *all top level* and say, Okay, David; do your thing. That would *begin* the -- the process of the application.

(Mead Decl. Ex. 4, Garodnick Tr. 143:10-18 (emphasis added).)

Dr. Schilling testified that he has no recollection of a date of conception but guesses it was around 2-3 months before February 1998. (Mead Decl. Ex. 6, Schilling Tr. 41:6-42:18.) He specifically avoided keeping invention records: "if you do that, the defendants, like yourselves, are going to argue that I just made it up at the last minute." (Mead Decl. Ex. 6, Schilling Tr. 150:24-152:11.)

**C.    The Inventors Handed the Idea to GBT's Patent Prosecutor, Who Produced No Documents and Is Not a Witness in this Case.**

Dr. Garodnick and Dr. Schilling testified that they handed off the idea to GBT's patent prosecutor Dr. Newman, and the '793 patent file history reflects that an application was filed on February 6, 1998. GBT produced no documents evidencing any work by Dr. Newman on the

patent application. GBT committed that Dr. Newman will not testify at trial in this case, and accordingly he was not deposed. (Mead Decl. Ex. 6, Email from R. Dorman (9/19/2013).)

### D. The Prosecution—GBT Cited only Three References, Including Dr. Schilling's '951 Patent, and the PTO Allowed the Claims without Rejection.

After filing the application, the inventors cited only three prior art references during prosecution, including U.S. Patent No. 5,166,951, a patent filed in 1991 naming Dr. Schilling as sole inventor. (Mead Decl. Ex. 7.) Dr. Schilling testified that the '793 patent is very close to his earlier '951 patent—from his perspective, the '793 patent "came from the '951." (Mead Decl. Ex. 6, Schilling Tr. 43:9-44:10.) Dr. Schilling confirmed that the '951 patent discloses most of the elements of the '793 patent, including (1) a multichannel spread spectrum transmitter, (2) transmitting multiple data channels, (3) a pilot generator, (4) a separate channel for a pilot for timing and synchronization, and (5) a combiner/adder that algebraically combines the signals. (Mead Decl. Ex. 6, Schilling Tr. 52:25-55:10.) The following annotations show the structural similarities.

| '793 FIG. 3 (Annotated) | '951 FIG. 2 (Annotated) |
|---|---|
|  | |

As '951 patent Figure 2 shows, the '951 patent did not send pilot (header) on every channel. Rather, it sent pilot on a dedicated channel without data, defined by the "Generic Chip Code Generator." The '951 patent taught that the generic chip code signal both serves as a pilot and provides timing and synchronization, so that the plurality of data channels are synchronized using timing data from the header:

> *Synchronous timing of the plurality of demultiplexed-data signals*
> *and the plurality of message-chip-codes signals is provided by the*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

*generic-chip-code signal*, although other sources can be used such
as a common clock signal for synchronization.

(Mead Decl. Ex. 7, '951 col. 13:12-16 (emphasis added).)  The '951 patent also noted that instead of using timing data from the header, a common clock signal could be used as a matter of design choice.  (*Id.*)  The PTO allowed the '793 claims without rejection.

### E. The Matsushita '558 Patent Discloses the Alleged '793 Invention, Including Header in Fewer than All of the Channels.

The Matsushita '558 patent (U.S. Patent No. 6,175,558 to Miya, assigned to Matsushita) was filed December 30, 1997, claiming priority to a Japanese application filed in June 1995. (Mead Decl. Ex. 2.)  The '558 patent teaches the '793 patent's sole alleged point of novelty— concatenating header (pilot) and data in one channel, while transmitting data without header in other parallel channels: "the transmitting end can reduce interference with the pilot channel by transmitting the *pilot symbols inserted into one channel only*."  ('558 col. 5:18-25 (emphasis added).)  The patent explains that including a pilot (PL) signal in only one channel enhances efficiency: "since it is all right to arrange the PL signal in one code only, transmitting efficiency in the multi code transmission can be enhanced because the information data can be transmitted to the PL signal transmission period 1401 in other channels."  ('558 col. 10:39-56.)

