1   RODERICK G. DORMAN (SBN 96908)
    rdorman@mckoolsmithhennigan.com
2   LAWRENCE M. HADLEY (SBN 157728)
    lhadley@mckoolsmithhennigan.com
3   MCKOOL SMITH HENNIGAN, P.C.
    865 South Figueroa Street, Suite 2900
4   Los Angeles, California  90017
    Telephone:     (213) 694-1200
5   Facsimile:      (213) 694-1234

6   Attorneys for Plaintiff
    GOLDEN BRIDGE TECHNOLOGY, INC.

7

8                         UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11   GOLDEN BRIDGE TECHNOLOGY, INC.,        )   Case No. CV-12-04882-PSG
                                            )
12                          Plaintiff,      )
                                            )
13          vs.                             )   **GOLDEN BRIDGE TECHNOLOGY,**
                                            )   **INC.'S OPPOSITION TO APPLE INC.'S**
14   APPLE, INC.,                           )   **MOTION FOR SUMMARY JUDGMENT**
                                            )   **OF INVALIDITY**
15                          Defendant.      )
                                            )   Date:  March 4, 2014
16                                          )   Time:  10:00 a.m.
                                            )   Courtroom:  5, 4th Floor
17   AND RELATED COUNTER CLAIM.             )   Judge:  The Hon. Paul S. Grewal
                                            )
18                                          )

19

20

21

22

23

24

25

26

27

28

1
2

## <u>TABLE OF CONTENTS</u>

**Page**

3    I.    INTRODUCTION ...................................................................................................1

4    II.   STATEMENT OF THE ISSUES TO BE DECIDED.........................................2

5    III.  STATEMENT OF THE FACTS ........................................................................2

6         A.    The '793 Patent Improves Efficiency By Replacing Pilot-Based
                Synchronization With Processor-Based Synchronization .............................2

7              1.    Background Of The '793 Invention .................................................2

8              2.    The Improvement Described in the '793 Patent .............................4

9              3.    The Claims of the '793 Patent ..........................................................5

10        B.    GBT Conceived The Invention Of The '793 Patent By December 1997 ...................6

11             1.    Dr. Garodnick Memorialized His Ideas For the '793 Patent In An
                     Invention Disclosure Document Dated August 1997 .......................6

12

13             2.    Drs. Garodnick and Schilling Completed the Conception And Worked
                     With Dr. Newman to Prepare the Application for the '793 Patent.................7

14
15             3.    GBT'S Patent Prosecutor Prepared and Filed the Application That
                     Matured Into the '793 Patent ...........................................................8

16        C.    The 'Matsushita '558 Patent Is Neither Prior Art Nor Discloses the Invention
                Claimed in the '793 Patent................................................................................9

17    IV.   APPLICABLE LEGAL STANDARDS .............................................................11

18    V.    ARGUMENT ........................................................................................................11

19        A.    Apple Has Not Met Its Burden of Proving That The '558 Patent Is Prior Art ...........12

20             1.    Sufficient Corroborating Evidence Exists For A Jury To Find A
                     Conception Date Prior to December 30, 1997 ................................12

21

22             2.    The Inventors' Reasonable Diligence Following Conception
                     Establishes A Triable Issue Regarding Whether The '558 Patent Is
                     Prior Art ........................................................................................14

23

24        B.    Apple Has Not Met Its Burden To Prove That Any Asserted Claim Of The
                '793 Patent Is Invalid As Anticipated Or Obvious Based On The '558 Patent...........16

25             1.    Disputed Facts Preclude Summary Judgment as to Invalidity........................17

26             2.    The '558 Patent Does Not Disclose the Claimed Processor for
                     Synchronizing Using Timing Data from the Header (Claims 5-7)..................17

27

28

i

## **TABLE OF CONTENTS**

### **(Continued)**

Page

3. The '558 Patent Does Not Disclose the Claimed Spread-Spectrum Means (Claims 5-6) and Plurality of Product Devices (Claim 7).....................22

4. The '558 Patent Does Not Disclose the Means for Generating Chip-Sequence Signals (Claim 6) and Chip-Sequence Generator (Claim 7). ...........23

VI.   CONCLUSION..................................................................................................................23

1

## TABLE OF AUTHORITIES

2

3

**Cases**                                                                 **Page(s)**

4

*Abdul-Jabbar v. GMC,*
5
    85 F.3d 407 (9th Cir. 1996) ...........................................................................23
6

*Alexsam, Inc. v. Idt Corp.,*
7
    2013 U.S. App. LEXIS 10009 (Fed. Cir. May 20, 2013) ........................................22

*Bellet v. Engelhardt,*
8
    493 F.2d 1380 (CCPA 1974) ...........................................................................21
9

*Bey v. Kollonitsch,*
10
    806 F.2d 1024 (Fed. Cir. 1986)........................................................................20

*Boston Sci. Corp. v. Cordis Corp.,*
11
    422 F. Supp. 2d 1102 (N.D. Cal. 2006) ............................................................21
12

*Boston Scientific Corp. v. Johnson & Johnson,*
13
    481 F. Supp. 2d 1018 (N.D. Cal. 2007) ............................................................20

14
*Brown v. Barbacid,*
    436 F.3d 1376 (Fed. Cir. 2006)........................................................................21
15

*Burroughs Wellcome Co. v. Barr Lab.,*
16
    40 F.3d 1223 (Fed. Cir. 1994)..........................................................................18
17

*Coleman v. Dines,*
18
    754 F.2d 353 (Fed. Cir. 1985)..........................................................................18

19
*Contessa Food Prod., Inc. v. Conagra, Inc.,*
    282 F.3d 1370 (Fed. Cir. 2002)........................................................................17
20

*Emi Group N. Am. v. Cypress Semiconductor Corp.,*
21
    268 F.3d 1342 (Fed. Cir. 2001)........................................................................26
22

*Fitzgerald v. Arbib,*
23
    268 F.2d 763 (C.C.P.A. 1959) .........................................................................21

24
*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986)........................................................................18
25

*In re Gurley,*
26
    27 F.3d 551 (Fed. Cir. 1994)............................................................................27

27
*In re Oelrich,*
    666 F.2d 578 (CCPA 1981) .......................................................................26, 29
28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

# TABLE OF AUTHORITIES

### (Continued)

**Cases**                                                                                                    **Page(s)**

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008)...................................................................22

*Jones v. Evans*,
   46 F.2d 197 (CCPA 1931) .......................................................................21

*K-Tec, Inc. v. Vita-Mix Corp.*,
   696 F.3d 1364 (Fed. Cir. 2012)..................................................................22

*KSR International Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)..................................................................................28

*Lemelson v. TRW, Inc.*,
   760 F.2d 1254 (Fed. Cir. 1985)..................................................................17

*Mahurkar v. C.R. Bard, Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996)....................................................................20

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006)..................................................................27

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
   527 F.3d 1330 (Fed. Cir. 2008)..................................................................17

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012)..................................................................17

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011)..............................................................................17

*Minton v. Nat'l Ass'n of Secs. Dealers, Inc.*,
   336 F.3d 1373 (Fed. Cir. 2003)..................................................................18

*Monsanto Co. v. Mycogen Plant Sci., Inc.*,
   261 F.3d 1356 (Fed. Cir. 2001)............................................................21, 22

*Price v. Symsek*,
   988 F.2d 1187 (Fed. Cir. 1993)..................................................................18

