1  McKool Smith Hennigan, P.C.
   Roderick G. Dorman (SBN 96908)
2  RDorman@McKoolSmithHennigan.com
   Lawrence M. Hadley (SBN 157728)
3  LHadley@McKoolSmithHennigan.com
   Jeanne E. Irving (SBN 81963)
4  JIrving@McKoolSmithHennigan.com
   865 South Figueroa Street Suite 2900
5  Los Angeles, CA 90017
   Tel: (213) 694-1200
6  Fax: (213) 694-1234

7  Attorneys for Plaintiff
   GOLDEN BRIDGE TECHNOLOGY, INC.

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  GOLDEN BRIDGE TECHNOLOGY, INC.,     )  Case No. CV-12-04882-PSG
                                         )
13                          Plaintiff,   )
                                         )
14          vs.                          )  **PLAINTIFF'S TRIAL BRIEF**
                                         )
15  APPLE, INC.,                         )
                                         )
16                          Defendant.   )  Trial Date:  June 3, 2014
                                         )  Time:        1:30 p.m.
17                                       )  Courtroom:  5 (4th Floor)
                                         )  Judge:      Hon. Paul S. Grewal
18  _____ )
                                         )
19  AND RELATED COUNTER CLAIM.           )
                                         )
20  _____ )

21

22

23

24

25

26

27

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

1

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      INTRODUCTION ...........................................................................................................1

II.     GBT's THEORY OF THE CASE .................................................................................1

        A.      Facts Supporting GBT's Infringement Case ......................................................1

        B.      Legal Standard for Proving Direct Infringement...............................................2

        C.      Key Evidence Supporting GBT's Infringement Claim .....................................3

III.    APPLE'S DEFENSES....................................................................................................3

        A.      Apple's Anticipation and Obviousness Defenses..............................................3

                1.      Apple's Assertion that the Processor Limitation of the '793
                        Patent Is "Inherent" in the Alleged Prior Art ........................................4

                2.      Whether Certain Patents and Publications Are Prior Art ........................5

        B.      Apple's Equitable Defenses...............................................................................6

IV.     GBT'S REASONABLE ROYALTY DAMAGES CLAIM ..........................................8

        A.      Legal Standards for Calculating Patent Damages .............................................8

        B.      Summary of Mr. Schulze's Damage Opinion ...................................................9

                1.      Pro Rata Patent Allocation of Cumulative Royalty................................9

                2.      GBT's Delaware Licenses ...................................................................12

                3.      The Hypothetical License.....................................................................13

McKool Smith Hennigan, P.C.
Los Angeles, CA

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
   960 F.2d 1020 (1991) ............................................................................................ 7

*Alexsam, Inc. v. Idt Corp.,*
   2013 U.S. App. LEXIS 10009 (Fed. Cir. May 20, 2013) ..................................... 4

*Apple Inc. v. Motorola, Inc.,*
   Nos. 2012-1548 and 2012-1549, 2014 U.S. App. LEXIS 7757 (Fed. Cir. Apr. 25, 2014) 8, 10, 11

*Bellet v. Engelhardt,*
   493 F.2d 1380 (CCPA 1974) ................................................................................ 6

*Bey v. Kollonitsch,*
   806 F.2d 1024 (Fed. Cir. 1986) ........................................................................... 6

*Boston Sci. Corp. v. Cordis Corp.,*
   422 F. Supp. 2d 1102 (N.D. Cal. 2006) .............................................................. 6

*Boston Scientific Corp. v. Johnson & Johnson,*
   481 F. Supp. 2d 1018 (N.D. Cal. 2007) .............................................................. 6

*Brocade Communs. Sys. v. A10 Networks, Inc.,*
   No. C 10-3428 PSG, 2013 U.S. Dist. LEXIS 69335 (N.D. Cal. May 15, 2013) ............... 11

*Brown v. Barbacid,*
   436 F.3d 1376 (Fed. Cir. 2006) ........................................................................... 6

*Burroughs Wellcome Co. v. Barr Lab.,*
   40 F.3d 1223 (Fed. Cir. 1994) ............................................................................. 5

*Coleman v. Dines,*
   754 F.2d 353 (Fed. Cir. 1985) ............................................................................. 5

*Emi Group N. Am. v. Cypress Semiconductor Corp.,*
   268 F.3d 1342 (Fed. Cir. 2001) ........................................................................... 5

*Fitzgerald v. Arbib,*
   268 F.2d 763 (C.C.P.A. 1959) ............................................................................ 6

