COOLEY LLP
TIMOTHY S. TETER (171451)
(teterts@cooley.com)
BENJAMIN G. DAMSTEDT (230311)
(bdamstedt@cooley.com)
LOWELL D. MEAD (223989)
(lmead@cooley.com)
EAMONN GARDNER (pro hac vice)
(egardner@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:    (650) 843-5000
Facsimile:     (650) 849-7400

Attorneys for Defendant
APPLE INC.

| | |
|---|---|
| Golden Bridge Technology Inc.,<br><br>                    Plaintiff,<br><br>    v.<br><br>Apple Inc.,<br><br>                    Defendant. | Case No.  5:12-cv-04882-PSG<br><br>**APPLE'S TRIAL BRIEF**<br><br>**Date: June 2, 2014**<br>**Time: 1:30 p.m.**<br>**Courtroom: 5, 4th Floor**<br>**Judge: The Hon. Paul S. Grewal** |

REDACTED/PUBLIC VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

**TABLE OF CONTENTS**

                                                               **Page**

I. Introduction ................................................................................................................... 1

II. Apple's Equitable Defenses Limit GBT's Recovery .................................................... 2

    A. Background Facts.............................................................................................. 2

        1. GBT attempted to include its CPCH technology in the WCDMA standard ................................................................................................. 2

        2. 3GPP elected to use HSUPA, leaving CPCH and GBT out of the WCDMA standard ................................................................................. 2

        3. After CPCH was removed, GBT filed an antitrust claim against 3GPP arguing that the choice to use HSUPA rather than CPCH rendered GBT's patents "virtually valueless" ........................................... 3

        4. During the antitrust action, both GBT's CEO and the '793 patent's lead inventor confirmed that HSUPA is not related to GBT or its patents ................................................................................................... 5

        5. Years after losing its antitrust action against 3GPP in which it disclaimed HSUPA, GBT turned around and filed suit against Apple claiming that the '793 patent provides significant value to HSUPA................................................................................................... 7

        6. GBT's pattern of taking inconsistent positions has continued throughout this lawsuit ..................................................................................... 7

    B. GBT's Conduct Gives Rise to Numerous Equitable Defenses. ........................... 8

        1. Unclean Hands ................................................................................... 8

        2. Equitable Estoppel .............................................................................. 9

        3. Laches ................................................................................................ 9

        4. Waiver .............................................................................................. 10

        5. FRAND ............................................................................................ 10

III. The '793 Patent Is Invalid, Not Infringed, Not Essential, and Has Very Little Value ............................................................................................................................ 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
 960 F.2d 1020 (Fed. Cir. 1992) .................................................................................................. 9

*Apple v. Motorola*,
 Nos. 2012-1548, 2012-1549 (Fed. Cir. April 25, 2014) ........................................................ 15

*Asyst Techs. v. Emtrak*,
 544 F.3d. 1310 (Fed. Cir. 2008) .............................................................................................. 13

*GPNE v. Apple*,
 No. 12-2885-LHK (N.D. Cal. Apr. 16, 2014) ................................................................... 14-15

*Illumina v. Complete Genomics*,
 2013 WL 1282977 (N.D. Cal. Mar. 26, 2013) ........................................................................ 12

*Keystone Driller Co. v. General Excavator Co.*,
 290 U.S. 240 (1933) .............................................................................................................. 2, 8

*KSR International Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007) ................................................................................................................ 13

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
 485 F.3d 1157 (Fed. Cir. 2007) ............................................................................................... 13

*Muniauction v. Thomson*,
 532 F.3d 1318 (Fed. Cir. 2008) ............................................................................................... 13

Case No. 5:12-cv-04882-PSG    ii.    **APPLE'S TRIAL BRIEF**

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

## I. INTRODUCTION

Apple submits this trial brief pursuant to the Court's scheduling order and standing order. This case presents a number of legal issues for the Court's resolution. Apple has submitted a several pre-trial motions to address many of those issues, which are incorporated by reference here,[1] and has identified defenses and disputed issues in the parties' Joint Pretrial Statement. In addition, the case includes a variety of equitable defenses for the Court's resolution. This brief provides the background regarding those equitable defenses.