The '558 patent depicts the pilot concatenated with data in a first channel, and parallel channels transmitting only data, such as Figure 14, juxtaposed here with '793 Figure 2.



| '793 FIG 2 | '558 FIG 14 |
|---|---|

The structural disclosures of the earlier-filed '558 patent and the later-filed '793 patent are also very similar, as shown in the an annotated comparison of their multichannel transmitters:

| '558 FIG. 12 (Annotated) | '793 FIG. 3 (Annotated) |
|---|---|



The '558 patent shows the transmitter structure from right to left, while the '793 patent shows the transmitter structure viewed from the other side, from left to right. Inverting the '558 patent drawing, as shown below, further highlights the similarity between the designs.

| '558 FIG. 12 (Annotated and Inverted) | '793 FIG. 3 (Annotated) |
|---|---|



GBT's answer to Apple's Interrogatory No. 10, seeking the basis for GBT's contention that the Matsushita '558 patent does not anticipate or render obvious the asserted claims, alleged:

> (1) the '558 patent may not be prior art, (2) the '558 patent does not disclose a processor for synchronizing a plurality of spread-spectrum data channels to the header in a first data channel, and (3) the '558 patent does not disclose spread-spectrum data channels without a header frame.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

(Mead Decl. Ex. 3, GBT's Response to Interrogatory No. 10)  As discussed further below, none of these alleged distinctions—or any other argument GBT has put forth—raises a triable issue to preclude a ruling of obviousness.

## IV.  LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  A patent is anticipated if a prior art reference discloses all of the elements, expressly or inherently.  35 U.S.C. § 102.  A patent is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  *See KSR v. Teleflex,* 550 U.S. 398, 406 (2007).  Obviousness is a question of law based on (1) the scope and content of the prior art, (2) the differences between the claims and prior art, (3) the level of ordinary skill in the pertinent art, and (4) objective indicia of nonobviousness.  *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

## V.  ARGUMENT

### A.  There Is No Material Dispute about the Level of Ordinary Skill in the Art.

For purposes of this motion, there is no material difference between the levels of ordinary skill identified by Apple's expert Dr. Acampora and GBT's expert Dr. Vojcic.[1]  Dr. Vojcic opined that his opinions would be the same under Dr. Acampora's identified level.  (Mead Decl. Ex. 8, Vojcic Rep. ¶ 23.)

---

[1] *See* Mead Decl. Ex. 10, Acampora Rep. ¶¶ 46-48 ("at least a master's degree in electrical engineering with 3-4 years of practical experience in the wireless communications, or the equivalent thereof"); Mead Decl. Ex. 8, Vojcic Rep. ¶ 22 ("a Bachelor's Degree in Electrical Engineering, Telecommunications or equivalent field of study and 4-5 years' experience in the field of wireless telephone communication, or a Master's Degree in Electrical Engineering, Telecommunications or equivalent field of study and 1-2 years' experience in the field of wireless telephone communication").

**B.     The '793 Patent Is Not Entitled to a Pre-Filing Priority Date.**

The '793 patent is not entitled to a priority date earlier than its February 6, 1998 filing date—including any date earlier than December 30, 1997, the filing date of Matsushita '558—because GBT does not have substantial corroborated evidence that (1) the inventors conceived of the inventions by an earlier date, and (2) the inventors were continuously diligent in reducing to practice the invention from that date through the '793 patent filing on February 6, 1998.

"Priority of invention and its constituent issues of conception and reduction to practice are questions of law predicated on subsidiary factual findings." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003).   Summary judgment is proper when the patentee fails to provide substantial evidence of conception and diligent reduction to practice.   *See, e.g.*, *Illumina v. Complete Genomics*, 2013 WL 1282977, at *7-15 (N.D. Cal. Mar. 26, 2013) (granting summary judgment of invalidity where patentee failed to provide substantial evidence of pre-filing diligence for a two-month critical period).

**1.     GBT Does Not Have Corroborated Evidence of Prior Conception.**

"Conception is the formation in the mind of the inventor of a *definite and permanent* idea of the *complete and operative* invention, as it is therefore to be *applied in practice*." *Singh*, 317 F.3d at 1340 (emphasis added).   To show conception, "a party must show *possession of every feature* recited in the count, and that *every limitation of the count must have been known to the inventor* at the time of the alleged conception." *Coleman v. Dines,* 754 F.2d 353, 359 (Fed. Cir. 1985) (emphasis added)