*Reed v. Tornqvist*,
   436 F.2d 501 (CCPA 1971) .......................................................................21

*Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*,
   264 F.3d 1344 (Fed. Cir. 2001)..................................................................19

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

**<u>TABLE OF AUTHORITIES</u>**

**(Continued)**

**Cases**                                                                                                          **Page(s)**

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003)..................................................................26, 27, 29

*Scott v. Koyana*,
    281 F.3d 1243 (Fed. Cir. 2002), 281 F.3d ..................................................20

*Singh v. Brake*,
    222 F.3d 1362 (Fed. Cir. 2000)..................................................................18

*T. W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ......................................................................23

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)..................................................................17

*Toro Co. v. Deere & Co.*,
    355 F.3d 1313 (Fed. Cir. 2004)..................................................................26

**STATUTES**

35 U.S.C. § 103(a) .......................................................................................22

35 U.S.C. § 282 ...........................................................................................17

**OTHER AUTHORITIES**

Fed.R.Civ.P. 56(c)(2).....................................................................................17

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Apple asks this Court to invalidate, as a matter of law, the '793 patent based on a single patent (the '558 patent) filed just six weeks before the application for the '793 patent. But Apple fails to provide the necessary clear and convincing evidence that the '558 patent is either prior art or invalidates the asserted claims of the '793 patent.

First, Apple ignores substantial, corroborated evidence that the inventors of the '793 patent, Drs. Garodnick and Schilling, began developing and therefore conceived the invention as early as August 1997—almost five months before the filing date of the '558 patent. Prior to the December 30, 1997 filing date of the '558 patent, the evidence shows that the inventors had fully conceived the invention and had begun the process of discussing the invention with their patent attorney and drafting the patent application. Between this time and the February 8, 1998 filing date of the '793 application, Dr. Newman, the patent attorney, diligently worked on preparing the patent application for filing. At the very least, these facts preclude a summary judgment determination that the '558 patent is prior art.

Second, even if the '558 patent were prior art, it does not invalidate the asserted transmitter claims of the '793 patent. The testimony of GBT's and Apple's technical experts reflect a deep factual division over what the '558 patent actually discloses. Yet it is undisputed that the '558 patent does not show or describe a processor for synchronizing channels as recited in the '793 patent. To overcome this plain defect, Apple asserts that a "processor" is inherently used to control "switches" for synchronization. But the specification of the '558 patent says nothing about a processor controlling switches. Instead, to the extent any synchronization occurs, the switches are controlled by a pilot signal—just as Dr. Schilling had invented years earlier and claimed in his '951 patent. Referring to the '951 patent, the Examiner expressly allowed the claims of the '793 patent because using a processor to control synchronization of multiple channels in a CDMA transmitter was novel over prior art systems using a pilot signal for that purpose. Apple's assertion that GBT's expert, Dr. Vojcic, agreed that a processor controls the switches in the '558 patent based on his reference to a "pre-wired circuit" is wrong: Dr. Vojcic's testimony referred to the pre-wired pilot signal/switch

1  mechanism shown in the both the '558 and '951 patents, not a processor as claimed in the '793

2  patent.

3      Apple's motion should be denied.

4  **II.    STATEMENT OF THE ISSUES TO BE DECIDED**

5      In response to Apple's statement of issues, GBT presents the following more focused

6  statement of the issues involved in the determination of this motion.

7      1. Whether the Matsushita '558 patent (filed December 30, 1997) is, as a matter of law, prior

8  art to the '793 patent when testimony and corroborating evidence show conception of the '793

9  invention by December 1997 and reasonable diligence from conception until the February 8, 1998

10  filing date?

11      2. Whether Apple has proven by clear and convincing evidence that the Matsushita '558

12  patent (even assuming it is prior art) anticipates or renders obvious the '793 patent despite not

13  disclosing expressly or inherently at least three limitations of the asserted claims, including the (a)

14  the "processor" limitation, (b) the "spread-spectrum means" and "plurality of product devices"

15  limitations, and (c) the "means for generating chip-sequence signals" and "chip-sequence generator"

16  limitations?

17  **III.    STATEMENT OF THE FACTS**

18      **A.    The '793 Patent Improves Efficiency By Replacing Pilot-Based Synchronization**

19           **With Processor-Based Synchronization**

20      GBT filed the '793 patent application on February 6, 1998, and on June 13, 2000, the United

21  States Patent and Trademark Office issued United States Letters Patent No. 6,075,793 entitled

22  "HIGH EFFICIENCY SPREAD SPECTRUM SYSTEM AND METHOD."

23      **1.    Background Of The '793 Invention**

24      The '793 patent, assigned to GBT, is directed to an advanced "spread spectrum" code

25  division, multiple access ("CDMA") mobile communications technology.  The invention was

26  developed by Donald Schilling and Joseph Garodnick, two Ph.D. electrical engineers with decades

27  of combined experience in wireless communications systems.

28

1    The particular CDMA system described in the '793 patent made use of Dr. Schilling's prior

2  "multicode" spread-spectrum CDMA invention, which resulted in U.S. Patent No. 5,166,951 ("the

3  '951 patent").  (Declaration of Jeffrey Huang ("Huang Decl."), Ex. 1).[1]  In Dr. Schilling's '951

4  patent, data is de-multiplexed into a number of individual data signals.  After dividing the data into

5  individual signals, each separate signal is "spread" using a "message chip code" created by a

6  "message chip code generator."  Finally, the individual spread signals are combined into a single

7  "multi-level" signal for transmission.  ('951 patent, Fig. 2 and 2:30-64.)  By de-multiplexing the

8  signals and applying a spreading code to each individual signal, Dr. Schilling's "multicode"

9  invention allowed for higher processing gain with reduced signal degradation in a CDMA

10 transmitter.

11    According to the '951 patent, the individual signals are all synchronized to each other.  As

12 explained in the specification and shown in the figures, synchronization was accomplished through

13 the use of a pilot signal on a dedicated channel.  The dedicated "pilot" signal (called the "generic

14 chip code") was combined with the other data channels prior to transmission.  It also was input into

15 each "message chip code generator" (which generated the spreading code) for each channel:



26 ('951 patent, Fig. 2 and 2:30-64.)  In the specification, Dr. Schilling also stated, without elaboration,

27 that a "common clock" should be used for synchronization.  *(Id.* at 13:15-16.)

---

[1] All Exhibits cited are attached to the Huang Declaration unless otherwise noted.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

## 2.      The Improvement Described in the '793 Patent

As explained in the '793 patent, the invention builds on Dr. Schilling's earlier multicode design.  First, Drs. Schilling and Garodnick developed an improved synchronization technique.  Rather than use bits from a dedicated pilot channel as inputs to each data channel to maintain synchronization, Drs. Schilling and Garodnick replaced the dedicated pilot channel with a processor that sends timing and control information to each channel:



**FIG. 3**

(Ex. 2 ('793 patent, Fig. 3).)  Second, by changing the synchronization design from a dedicated pilot channel to a processor, Drs. Schilling and Garodnick were able to use that channel to carry both pilot bits (and other header information) as well as data.  (*Id.*, 2:23-25, 6:17-23, 8:27-30.)  By using the dedicated pilot channel from the '951 patent to carry both pilot bits and data, Drs. Schilling and Garodnick were able to gain considerably improved data rates in the '793 invention.  (Ex. 3 (Vojcic Report, ¶ 45).)