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
   802 F.2d 1367 (Fed. Cir. 1986) ........................................................................... 5

*In re Oelrich,*
   666 F.2d 578 (CCPA 1981) ................................................................................. 5

*Innogenetics, N.V. v. Abbott Labs.,*
   512 F.3d 1363 (Fed. Cir. 2008) ........................................................................... 4

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

*Jones v. Evans*,
    46 F.2d 197 (CCPA 1931) ................................................................................................. 6

*JVW Enters. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005) ........................................................................................ 2

*K-Tec, Inc. v. Vita-Mix Corp.*,
    696 F.3d 1364 (Fed. Cir. 2012) ........................................................................................ 4

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods. LLC*,
    2013 U.S. Dist. LEXIS 161636 (M.D. Pa. Nov. 13, 2013) .................................... 11, 13

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .................................................................................. 8, 11

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ........................................................................................ 3

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993) ........................................................................................ 5

*Reed v. Tornqvist*,
    436 F.2d 501 (CCPA 1971) ............................................................................................... 6

*" ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ........................................................................................ 13

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) .......................................................................................... 8

*Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001) ........................................................................................ 6

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003) ........................................................................................ 4

*Scott v. Koyama*,
    281 F.3d 1243 (Fed. Cir. 2002) ........................................................................................ 6

*Singh v. Brake*,
    222 F.3d 1362 (Fed. Cir. 2000) ........................................................................................ 5

*Summit 6 LLC v. Research in Motion Corp.*,
    No. 3:11-cv-367-O, 2013 U.S. Dist. LEXIS 95164 (N.D. Tex. June 26, 2013) ................... 11

*Toro Co. v. Deere & Co.*,
    355 F.3d 1313 (Fed. Cir. 2004) ........................................................................................ 5

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ............................................................................................................ 3

McKool Smith Hennigan, P.C.
Los Angeles, CA

iii

STATUTES

35 U.S.C. § 103(a) ....................................................................................................4

35 U.S.C. § 271(a) ...................................................................................................2

35 U.S.C. § 284 .......................................................................................................8

OTHER AUTHORITIES

Goodman, David J. and Robert A. Myers, "*Review of Patents Declared as Essential to
    WCDMA Through December, 2008,*" ...................................................................12

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

PLAINTIFF'S TRIAL BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

## I.   INTRODUCTION

Pursuant to the Civil Pretrial Instructions of this Court, Plaintiff Golden Bridge Technology, Inc. ("GBT") submits this trial brief.  GBT's trial brief (1) summarizes its theory of the case (2) identifies key evidence, and (3) provides legal standards on controlling issues of law.

## II.   GBT'S THEORY OF THE CASE

In this patent case, GBT accuses four Apple products of infringing three claims of U.S. Patent No. 6,075,793.  The four Apple products at issue are:  iPhone 4, iPhone 4S, iPhone 5, and iPad 2nd Generation.

### A.   Facts Supporting GBT's Infringement Case

GBT is the owner of U.S. Patent No. 6,075,793 entitled "High Efficiency Spread Spectrum System and Method" ("the '793 patent").  The '793 patent is directed to an advanced "spread spectrum" code division, multiple access ("CDMA") mobile communications technology.  The invention was developed by Donald Shilling and Joseph Garodnick, two Ph.D. electrical engineers with decades of combined experience in wireless communications systems.

The particular CDMA system described in the '793 patent made use of Dr. Schilling prior "multicode" invention in which a mobile device, prior to up-linking data to a base station, divides the data into a number of individual data streams.  Each individual data signal is then "spread" (*i.e.*, channelized) using message-chip-codes.  After spreading, the individual spread spectrum signals are combined into one or more composite signals for uplink transmission at a carrier frequency.

In Dr. Schilling's original "multicode" invention, he called for synchronizing each channel by inputting into each channel a "generic chip code" signal (*i.e.*, a form of "pilot" signal) from a dedicated pilot channel.  After Dr. Schilling received his "multicode" patent, other scientist conceived many theoretical improvements to his proposed multicode system—many of which achieved their own patent protection.  Yet each idea for improvement continued to adopt Dr. Schilling's original concept of using a dedicated "pilot" signal for synchronization, to the extent the improvement required synchronization of the uplink channels.

In the '793 patent, Drs. Schilling and Garodnick scrapped the earlier synchronization design by replacing the dedicated pilot channel with a processor that sends timing and control information

to each channel.  One benefit of their new invention was freeing up the former dedicated pilot channel to carry both pilot bits and data, thus allowing improved data rates.