Plaintiff Golden Bridge Technology, Inc. ("GBT") spent years working on the development of the "Common Packet Channel" ("CPCH") for WCDMA. The 3GPP group responsible for the WCDMA standard, however, decided not to use CPCH, opting instead to include "High Speed Uplink Packet Access" ("HSUPA") as an optional portion of the standard. Having been left out of the WCDMA standard, GBT came to the courts for relief. In its first suit, GBT represented to the courts and to the public that the 3GPP standards group violated the antitrust laws by removing CPCH from the WCDMA standard and using HSUPA instead; thus rendering GBT's patent portfolio "virtually valueless." After that case was dismissed on summary judgment, GBT decided to reverse course. Despite its representations that its portfolio was rendered "virtually valueless" by the 3GPP group's decision to use HSUPA rather than CPCH, GBT now argues that one of those very same patents, U.S. Patent No. 6,075,793, is essential to HSUPA and worth tens of millions of dollars.

Not surprisingly, in order to support its conflicting overall position between the antitrust case and the present action, GBT has also taken numerous inconsistent positions on underlying issues. The court system, however, is not simply a forum for GBT to keep telling different stories to see if one of them might work. "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first

---

[1] The motions are: Apple's Motion To Strike Untimely New Infringement Contentions (Dkt. 296); Apple's Motion To Exclude the Opinions and Testimony of Mr. Karl J. Schulze, CPA (Dkt. 298); Apple's Motion for Summary Judgment of Noninfringement (Dkt. 303); Apple's Motion for Summary Judgment of Invalidity (Dkt. 306); and Apple's Motion for Partial Summary Judgment of No Pre-Suit Damages (Dkt. 307).

show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244-45 (1933) (quoting Story's Equity Jurisprudence, 14th ed., § 98).

## II. APPLE'S EQUITABLE DEFENSES LIMIT GBT'S RECOVERY

### A. Background Facts

#### 1. GBT attempted to include its CPCH technology in the WCDMA standard

GBT filed the application for the '793 patent on February 6, 1998. At that time, GBT focused on a different technology, the "Common Packet Channel" (CPCH), which—according to GBT's CEO Mr. Elmer Yuen—was GBT's "main contribution" to the WCDMA standardization efforts. (Yuen 2013-08-29 Tr. 68:6-20.) During the standards setting process, GBT advocated CPCH, and believed that it had patents covering the CPCH technology. CPCH was intended to be a common non-dedicated channel for medium-sized packets. Mr. Yuen deemed CPCH to be the "prima donna" or "crown jewel" of GBT's portfolio. (Yuen 2013-08-29 Tr. 238:9-19.)

#### 2. 3GPP elected to use HSUPA, leaving CPCH and GBT out of the WCDMA standard

The early versions of the WCDMA standard included CPCH as an optional feature, however, the industry never used CPCH. (Yuen 2013-08-29 Tr. 138:14-16.) Instead, the 3GPP group decided to standardize a different uplink technology, "High Speed Uplink Packet Access" (HSUPA). In 2002, ███████████████████████ companies such as Ericsson, Motorola, Qualcomm, and Nokia were making contributions to the enhanced uplink area. (Yuen 2006-05-09 Tr. 103.) Mr. Yuen was aware of that work. (Yuen 2006-05-09 Tr. 117:13-118:2.) Dr. Parsa warned:

███████████████████████████████████████████████████████████████

[REDACTED]

(Yuen 2006-05-09 Tr. 106:7-15 (quoting Parsa-authored document).) GBT did not participate in HSUPA's standardization. (Yuen 2013-08-29 Tr. 141:24-142:2.) To the contrary, GBT viewed HSUPA as a threat, believing that the industry "gang[ed] up and wanted to substitute CPCH with HSUPA." (Yuen 2013-08-29 Tr. 142:14-143:2.)