**a.     The Garodnick Document Is Not Independently Corroborated.**

The Garodnick Document, purportedly dating from August 1997, is insufficient evidence of pre-filing conception as a matter of law.   First, GBT has produced no evidence corroborating Dr. Garodnick's testimony about this document, which he said he found on his computer shortly before his deposition, "printed it and ran." (Mead Decl. Ex. 4, Garodnick Tr. 94:23-96:2.)   An inventor "must provide independent corroborating evidence in addition to his own statements and documents." *Martek Biosciences v. Nutrinova*, 579 F.3d 1363, 1375 (Fed. Cir. 2009) (emphasis added).   "[T]he corroboration requirement provides an additional safeguard against courts being

deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony." *Medichem v. Rolabo*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). GBT has provided no "independent corroborating evidence" that anyone else saw Dr. Garodnick's document prior to February 1998; GBT has only "his own statements and documents" which are legally insufficient to establish conception. *Martek*, 579 F.3d at 1375.

### b. The Garodnick Document Does Not Disclose The Complete Invention Including The Claimed Processor For Synchronizing.

Even if it were properly corroborated, the Garodnick Document does not evidence conception of the "complete and operative invention, as it is hereafter to be applied in practice," of the "transmitter" recited in '793 claims 5-7. *Hybritech v. Monoclonal Antibodies,* 802 F.2d 1367, 1376 (Fed. Cir. 1986). Drawing all inferences in GBT's favor, the Garodnick Document reflects only, at best, an incomplete suggestion, with no description of how any CDMA transmitter might be applied in practice. (Mead Decl. Ex. 10 Acampora Rep. ¶¶ 107-11.) Contrary to the Garodnick Document, the claimed invention is not an abstract "starting point" about placing header bits (though that is its sole point of alleged novelty). Claims 5-7 recite an apparatus with specific components for transmitting a multichannel signal, including (1) a header device for concatenating header and data, (2) a processor, coupled to the header device, for synchronizing data channels using timing data from the header, and (3) structures for spreading, combining, and transmitting the signal. ('793 claims 5-7.)

Dr. Garodnick admitted his document does not show a complete invention—it was only a "top level" "starting point" to begin the discussion. (Mead Decl. Ex. 4, Garodnick Tr. 143:11-145:24.) It was "not enough" to convey any complete invention:

> Q. Did you feel that Exhibit 27 was enough such that you could give it to a person of ordinary skill in the art and they could go ahead and make and use the invention without undue experimentation?
>
> MR. HADLEY: Objection. Form.
>
> A. Let me see. I -- *it was not enough. And that was not its intent*.
>
> Q. Why wasn't it enough? What was missing?
>
> A. Well, *the entire specification's not there, all the drawings*.

*How would somebody implement? How would -- how could this be reduce to practice by somebody normally skilled in the art is not there.*

Q. So you needed more, which is what you ended up filing in the '793 patent application itself; is that right?

A. Yes.

Q. You said it wasn't the intent. Why wasn't it the intent?

A. You -- why wasn't it the intent? *There's not enough information here to know what -- to reduce to practice.*

Q. Without undue experimentation.

A. Well --

MR. HADLEY: Objection to the form.

A. -- you know, it's – *it's a high level document. It's not intended for somebody normally skilled in the art to implement. It was intended to be enough to get David Newman to begin the patent process.*

(Mead Decl. Ex. 4, Garodnick Tr. 144:25-146:5.) After reviewing '793 Figure 2 (which is the same as the figure in the alleged conception document), Dr. Schilling testified that "I don't understand this one…I don't know what it's all about…beats the hell out of me at this point." (Mead Decl. Ex. 6, Schilling Tr. 57:8-58:24.)

Dr. Acampora agrees that the document did not convey to a skilled artisan the complete claimed invention, including the claimed processor for synchronizing data channels using timing data from the header. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 107-11.) Dr. Acampora's opinion is uncontradicted, as Dr. Vojcic did not opine on conception. Thus, GBT has no evidence of conception, which requires the invention to be "so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006).

**2. GBT Has No Evidence of Continuous Diligence to a Reduction to Practice.**

Summary judgment on priority also should be entered for the additional reason that GBT has no evidence of continuously diligent reduction to practice from any date of conception (including any date prior to December 30, 1997) to February 6, 1998. GBT bears the burden of

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

producing evidence of prior conception *and* continuous diligence from just before the date of the prior art until GBT's reduction to practice. *Environ Prods., Inc. v. Furon Co.*, 215 F.3d 1261, 1266 (Fed. Cir. 2000). "The evidence must show that the alleged earlier inventor was diligent throughout *the entire critical period*." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001) (emphasis added); *see also Griffith v. Kanamaru*, 816 F.2d 624, 626 (Fed. Cir. 1987). "The standards for finding reasonable diligence are harsh." *Liang v. Borger*, 214 U.S.P.Q. 368, 372-73 (Bd. Pat. App. & Int. 1981); *see also* 3A-10 Chisum on Patents § 10.07 ("Diligence is a stringent standard.").