In allowing the claims, the Examiner expressly recognized that using a processor to synchronize channels in a wireless multicode transmitter was novel over the prior art of record, including the '951 patent, which used pilot signal for the synchronization of multiple data channels: "[N]one of the references of record alone or in combination disclose or suggest the combination of

limitations specified in the independent claims, especially a processor, for synchronizing the remaining plurality of data channels to the header in the first data channel, as specified in claims 1, 5, and 7.  The invention includes *headers in fewer than all of the channels*."  (Ex.4 ('793 File History, Notice of Allowability at 2 (emphasis in original)).)  Apple's technical expert, Dr. Acampora, likewise agreed that the pilot signal synchronization design in the '951 patent represents a "different approach than the '793 claims."  (Ex. 5 (Acampora Report, ¶. 133).)

### 3.     The Claims of the '793 Patent

The '793 patent contains 7 claims.  Claims 5-7 (at issue here) are limited to a transmitter—in particular, a multichannel spread spectrum transmitter for communicating two or more data-sequence signals from two or more data channels using parallel chip-sequence signals (*i.e.*, message-chip-codes).

Independent claim 5 recites five limitations for the transmitter as follows:

1.    a "header device" that takes one of the data channels and concatenates (i.e., interleaves) "header" information onto it to form a "header frame";

2.    a "processor" coupled to both the control channels and data channels that synchronizes the data channels;

3.    a "spread-spectrum means" that processes the "data-sequence signals" with respective "chip sequence signals" to produce "spread-spectrum channels," including at least:

    a.    a "spread-spectrum header channel" produced by processing the header frame (from limitation 1 above) with a chip sequence signal; and,

    b.    two or more "spread-spectrum data channels" produced by processing individual data channels with a chip sequence signal;

4.    a "combiner means" that algebraically combines the resulting spread-spectrum channels; and,

5.    a "carrier means" that transmits the multichannel spread-spectrum signal over a communications channel.

1   Claim 6, which is dependent on claim 5, recites a spread-spectrum-header channel and at

2   least three spread-spectrum-data channels.  Claim 6 also recites a means for generating the chip-

3   sequence signals, and specifies the use of "EXCLUSIVE-OR" gates for multiplying the channels

4   with the chip-sequence signals.  Finally, claim 6 requires synchronization of the channels to the

5   header channel through timing and control signals from the processor.

6   Independent claim 7 is similar to claims 5 and 6.  The primary difference is that claim 7

7   recites the use of "product devices" for multiplying the channels with their respective chip-sequence

8   signals.

9   **B.      GBT Conceived The Invention Of The '793 Patent By December 1997**

10   Considering the passage of time, Drs. Schilling and Garodnick, not surprisingly, expressed

11   slightly differing views on how they came up with the invention claimed in the '793 patent.  Dr.

12   Schilling recalled that the '793 patent represented an improvement over his earlier '951 patent.  (Ex.

13   6 (Schilling Dep. Tr. at 41:12-44:10).)  Dr. Schilling also testified that the '793 specification at

14   column 1, lines 55-63, described his '951 invention as a prior art solution for increasing data rates

15   without lowering processing gain.  (Ex. 6, (Schilling Dep. Tr. at 46:3-52:21).  Dr. Garodnick

16   confirmed that this same passage in the '793 specification described Dr. Schilling's earlier invention

17   in the '951 patent.  (Ex. 7 (Garodnick Dep. Tr. at 197:13-21).)  Dr. Garodnick further recalled that

18   the concepts disclosed in the '793 patent came to him as part of GBT's work on a committee in the

19   late 1990s, known as T.R. 46, which was formed to provide the international 3GPP standards body

20   with the United States' suggestions for a new 3G standard.  (Ex. 7 (Garodnick Dep. at 47:19-48:4).)

21   During this time, GBT called its proposals to the T.R. 46 committee "Wireless Multimedia and

22   Messaging Services (WIMS)," and over a period of time, both he and Dr. Schilling worked on

23   improvements to the WIMS proposal.  (*Id*. at 54:13-25; 58:16-24; 66:10-16.)

24   **1.      Dr. Garodnick Memorialized His Ideas For the '793 Patent In An**

25   **Invention Disclosure Document Dated August 1997**

26   The testimony shows that Dr. Garodnick came up with the basic concept for the '793 patent

27   in August 1997.  (Ex. 7, (Garodnick Dep. at 91:14-21).)  Dr. Garodnick memorialized his idea in an

28   Invention Disclosure document that he personally created on his computer, which bore an

1   "electronic creation" date of August 1, 1997.  (Ex. 8 (Invention Disclosure)); Ex. 7, Garodnick Dep.

2   at 92:21-95:6.)  When searching for documents in preparation for his deposition, he located this

3   document, printed it out, and notated "8/1/1997" on the face of the document to reflect the date on

4   the file for this document.  (*Id.* at 91:14-97:5.)  Dr. Garodnick maintained custody of this document

5   in electronic form since its creation.  (*Id.* at 94:17-100:4.)  This document was saved in Dr.

6   Garodnick's old patent archives on his computer.  (*Id.* at 91:14-97:5.)

7          There is no doubt that Dr. Garodnick's Invention Disclosure pertains to the '793 patent.  The

8   disclosure is entitled "United States Patent Application of Joseph Garodnick and Donald L. Schilling

9   for High Efficiency Spread Spectrum Multipath Receiver."  It provides a detailed description of the

10  "problem" to be solved by the invention followed by a detailed description of the "solution" to the

11  problem.  (Ex. 8 at 2).  The disclosure further includes a diagram identical to Figure 1 in the '793

12  patent in the "problem" section.  (Ex. 8 at 1.)  Finally, the disclosure includes a diagram identical to

13  Figure 2 in the '793 patent.  (Ex. 2 at 2.)

14              **2.     Drs. Garodnick and Schilling Completed the Conception And Worked**

15                      **With Dr. Newman to Prepare the Application for the '793 Patent**

16          Dr. Schilling's recollection of the timing is consistent with Dr. Garodnick's memory.

17  Although Dr. Schilling does not have a specific recollection of Dr. Garodnicks' Invention

18  Disclosure, he confirms that it pertains to the '793 patent.  (Declaration of Donald L. Schilling

19  ("Schilling Decl.") ¶ 2).)  Dr. Schilling also confirms that Dr. Garodnick's August 1997 disclosure

20  does not contain a description of the processor solution to synchronization.  He does recall that the

21  complete idea for the '793 patent, including processor synchronization, existed two to three months

22  before the February 6, 1998, filing date.  (*Id.*, ¶ 2-3; Ex. 6 (Schilling Dep. Tr. at 41:12-43:18).)  Dr.

23  Schilling further testified that although he had no "record" of the date, he recalls the process of

24  coming up with the idea and working with Dr. Garodnick and the patent attorney, Dr. Newman.

25  (Ex.6 (Schilling Dep. Tr. at 41:12-43:18).)  According to Dr. Schilling, it took time for him to

26  develop the idea and to be in a position to speak with Drs. Garodnick and Newman in an intelligent

27  way.  (*Id.* at 41:12-42:13.)

28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

1    With the complete conception, Drs. Schilling and Garodnick worked with Dr. Newman to

2  prepare the patent application.  (Ex. 7 (Garodnick Dep. Tr. at 146:14-21.)  Both Drs. Garodnick and

3  Schilling testified that preparing the application for filing was an iterative process, with multiple

4  back and forth between them and with Dr. Newman.  (Ex.6 (Schilling Dep. Tr. at 41:12-42:19); Ex.