The International Telecommunications Union publishes standards for wireless communications.  Besides specifying communications frequencies, these standards ensure that mobile devices and base stations that are operating in compliance with the standards can communicate with each other.  One of the Third Generation or "3G" standards, developed in the late 1990s, adopted wide band CDMA as the transmission protocol, and became known as the Universal Mobile Telecommunications System or WCDMA/UMTS.  UMTS standards are published by the Third Generation Partnership Project ("3GPP").  An update to the 3GPP standards, published in 2006, adopted a technology dubbed High Speed Uplink Packet Access ("HSUPA").  In HSUPA, uplink data from a mobile device can be divided in up to four data channels, along with two control channels—one of which carries both pilot bits and data.  By 2010, Apple and others began selling HSUPA-enabled mobile devices, creating the first commercial system with multicode uplink capability in a spread spectrum CDMA network.  Like the '793 patent, these devices use a processor rather than pilot bits to synchronize the multiple channels.

In this case, GBT alleges that Apple directly infringes the '793 patent though manufacturing and selling mobile wireless communications devices, which operate on the UMTS 3G network and comply with the 3GPP HSUPA standards.  GBT asserts independent claims 5 and 7, and dependent claim 6, against the iPhone 4, iPhone 4S, iPhone 5, and iPad 2nd Generation.  GBT does not assert indirect infringement in this case.

**B.      Legal Standard for Proving Direct Infringement**

To establish that Apple has directly infringed the '793 patent, GBT must prove by a preponderance of evidence that Apple has made or sold within the United States a device that meets all of the limitations of the asserted claim.  *See* 35 U.S.C. § 271(a); *see also* Model Patent Jury Instructions for the Northern District of California §§ 3.2-3.4 (Nov. 3, 2011).

"Determining infringement involves two steps. First, the trial court must construe the claims… Second, the fact-finder must determine whether the claims, as properly construed, read on the accused device." *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329 (Fed. Cir.

McKool Smith Hennigan, P.C.
Los Angeles, CA

2005).  Infringement of a claim is established where every element of the claim, or its equivalent, is found in the accused device.  *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

### C.   Key Evidence Supporting GBT's Infringement Claim

At trial, GBT will prove that the four accused Apple products infringe claims 5-7 of the '793 patent.  The key evidence that GBT will offer to prove its case includes the relevant 3GPP standards along with documents and testimony from Apple, Qualcomm and Intel regarding the accused devices.  The multicode functionality relevant to the asserted claims of the '793 patent mostly resides in integrated circuits or "chips" that perform modem/baseband processor tasks within each accused product.  Apple purchases the modem/baseband processor chips from Qualcomm and Intel.  GBT's expert witness Dr. Huan Liu reviewed source code produced by Qualcomm and Intel for the chips.  Additionally, Dr. Liu reviewed technical documents produced by Apple, Qualcomm and Intel.  Dr. Liu also considered deposition testimony from Apple, Qualcomm and Intel witnesses describing the operation of the devices.  From this information, Dr. Lui was able to determine how the accused devices implement the multicode spread spectrum CDMA requirements of the HSUPA standard.

GBT's other expert witness, Dr. Branimar Vojcic, considered Dr. Liu's work, along with much of the same supporting materials.  Dr. Vojcic further studied the '793 patent, the file history, and this Court's claim construction.  Based on this evidence, Dr. Vojcic has opined that each limitation of claims 5, 6, and 7, as construed, read on the four accused Apple devices.

## III.   APPLE'S DEFENSES

Apple contends that the asserted claims of the '793 patent are not infringed and are invalid.  Apple further raises a number of equitable affirmative defenses.  The facts, legal standards, and key evidence that GBT will rely upon to rebut Apple's defenses are set forth in GBT's oppositions to Apple's motions for summary judgment of non-infringement and invalidity.  Apple's invalidity and equitable defense raise certain legal issues set forth below.

### A.   Apple's Anticipation and Obviousness Defenses

Apple contends that the claims of the '793 patent at issue in this case are anticipated and

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  obvious.  To prove anticipation, Apple "must show by clear and convincing evidence that a single

2  prior art reference discloses each and every element of a claimed invention."  *K-Tec, Inc. v. Vita-Mix*

3  *Corp.*, 696 F.3d 1364, 1377 (Fed. Cir. 2012) (quotation and citation omitted).  To prove

4  obviousness, Apple must show that the subject matter of the asserted claims of the '793 patent

5  "would have been obvious at the time the invention was made to a person of ordinary skill in the art

6  to which the subject matter of the invention pertains."  35 U.S.C. § 103(a).  Proving obviousness

7  requires more than conclusory statements: "there must be some articulated reasoning with some

8  rational underpinning to support the legal conclusion of obviousness."  *Innogenetics, N.V. v. Abbott*

9  *Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citations and quotations omitted); *Alexsam, Inc. v. Idt*

10  *Corp.*, 2013 U.S. App. LEXIS 10009, at *28-29 (Fed. Cir. May 20, 2013) (because "the technology

11  was complex and the prior-art references were not easily understandable without expert testimony, .