As Parsa predicted, and GBT feared, CPCH was rendered obsolete by HSUPA, and GBT was left out of the uplink packet data transfer space. During the 2006 deposition, Mr. Yuen acknowledged that GBT's CPCH technology had been removed, and acknowledged that antitrust defendants would use HSUPA and had "won":

Q. -- nobody is using CPCH and nobody is ever going to use CPCH, right?

MR. VOWELL: Objection; form. Argumentative.

A. What you believe.

MR. MCCABE: Well, of course it's argumentative.

A. Now, of course. After it's dismissed, of course nobody will ever use it.

Q. (BY MR. MCCABE) You know that, right?

A I know. I know. That's why we sue you.

Q. No. They're going to use HSUPA, right?

A. Now that they removed it, of course. *You won*.

(Yuen 2006-05-09 Tr. 146:14:147:1 (emphasis added).)

### 3. After CPCH was removed, GBT filed an antitrust claim against 3GPP arguing that the choice to use HSUPA rather than CPCH rendered GBT's patents "virtually valueless"

HSUPA first appeared in WCDMA Release 6, in 2004, four years after the '793 patent issued. With HSUPA available and without any industry demand for CPCH, the 3GPP group removed the CPCH feature from the standard. In response, GBT sued several members of the

3GPP standards group[2] for alleged antitrust violations, arguing that the 3GPP standards group violated the antitrust laws by removing CPCH from the WCDMA standard. In particular, GBT proclaimed that the CPCH technology was the core of GBT's portfolio, and that GBT's other patents, including the '793 patent at issue in this case, were "virtually valueless." In its antitrust complaint, GBT alleged:

> 1. This is an action by GBT against Defendants for conspiring with each other to unlawfully deprive GBT of the value of certain patented technology to be used in the next generation of cellular telephones and mobile communications.
>
> 2. As is set forth below, GBT's technology was an optional standard to be used in the next generation of cellular communications technologies, intended to ensure the compatibility of cellular phone equipment throughout the world. As such, GBT's technology was extremely valuable, since it could, and probably would have been, adopted and implemented by most manufacturers of cellular communications equipment and most operators of cellular communications networks.
>
> 3. After GBT sought to enter into reasonable license agreements with various cellular telephone manufacturers and providers, including Defendants, Defendants conspired among themselves to remove GBT technology from the new standards for no legitimate reason and for the purpose of punishing GBT and depriving it of the ability to exploit its valuable technology. *Defendants' actions have rendered GBT's technology virtually valueless.*

(Case 2:05-cv-00170-LED, Doc. 1-1, ¶¶ 1-3 (May 6, 2005) (emphasis added).)  Although the '793 patent had long since issued, and although 3GPP had already adopted HSUPA, GBT did not allege that the '793 patent had any value or attempt to exclude it from GBT's "virtually valueless" technology. GBT contended that no replacement for CPCH existed in the 3GPP standard. GBT stated:

> 38. Upon information and belief; there is no replacement for the CPCH feature in the 3GPP standard, which was originally included as a technically superior solution to meet the requirement of a channel for transmitting medium-sized packets of data in WCDMA networks.

---

[2] GBT filed suit on May 6, 2005 against Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Panasonic Mobile Communications Development Corporation of U.S.A., Panasonic Mobile Communications Co., LTD., NTT DoCoMo USA, Inc., NTT DoCoMo, Inc., Qualcomm Incorporated, Lucent Technology, Inc., and Telecom Italia.

(Case 2:05-cv-00170-LED, Doc. 1-1, ¶ 38 (May 6, 2005).) GBT did not allege that the '793 patent was a replacement for CPCH, much less a replacement feature in the 3GPP standard. GBT further alleged:

> 43. Defendants actions, in concert with others, have damaged GBT by removing, without any justification, a lucrative source of licensing revenue for GBT from the range of implementation options available to UMTS equipment manufacturers and network operators, thus significantly reducing the present value of' GBT's patent portfolio.