GBT must provide evidence sufficient to find continuous diligence throughout the entire period from any pre-filing conception date to February 6, 1998. GBT has no such evidence. Dr. Schilling lived in Florida, but as a favor to GBT, spent one day a month as an unpaid advisor to GBT. (Mead Decl. Ex. 6, Schilling Tr. 20:14-21:24.) The rest of the time Dr. Schilling worked on his golf and tennis games and wrote books, just "taking it easy." (Mead Decl. Ex. 6, Schilling Tr. 20:14-21:24.) Dr. Garodnick commuted to GBT from his Massachusetts home for two or three days a week, taking the rest of the week off. (Mead Decl. Ex. 6, Garodnick Tr. 36:24-39:16.)

GBT offers no evidence that Attorney Newman was diligent during the necessary period. Dr. Garodnick guessed that he gave the Garodnick Document to Dr. Newman in August 1997. (Mead Decl. Ex. 3, Garodnick Tr. 142:14-24.) But the patent application was not filed until six months later, in February 1998. Dr. Garodnick did not know why it took so long, speculating that "the wheels of the law turn slowly." (Mead Decl. Ex. 4, Garodnick Tr. 146:14-21.) The six-month gap in GBT's evidence precludes a finding of diligence. *Griffith*, 816 F.2d at 627 (a three-month delay in diligence defeated the attempt to swear behind); *Illumina*, 2013 WL 1282977, at *7-15 (two-month delay was not diligent); *Basmadjian v. Landry*, 54 U.S.P.Q.2d 1617 (Pat. App. 2000) (three months delay is not diligent); *In re Nelson*, 420 F.2d 1079, 1081 (C.C.P.A. 1970) (two months of delay is not diligent); *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1278 (Fed. Cir. 2004); *Naber v. Cricchi,* 567 F.2d 382, 386 (C.C.P.A. 1977). Summary judgment of no pre-filing priority date should be granted.

**C. Matsushita '558 Invalidates the Asserted Claims.**

Matsushita '558, filed December 30, 1997, discloses or renders obvious all limitations of claims 5-7 alone and in view of the knowledge of a skilled artisan. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 245-305.)

> **1. Matsushita '558 Discloses a Multichannel Spread Spectrum Transmitter (Claims 5-7).**

GBT does not dispute that Matsushita '558 (Mead Decl. Ex. 2) discloses "a multichannel-spread-spectrum transmitter for communicating a plurality of data-sequence signals from a plurality of data channels using parallel chip-sequence signals" as recited in the preambles of claims 5-7. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 250, 295.) The '558 describes a "direct spreading CDMA" transmitter, "a multi code transmission which is a system where an information exceeding an information transmitting speed per one channel (one spreading code) is transmitted." ('558 col. 2:12-19.)

> **2. Matsushita '558 Discloses the Header Device for Concatenating Header and Data to Generate a Header Frame (Claims 5-7).**

GBT does not dispute that Matsushita '558 discloses the claimed "header device, coupled to a first data channel of said plurality of data channels, for concatenating a header to a first data-sequence signal to generate a header frame" recited in claims 5-7. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 251-63, 296.) The Court construed "header" to mean a "sequence of bits or symbols, which include a pre-defined sequence of bits or symbols (pilot)." (Dkt. No. 282 at 2.)