5  7 (Garodnick Dep. Tr. at 103:19-104:7; 140:3-11; 146:14-21).)  Dr. Garodnick testified that Dr.

6  Newman wrote the first draft of the '793 patent application.  (Ex. 7 (Garodnick Dep. Tr. 103:19-

7  104:7); Ex. 6 (Schilling Dep. Tr. at 33:17-5).)  Dr. Schilling testified that during few months before

8  the filing date, he and Dr. Garodnick reviewed and critiqued Dr. Newman's write up.  (Ex. 6

9  (Schilling Dep. Tr. at 41:12-42:19).)  Dr. Garodnick also testified that additional drawings (besides

10  those in the Invention Disclosure) were prepared with Dr. Newman during the time leading up to

11  filing the '793 application.  (Ex. 7 (Garodnick Dep. Tr. at 102:6-22).)   Dr. Schilling confirmed that

12  he would provide Dr. Newman with additional drawings or descriptions of drawings.  (Ex. 6

13  (Schilling Dep. Tr. at 33:17-5).)

14    **3.    GBT'S Patent Prosecutor Prepared and Filed the Application That**

15    **Matured Into the '793 Patent**

16    Dr. Newman, with the help of Drs. Schilling and Garodnick, prepared and filed the

17  application which matured into the '793 patent.  (Declaration of David Newman ("Newman Decl.,)

18  at ¶¶ 2, 14; Ex. 7 (Garodnick Dep. Tr. at 103:19-104:7); Ex. 6 (Schilling Dep. Tr. Dep. Tr. at 33:17-

19  5).)  Dr. Newman recalls that he began discussing the invention claimed in the '793 patent in

20  December 1997.  Dr. Newman and Dr. Schilling had a system for preparing and filing patent

21  applications.  (Newman Decl., at ¶¶ 5-10.)  The process of preparing and filing the '793 patent

22  application took longer than typical because there were two inventors—Drs. Garodnick and Dr.

23  Schilling.  (Newman Decl., at ¶ 10.)  Dr. Newman had to (1) juggle coordinating times to confer

24  with both Drs. Garodnick and Schilling over the phone to discuss the invention, (2) distill and

25  incorporate multiple comments or edits to the draft patent application received from both inventors,

26  (3) incorporate the new drawings and figures received from both inventors, and (4) discuss follow up

27  comments in order to finalize the patent application.  (*Id*.)  This was an iterative process that

28  overlapped the 1997 holiday season.

1    Neither Dr. Garodnick nor Dr. Schilling maintained inventor notebooks or records of their

2    communications with Dr. Newman during this process because they believed that their

3    communications with Dr. Newman were the equivalent to an inventor "notebook." (Ex. 7

4    (Garodnick Dep. Tr. at 104:8-21); Ex. 6 (Schilling Dep. Tr. at 33:17-34:7; 150:24-151:8).) Dr.

5    Schilling further testified that he believed the earlier works on the '793 patent application maintained

6    by Dr. Newman were lost in a Tornado near his home in La Plata, Maryland. (Ex.6 (Schilling Dep.

7    Tr. at 33:17-34:16).) Dr. Newman further declared that an F4 tornado hit La Plata, Maryland on

8    April 28, 2002 destroying his entire office along with all of his issued patent files, including the '793

9    patent. (Newman Decl., at ¶ 18; *see also* http://www.erh.noaa.gov/lwx/Historic_Events/apr28-

10   2002/laplata.htm.)[2]

11   The '793 patent issued from Application No. 09/020,105 on June 13, 2000, over two years

12   after it was filed. (Ex 2 at 1.)

13   **C.    The 'Matsushita '558 Patent Is Neither Prior Art Nor Discloses the Invention**

14   **Claimed in the '793 Patent**

15   Apple asserts that the Matsushita '558 patent is prior art. This is disputed. The '558 patent

16   was filed on December 30, 1997—a mere six weeks prior to the filing date of the '793 patent. (Ex. 9

17   ('558 patent) at 1.) Although the '558 patent "claims" priority to an application filed on June 1995,

18   there is no evidence that the "invention" claimed in the '558 patent was published before February 6,

19   1998 (much less, December 30, 1997). (*Id*.)

20   Apple argues that "the '558 patent teaches the '793 patent's sole alleged point of novelty—

21   concatenating header (pilot) and data in one channel, while transmitting data without header in other

22   parallel channels…." (Mot. at 12.) This also is disputed. Simply including header/pilot bits in one

23   channel without header in other channels is not the "sole alleged point of novelty" of the '793 patent

24   as confirmed by the Examiner's Statement of Reasons for Allowance. Rather, as the Examiner

25   confirmed, it is the use of a processor (as opposed to the pilot signal used in the '951 patent) to

26

27   _____

28   [2] GBT agreed not to call Dr. Newman as a witness at trial. However, GBT objects to Apple's apparent invitation for the Court to draw an adverse inference from this agreement. Apple was free to seek third party discovery from Dr. Newman and deliberately chose not to.

1   synchronize multiple data channels to a header channel (containing pilot/header and data) in a

2   CDMA transmitter.  (Ex. 4 ('793 File History, Notice of Allowability at 2).)

3         Indeed, the '558 patent discloses no processor whatsoever for synchronizing the data

4   channels to the pilot channel.  Other than a vague reference to a "synchronizing sequence system" to

5   the pilot symbols, (Ex. 5 ('558 patent, 10:5-8), the patent provides no discussion of synchronization

6   of channels in the transmitter.  As opposed to a processor, the plain inference from the figures, such

7   as Figure 4, is that a pilot signal (labeled "PL SIGNAL") provides any synchronization of channels.

8   In fact, Figure 4 of the '558 patent is nearly identical to Figure 2 of the '951 patent with the PL

9   SIGNAL corresponding to the Generic Chip Code and the Separation Circuit corresponding to the

10  DEMUX:

11

12  

13

14

15

16

17

18

19

20

21

22  

23

24

25

26

27

28

1    The dissimilarities do not stop there.  Apple's inadmissible annotated diagrams (Mot. at 12-

2    13) show that while both figures have some similar generic elements—the antenna, spreaders, and

3    multiple channels, Figure 12 of the '558 patent does not disclose several critical structural elements

4    in the  '793 patent—the processor, chip sequence generator, and sync blocks (among others).  (Ex. 3

5    (Vojcic Report, ¶ 74).)  For these reasons the '558 patent does not anticipate or render obvious the

6    asserted claims in the '793 patent.

7    **IV.    APPLICABLE LEGAL STANDARDS**

8          Summary judgment may be granted only "when the pleadings, depositions, answers to

9    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

10   genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

11   law."  Fed.R.Civ.P. 56(c)(2).  "[T]he question is not the 'weight' of the evidence, but instead the

12   presence of a genuine issue of material fact."  *Contessa Food Prod., Inc. v. Conagra, Inc.*, 282 F.3d

13   1370, 1376 (Fed. Cir. 2002).  "[A]ny doubt as to the presence or absence of disputed issues of

14   material fact must be resolved in favor of the presence of disputed issues, or in other words in favor

15   of the party opposing summary judgment."  *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1261 (Fed. Cir.

16   1985).  Any "factual inferences must be drawn in favor of the nonmoving party on summary

17   judgment."  *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1370 (Fed. Cir. 2012).