12  . . [e]xpert testimony was required not only to explain what the prior-art references disclosed, but

13  also to show that a person skilled in the art would have been motivated to combine them in order to

14  achieve the claimed invention.").

### 1.   Apple's Assertion that the Processor Limitation of the '793 Patent Is "Inherent" in the Alleged Prior Art

17  One important legal issue that will arise in connection with Apple's invalidity defenses is the

18  doctrine of "inherency."  None of the prior art that Apple cites as rendering the '793 patent invalid

19  by anticipation or obviousness actually shows or describes a processor for synchronizing data

20  channels in a multicode environment.  Indeed, many of Apple's allegedly invalidating references do

21  not address synchronization of uplink channels at all.  Accordingly, Apple's expert, Dr. Acampora,

22  places heavy reliance on the notion that the processor limitation in the asserted claims of the '793

23  patent are inherently disclosed in the prior art.  But Dr. Acampora, in reaching his opinion, fails to

24  apply the proper legal standard for inherent disclosure.

25  To prove inherent disclosure, Apple must establish by clear and convincing evidence that a

26  single prior art reference, as a matter of fact, when practiced, would ***necessarily*** feature or result in

27  the "processor" limitation of the '793 patent.  *See Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d

28  1373, 1377 (Fed. Cir. 2003).  Stated differently, for inherent anticipation, a single prior art reference

McKool Smith Hennigan, P.C.
Los Angeles, CA

must sufficiently describe and enable at least one embodiment that ***necessarily*** features or results in the subject matter embraced by the "processor" limitation. *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004). Since the "processor" limitation is one of structure, Apple must prove that a person of ordinary skill in the art would recognize that the missing "processor" is necessarily present in the reference and would inherently exist for every combination of the asserted claims' limitations. *Emi Group N. Am. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350-51 (Fed. Cir. 2001); *In re Oelrich*, 666 F.2d 578, 581, (CCPA 1981) ("Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient."). Dr. Acampora's expert report falls well short of providing an "articulated reasoning with rational underpinning" that would prove a "processor" is necessarily present in each prior art reference and would inherently exist for every combination of the asserted claims' limitations. To the contrary, Dr. Acampora admits that most of the prior art references would work by using a pilot signal for synchronization, just as disclosed in Dr. Schilling's prior multicode invention.

### 2. Whether Certain Patents and Publications Are Prior Art

Another legal issue in connection with Apple's asserted prior art is whether the references are in fact prior art. This issue turns on the invention date of the '793 patent. Although a question of law, priority of an invention is based on findings of evidentiary fact directed to conception, reduction to practice, and diligence. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). Conception is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). Conception is complete once "only ordinary skill could reduce it to practice, without extensive research or experimentation." *Burroughs Wellcome Co. v. Barr Lab.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). While proof of conception requires corroborating evidence, courts apply a "rule of reason" that examines "all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985). "There is no particular formula that an inventor must follow in providing corroboration of his testimony of conception." *Singh v.*

McKool Smith Hennigan, P.C.
Los Angeles, CA

*Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000).  This may include consideration of circumstantial evidence.  *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001).

"The Federal Circuit defines 'reasonable diligence' as continuous activity toward reduction to practice so that the invention's conception and reduction to practice are substantially one continuous act." *Boston Scientific Corp. v. Johnson & Johnson*, 481 F. Supp. 2d 1018, 1028 (N.D. Cal. 2007) (citing *Mahurkar*, 79 F.3d at 1577).  Reasonable diligence can be accomplished through a variety of activities.  *See Bey v. Kollonitsch*, 806 F.2d 1024, 1030 (Fed. Cir. 1986) (attorney's work in preparing patent application); *Scott v. Koyama,* 281 F.3d 1243, 1248 (Fed. Cir. 2002) (efforts to locate a construction company to build a manufacturing plant for practicing the process).[1] "The question of reasonable diligence is one of fact." *Brown v. Barbacid*, 436 F.3d 1376, 1379 (Fed. Cir. 2006); *Boston Sci. Corp. v. Cordis Corp.*, 422 F. Supp. 2d 1102, 1113-14 (N.D. Cal. 2006) (the diligence issue is concerned with whether a party exercised reasonable diligence, and such reasonableness determinations are [a] standard task for the trier of fact.).