(Case 2:05-cv-00170-LED, Doc. 1-1, ¶ 43 (May 6, 2005).) GBT did not allege that the '793 patent was essential to practice any aspect of the standard. To the contrary, GBT alleged:

> 48. The foregoing concerted refusal to deal was intended by Defendants to remove a source of customers from GBI for its patents, including its patents covering CPCH and, thus, to eliminate GBT as a competitor as a source of technology related to cellular communications.
>
> 49. Those customers include manufacturers of cellular communications equipment, as well as operators of cellular communications networks.

(Case 2:05-cv-00170-LED, Doc. 1-1, ¶¶ 48-49 (May 6, 2005) (emphasis added).) GBT's broad allegation represented to Federal Court, to the defendants, and to the world that the defendants sought to "eliminate GBT as a competitor as a source of technology related to cellular communications." GBT did not state that the '793 patent was essential to any aspect of 3GPP, even though HSUPA was already part of the standard. To the contrary, GBT indicated that the removal of CPCH would "eliminate GBT as a competitor as a source of technology related to cellular communications." (Case 2:05-cv-00170-LED, Doc. 1-1, ¶ 48 (May 6, 2005).)

**4. During the antitrust action, both GBT's CEO and the '793 patent's lead inventor confirmed that HSUPA is not related to GBT or its patents**

The antitrust-defendants deposed GBT's CEO, Elmer Yuen, during the antitrust case. Mr. Yuen showed a good familiarity with HSUPA. Furthermore, Mr. Yuen testified that HSUPA was "not our business."

[text redacted]

[redacted]

(Yuen 2006-05-09 Tr. 117:13-118:2 (emphasis added).) Testifying on behalf of GBT, Mr. Yuen did not allege, that HSUPA was in fact GBT's invention. To the contrary, Mr. Yuen candidly admitted that HSUPA was "not our business." Mr. Yuen testified to GBT's awareness that numerous companies were adopting HSUPA, but did not suggest that GBT had any patent rights that covered it.

GBT hired the '793 patent's lead inventor, Dr. Schilling, to serve as an expert in the Antitrust case. Dr. Schilling performed a search for patents relating to HSUPA, offered an expert report and deposition testimony in the antitrust case that the antitrust defendants – not GBT – owned the patents for HSUPA. He opined that the 3GPP defendants removed a technology over which GBT had patents (CPCH) in favor of technology that the antitrust defendants (not GBT) developed and patented (HSUPA). (Schilling 2013-05-20 Tr. 194:3-197:6; Schilling Antitrust 2006-12-18 Tr. 219:5-220:2 ("those patents in HSUPA were owned by the major companies…this is what this whole lawsuit is about—that you opted for a technique that you all own the patents on, rather than on the technique where the patents are owned by someone else."). During the antitrust case, neither GBT nor Dr. Schilling alleged that GBT had any patents covering HSUPA. Dr. Schilling did not even mention the '793 patent, which did not come to mind: "Didn't even think about it, probably." (Schilling 2013-05-20 Tr. 191:12-197:6.)

**5. Years after losing its antitrust action against 3GPP in which it disclaimed HSUPA, GBT turned around and filed suit against Apple claiming that the '793 patent provides significant value to HSUPA**

After GBT lost its antitrust claim on summary judgment, GBT did not pursue any claim against HSUPA until it filed this suit in May 2012, seven years after filing its antitrust complaint.[3] Apple sought discovery from GBT regarding the antitrust case, but GBT contended that many of the documents from the antitrust case are missing. Such documents would have a direct bearing on this case, as the antitrust case involved allegations that the defendants removed GBT's technology (CPCH) in favor of a technology that GBT did not have patents covering (HSUPA). If GBT intended to pursue patent claims against HSUPA, GBT should have preserved documents from the antitrust case, but apparently did not.