The '558 patent teaches several embodiments that concatenate header with data in at least one channel. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 251-63.) For example, in the first and fourth embodiments, a separation circuit receives a stream of transmitting data and separates that data into control data and information data, which are transmitted to the spreading circuit 103 as separate channels:

| '558 Col. 6:66-7:5 | '558 FIG. 4 |
|---|---|
| The constitution of a CDMA radio multiplex transmitting device in the present embodiment is the same with that of the first embodiment. In FIG. 4, when a transmitting data **101** is separated by the separation circuit **102**, it is separated into a control data and an information data (such as sound data, etc.) which are transmitted to the spreading circuit **103** as a different channel. | FIG. 4<br> |

In the fourth embodiment, control information may be sent on one channel with pilot/header (PL) (the "D" Channel), while information data is transmitted on other channels (the "B" Channels):

| '558 Col. 7:15-19 | '558 FIG. 9 |
|---|---|
| In this embodiment, multiplexed channels include a D channel **602** for communication which transmits the control data and a B channel **603** for communication which transmits the information data and, by using a spreading code **0** of the D channel, the PL signal **601** is transmitted. | <br>FIG. 9 |

Thus, the '558 patent teaches a header device (such as switch 104-0 and the separation circuit 102) for concatenating the pilot/header with control data (as shown in FIG. 9) and/or any data from the transmitting data stream 101. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 254-55.) The "header frame" is the result of the concatenation of 105 and 101 by the header device. (*Id.*)

Similarly, '558 Figure 12 shows a multichannel transmitter that transmits header information (including pilot) on fewer than all of the channels. (*Id.* ¶¶ 256-57.) Figure 12 shows the header information (e.g., PL signal 905) being concatenated with data. Switch 904-0 is shown switching between PL signal 905 (header), the ramping up and ramping down signals (910 and 911) and data 901 from the separation circuit 902. The header device (switch 904-0 and separation circuit 902) concatenates the data (901) with the header (905), resulting in the header

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

frame concatenation of 905, 910, 911, and 901.

| '558 Col. 8:47-67. | '558 FIG. 12 |
|---|---|
| The present embodiment is so constituted that the PL signal **905**, a ramp up (RP) signal **910**, a ramp down (RD) signal **911** and the transmitting data **901** can be selectively input to the spreading circuit **903-0**. Therefore, it is provided with a switch **912**. The object of the ramping signal is to prevent a spurious emission toward outside from a transmission band which is caused by a steep rise and fall of a signal in a burst transmission.<br>In the CDMA radio multiplex transmitting device as constituted above, the transmitting data **901** is separated into (N+1) channels by the separation circuit **902** in the same manner with that of the third embodiment. A separated signal of each channel is spread by the spreading circuits **903-0** - **903**-N having different spreading sings and multiplexed by the multiplex circuit **906**. | <br>FIG. 12 |

Additional embodiments in the '558 patent also teach the concatenation of header and data, as Dr. Acampora further discusses. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 258-63.)

### 3. Matsushita '558 Discloses Claimed Processor for Synchronizing Using Timing Data from the Header (Claims 5-7).

The '558 patent discloses "a processor, coupled to the header device and to the plurality of data channels, for synchronizing the plurality of data channels." The Court construed synchronizing as "timing the two or more data channels using timing data from the header and timing and control signals from the processor." (Dkt. No. 282 at 2.)

Dr. Vojcic admits that the '558 header channel includes the "ramp up" (RU) and "ramp down" (RD) data, which times the data channels. Dr. Vojcic states:

> For example, *the ramp down signal* 911 in Fig. 12, that signifies the end of pilot signal burst *could trigger automatically* closing of the switches 904-1 to 904-N, and the start of *ramp up signal* 910 *could open* the switches. *A person of ordinary skill in the art would understand the control of the switches in this manner based on the description provided in the '558 patent.*

(Mead Decl. Ex. 8, Vojcic Rep. ¶76 (emphasis added); *See also* Mead Decl. Ex. 10, Acampora Rep. ¶¶ 133, 175-76, 265-66.) Figure 13, below, confirms that the "RU" and "RD" data is in the header channel, not the data channels:



FIG. 12

FIG. 13

Dr. Vojcic's admission is dispositive—a person of ordinary skill in the art would understand that data in the header channel (the RU data and the RD data) times or synchronizes the '558 data channels. In response, GBT raises two red herrings. First, Dr. Vojcic argues that "in the '558 patent, the pilot in the header channels is not transmitted at the same time as data channels and thus, they are not time aligned as required in the '793 patent." (Mead Decl. Ex. 8, Vojcic Rep. ¶ 75.) Dr. Vojcic's assertion is irrelevant, as it merely attempts to re-argue GBT's rejected claim construction that each "channel" requires a "continuous stream" of data. (*See* Dkt. No. 274 at 13-14.) In any event, the '558 patent teaches that pilot can be transmitted *at the same time as data on the other channels*:

> [I]n the present embodiment, the switch 104-0 for a channel having a spreading code 0 in FIG. 4 is switched over at an interval of T period, but *switches 104-1~104-N for channels having spreading sings 1-N are not switched over and always in ON (connection) condition.* . . . A PL signal 1403 is inserted into a PL signal transmission period 1401. Signals of (N+1) channels are multiplexed and a PL signal of a spreading code 0 is transmitted at an interval of T period. *At the same time, an information data is transmitted in other channel.*

('558 col. 10:16-38 (emphasis added); *see also*, *e.g.*, col. 3:3-6 ("the transmitting data is transmitted by other channel in the pilot transmitting period"); Mead Decl. Ex. 10, Acampora Rep. ¶ 260.) Figure 14 of the '558 patent, reproduced above, shows the data in channels 1-N continuously transmitted at the same time as the pilot concatenated into channel 0. ('558 FIG. 14.)

Second, Dr. Vojcic argues that nothing is labeled a "processor" inside the '558 patent's

Separation Circuit, and that there were other known ways of synchronizing data channels and controlling switches, such as "pre-wiring" them. (Mead Decl. Ex. 8, Vojcic Rep. ¶ 76.) The argument is irrelevant. The '793 patent does not distinguish between a "processor" and a "pre-wired" circuit. It discloses only a box labeled "processor." (*See* '793 Fig. 3 ("PROCESSOR").) A component for processing and control, like the blank box that is the '793 patent "processor," was inherent in the '558 patent disclosure, and at least as obvious as other known options. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 133, 175-6, 265-6.) The alleged difference between a box labeled "processor" and "pre-wired" circuitry is not a patentable distinction. Synchronized data channels were well-known in the multichannel CDMA prior art, as were various structures and techniques for achieving the synchronization. For example, Dr. Schilling's prior art '951 patent (cited in the '793 patent) taught two ways to synchronize data channels, both of which were obvious design choices by the time the '793 patent was filed in 1998. The Schilling '951 patent describes a pilot signal (called the "generic" signal) that both serves as a pilot and provides timing and synchronization for the plurality of message chip code signals. The '951 patent reflects that it was a matter of design choice to use either timing data from this header signal, or other sources such as a common clock signal, to synchronize the data channels:

> Synchronous timing of the plurality of demultiplexed-data signals and the plurality of message-chip-codes signals is provided by the generic-chip-code signal, although other sources can be used such as a common clock signal for synchronization.

(Mead Decl. Ex. 7, '951 Col. 13:12-16.) Thus, one known and obvious way to synchronize data channels in a multichannel transmitter was to use a common clock signal to ensure that the channels are aligned.[2] Another obvious design choice for synchronizing data channels was the only technique described and claimed in Dr. Schilling's later '793 patent—synchronizing the data channels to the header/pilot signal, using timing data from header. Dr. Schilling explained at deposition how his prior art '951 patent teaches that a pilot is not just a pilot—it can also be used for timing and synchronization:

---

[2] The Accused Products in this case use a type of clocking mechanism that frame-aligns the accused channels without using timing data from the header, as discussed in Apple's motion for summary judgment of non-infringement.

> Q.   So what we have in Figure 2 then is a multichannel spread-spectrum transmitter with multiple data channels that includes a separate channel for a pilot; correct?
>
> A.   For a *pilot, for synchronization purposes. Timing and synchronization.* Because, you see, *it's not just a pilot. It tells you when everything will start.*

(Mead Decl. Ex. 6, Schilling Tr. 54:4-13 (emphasis added); 46:3-48:22 (discussing timing based on pilot).)   None of the three patents—the Schilling '951, the '793, or the '558, discuss the alleged difference between a "processor" and "pre-wired" circuitry, because from an inventive standpoint, it is a distinction without a difference.   Thus, Dr. Vojcic's "pre-wired" argument cannot defeat summary judgment.   *KSR*, 550 U.S. at 427 ("Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.").

### 4.   Matsushita '558 Discloses the Claimed Spread-Spectrum Means (Claims 5-6) and Plurality of Product Devices (Claim 7).