18   And of course, "[r]esolving … credibility disputes … is not appropriate on summary judgment."

19   *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1339 (Fed. Cir. 2008).

20   **V.    ARGUMENT**

21         Under 35 U.S.C. § 282, the '793 patent is presumed valid and "[t]he burden of establishing

22   invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  Given

23   this presumption, any invalidity assertion on any statutory basis must be proved by clear and

24   convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).  The party

25   asserting invalidity has "the initial burden of going forward with evidence to support its invalidity

26   allegation."  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).

27         To assess validity, this Court must engage in a three-step analysis:  (1) determine whether the

28   prior art is truly prior art within the meaning of § 102, (2) determine the proper construction of the

1   claims, and (3) compare the properly construed claims against the allegedly invalidating art.  *See*

2   *Minton v. Nat'l Ass'n of Secs. Dealers, Inc.*, 336 F.3d 1373, 1376 (Fed. Cir. 2003).

3       Apple's motion asserts that the '558 patent anticipates or render obvious the asserted claims

4   of the '793 patent, but fails under the required analysis:  Apple has not proven by clear and

5   convincing evidence that the '558 patent is prior art within the meaning of § 102.  Nor has it proven

6   under the clear and convincing evidence standard that the construed claims of the '793 patent, when

7   compared to the '558 patent, lacks novelty.  Thus, Apple's motion should be denied.

8       **A.    Apple Has Not Met Its Burden of Proving That The '558 Patent Is Prior Art**

9       The Court should deny Apple's motion for summary judgment because there are at least

10  disputed issues of material fact regarding the priority date of the '793 patent.  Although a question of

11  law, priority of an invention is based on findings of evidentiary fact directed to conception, reduction

12  to practice, and diligence. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).  Apple's

13  conclusion that there are no factual issues as to an invention date before February 6, 1998 is wrong.

14          **1.    Sufficient Corroborating Evidence Exists For A Jury To Find A**

15                 **Conception Date Prior to December 30, 1997**

16      Conception is "the formation in the mind of the inventor, of a definite and permanent idea of

17  the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech, Inc. v.*

18  *Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986).  Conception is complete once

19  "only ordinary skill could reduce it to practice, without extensive research or experimentation."

20  *Burroughs Wellcome Co. v. Barr Lab.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).  While proof of

21  conception requires corroborating evidence, courts apply a "rule of reason" that examines "all

22  pertinent evidence so that a sound determination of the credibility of the inventor's story may be

23  reached." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985).  "There is no particular formula

24  that an inventor must follow in providing corroboration of his testimony of conception." *Singh v.*

25  *Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000).  This may include consideration of circumstantial

26  evidence. *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir.

27  2001).

28

Here, Drs. Schilling and Garodnick plainly conceived of the invention claimed in the '793 patent before the February 6, 1998 filing date, and by all accounts at least a few months prior. A conception date by the beginning of December 1997 is well corroborated by testimony, documents, and circumstantial evidence. Dr. Garodnick's Invention Disclosure corroborates his testimony that he conceived the ideas leading to the '793 patent by August 1997 and that he prepared the disclosure to begin the patenting process with GBT's patent attorney, Dr. Newman. (Ex. 7 (Garodnick Dep. Tr. at 198:21-199:15).) Apple discounts the Invention Disclosure because it does not disclose each limitation of the '793 patent—particularly the "processor" limitation.[3] But GBT does not contend that conception was complete by August. Rather, the detail provided in the disclosure, including several figures inserted directly into the application of the '793 patent, raises a strong inference that conception had been completed prior to December 30, 1997, and corroborates Dr. Schilling's testimony that conception was complete 2-3 months before the February 6, 1998 filing date. (Ex. 6 (Schilling Dep. Tr. at 41:12-42:13; 151:5-152:11).) Apple also rejects the Invention Disclosure because the print out does not contain a typed date. But Dr. Garodnick confirmed under oath that he took the August 1, 1997 date directly from the electronic file on his computer. (Ex. 7 (Garodnick Dep. Tr. at 94:17-95:13).) Further, after Dr. Garodnick testified, Apple declined to inspect Dr. Garodnick's computer despite GBT's offer to make it available.[4] While Dr. Garodnick testified that he provided the Invention Disclosure to GBT's patent attorney in August 1997, an F4 tornado destroyed GBT's patent attorney's records in April 2002. (Newman Decl., at ¶ 18.)

Additionally, Dr. Newman's practice in drafting patent applications for Dr. Schilling corroborates a conception prior to December 30, 1997. At the time that Dr. Schilling began speaking with Dr. Newman about the invention claimed in the '793 patent, he knew that the

---

[3] Apple disingenuously argues on one hand that the "claimed" processor in the '793 patent for synchronizing the data signals is not disclosed in the August 1997 Invention Disclosure document, while on the other hand argues that the "claimed" processor is inherently disclosed in the '558 patent for invalidity purposes. If Apple's inherency argument were to apply to the '558 patent, then the same argument would apply to the August 1997 Invention Disclosure document.

[4] During the Deposition of Dr. Garodnick, Apple's counsel represented that it wanted to conduct discovery of Dr. Garodnick's computer. (Ex. 7 (Garodnick Dep. Tr. at 97:9-99:8).) Apple never followed upon GBT's offer to conduct discovery of Dr. Garodnick's computer that contained the August 1997 Invention Disclosure. Seemingly, Apple sought to avoid the corroborating evidence it now argues does not exist.

13

invention would work based upon his 28 years of experience with spread-spectrum technology. (Ex. 6 (Schilling Dep. Tr. at 152:12-153:2).)  Moreover, both inventors testified that drafting the patent application was an iterative process, which certainly began well before the February 6, 1998 filing date.  (Ex. 6 (Schilling Dep. Tr. at 41:12-42:19 and 151:5-152:11); Ex. 7 (Garodnick Dep. Tr. at 102:6-22; 103:19-104:7).)  Dr. Newman confirmed this as well by recalling that he began discussing the invention in December 1997.  (Newman Decl., at ¶ 14.)

This testimony coupled with the documentary evidence is more than sufficient to lead a reasonable jury to find a conception date by December 1997, and certainly before December 30, 1997.

### 2.    The Inventors' Reasonable Diligence Following Conception Establishes A Triable Issue Regarding Whether The '558 Patent Is Prior Art

GBT's corroborated evidence of conception prior to December 30, 1997, together with evidence that Dr. Newman diligently prepared and filed the patent application, creates a triable issue of fact as to whether the '558 patent is prior art to the '793 patent.  GBT has come forward with evidence that Drs. Schilling and Garodnick conceived the invention claimed in the '793 patent before December 30, 1997, at the latest.  Since GBT was also diligent from the time of conception until the filing of the '793 patent on February 6, 1998, the '558 patent is not Section 102(a) prior art in this case. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996).

The law regarding diligence is settled.  "The Federal Circuit defines 'reasonable diligence' as continuous activity toward reduction to practice so that the invention's conception and reduction to practice are substantially one continuous act." *Boston Scientific Corp. v. Johnson & Johnson*, 481 F. Supp. 2d 1018, 1028 (N.D. Cal. 2007) (citing *Mahurkar*, 79 F.3d at 1577).  Reasonable diligence can be accomplished through a variety of activities.  *See Bey v. Kollonitsch*, 806 F.2d 1024, 1030 (Fed. Cir. 1986) (attorney's work in preparing patent application); *Scott v. Koyama,* 281 F.3d 1243, 1248 (Fed. Cir. 2002) (efforts to locate a construction company to build a manufacturing plant for practicing the process).[5]  Significantly, "[t]he question of reasonable diligence is one of fact."