In this case, the determination of the invention date under these legal standards will control which alleged prior art references are actually prior art.

## B.    Apple's Equitable Defenses

Apple raises a number of equitable defenses—mostly predicated on GBT's prior patent actions against both Apple and other defendants based on entirely different patents, and one antitrust case against different defendants.  According to Apple, these defenses include waiver, equitable estoppel, laches, implied license, and unclean hands.  Each defense lacks merit.

---

[1] *Bellet v. Engelhardt*, 493 F.2d 1380, 1389 (CCPA 1974) (finding diligence despite approximately a three month delay in testing because the delay was explained by "a shortage of monkeys and a limited ability to house them"); *Fitzgerald v. Arbib*, 268 F.2d 763, 766 (C.C.P.A. 1959) (implicitly allowing for inactivity but finding that the inactivity was not adequately explained); *Jones v. Evans*, 46 F.2d 197, 202 (CCPA 1931) (finding diligence despite a "possible interval from April 16th to early in July . . . in which it did not "affirmatively appear that any steps were being taken," but during which some activity was ongoing); *Reed v. Tornqvist*, 436 F.2d 501, 504-05 (CCPA 1971) (concluding it is not unreasonable for inventor to delay completing a patent application until after returning from a three week vacation in Sweden, extended by illness of inventor's father).

McKool Smith Hennigan, P.C.
Los Angeles, CA

First, Apple never pled a defense of implied license, so it cannot raise that defense now. *See* Apple Inc.'s Answer to First Amended Complaint for Patent Infringement and Counterclaims (CDCA Doc. 208), Aug. 6, 2012 at 24.

Second, laches cannot apply. Laches is an equitable doctrine that can bar a patentee's claim for damages only if the accused infringer establishes two elements: (1) the patentee's delay in bringing the suit was unreasonable and inexcusable, and (2) the alleged infringer suffered material prejudice attributable to the delay. A presumption of laches arises that shifts the burden of going forward with evidence where the patentee delays bringing suit more than 6 years after the date the patentee knew or should have known of the alleged infringing activity. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (1991). Because GBT filed this action within six years of Apple introducing its HSUPA-enabled products, the presumption of laches cannot apply. Further, Apple lacks any evidence that GBT delayed in bringing this action or that Apple suffered any prejudice due to any alleged delay.

Third, waiver and equitable estopped cannot apply. GBT never waived any claims. To invoke equitable estoppel, a defendant must prove three separate factors: (1) that through misleading conduct, the plaintiff led the defendant to reasonably infer that it did not intend to enforce its patent against the defendant; (2) the defendant relied on that conduct; and (3) that due to its reliance, the defendant will be materially prejudiced if the plaintiff is allowed to proceed with its claim. *Aukerman*, 960 F.2d at 1041. Conduct by the plaintiff may include specific statements, action, inaction, or silence where there was an obligation to speak. *Id.* Apple cannot meet its burden to prove a single factor—let alone all three. Indeed, GBT consistently demonstrated to Apple its intend to enforce its intellectual property against mobile handset providers, offered to license Apple, and when Apple refused, brought this action shortly after Apple introduced HSUPA-enabled products.

Finally, Apple agrees that its equitable defenses must be tried in a bench trial, not before the jury. Accordingly, Apple's equitable defenses, and any evidence allegedly supporting them, should be excluded from this trial. If GBT prevails at trial, this Court should allow Apple to present evidence allegedly supporting its equitable defenses as part of post-trial briefing. If, after GBT

McKool Smith Hennigan, P.C.
Los Angeles, CA

responds, this Court believes that Apple has offered sufficient evidence to raise *prima facie* equitable defenses under the appropriate legal standards, the Court can consider the appropriate means for Apple to have its equitable defenses adjudicated at that time.

## IV.   GBT'S REASONABLE ROYALTY DAMAGES CLAIM

GBT seeks a reasonable royalty for Apple's infringement.  GBT does not seek enhanced damages for wilful infringement.  Nor does GBT seek an injunction.  Below, GBT sets forth the relevant legal standards for calculating a reasonable royalty, along with the evidence supporting GBT's damages claim in this case

### A.   Legal Standards for Calculating Patent Damages

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  "[T]the fact of infringement establishes the fact of damage." *Apple Inc. v. Motorola, Inc*., Nos. 2012-1548 and 2012-1549, 2014 U.S. App. LEXIS 7757, at *93 (Fed. Cir. Apr. 25, 2014).