**6. GBT's pattern of taking inconsistent positions has continued throughout this lawsuit**

In addition to the directly contradictory bases for its claims in its prior antitrust case and in the present case, GBT has taken directly contradictory positions regarding the scope and import of the '793 patent. For example, GBT previously threatened Ericsson that "the structures used in Ericsson's base stations fall squarely within the scope of the claim language" of the same "claims 5-7 of U.S. 6,075,793," meaning GBT asserted these claims against *downlink* (base station to mobile) transmitters. (Dkt. 382-4 at 2.) GBT raised similar assertions against others. At *Markman* in this case, however, in an attempt to avoid prior art, GBT argued that these same claims are necessarily limited to *uplink* (mobile to base station) transmitters and exclude a base station transmitter. GBT argued, for example, that the patent's features make a "base station transmitter incompatible with the claim language" (Dkt. 273 at 10-11) and that the claim language "does not disclose or describe a downlink transmission" (Dkt. 275 at 4).

---

[3] In addition to the antitrust case and the present action, GBT filed two additional lawsuits related to the WCDMA standard. In those other two lawsuits, GBT argued that two of its patents (not the patent-in-suit in the present case) were essential to the WCDMA standard. Both suits were dismissed on summary judgment.

**B. GBT's Conduct Gives Rise to Numerous Equitable Defenses.**

GBT's conduct, as set forth above, bars any recovery under the equitable doctrines of unclean hands, estoppel, laches and/or waiver. In addition, GBT's conduct limits its ability to receive damages under FRAND.

### 1. Unclean Hands

A patentee may be barred from enforcing its patent against an alleged infringer where the patentee (1) acts or acted inequitably, unfairly, or deceitfully towards the alleged infringer or the Court (2) in a way that has immediate and necessary relation to the relief that the patent holder seeks in a lawsuit. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933) (affirming dismissal of patent holder's complaints for unclean hands from suppressing evidence of prior use in another litigation). GBT has unclean hands in multiple respects. First, in pursuing its antitrust claims, GBT represented to the Federal Court and the public that CPCH technology was the core of GBT's portfolio, and that GBT's other patents, including the '793 patent at issue in this case, were "virtually valueless" due to the removal of CPCH from UMTS and its replacement with HSUPA. This is directly contrary to GBT's representations to this Court that the '793 patent is essential to HSUPA and that all HSUPA users should pay a substantial royalty. Similarly, GBT has acted with unclean hands regarding its assertions about the scope of the '793 patent, such as asserting claims 5-7 against base station makers and then telling this Court these claims cannot possibly read on a base station in an attempt to maintain a case against Apple.

With respect to Apple in particular, GBT is attempting to use its 2009 portfolio-wide license offer of $7 Million which Apple rejected—an offer that would have covered the '793 patent as well as dozens of other patents—as a basis for now asserting that during a hypothetical negotiation Apple would have accepted $27 Million for the '793 patent alone. The unfair and deceitful nature of GBT's conduct is only compounded by the fact that GBT made the 2009

portfolio-wide license offer of $7 Million to Apple under the false pretense that others in the industry had paid the same amount.[4]

### 2. Equitable Estoppel

Equitable estoppel applies where: (1) patentee, through misleading conduct, led the accused infringer to reasonably infer that patentee did not intend to enforce its patent; (2) the accused infringer relied on patentee's conduct; and (3) due to its reliance, the accused infringer will be materially prejudiced if the patentee is allowed to proceed with its infringement claim. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). As discussed above, in pursuing its antitrust claims, GBT represented to the Federal Court and the public that its patent portfolio was "virtually valueless" in view of the 3GPP group's choice to use HSUPA rather than CPCH. As the industry moved forward with its implementation of WCDMA, members of the industry relied on the GBT's representations—including in making decisions on whether to implement the optional aspects of HSUPA. By failing to disclose that it claim that the '793 patent is related to HSUPA, and by representing that its portfolio was "virtually valueless" in view of HSUPA, GBT prejudiced the entire industry's opportunity to seek alternative non-infringing designs, or to simply not implement the optional HSUPA features.