Matsushita '558 discloses the "spread-spectrum means" element of claim 5 and dependent claim 6 and the similar "plurality of product devices" element of claim 7.[3]

The Court construed the function of the "spread-spectrum means" as "spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively." (Dkt. No. 282 at 2.)   The Court construed the corresponding structure as "product devices and equivalent thereof."   (*Id.*)   The Court construed "product device" as "a device that

---

[3] '793 claim 5 ("spread-spectrum means, coupled to the plurality of data channels, for spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal, and a plurality of spread-spectrum-data channels"), claim 7 ("a plurality of product devices, coupled to the plurality of data channels and to said chip-sequence generator, for multiplying the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel and a plurality of spread-spectrum-data channels, the spread-spectrum-header channel generated by multiplying the header frame with a first chip-sequence signal, each of the plurality of spread-spectrum-data channels generated by multiplying a respective data-sequence signal by a respective chip-sequence signal").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

performs a multiplication operation." (*Id.*)

During discovery, GBT contended that "the '558 patent does not disclose spread-spectrum data channels without a header frame." (Mead Decl. Ex. 3, GBT's Response to Interrogatory No. 10.) GBT's expert Dr. Vojcic attempts to raise a similar distinction, querying whether the '558 patent discloses channels that contain data without header: "it appears that the header channel disclosed in the '558 patent contains only pilot and data, and the '558 patent does not disclose where other header information is placed (i.e., it could be in the data channels)." (Mead Decl. Ex. 8, Vojcic Rep. ¶¶ 79, 82.)

Dr. Vojcic's conclusory guess about the '558 patent's disclosure contradicts its express teachings, and does not raise any issue of fact. The Court construed "header" to mean a "sequence of bits or symbols, which include a pre-defined sequence of bits or symbols (pilot)." (Dkt. No. 282 at 2.) The '558 patent expressly teaches several embodiments where header— pilot—is concatenated with data in *only one* channel, while other parallel channels transmit data without any sequence of bits or symbols that includes a pre-define sequence (pilot). Thus, the channels where header (pilot) is not transmitted are "spread spectrum data channels" that do not contain header. The '558 patent teaches:

> In order to realize the above described object of the present invention, it is so arranged that the transmitting end transmits by *periodically inserting the pilot symbols into one channel (one spreading code) only* which is multiplexed in the multi code transmission. . . . According to the present invention, at the transmitting end, interference with a pilot channel can be reduced by *transmitting the pilot symbols by inserting it into one channel only.*

('558 col. 2:59-3:14 (emphasis added).) *See also*, *e.g.*, '558 col. 5:18-25, 6:8-13, 8:1-6, 8:39-45, 10:1-10 (disclosing transmitting pilot (header) on only one channel).) Dr. Vojcic's speculation that there might be pilot in every channel cannot change the express description that pilot is inserted "into one channel *only*." (*Id.* col. 2:59-3:14 (emphasis added).)

The '558 patent teaches a flexible array of options for placing header (pilot) and control information on channels, and the '793 patent achieves no patentable distinction over it. For example, the '558 patent encourages persons of ordinary skill in the art to transmit control

information on separate channels for efficiency, such as sending control information on one channel ("D") with pilot, and only information data on other channels ("B") channels, for efficiency. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 275-6; '558 col. 7:15-33, Fig. 9.)

### 5. Matsushita '558 Discloses the Claimed Combiner (Claims 5-7).

GBT does not dispute that Matsushita '558 discloses the claimed "combiner means, coupled to said spread-spectrum means, for algebraically combining the plurality of spread-spectrum channels as a multichannel-spread-spectrum signal" (claims 5-6) and the similar "combiner, coupled to said plurality of product devices, for algebraically combining the plurality of spread-spectrum channels as a multichannel-spread-spectrum signal" (claim 7).

The Court construed "combiner means" as performing the function of "algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum channel" with the corresponding structure "an adder and equivalents thereof." (Dkt. No. 282 at 2.) The '558 patent discloses the combiner means and combiner in its multiplex circuit, 906, which adds the spread-spectrum channels together, forming a multichannel spread-spectrum signal. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 277-8, 300; *see* '558 Fig. 12 (multiplex circuit 906 combines channels 903-0 through 903-N).) A person of ordinary skill in the art would have understood that the structure is an adder such as identified in the '793 patent. (*Id*.)