---

[5] *Bellet v. Engelhardt*, 493 F.2d 1380, 1389 (CCPA 1974) (finding diligence despite approximately a three month delay in testing because the delay was explained by "a shortage of monkeys and a limited ability to house them"); *Fitzgerald v. Arbib*, 268 F.2d 763, 766 (C.C.P.A. 1959) (implicitly

1 | *Brown v. Barbacid*, 436 F.3d 1376, 1379 (Fed. Cir. 2006); *Boston Sci. Corp. v. Cordis Corp.*, 422 F.

2 | Supp. 2d 1102, 1113-14 (N.D. Cal. 2006) (the diligence issue is concerned with whether a party

3 | exercised reasonable diligence, and such reasonableness determinations are [a] standard task for the

4 | trier of fact.).

5 | Here, the relevant time period for diligence is from a time just before December 30, 1997, the

6 | priority date of the '558 patent, until February 6, 1998, the filing date of the '793 patent.  *Monsanto*

7 | *Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001).  During this period, sufficient

8 | evidence exists for a reasonable jury to find that Drs. Schilling and Garodnick were diligent in

9 | reducing the invention claimed in the '793 patent to practice.[6]  In fact, it is reasonable to conclude

10 | that during this entire time Dr. Newman was diligently preparing the patent application with input

11 | from Drs. Gardnick and Schilling.  Dr. Newman recalls discussing the invention claimed in the '793

12 | patent in December 1997.  (Newman Decl., at ¶ 14.)  Drs. Schilling and Newman followed this same

13 | procedure for approximately 100 patents applications that Dr. Newman prepared for Dr. Schilling.

14 | (*Id*. at ¶¶ 5-12.)  Dr. Newman would discuss the invention with the inventors over the phone, and

15 | then would provide the inventors with drafts that were then reviewed, critiqued and discussed.  (*Id*.

16 | at ¶¶ 5-16.)   Dr. Schilling and Dr. Garodnick discussed the invention and the contents of the patent

17 | application with Dr. Newman over the telephone. (*Id.*)  They prepared and faxed drawings related to

18 | the invention to Dr. Newman during this time period.  (*Id.*)  The application went through numerous

19 | iterations before it was ready for filing, including numerous faxed comments and notes from Drs.

20 | Schilling and Garodnick to Dr. Newman, which they considered to be the equivalent of their

21 | inventor notebook.  (Ex. 7 (Garodnick Dep. Tr. 102:6-22; 103:19-104:7; 140:3-11; 146:14-21); Ex. 6

22 |

23 | allowing for inactivity but finding that the inactivity was not adequately explained); *Jones v. Evans*, 46 F.2d 197, 202 (CCPA 1931) (finding diligence despite a "possible interval from April 16th to

24 | early in July . . . in which it did not "affirmatively appear that any steps were being taken," but during which some activity was ongoing); *Reed v. Tornqvist*, 436 F.2d 501, 504-05 (CCPA 1971)

25 | (concluding it is not unreasonable for inventor to delay completing a patent application until after returning from a three week vacation in Sweden, extended by illness of inventor's father).

26 | [6] Apple failed to come forward with any evidence that Drs. Schilling and Garodnick were only

27 | permitted to work in GBT matters when they were physically present at GBT's facilities.  On the contrary, Drs. Schilling and Garodnick communicated with Dr. Newman regarding the '793 patent

28 | over the telephone and through facsimile from their homes during the critical period.  (Newman Decl., at ¶¶ 14-16.)

(Schilling Dep. Tr. at 33:17-5; 41:12-42:19).)  This process took longer than usual for Dr. Newman in this instance because there were two inventors and he had to coordinate multiple schedules and integrate multiple edits and comments before the application could be finalized.  (Newman Decl., at ¶¶ 14-16.)  But for an F4 class tornado that destroyed Dr. Newman's office in La Plata, Maryland, and all of his issued patent files therein, on April 28, 2002, the inventor records for the '793 patent would be intact.  (Newman Decl., at ¶¶ 17-18.)

This activity from at least just prior to December 30, 1997 until February 6, 1998 is sufficient to find that the inventors were reasonably diligent.  *Monsanto Co.*, 261 F.3d at 1369 (there need not necessarily be evidence of activity on every single day if a satisfactory explanation is evidenced).  This creates a triable issue of fact that precludes summary judgment based on the '558 patent as prior art.

**B.    Apple Has Not Met Its Burden To Prove That Any Asserted Claim Of The '793 Patent Is Invalid As Anticipated Or Obvious Based On The '558 Patent**

To prove anticipation, Apple "must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention."  *K-Tec, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1377 (Fed. Cir. 2012) (quotation and citation omitted).  To prove obviousness, Apple must show that the subject matter of the asserted claims of the '793 patent "would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter of the invention pertains."  35 U.S.C. § 103(a).  Proving obviousness requires more than conclusory statements: "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citations and quotations omitted); *Alexsam, Inc. v. Idt Corp.*, 2013 U.S. App. LEXIS 10009, at *28-29 (Fed. Cir. May 20, 2013) (because "the technology was complex and the prior-art references were not easily understandable without expert testimony, . . . [e]xpert testimony was required not only to explain what the prior-art references disclosed, but also to show that a person skilled in the art would have been motivated to combine them in order to achieve the claimed invention.").

1    **1.    Disputed Facts Preclude Summary Judgment as to Invalidity**

2          The Court should deny summary judgment of invalidity because, even assuming that the '558

3    patent is "prior art," Apple has failed to clearly and convincingly show that the '558 patent discloses,

4    alone or in combination, each of the limitations in the '793 patent.  In deciding summary judgment,

5    the Court is not free to weigh the conflicting evidence and inferences, determine the credibility of

6    the witnesses, or substitute its own judgment of the facts for that of a jury.  *Abdul-Jabbar v. GMC*,

7    85 F.3d 407, 410 (9th Cir. 1996); *T. W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,

8    630-31 (9th Cir. 1987).  Yet that is exactly what Apple asks this Court to do:  weigh the conflicting

9    evidence and inferences drawn between competing experts—Dr. Acampora and Dr. Vojcic.  Apple's

10   expert, Dr. Acampora, alleges that all of the asserted claims are invalid as anticipated or obvious

11   based upon the '558 patent.  In contrast, GBT's expert, Dr. Vojcic, asserts that the claims are not

12   invalid as anticipated or obvious by the '558 patent.  The opinions reflect a deep factual conflict

13   regarding what the '558 patent does and does not disclose.  For this reason alone, summary judgment

14   of invalidity cannot be granted.  *T. W. Elec. Serv.*, 809 F.2d at 630-31.

15          **2.    The '558 Patent Does Not Disclose the Claimed Processor for**

16                 **Synchronizing Using Timing Data from the Header (Claims 5-7)**

17          Apple has failed to present any indisputable evidence that clearly and convincingly shows

18   how the '558 patent meets the "processor" limitation in each of the asserted claims.  The processor

19   in the asserted claims is for synchronizing the data channels.  Claims 5 and 7 require "a processor,

20   coupled to the header device and to the plurality of data channels, for synchronizing the plurality of

21   data channels[.]"  Claim 6 requires "the first spread-spectrum-data channels, the second spread-

22   spectrum-data channel, and the nth-1 spread-spread spectrum data channel synchronized, responsive

23   to timing and control signals generated by the processor, to the spread-spectrum-header channel[.]"