To calculate the reasonable royalty, courts generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995).  This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." *Lucent*, 580 F.3d at 1325.  "[F]actual developments occurring after the date of the hypothetical negotiation can inform the damages calculation."  *Id*. at 1333*, citing Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).  Under the Book of Wisdom, the hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent*, 580 F.3d at 1333 (citing *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)).

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1

### B.      Summary of Mr. Schulze's Damage Opinion

GBT asserts that the technology behind the '793 patent is necessary to practice the HSUPA standard, and GBT has committed to license the '793 patent on a Fair, Reasonable, and Non-Discriminatory ("FRAND") basis.  The HSUPA protocol utilizes multiple data channels to provide increased uplink speeds from a cellular device to a cellular base station.  The implementation of HSUPA enabled handset manufacturers and carriers to provide a more robust set of multimedia applications to their users, including applications found on smartphones and iPads such as video-conferencing and ability to upload multiple photos at a time.

Apple began infringing the '793 patent when it included in its products cellular transceivers capable of supporting HSUPA, beginning with the release of the iPhone 4 in June 2010.  GBT's damages expert, Karl Schulze, will testify that a reasonable royalty due GBT for Apple's infringement is within a range between 0.05% – 0.07% (*i.e.*, 0.0005 – 0.0007) of the price of each infringing device.  For the period of June 2010 through May 19, 2014 (the original trial date in this case), a royalty rate in that range produces a royalty of between $38,664,313 and $54,130,038.

These amounts are calculated based on standard economic models frequently used in calculating reasonable royalty damages, including an evaluation of the Georgia-Pacific factors commonly used and approved by the Federal Circuit in patent cases.  In assessing the Georgia-Pacific factors, two separate sets of data are particularly pertinent to Mr. Schulze's reasonable royalty opinion:  (1) facts relating to what licensees have actually paid in royalty rates for similar standard essential patents other than GBT's standard essential patents, and (2) facts relating to what licensees have actually paid GBT for GBT's standard essential patent portfolio, which includes the patent-in-suit.  Because no company has ever licensed the '793 patent alone, these facts are the closest and most pertinent to the hypothetical negotiation that will determine reasonable royalty damages in this case.

### 1.      Pro Rata Patent Allocation of Cumulative Royalty.

The cumulative royalty approach looks at what the market has actually paid, in terms of cumulative royalty rates, for standard essential patents, and then allocates to each standard essential patent (or patent family) utilized in the technology a pro rata share of the cumulative royalty.

McKool Smith Hennigan, P.C.
Los Angeles, CA

Telecommunications industry groups advanced the cumulative royalty approach as early as 1999 when the UMTS Intellectual Property Association (UIPA) released a document titled "3G Patent Platform for Third Generation Mobile Communications Systems: Definition, Function, Structure, Operation, Governance."  Indeed, Apple's October 10, 2012 letter titled "Apple Remarks for ITU Patent Roundtable," acknowledged the propriety of this approach by stating:

> An appropriate royalty rate should reflect a party's pro-rata ownership of standard essential patents as compared to the total, industry-wide pool of such assets. Such an approach respects both licensors and licensees because the rate is objective, it is proportional among licensors, and it is comparable among licensees.

Further, in its legendary litigation against Samsung, Apple urged the court to apply this same royalty construct, arguing:  "If Apple is found liable for infringement of either of the two asserted declared-essential patents, Samsung's royalty should not exceed its proportional share of reasonable aggregate royalties for all IPR declared essential to the UMTS standard, applied to an appropriate royalty base."  Apple Trial Brief (Dkt. 1323), *Apple, Inc. v. Samsung Electronics Co., Ltd.*, N.D. Cal. Case No. 11-cv-01846-LHK (PSG).[2]

Indeed, in the Federal Circuit's recent opinion in *Apple v. Motorola*, the Federal Court reversed the exclusion of that portion of Motorola's damage expert's testimony utilizing an analogous methodology.  There, the Motorola expert testified that licenses between Motorola and all U.S. major cell phone makers other than Apple showed that Motorola had previously received a royalty rate of approximately 2.25% of the sales price of each handset for a license to its entire portfolio of standard essential patents.  *Apple Inc. v. Motorola, Inc.*, 2014 U.S. App. LEXIS 7757, at *80.  The expert opined that the patent-in-suit represented 5% of the essential patents in Motorola's portfolio, and on that basis concluded that Apple would have been willing to pay 5% of the entire SEP portfolio rate for a license to the '898 patent.  *Id.* at *83.  The Federal Circuit found that that district court erred in excluding this testimony, finding that "Motorola's analysis of comparable licenses used 'reliable principles and methods,' and Motorola reliably applied them to sufficient