### 3. Laches

The equitable defense of laches applies where: (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time when it knew or reasonably should have known of its claim; and (2) the delay operated to the prejudice or injury of the accused infringer. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Since at least as early as 2005, GBT was aware that HSUPA replaced CPCH in the UMTS standard. Despite full knowledge of HSUPA, GBT waited until 2012 before notifying Apple of its argument that it has a patent purportedly related to HSUPA. Instead of timely pursuing its claims that its patent related to HSUPA, GBT took the opposite approach—filing an antitrust

---

[4] In an effort to justify the $7 Million request, GBT wrote to Apple that "GBT's licensees include Samsung, Seiko-Epson and Nokia, which recently concluded a license with GBT at US $7 million." (GBTM003619.) Nokia, however, did not license the GBT portfolio for $7 Million.

action based on the assertion that HSUPA had rendered GBT's patents, including the '793 patent at issue in this case, "virtually valueless." Even after GBT lost on its antitrust claims, GBT waited years before pursuing any claims based on HSUPA. During this delay, GBT contends that it lost many document from the antitrust case—despite the relevance of the antitrust action to Apple's defense in this action. In sum, GBT (1) chose to delay filing any suit that its patents were valuable to HSUPA until after it had tried its luck with a suit claiming that HSUPA made its patent valueless, (2) delayed filing suit based on HSUPA until years after its antitrust claims were dismissed, and (3) lost its documents related to the antitrust litigation before filing its suit against HSUPA.

### 4. Waiver

GBT can waive its rights in two ways: (1) by intentionally relinquishing its rights to enforce the asserted patent, or (b) by conduct so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished. As discussed above, in pursuing its antitrust claims, GBT represented to the Federal Court and the public that CPCH technology was the core of GBT's portfolio, and that GBT's other patents, including the '793 patent at issue in this case, were "virtually valueless" due to the removal of CPCH from UMTS and its replacement with HSUPA. This conduct is directly inconsistent with any intent to enforce the '793 patent against HSUPA, or to charge UMTS users a substantial royalty for HSUPA. Accordingly, GBT's has waived its ability to enforce the '793 patent against HSUPA.

### 5. FRAND

In addition, GBT has violated its FRAND commitment by failing to offer a FRAND license for the patent-in-suit, which GBT contends is essential to practice the optional HSUPA feature in the WCDMA standard. In particular: (1) the '793 patent is, by GBT's own admission, "virtually valueless", (2) GBT previously offered a fully paid-up license to its entire portfolio of dozens of patents (including the non-asserted CPCH and RACH patents) for $7 Million, (3) GBT has a FRAND obligation for any essential patents, and (4) GBT knows that a FRAND license for the '793 patent should be very low value (much less than $7 Million). The '793 patent is nowhere near a fundamental or enabling technology, and the UMTS standards drafters could have chosen

any number of different approaches, including the approaches set forth in CDMA2000, 1xEVDO, and LTE. GBT is not entitled to extract a "hold-up" royalty merely because the UMTS standards drafters happened to select an approach that GBT believes infringes the '793 patent, rather than the other perfectly acceptable (and even better) approaches.

### III. THE '793 PATENT IS INVALID, NOT INFRINGED, NOT ESSENTIAL, AND HAS VERY LITTLE VALUE

Apple has set forth its arguments in detail in its pending motions for summary judgment and *Daubert* motion, incorporated by reference here. (Dkt. 299 (damages *Daubert*); Dkt. 304 (MSJ noninfringement); Dkt. 308 (no presuit damages); Dkt. 306 (invalidity).)

In addition to the defenses that are currently the subject of Apple's pending summary judgment motions, Apple will present the defenses set forth in the expert reports of Dr. Acampora, Dr. Goldberg, Mr. Chase, and developed at trial from Apple's witnesses and GBT's witnesses on cross-examination. Apple will present numerous references (in addition to the '558 patent that is the subject of the pending summary judgment motion) that anticipate and render obvious the asserted claims. In particular, as set forth in Dr. Acampora's report, Apple intends to present extensive evidence of the state of the art and establish at trial:

- Okumura and Adachi, U.S. Patent No. 5,896,374 (1996) invalidates the Asserted '793 Claims.