### 6. Matsushita '558 Discloses the Carrier Subsystem (Claims 5-7).

GBT does not dispute that Matsushita '558 discloses the claimed "carrier means" (claims 5-6) and "transmitter subsystem" (claim 7) elements.[4] (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 279-80, 301.) The Court construed the "carrier means" as performing the function "transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency." (Dkt. No. 282 at 2.) The Court determined that the corresponding structure is a "transmitter-carrier subsystem comprised of appropriate filters, power amplifiers, and matching circuits coupled to an antenna, with or without a hard limitation, and equivalents thereof." (*Id*.) The '558

---

[4] *See* '793 claim 5 ("carrier means, coupled to said combiner means, for transmitting the multichannel-spread-spectrum signal over a communications channel at a carrier frequency"); claim 7 ("a transmitter subsystem, coupled to said combiner, for transmitting the multichannel-spread-spectrum signal over a communications channel at a carrier frequency").

discloses the carrier means and transmitted subsystem elements in its Radio Transmitting Unit 907 and 908 Antenna, which the skilled artisan would understand discloses the claim limitations. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 279-80, 301; see '558 Fig. 12 (units 907 and 908).)

### 7. Matsushita '558 Discloses the Means for Generating Chip-Sequence Signals (Claim 6) and Chip-Sequence Generator (Claim 7).

GBT did not dispute in its interrogatory answer that the '558 patent discloses the "means for generating the plurality of chip-sequence signals" (claim 6) and "a chip-sequence generator for generating a plurality of chip-sequence signals, each of said plurality of chip-sequence signals being orthogonal to other chip-sequence signals within the plurality of chip-sequence signals" (claim 7). The Court construed the "means for generating" to have the function of "generating the plurality of chip-sequence signals" and the structure as "a chip sequence generator and equivalents thereof." (Dkt. No. 282 at 2.)

The chip-sequence generator—a way to generate chip codes—is a basic, well-known feature for any system that uses such codes. The '558 patent necessarily discloses a generator for providing the various different chip sequences, 0, 1, … N, that the '558 patent discloses, such as shown in '558 FIG. 12. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 80, 283, 298.) The '558 patent would be understood to include one or more chip sequence generators such as disclosed in the '793 patent. (*Id.*)

### 8. Matsushita '558 Discloses the Remaining Limitations of Dependent Claim 6.

GBT does not dispute that Matsushita '558 discloses or renders obvious the remaining limitations of claim 6, including multiple "exclusive-OR" gates for generating spread-spectrum signals and synchronization by the processor. (*See* '793 claim 6: "first" through "nth" exclusive-OR gates, and channels synchronized responsive to timing and control signals generated by the processor.) The Court construed "exclusive-or gate" as "a digital logic gate that performs the Boolean operation of nonequivalence, where the output of two compared values is only true if both inputs have different values." (Dkt. No. 282 at 22.) Matsushita '558 discloses the same "X" blocks for spreading as the '793 patent, which the person of ordinary skill in the art plurality of exclusive-OR gates, using different spreading codes, disclosing and rendering obvious the

limitations of claim 6. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 282-293.)

In sum, there is no issue of fact—Matsushita '558 discloses and/or renders obvious every limitation of asserted claims 5-7. The claims have no patentable distinction over Matsushita.

### D. GBT Offers No Evidence of Secondary Considerations of Non-Obviousness.

GBT has no secondary considerations of non-obviousness to rebut the clear obviousness of its claims over the '558 patent. (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 444-67.) Dr. Vojcic argues that the '793 patent should take credit for the commercial success of HSUPA. (Mead Decl. Ex. 8, Vojcic Rep. ¶¶ 104-108.) But GBT establishes no nexus between any success of HSUPA and the invention claimed by the '793 patent. Dr. Acampora explains, and Dr. Vojcic did not dispute, that "the '793 patent does not add any performance benefit to HSUPA that 3GPP could not have achieved through alternative means." (Mead Decl. Ex. 10, Acampora Rep. ¶¶ 447-58.)

## VI. CONCLUSION

Without an corroborating evidence of prior conception or diligence, GBT has no response to the '558 patent. GBT's expert, Dr. Vojcic, admits that the '558 patent shows timing the data channels using data from the header, and his other critiques merely attempt to reargue claim construction. GBT does not raise any genuine issue of material fact. Summary judgment of invalidity is required.


Dated: January 30, 2014

*/s/ Timothy S. Teter*
Timothy S. Teter (171451)
teterts@cooley.com
Lowell D. Mead (223989)
lmead@cooley.com
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Defendant Apple Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on January 30, 2014, with a copy of this document via the Court's CM/ECF system per Local Rules. Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or first class mail on this date.

By:  */s/ Timothy S. Teter*