24   This Court construed synchronizing as "timing two or more data channels using timing data from the

25   header and timing and control signals from the processor."  (Dkt. No. 282 at 2.)

26          The '558 patent neither shows or describes a processor that synchronizes data channels to the

27   header channel as construed by this Court.  To the contrary, in each embodiment, the only

28   mechanism that could perform any synchronization is the switches shown between the "separation

17

circuit" (which de-multiplexes the transmitting data stream) and the "multiplex circuit" (which recombines the channels after spreading).  As described in the specification, these switches are controlled by a rudimentary pilot signal in most embodiments (e.g., Fig. 4), or, in one embodiment (Fig. 12) a pilot signal in combination with two other signals (RU and RD) that indicate ramping up and ramping down of the pilot signal.



Thus, for each embodiment, the only disclosure of a mechanism for synchronizing the channels is a pilot signal (or pilot signals and their associated ramp up and down signals) together with switches. Such "pilot bit" synchronization is the exact mechanism disclosed in Dr. Schilling's the earlier '951 patent, which the examiner not only considered, but distinguished in allowing the '793 claims. (Ex. 4.)

Apple calls the pilot and switch mechanism in the '558 patent a "red herring" because GBT's technical expert, Dr. Vojcic referred to the mechanism as a "pre-wired" circuit in his expert report. Dr. Vojcic's use of the term "pre-wired" does not create a "red herring."  The fact remains that the pilot and switch mechanism disclosed in the '558 patent is fundamentally different from processor control of synchronization as disclosed in the '793 patent.  Apple's speculation that a processor could control the switches in the '558 patent is even more off-base:  The only mechanism shown for controlling the switches in the '558 patent is the pilot signal (and ramp up/ramp down signals associated with the pilot)—just as taught in Dr. Schilling's earlier '951 patent.

1   Apple also contends that a "processor" is disclosed to time-align the pilot with data on other

2   channels during transmission based on one sentence in the '558 patent describing and "Eighth

3   Embodiment."  That sentence reads: "At the same time, an information data is transmitted in other

4   channel[s,]" and then points to the channel format in Figure 14.  (Mot. at 17.)  But the '558 patent

5   specification explains that in the Eighth Embodiment, instead of switching "off" all other channels

6   (1-N) during the transmission of the pilot signal on channel 0, the switches for data channels 1-N

7   "are not switched over and always in ON (connection) condition."  (Ex. 9, '558 patent col. 10:52-

8   56).  In other words, in this embodiment, the transmitter does not even use the disclosed switches to

9   synchronize channels 1-N to any other channel, including channel 0 (which uses the simple "on/off"

10  switch shown in Figure 4 to send alternating pilot and data signals).  (*Id.* and Figure 4).  Rather, in

11  this embodiment, the data channels 1-N are un-gated and unregulated in any way—data is simply

12  transmitted as soon as it hits the wire, without any dependence on the transmission timing in channel

13  0 or any other of the 1-N data channels.  Thus, the Eighth Embodiment discloses no synchronization

14  of any one channel to any other channel, much less synchronization of a plurality of data channels to

15  a header channel as claimed in the '793 patent.

16  This operation of the Eighth Embodiment is further confirmed by the explanation in the '558

17  patent that the receiver side is responsible for synchronization and the transmitter side does not

18  perform synchronization.  According to the specification, "at a receiving end, in the same manner

19  with that of the second embodiment, a synchronous detection can be executed for all multiplexed

20  channels by inferring a line condition from the pilot symbols of channel 0."  (Ex. 9, '558 patent at

21  10:57-60.)  In short, for this embodiment, the '558 patent does not disclose any synchronization by

22  the transmitter, and instead relies solely on the receiver to synchronize the multicode transmission.

23  **a.     The "Processor" Limitation is Not Inherently Disclosed**

24  Without an express disclosure of a processor, Apple argues that a processor is inherent in the

25  '558 patent, or at least as obvious as other known options for synchronizing the data channels and

26  controlling the switches.  (Mot. at 18.)  Apple's arguments are not evidence; nor do they prove

27  invalidity.  The critical question for inherent anticipation is whether, ***as a matter of fact***, practicing

28  the '558 patent ***necessarily*** featured or resulted in the "processor" limitation of the '793 patent.  *See*

19

1    *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Stated differently,

2    for inherent anticipation, the '558 patent must have sufficiently described and enabled at least one

3    embodiment that ***necessarily*** featured or resulted in the subject matter embraced by the "processor"

4    limitation.  *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004).  Since the "processor"

5    limitation is one of structure, Apple must prove that a person of ordinary skill in the art would

6    recognize that the missing "processor" is necessarily present in the reference and would inherently

7    exist for every combination of the asserted claims' limitations.  *Emi Group N. Am. v. Cypress*

8    *Semiconductor Corp.*, 268 F.3d 1342, 1350-51 (Fed. Cir. 2001); *In re Oelrich*, 666 F.2d 578, 581,

9    (CCPA 1981) ("Inherency, however, may not be established by probabilities or possibilities. The

10   mere fact that a certain thing may result from a given set of circumstances is not sufficient.").

11           Apple fails to point to anything in the '558 patent that would constitute "a processor, coupled

12   to the header device and to a plurality of data channels, for synchronizing the plurality of data

13   channels."  As described above, for the embodiment that allows for transmission of information on

14   other channels while a pilot signal is transmitted on channel 0, the transmitter in the '558 patent does

15   nothing to synchronize and therefore does not disclose any structure to perform synchronization—

16   either by way of a processor or pre-wired switches controlled by a pilot signal.  For the remaining

17   embodiments, where all data channels are switched "off" during the transmission of the pilot signal

18   on channel 0, Apple simply points to the "separation circuit" in the '558 patent and hypothesizes that

19   it includes a processor for synchronizing the data channels.  (Mot. at 23 (citing Acampora Report at

20   266).)  But according to Dr. Vojcic, the "separation circuit" in the '558 patent would be understood

21   by a person of ordinary skill in the art to only de-multiplex (*i.e.*, split) the data stream into N parallel

22   data streams.  Such de-multiplexors in radio transmission circuits at the time of the invention were

23   stand-alone circuits that did not contain a processor.  (Ex. 3 (Vojcic Report, ¶ 76); Ex. 9 ('558

24   Patent, 6:26-28; 8:61-63).)  Even if "separation circuits" known in the art could have contained a

25   processor (which is factually disputed) it still would not constitute the requisite "clear and

26   convincing" evidence that it necessarily included a "processor" that synchronizes the channels in

27   accordance with this Court's construction.  Thus, Apple's inherency contention cannot be resolved

28   in summary judgment.  *See Schering Corp.*, 339 F.3d at 1377.