---

[2]      Mr. Schulze's conclusion that it is reasonable to evaluate the contribution of the '793 patent as a pro rate share of the cumulative royalty is further supported by the opinion of GBT's technical expert, Dr. Branimir Vojcic that incremental value of the '793 patent over the next best alternative is significant.

facts and data to estimate the overall value of the '898 patent." *Id*. at *79-80.

The HSUPA standard that incorporates the technology of the '793 patent is part of Release 6 of the 3GPP WCDMA standard. Mr. Schulze examined what the market has actually paid, in terms of cumulative royalty rates, for all the standard essential patents that are utilized by a mobile device practicing the WCDMA standard. Based on his analysis of several studies addressing the cumulative royalty implicated in practicing this standard, Mr. Schulze determined that the estimated cumulative royalty per handset for the patents essential to the WCDMA standard was 12% of the sales price of the handset.[3]

---

[3] It is an industry practice to calculate royalties for standard essential patents in handsets by applying the royalty rate to the cost of the infringing handsets. The studies relied on by Mr. Schulze that analyze royalty rates paid for standard essential patents use the handsets as the royalty base, and the license agreements relied on by the authors of those scholarly studies had royalty rates determined on a per handset basis. *See also, Apple Inc. v. Motorola, Inc*., Nos. 2012-1548 and 2012-1549, 2014 U.S. App. LEXIS 7757, at *80 (Fed. Cir. Apr. 25, 2014) (discussing license agreements between Motorola and the major U.S. cell phone makers, except for Apple, the Supreme Court noted, "[t]he royalty base in each of these licenses was the sale price of a cell phone.").

Additionally, Sipro Labs maintains a list of 334 declared WCDMA standard essential patent families contained in a patent pool available to makers of handsets. The royalty for this WCDMA patent pool is based on a percentage of the Net Selling Price of a handset (with a cap). http://www.sipro.com/pdfs/ListOfPatents%20131104.pdf. Indeed, every license Apple produced to GBT in this case with Apple as licensee, and that included a running royalty component, was also based on the handset selling value or the number of units sold.

Citing *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1339 (Fed. Cir. 2009), *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods. LLC*, 2013 U.S. Dist. LEXIS 161636 (M.D. Pa. Nov. 13, 2013), acknowledged that a damage opinion may use a royalty base of total revenue where prior licenses demonstrated "the industry's acceptance of a 'total revenue' royalty base." *Id*. at *19-20. *See also, Mondis Tech., Ltd. v. LG Elecs., Inc*., Cases Nos. NO. 2:07-CV-565-TJW-CE and 2:08-CV-478-TJW, 2011 U.S. Dist. LEXIS 78482, at *15-22 (E.D. Tex. June 14, 2011) (allowing use of entire revenue of accused product as royalty rate without accused features driving demand, where most relevant information about hypothetical license was calculated as percent of product revenue).

Further,

The Federal Circuit has made clear that when performing a running royalty calculation, . . . using the entire product as the base is acceptable. *See Lucent*, 580 F.3d at 1338-39 ("[C]ourts must nevertheless be cognizant of a fundamental relationship between the entire market value rule and the calculation of a running royalty damages award. Simply put, the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

To apportion the pro rata share of the cumulative royalty that is attributable to the '793 patent, Mr. Schulze first determined the number of patents essential to the standard.  A widely cited 2009 study titled "*Review of Patents Declared as Essential to WCDMA Through December, 2008*"[4] determined that there were 529 patents essential to WCDMA.  Because the '793 patent relates to technology found in the handset, Mr. Schulze examined what portion of these standard essential patents were embodied in the handset.  Mr. Schulze used a Sipro Labs analysis of 334 declared WCDMA standard essential patent families as part of the patent pool available to makers of handsets; that analysis categorized whether patents related to each of four patent categories, one of which was terminals (i.e., handsets).[5]  Based on the Sipro Labs classifications, Mr. Schulze determined that the relative percentage of patent families relating to terminals was roughly 49%.  Using this percentage, Mr. Schulze determined that there are 260 patent families essential to WCDMA implanted in the handset or device.[6]  Mr. Schulze performed a further apportionment by dividing the estimated cumulative handset royalty rate of 12% by 260 to isolate that portion of the cumulative royalty that would be applicable to the '793 patent alone, yielding 0.046%.