- Adachi (1995) invalidates the asserted claims.

- Matsushita's U.S. Patent No. 6,175,558 invalidates the Asserted '793 Claims.

- The Frames Publications Invalidate the Asserted Claims, including:

    1. Ojanpera, Klein, and Anderson, FRAMES MULTIPLE ACCESS FOR UMTS (May 1997).
    2. Ovesjo and Dahlman, U.S. Patent No. 6,108,369 (July 1997).
    3. Honkasalo, Jokinen, and Rasanen, U.S. Patent No. 5,793,744 (July 1996).
    4. Concept Group Alpha Documents (Tdoc SMG 905/97 and Tdoc SMG2 270/97).

Apple further intends to show that GBT did not invent the frame structure used in WCDMA and HSUPA. To the contrary, the frame structure appears in the FRAMES publications, including SMG 905/97 and SMG2 270/97 as follows:



(SMG 905/97 at 12; SMG2 270/97 at 14.)

GBT attempts to avoid two items of prior art (the '558 patent and a December FRAMES submission) by claiming an earlier invention date. However, as courts in this district have recognized, summary judgment is proper when the patentee fails to provide substantial evidence of conception and diligent reduction to practice. *Illumina v. Complete Genomics*, 2013 WL 1282977, at *7-15 (N.D. Cal. Mar. 26, 2013) (granting summary judgment of invalidity where patentee failed to provide substantial evidence of pre-filing diligence for a two-month critical period).

GBT has also attempted to recharacterize the alleged '793 invention as being a novel "processor." To the contrary, the '793 patent does not describe a new type of "processor," or a new and nonobvious use of an old processor. The '793 patent discloses only an empty box labelled "processor" and uses that processor in a well-known, obvious way to synchronize the

data channels. The use of a "processor" was neither novel nor nonobvious, as Dr. Acampora explains in detail in his report. As the Supreme Court stated in *KSR*:

> When there is a design need or market pressure to solve a problem and *there are a finite number of identified, predictable solutions*, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, *it is likely the product not of innovation but of ordinary skill and common sense*. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (emphasis added). *See also Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007).

GBT does not dispute that "processors" were known and well within the grasp of persons of ordinary skill in the art, and the '793 patent does not describe any new "processor" circuitry. It shows nothing more than an empty box labeled "processor." ('793 Fig. 3.) In similar circumstances, the Federal Circuit has repeatedly held that such basic, well-known elements are obvious as a matter of law. *See Western Union v. Moneygram Payment Sys.*, 626 F.3d 1361, 1370-71 (Fed. Cir. 2010) (reversing denial of obviousness JMOL where patent added standard elements, like TCP/IP internet protocols, to known system – "adding a connectionless protocol (TCP/IP) that has been used in electronic communications, such as the Internet, since the 1980s to other obvious elements of claim adds nothing new to the field of endeavor"); *Asyst Techs. v. Emtrak*, 544 F.3d. 1310, 1314-16 (Fed. Cir. 2008) (affirming grant of obviousness JMOL because use of multiplexer instead of an information bus was obvious – "[T]he choice between the two devices was a familiar one that was based on well-known considerations."); *Muniauction v. Thomson*, 532 F.3d 1318, 1324-28 (Fed. Cir. 2008) (reversing denial of obviousness JMOL where patent simply added web browser to prior art electronic bidding systems – "[T]he use of web browsers was well known" before the alleged invention).[5]

---

[5] None of the secondary factors support nonobviousness. GBT bears the burden of showing a nexus between the claimed invention and secondary factors, and has presented no evidence whatsoever to carry that burden.