1

**b.** **The "Processor" Limitation Was Not An Obvious Design Choice**

2    Against the evidence, Apple argues that using a processor for synchronizing channels in the

3 '558 patent was at least as obvious as other known options, such as pre-wired circuits.  In support,

4 Apple points to the two synchronization techniques described in the '951 patent: (1) using a pilot

5 signal input to each data channel and (2) a common clock signal.  (Mot. at 23.)  But Apple ignores

6 the fact that the '793 patent adopted a different approach to synchronization in a multicode system—

7 namely, a processor—which is not disclosed in the '558 patent or the '951 patent.  Plainly, a

8 common clock differs from a processor, and Apple does not suggest otherwise.  In fact, Apple's own

9 expert admits that the pilot signal synchronization mechanism disclosed in the'951 patent (which the

10 '558 patent seems to adopt as well for some embodiments) provides a different approach to that

11 disclosed in the '793 patent.  (Ex. 5 (Acampora Report, ¶ 133); Ex. 3 (Vojcic Report, ¶ 46).)

12    Apple further argues that the synchronization techniques disclosed in the '951 patent were

13 matters of design choice at the time the '793 patent was filed.  (Mot. at 23.)  Even if that were true, it

14 does not render the different processor-based approach used in the '793 patent obvious.  Indeed, the

15 use of a pilot signal to control synchronization of each channel in the '951 patent effectively teaches

16 away from a processor-based approach.  *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.

17 Cir. 2006); *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) (a reference teaches away when it

18 "suggests that the line of development flowing from the reference's disclosure is unlikely to be

19 productive of the result sought by the applicant.").  Dr. Schilling confirmed that the pilot signal

20 approach used in the '951 patent does not require a processor.  (Ex. 6 (Schilling Dep. Tr. at 88:16-

21 89:22; 98:21-100:25).)  Further, in the embodiments disclosed by '558 patent that even arguably

22 synchronize any transmitter channels, the pilot signal and associated pre-wired switches control the

23 synchronization just as disclosed in Dr. Schilling's '951 patent.  In the other embodiment of the '558

24 patent, in which data is transmitted simultaneously with pilot signals, the specification suggests that

25 the channels are not time aligned.  (Ex. 3 (Vojcic Report, ¶ 75.)  Accordingly, the '558 patent

26 provides no motivation to add a processor for synchronization, which certainly would add

27 complexity and cost, without additional benefit.  (Ex. 3 (Vojcic Report, ¶ 46); *KSR International Co.*

28 *v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).

1    In sum, using a processor to synchronize data channels to a header channel in a muticode

2    transmitter was neither inherently disclosed in the '558 patent nor an obvious design choice.  (Ex. 3

3    Vojcic Report, ¶¶ 76-77).)  Rather, the prior art disclosed alternative ways of synchronizing—using

4    pilot signals as in the '951 and '558 patents, using a common clock (suggested in the '951 patent), or

5    not synchronizing in the transmitter as shown in an embodiment of the '558 patent.  Each alternative

6    had its own advantages and disadvantages.  Dr. Schilling and Gradnock conceived another way—use

7    a processor to synchronize, which provides a win-win:  synchronization while freeing channel space

8    for more data.  (Ex. 2 ('793 patent at 1:65-2:40.)  Their solution was novel, and Apple provides no

9    clear and convincing evidence that any prior art (and certainly not the '558 patent) disclosed it.

10       **3.      The '558 Patent Does Not Disclose the Claimed Spread-Spectrum Means**

11            **(Claims 5-6) and Plurality of Product Devices (Claim 7)**

12    Apple also has failed to clearly and convincingly show that the '558 patent discloses spread-

13    spectrum data channels without a header frame, as required by the spread spectrum means element

14    of Claim 5 and 6, and the similar "plurality of product devices" element of Claim 7.  The '793 patent

15    does not contemplate including header information in the data channels, but the '558 patent does.

16    Apple's entire argument hinges on the theory that "pilot" as used in the '558 patent

17    comprises the full metes and bounds of the term "header."  (Mot. at 24-26.)  "Header" was construed

18    as a "sequence of bits or symbols, which include a pre-defined sequence of bits or symbols (pilot)."

19    (Dkt. No. 282 at 2.)  Apple has not and cannot point to any disclosure in the '558 patent or evidence

20    from a person of ordinary skill that the "pilot" in the '558 patent fully encompasses all header

21    information.  Figures 9 and 13 of the '558 patent shows a channel containing user data and a pilot

22    field together with "control data."  (Ex. 3 (Vojcic Report, ¶ 79).)  The specification for the '558

23    patent discloses that the "control data" includes the D channel control data.  (Ex. 9 ('558 patent,

24    7:15-19.)  Apple's expert has not refuted (just disagreed with) Dr. Vojcic's opinion that a person of

25    ordinary skill in the art would not consider "D channel control data" to be "header" information.

26    (Ex. 3 (Vojcic Report, ¶ 79).)  Since there are a genuine issues of fact as to whether the other header

27    information in the '558 patent is placed in the "data channels," which is foreclosed by the '793

28    patent, summary judgment should be denied.

1

        **4.**        **The '558 Patent Does Not Disclose the Means for Generating Chip-**

2

                **Sequence Signals (Claim 6) and Chip-Sequence Generator (Claim 7).**

3
        Apple wrongly asserts that GBT does not dispute whether the '558 patent discloses the

4
"means for generating the plurality of chip-sequence signals" (Claim 6) and "a chip-sequence

5
generator for generating a plurality of chip-sequence signals, each of said plurality of chip-sequence

6
signals being orthogonal to other chip-sequence signals within the plurality of chip-sequence

7
signals" (Claim 7). To the contrary, GBT agrees with Apple's expert that the '558 patent does not

8
disclose a means for generating the plurality of chip-sequence signals.  (Ex. 5 (Acampora Report, ¶

9
283).)  But GBT does disagree with Apple's contention that the '558 patent "necessarily" discloses a

10
generator for providing various different chip sequences (or multiple chip sequence generator

11
structures).  Apple's inherency argument is entirely premised on the possibility that the "chip-

12
sequence signals" are generated in the '558 patent and not stored in memory or "pre-wired."

13
Because anticipation by inherency cannot be established by mere possibilities, Apple has failed to

14
clearly and convincingly prove that the practicing the '558 patent necessarily resulted in generating

15
the plurality of chip-sequence signals with a chip-sequence generator and equivalents thereof.

16
*Schering Corp.*, 339 F.3d at 1377; *In re Oelrich*, 666 F.2d at 581 ("Inherency, however, may not be

17
established by probabilities or possibilities. The mere fact that a certain thing may result from a

18
given set of circumstances is not sufficient.").  As such, summary judgment as to the invalidity of the

19
'793 patent should be denied for this reason as well.

20
**VI.**        **CONCLUSION**

21
        For the foregoing reasons, Plaintiff respectfully requests that Defendant's motion be denied.

22

23
DATED:  February 20, 2014                MCKOOL SMITH HENNIGAN, P.C.

24

25

26
                            By&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;/s/ *Lawrence M. Hadley*&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;
                                Lawrence M. Hadley

27
                            Attorneys for Plaintiff

28
                            GOLDEN BRIDGE TECHNOLOGY, INC.

23

1

<u>CERTIFICATE OF SERVICE</u>

2        The undersigned certifies that counsel of record who are deemed to have consented to

3   electronic service are being served on February 20, 2014, with a copy of this document via the

4   Court's CM/ECF system per Local Rules.  Any other counsel will be served by electronic mail,

5   facsimile, overnight delivery and/or first class mail on this date.

6

7                                     */s/ Lawrence M. Hadley*

                                   Lawrence M. Hadley

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKool Smith Hennigan, P.C.
Los Angeles, California

Case No. CV-12-04882-PSG

CERTIFICATE OF SERVICE