### 2.      GBT's Delaware Licenses.

Mr. Schulze also analyzed eight licensing agreements GBT entered into as a result of a January 2012 mediation conducted by Mag. Judge Thynge of the U.S. District Court in Delaware (the "Delaware licenses").  While the settled litigation had asserted two patents, all but one of the

---

magnitude of the rate is within an acceptable range (as determined by the evidence).").
*Summit 6 LLC v. Research in Motion Corp*., No. 3:11-cv-367-O, 2013 U.S. Dist. LEXIS 95164, at *34 (N.D. Tex. June 26, 2013).  *See also, Brocade Communs. Sys. v. A10 Networks, Inc*., No. C 10-3428 PSG, 2013 U.S. Dist. LEXIS 69335 (N.D. Cal. May 15, 2013) ("Acting en banc or otherwise, the Federal Circuit has not, however, overruled *Lucent*'s holding regarding the use of a small royalty rate with an entire apparatus's revenues.").

[4]      Goodman, David J. and Robert A. Myers, "*Review of Patents Declared as Essential to WCDMA Through December, 2008*," Fairfield Resources International, Inc., January, 2009.

[5]      "Sipro centralizes access to essential patents through patent pool creation and management and is the licensing agent for these patent pools."
http://www.sipro.com/pdfs/ListOfPatents%20131104.pdf.

[6]      This number is consistent with an analysis performed by the consulting firm, The GTT Group, finding that there are 250 patents essential to WCDMA.

PLAINTIFF'S TRIAL BRIEF

1  licenses granted in the agreements covered four patent families, each of which GBT maintains is

2  essential to the WCDMA standard, including the '793 patent.  Mr. Schulze's trial testimony will

3  analyze the similarities and dissimilarities between the Delaware licenses and the hypothetical

4  license, and account for relevant differences.  *Wordtech Sys., Inc v. Integrated Networks Solutions,*

5  *Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (damages expert may rely on licenses that are different

6  from the hypothetical agreement as long as he "account[s] for 'the technological and economic

7  differences' between them"); *HTC Corp. v. Tech. Props. Ltd*., Case No.: 5:08-cv-00882-PSG, 2013

8  U.S. Dist. LEXIS 129264, *7-8 (N.D. Cal. Sept. 6, 2013); *Kimberly-Clark*, 2013 U.S. Dist. LEXIS

9  161636, at *20.

10       To determine the royalty rates paid by each of the eight licensees, Mr. Schulze assessed the

11  percentage of total infringing revenue each defendant had paid as a license royalty.  The range of the

12  lowest to the highest was 0.04% to 0.53%, with an average royalty rate of 0.25875% of infringing

13  sales.  Because there were four patent families included in these licenses, Mr. Schulze apportioned

14  to the '793 patent one quarter of the royalty rate, or 0.0647%.

### 3.     The Hypothetical License.

16       Mr. Schulze's damage analysis incorporates each of the Georgia-Pacific factors and

17  considers appropriate adjustments to any royalty starting point in the context of the hypothetical

18  negotiation.  For example, in the hypothetical negotiation, it is taken as a given that the patent is

19  valid, enforceable and infringed, warranting an upward adjustment from a real life license negotiated

20  while these issue may be in doubt.[7]  On balance, Mr. Schulze has determined that the hypothetical

21  negotiation would result in a royalty in the range of 0.05% to 0.07% applied to the sales price of

22  each infringing unit, resulting in a reasonable royalty through May 19, 2014 (the original trial date)

23  within a range between $38.7 and $54.1 million.

[7]      Additionally, "a reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty." *ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860, 869-873 (Fed. Cir. 2010) (internal citations and quotations omitted); *HTC*, 2013 U.S. Dist. LEXIS 129264, at *9 n.14.

McKool Smith Hennigan, P.C.
Los Angeles, CA

Dated:  May 2, 2014

By:  */s/ Lawrence M. Hadley*
      Roderick G. Dorman (SBN 96908)
      Lawrence M. Hadley (SBN 157728)

MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa Street, Suite 2900
Los Angeles, CA  90017
(213) 694-1200
(213) 694-1234 (facsimile)
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on May 2, 2014, with a copy of this document via the Court's CM/ECF system per Local Rules.  Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or first class mail on this date.


*/s/ Lawrence M. Hadley*
Lawrence M. Hadley

McKool Smith Hennigan, P.C.
Los Angeles, CA

986485

CERTIFICATE OF SERVICE