With respect to infringement, Apple intends to show that none of the Accused Products infringe any of the Asserted Claims due to the absence of several limitations, including but not limited to the "header device," "spread-spectrum", and "synchronizing" limitations, as set forth in Dr. Acampora's and Dr. Goldberg's reports. Furthermore, under the claim construction adopted by the Court, the '793 patent is not essential to HSUPA, and GBT cannot prove infringement either by pointing to the standard or by alleging a "representative products" theory.[6]

Finally, Apple intends to show that even if the patent is valid and infringed (and it is not) that the appropriate measure of damages would be a fully-paid up lump sum "reasonable royalty", no greater than the amount set forth in Mr. Chase's report. As Apple's pending *Daubert* motion explains, GBT's damages theory and damages report violates the Entire Market Value exception, relies on non-comparable agreements, and is not tied to the facts of this case. (Dkt. 299.)

For example, the *GPNE* decision addressed a fundamental error underlying Mr. Schultze's damages theory, holding that the smallest salable unit need not be sold by the accused infringer. *GPNE v. Apple*, No. 12-2885-LHK, slip op. at 19-25 (N.D. Cal. Apr. 16, 2014). Instead, in a case involving allegations that the patent-in-suit is essential for practicing a cellular standard—like *GPNE* and this case—"the baseband processor is the smallest salable unit." *Id.* at 24; *see also id.* at 5-11 (excluding patent owner's damages expert based on failure to provide reliable quantitative proof to support its damages request).

As Apple explains at length in the *Daubert* briefing, GBT's damages theory is simply not connected to the facts of the case. (Dkt. 299 at 14-21.) *See also GPNE*, Slip Op. at 9 (granting *Daubert* motion in similar circumstances: "GPNE must make some attempt to distinguish the allegedly infringing features of 3G and 4G LTE from the non-infringing features, so that Mr. Dansky may apportion value between them. Yet GPNE presents and Mr. Dansky cites no

---

[6] GBT does not assert either the doctrine of equivalents or indirect infringement. As GBT noted in its summary judgment opposition, "GBT does not allege" either the doctrine of equivalents or indirect infringement. (Dkt. 335 at 24.) In any event, Apple does not infringe either under the doctrine of equivalents or indirectly. Apple has not induced or contributed to infringement, as none of Apple's customers directly infringed, and Apple did not have the requisite mental state. Apple did not design the accused chipsets; it purchases them from third parties.

evidence indicating the value of the specific technology claimed by GPNE's patents."); *Apple v. Motorola*, Nos. 2012-1548, 2012-1549, Slip. Op. at 58 (Fed. Cir. April 25, 2014) ("We agree with the district court that Donohoe's testimony is insufficient to support an award of damages. Indeed, the district court would have been justified in excluding Donohoe's testimony as inherently unreliable based on his failure to tie the 40%-50% rate to the technological contribution of the patent to the standard-essential patent portfolio. *We have consistently explained that proof of damages must be carefully tied to the claimed invention itself.*") (emphasis added).[7]

The '793 patent addresses at most a small housekeeping feature in a small portion of an optional standard. As Dr. Acampora, Dr. Goldberg, and Mr. Chase will explain, the alleged invention has little intrinsic value to Apple and its customers, as it relates solely to the placement of a few bits during the transmission of thousands.

Dated: May 2, 2014

/s/ Timothy S. Teter
Timothy S. Teter (171451)
teterts@cooley.com
Benjamin G. Damstedt (230311)
bdamstedt@cooley.com
Lowell D. Mead (223989)
lmead@cooley.com
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:   (650) 843-5000
Facsimile:    (650) 849-7400

*Attorneys for Defendant Apple Inc.*

---

[7] Given the serious flaws in Mr. Schulze's opinion, including his reliance on an "industry practice" exception to the law that does not exist (Dkt. 299 at 16-19), cross-examination alone will not cure the prejudice caused by the admission of Mr. Schulze's flawed testimony: "Without a methodology, an explicit apportionment analysis, or an explanation of why apportionment is inappropriate, cross-examination is futile." *GPNE*, Slip Op. at 11.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on May 2, 2014, with a copy of this document via the Court's CM/ECF system per Local Rules. Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or first class mail on this date.

By: */s/ Timothy S. Teter*

106475274 v10