1
2
3
4
5
6
7
8
9
10

**United States District Court**
For the Northern District of California

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC., | ) | Case No. 5:12-cv-04882-PSG |
| Plaintiff, | ) | **CLAIM CONSTRUCTION ORDER** |
| v. | ) | |
| APPLE INC., | ) | **(Re: Docket No. 282)** |
| Defendant. | ) | |

In this patent infringement suit, Plaintiff Golden Bridge Technology, Inc. ("GBT") alleges that Defendant Apple, Inc. ("Apple") infringes U.S. Patent No. 6,075,793.  The parties submitted 10 claim construction disputes for resolution by the court.[1]  On June 26, 2013, the court held a claim construction hearing and the following day issued a summary construction order.[2]  At that time, the court explained that a more complete order would follow providing the court's reasoning.[3]  The court now provides that reasoning.

## I.    BACKGROUND

This case involves spread spectrum code division multiple access ("CDMA") mobile

---

[1] The parties also stipulated to the construction of 8 terms. *See* Docket No. 282 at 1–2.

[2] *See* Docket Nos. 281, 282.

[3] Docket No. 282 at 3.

technology that allows mobile wireless stations, such as cell phones, to communicate with a fixed base station.

The '793 patent was filed February 6, 1998 and issued June 13, 2000.[4] Although ultimately assigned to GBT, the claimed invention was developed by Dr. Donald Schilling and Dr. Joseph Garodnick. The patent discloses "[a] multichannel-spread-spectrum system for communicating a plurality of data-sequence signals from a plurality of data channels using parallel chip-sequence signals in which fewer than all of the channels include header information."[5]

In certain prior art spread-spectrum systems, each channel transmits pilot signals and other header information in addition to data.[6] The pilot signals and other header information are used by the receiver to synchronize the channels and piece together the received data. The '793 patent's alleged point of novelty is putting pilot signals and other header information in only one channel, leaving the other channels free to transmit only data. By eliminating the header in all but one channel, the '793 transmitter can transmit more data in the same bandwidth as other transmitters.[7] The '793 patent synchronizes the header and data channels using control and timing signals generated by a processor linked to both the header and data channels.[8]

---

[4] Docket No. 306-2 ("'793 Patent") at 1.

[5] *Id. See also* Docket No. 273 at 2–3.

[6] *See* Docket No. 273 at 5; '793 Patent at col.1 ll.27–62; col.3 l.64–col.4 l.9; Fig. 1.

[7] *See* '793 Patent at col.2 ll.3–40.

[8] *See id.* at Fig. 3; col.2 ll.19–25; col.6 ll.17–23; col.8 ll.27–30.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Figure 3 shows a schematic of the invention:



**FIG. 3**

Claim 5 of the '793 patent requires:

> 5. A multichannel-spread-spectrum transmitter for communicating a plurality of data-sequence signals from a plurality of data channels using parallel chip-sequence signals, comprising:
> a header device, coupled to a first data channel of said plurality of data channels, for concatenating a header to a first data-sequence signal to generate a header frame;
>
> a processor, coupled to the header device and to the plurality of data channels, for synchronizing the plurality of data channels;
>
> spread-spectrum means, coupled to the plurality of data channels, for spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal, and a plurality of spread-spectrum-data channels;

3

combiner means, coupled to said spread-spectrum means, for algebraically combining the plurality of spread-spectrum channels as a multichannel-spread-spectrum signal; and

carrier means, coupled to said combiner means, for transmitting the multichannel-spread-spectrum signal over a communications channel at a carrier frequency.[9]

Claim 6, which depends from claim 5, requires a header channel and at least three data channels. Claim 7 is independent and similar to claims 5 and 6. The primary difference is that claim 7 recites the use of "product devices" for multiplying the channels with their respective chip-sequence signals.[10]

Following the Markman hearing held in this case, the court construed disputed claim terms as follows:[11]

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "Multichannel-spread-spectrum transmitter" | Plain and ordinary meaning. |
| "Data channel" | "A communication channel able to carry data." |
| "Spread-spectrum data channel" | "A channel, without a header, that is generated by processing data-sequence signal by a respective chip-sequence signal." |
| "Spread-spectrum header channel" | "A channel generated by processing the header frame with a first chip-sequence signal." |
| "Chip sequence signal" and "Parallel chip sequence signals" | Plain and ordinary meaning. |
| "Synchronizing the plurality of data channels" | "Timing the two or more data channels using timing data from the header and timing and control signals from the processor." |
| "Spread spectrum means" | *Function:* "Spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively." *Structure:* "Product devices and equivalents thereof." |

United States District Court
For the Northern District of California

[9] '793 Patent at col.11 ll.3–29.

[10] *See* Docket No. 337 at 4.

[11] *See* Docket No. 282.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

4

| "Combiner means" | **Function:** "Algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum channel."<br>**Structure:** "An adder and equivalents thereof." |
|---|---|
| "Carrier means" | **Function:** "Transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency."<br>**Structure:** "Transmitter-carrier subsystem comprised of appropriate filters, power amplifiers, and matching circuits coupled to an antenna, with or without a hard limitation, and equivalents thereof." |

## II. LEGAL STANDARDS

Nine years after the Federal Circuit's seminal *Phillips* decision,[12] the canons of claim construction are now well-known—if not perfectly understood—by both parties and courts.  "To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing."[13]  This requires a careful review of the intrinsic record, comprised of the claim terms, written description, and prosecution history of the patent.[14]  While claim terms "are generally given their ordinary and customary meaning," the claims themselves and the context in which the terms appear "provide substantial guidance as to the meaning of particular claim terms."  Indeed, a patent's specification "is always highly relevant to the claim construction analysis."[15]  Claims "must be read in view of the specification, of which they are part."[16]  Although the patent's prosecution history "lacks the

---

[12] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

[13] *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008).

[14] *See id.* ("To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing. Intrinsic evidence, that is the claims, written description, and the prosecution history of the patent, is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony.") (citing *Phillips*, 415 F.3d at 1312).

[15] *Phillips,* 415 F.3d at 1312–15.

[16] *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995); *see also Ultimax Cement Mfg. Corp v. CTS Cement Mfg. Corp.*, 587 F. 3d 1339, 1347 (Fed. Cir. 2009).

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

clarity of the specification and thus is less useful for claim construction purposes," it "can often

inform the meaning of the claim language by demonstrating how the inventor understood the

invention and whether the inventor limited the invention in the course of prosecution, making the

claim scope narrower than it would otherwise be."[17]  The court also has the discretion to consider

extrinsic evidence, including dictionaries, learned treatises, and testimony from experts and

inventors.[18]  Such evidence, however, is "less significant than the intrinsic record in determining

the legally operative meaning of claim language."[19]

## III. DISCUSSION

### A.  Dispute #1:  "Multichannel-spread-spectrum transmitter"

| CLAIM TERM 1 | |
|---|---|
| "Multichannel-spread-spectrum transmitter" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "User equipment that uplinks multichannel-spread spectrum signals to a base station." | No construction necessary. Alternatively, "a transmitter for communicating a multichannel spread-spectrum signal." |
| CONSTRUCTION | |
| Plain and ordinary meaning. | |

The term "multichannel-spread-spectrum transmitter" appears in claims 5 and 7 of the '793

Patent. For example, claim 5 recites: "[A] multichannel-spread-spectrum transmitter for

communicating a plurality of data-sequence signals from a plurality of data channels using parallel

---

[17] *Phillips*, 415 F.3d at 1317 (internal quotations omitted).

[18] *See id.* ("Although we have emphasized the importance of intrinsic evidence in claim construction, we have also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'") (quoting *Markman*, 52 F.3d at 980).

[19] *Id.* (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (internal quotations and additional citations omitted).

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

chip-sequence signals, comprising . . . a header device, . . . a processor, . . . spread-spectrum means, . . . combiner means, . . . and carrier means."[20]

The parties dispute whether "multichannel-spread-spectrum transmitter" covers both uplink transmission from a mobile station to a receiving base station and downlink transmission from a base station to a receiving mobile station, or whether it is limited simply to the uplink.

GBT argues that "multichannel-spread-spectrum transmitter" should be limited to uplink from "user equipment" for two reasons.[21] First, the inventor of the '793 Patent acted as his own lexicographer and limited this term to uplink from mobile stations. Second, the claim is so limited by the doctrine of claim differentiation.[22]

Apple disagrees that the inventor of the '793 Patent acted as his own lexicographer to limit the meaning of "multichannel-spread-spectrum transmitter," and argues that to limit this term to uplink would improperly narrow a generic term known in the art.[23] Accordingly, Apple contends that no construction is necessary, but if the court construes "multichannel-spread-spectrum transmitter," it should define it as "a transmitter for communicating a multichannel spread-spectrum signal."[24]

For the reasons set forth below, the court gives the term its plain and ordinary meaning.

---

[20] '793 Patent, at col.11 ll.3–29.

[21] Docket No. 273 at 9–10.

[22] GBT originally advanced an additional argument based on the expert testimony of its expert, Dr. Branimir Vojcic. *See* Docket No. 273 at 10. Extrinsic evidence such as expert testimony may be useful for "a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.* But GBT backed away from its original argument in its reply, and conceded that the expert testimony was of little relevance. *See* Docket No. 275 at 3.

[23] *See* Docket No. 274 at 7–13.

[24] *Id.* at 7.

7

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

### i. Inventor Lexicography

"[C]laim terms must be given their plain and ordinary meaning to one of skill in the art."[25] There are but two exceptions to this rule.[26] First, when a patentee acts as his own lexicographer by giving a claim term a definition other than its plain and ordinary meaning.[27] Second, when the patentee disavows the full scope of a claim term either in the specification or during prosecution of the patent.[28]

To act as his or her own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" which differs from its plain and ordinary meaning to one skilled in the art.[29] According to the Federal Circuit, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments;" rather, "the patentee must 'clearly express an intent' to redefine the term."[30] The '793 patent contains no explicit redefinition of the term "multichannel spread-spectrum transmitter" to include only the uplink.

Federal Circuit law is clear that courts typically should not import limitations from a preferred embodiment into a claim.[31] The court is especially mindful of this guidance in light of the fact that GBT can point to no express definition of "multichannel-spread-spectrum transmitter" in the specification, but rather argues that the specification, read as a whole, implicitly re-defines the

---

[25] *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also Phillips*, 415 F.3d at 1312-13 ("Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention.").

[26] *Thorner*, 669 F.3d at 1365.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 1365 (quoting *Helmsderfer v. Brobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

[31] *See, e.g.*, *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). *See also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

term. As GBT notes in its briefing,[32] and argued at the Markman hearing, the Federal Circuit has held that an inventor can act as his own lexicographer by implication, rather than by expressly redefining a term.[33] But the Federal Circuit has been careful to emphasize that any such implied redefinition "must be so clear that it equates to an explicit one."[34] "In other words, a person of ordinary skill in the art would have to read the specification and conclude that the applicant has clearly . . . acted as its own lexicographer."[35] Critically, under Federal Circuit case law, simply "disclosing embodiments that all use the term in the same way is not sufficient to redefine a claim term."[36]

GBT argues that the inventor of the '793 patent consistently and repeatedly uses the term "multichannel spread-spectrum transmitter" to refer only to uplink transmission from a user to the base station.[37] According to GBT, this usage constitutes an implicit redefinition of the term from its plain and ordinary meaning—which would encompass uplink and downlink transmission—to include only uplink transmission from a user to the base station. GBT points to the following intrinsic evidence in support of its inventor lexicography argument: (1) Figure 3, which shows a multichannel spread-spectrum transmitter as it would be configured in user equipment for uplink transmission; (2) Figure 4, which shows a multichannel spread-spectrum receiver; and (3) the following text of the specification:

> The present invention is for a multichannel spread-spectrum link which, in a preferred embodiment, is from a user to the base station. The present invention is illustrated, by way of example, with a multichannel spread-spectrum transmitter transmitting the multichannel spread-spectrum signal to a multichannel spread-spectrum receiver.[38]

---

[32] Docket No. 275 at 2.

[33] *See Thorner*, 669 F.3d at 1368 (citing *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*, Inc., 262 F.3d 1258, 1271 (Fed. Cir. 2001)).

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] Docket No. 275 at 2.

[38] '793 Patent at col.3 ll.51–56.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

GBT argues in addition that because the specification only describes the uplink, and never the downlink, "[a]ny variations of the preferred embodiment contemplated by the specification are variations to the 'spread spectrum packet system' of the uplink."[39] In other words, because the preferred embodiment is limited to the uplink and the downlink is not similarly discussed, the court should infer that the patentee intended to limit "multichannel-spread-spectrum transmitter" to the uplink alone.

The court is not persuaded that the '793 Patent inventor acted as his own lexicographer to limit "multichannel-spread-spectrum transmitter" to the uplink. Because nothing in the claims themselves expressly limits "multichannel-spread-spectrum transmitter" to the uplink, the court looks to the specification. GBT argues that the "invention here is an improved uplink," and that "[t]he invention is not an improved base station."[40] But the specification describes the present invention as a "multichannel-spread-spectrum *link*," not uplink.[41] While the preferred embodiment may be "from a user to the base station,"[42] under Federal Circuit case law, "disclosing embodiments that all use the term in the same way is not sufficient to redefine a claim term."[43] GBT asks the court to do precisely what Federal Circuit case law prohibits.

Finally, GBT cites several cases in support of its argument that by disclosing only the uplink in the specification the inventor of the '793 Patent intended to limit "multichannel-spread-spectrum transmitter" to the uplink. However, the cases cited by GBT are distinguishable from the facts of this case. For example, GBT asserts that the court in *Wang Labs., Inc.* v. *Am. Online, Inc.* construed the term "frame," which ordinarily could be character-based or bit-based to only the character-based system because the narrower construction was the only one described and enabled by the specification.[44] The district court in *Wang Labs* concluded that the specification was fairly

---

[39] Docket No. 275 at 2–3 (quoting '793 Patent at col.9 ll.40–46).

[40] Docket No. 284 at 20:16–17; 20:19–20.

[41] '793 Patent at col.3 ll.50–51.

[42] *Id.* at col.3 ll.51–52.

[43] *Thorner*, 669 F.3d at 1368.

[44] 197 F.3d 1377, 1381–84 (Fed. Cir. 1999)

10

read as describing only the character-based protocol and interpreted the claims as limited thereto.[45]

Unlike this case, however, the court in *Wang Labs* found that repeatedly and consistently referred

only to the character-based protocol in describing the invention in the specification.[46] Moreover,

the patent several times explicitly used language that could apply only to the character-based

protocol.[47] Here, by contrast, the one reference GBT can cite is to a preferred embodiment from a

user to base station, which is "illustrated, by way of example" as from a transmitter to receiver.[48]

   *Typhoon Touch Techs., Inc. v. Dell, Inc.*, also cited by GBT, is similarly distinguishable.[49]

GBT argues that in *Typhoon Touch* the Federal Circuit affirmed a narrow construction of

"keyboardless" to mean "without a mechanically integrated keyboard," instead of simply "not

requir[ing] the use of a separate keyboard," based on the specification describing no device having

a mechanically integrated keyboard but disclosing the use of an externally connected keyboard.[50]

However, the specification in that case specifically criticized mechanical keyboards as unwieldy,

and specifically and repeatedly described devices which involved the use of on-screen keyboards in

lieu of a mechanical keyboard.[51] The specification also stated that an external keyboard could be

hooked up to the device.[52] The specification also distinguished between integrated and peripheral

keyboards, and between mechanical and simulated keyboards.[53] On this basis, the Federal Circuit

concluded that the district court correctly construed "keyboardless" to mean without an integrated

---

[45] *Id*. at 1383.

[46] *Id*. at 1381.

[47] See *id*. at 1382 ("Whenever a stored frame is to be displayed, the decoder module in Figure 6 must decode the characters and attributes and deliver the decoded characters to a *character-based display module*.") (emphasis added; internal quotation marks and alterations omitted).

[48] '793 Patent at col.3 ll.51–56.

[49] 659 F.3d 1376, 1382-1383 (Fed. Cir. 2011).

[50] Docket No. 275 at 2 n.1.

[51] *Typhoon Touch*, 659 F.3d at 1382–1383.

[52] *Id*. at 1383.

[53] *Id*.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

mechanical keyboard, but not excluding a hooked up peripheral keyboard.[54] Here, by contrast, the specification describes only a preferred embodiment which is from user to base station. As discussed above, the patent does not otherwise describe the invention in a way which would limit the "multichannel-spread-spectrum transmitter" component to the uplink from user equipment. Simply put, describing only one preferred embodiment is not sufficient to limit the claims to the scope of that embodiment.[55]

Ultimately, neither the specification nor the claim terms evince clear intent by the inventor of the '793 patent to limit the meaning of "multichannel-spread-spectrum transmitter" to uplink from "user equipment." Although Figure 3 illustrates a multichannel spread-spectrum transmitter configured for uplink transmission from user equipment and the sole preferred embodiment described in the specfification is from a user to the base station, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments."[56] "[A] claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a clear intention to limit the claim's scope with words or expressions of manifest exclusion or restriction."[57] The court finds that the '793 Patent's specification lacks such clear intent to limit the term "multichannel spread-spectrum transmitter" to the uplink, and the court will not turn one illustrative mention in the specification of the invention in terms of the uplink into a limitation on the patent's claims.

### ii. Claim Differentiation

GBT argues that under the doctrine of claim differentiation, reading Claim 1 against Claims 5 and 7 reveals that "multichannel spread-spectrum transmitter" should be limited to the uplink.[58]

---

[54] *Id.*

[55] *Thorner*, 669 F.3d at 1368 ("[D]isclosing embodiments that all use the term in the same way is not sufficient to redefine a claim term.").

[56] *Id.* at 1365.

[57] *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir 2010) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004)) (internal quotation marks omitted).

[58] Docket No. 273 at 10.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

In its most specific guise, the doctrine of claim differentiation provides that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."[59] However, the doctrine ultimately represents the "presumption that each claim in a patent has a different scope."[60] Accordingly, even outside the independent/dependent claim context, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms."[61] "[T]wo considerations generally govern this claim construction tool when applied to two independent claims: (1) claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous; and (2) claim differentiation can not broaden claims beyond their correct scope."[62] GBT seeks to use claim differentiation to narrow the scope of Claims 5 and 7, so the court's analysis is limited to the first, which the court finds does not compel the result GBT seeks.

The doctrine of claim differentiation does not require limiting Claims 5 and 7 to the uplink because the scope of Claim 1 is significantly different than Claims 5 and 7 regardless of how the latter two claims are construed. Claim 1 recites a "multichannel spread-spectrum system" which includes limitations for a "transmitter subsystem" and a "receiver processor."[63] Specifically, Claim 1 is directed to a "multichannel spread-spectrum system" comprising a "transmitting system" for transmitting over a communication channel," a "translating device" for translating the received signal," a "header-matched filter" for detecting the header, a "receiver processor" for generating

---

[59] *Phillips*, 415 F.3d at 1315.

[60] *Versa Corp. v. Ag–Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004).

[61] *Phillips*, 415 F.3d at 1314.

[62] *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (internal quotation marks omitted).

[63] '793 patent at col.10 ll.5–7; col.10 ll.19–21. Although GBT asserts in its opening brief that Claim 1 recites limitations for both "the transmitter" and "base station," *see* Docket No. 273 at 10, Claim 1 includes only limitations for a "transmitter subsystem" and "receiver processor."

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

**United States District Court**
For the Northern District of California

1   control and timing signals, and "data-matched filters" for despreading the received multichannel

2   spread-spectrum signal.[64]

3        By contrast, Claims 5 and 7 are each directed to a transmitter alone. Claim 5 recites a

4   "multichannel spread-spectrum transmitter" comprising a "header device," a "processor," spread-

5   spectrum means," "combiner means," and "carrier means."[65] Claim 7 recites a "multichannel

6   spread-spectrum transmitter" comprising a "header device," a "processor," a "chip-sequence

7   generator," a "plurality of product devices," a "combiner," and a "transmitter subsystem."[66]

8        It is unclear what in Claim 1 would be rendered superfluous were the court not to read

9   "multichannel spread-spectrum transmitter" as limited to the uplink. GBT argues that because

10  Claim 1 recites a system that includes limitations for "both the transmitter and base station," the

11  term "multichannel spread-spectrum transmitter" in Claims 5 and 7 "cannot also encompass both

12  the uplink (transmitter) and downlink (base station)."[67] GBT does not support this assertion with

13  any citation to the evidence, but even if the court were to accept GBT's contention that Claim 1

14  recites a system for uplink transmission from user equipment to a base station, the court fails to see

15  how it therefore must be the case that  "multichannel spread-spectrum transmitter" in Claims 5 and

16  7 cannot encompass both uplink and downlink transmission. Claims 5 and 7 recite various

17  limitations that are absent in Claim 1, including receiver functionality, which is present only in

18  Claim 1, and not Claims 5 and 7. Claims 5 and 7 are not dependent upon Claim 1, so even if the

19  system recited in Claim 1 were limited to uplink from user to base station, this would not

20  consequently limit Claims 5 and 7 to the uplink as well. Put simply, the scope of Claim 1 is

21  significantly different from Claims 5 and 7 regardless of whether the term "multichannel spread-

22  spectrum transmitter" in the latter claims is limited to the uplink or not.

23

24

25  [64] '793 Patent at col.9 l.49–col.10 l.28.

26  [65] *Id*. at col.11 ll.3–29.

27  [66] *Id*. at col.12 ll.14–49.

28  [67] Docket No. 273 at 10.

14

GBT also makes a related argument that "multichannel-spread-spectrum transmitter" is logically limited to the uplink because Claim 1 recites a limitation of a "header-matched filter," which at one point in the specification is described as located at a base station.[68] However, nothing in the specification requires that a "header-matched filter" be located at a base station. The specification describes the function of a "header-matched filter" as a means of detecting the header in a multichannel spread-spectrum signal, and offers several different types of filter that can function as a "header-matched filter."[69] GBT provides no reason to conclude that a mobile user device will not also need to detect the header, and does not explain why a header-matched filter would not function for header detection by user devices in receiving downlink transmissions from a base station. Instead, GBT simply states that Claim 1 "includes both the limitations for an *uplink* multichannel spread-spectrum transmitter and base station receiver."[70] As discussed above, Claim 1 includes neither of these limitations; rather, Claim 1 recites a "multichannel-spread-spectrum system" which includes the limitations for limitations for "a transmitter subsystem," and "a receiver processor."[71]

In summary, the court finds that "multichannel-spread-spectrum transmitter" is not limited to the uplink. The specification states that uplink transmission from user to base station is a preferred embodiment, but elsewhere "multichannel-spread-spectrum transmitter" is used in a way which would apply to both sides of a communication. Moreover, both the user and the base station must both transmit and receive, and there is no suggestion in the patent that the particular invention claimed is for one or the other. Accordingly, the term "multichannel spread-spectrum transmitter" is given its plain and ordinary meaning, not limited to the uplink.

---

[68] "The header-matched filter at a base station can detect the header embedded in the multichannel spread-spectrum signal from all users, since the chip-sequence signal for the header and data is common to all users." '793 Patent at col.7 ll.41–44.

[69] *Id*. at col.7 ll.27–44.

[70] Docket No. 275 at 3.

[71] '793 Patent at col.9 l.49; col.10 l.5; col.10 l.19.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

**B.** **Dispute #2: Data channel, spread-spectrum-data channel, and spread-spectrum header channel**

| CLAIM TERM #2 | |
|---|---|
| "data channel" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "A continuous stream of data bits during a frame, that carries a data-sequence signal."[72] | "A communication channel able to carry data" |
| **CONSTRUCTION** | |
| "A communication channel able to carry data." | |

The term "data channel" appears in claims 5, 6, and 7 of the '793 Patent. For example, claim 5 recites: "[A] multichannel-spread-spectrum transmitter for communicating a plurality of data-sequence signals from a plurality of *data channels* using parallel chip-sequence signals, comprising . . . a header device, . . . a processor, . . . spread-spectrum means, . . . combiner means, . . . and carrier means."[73]

The dispute over "data channel" concerns whether the data contained in the channel must be continuous, or whether it may contain idle periods or breaks. The parties appear to agree that the ordinary definition of "channel" is a conduit or pathway that carries something.[74] In Apple's view, a "data channel" would then simply be a channel that carries data.[75] However, GBT argues that the inventor of the '793 patent implicitly defined "data channel" to mean not merely the pathway

---

[72] In its claim construction brief, GBT originally proposed that "data channel" be given the following construction: "a continuous data stream during a frame, that carries a data-sequence signal." Docket No. 273 at 11. At the Markman hearing, GBT replaced "a continuous data stream" with "a continuous stream of data bits." *See* Docket No. 284 at 74:2–6.

[73] '793 Patent at col.11 ll.3–29 (emphasis added).

[74] As a result, at the Markman hearing, the parties agreed that the only real dispute regarding "data channel" (as well as with the other two channel terms) was whether the data carried in the channel must be continuous. *See* Docket No. 284 at 64:4–9; 74:24–25 ("The remaining issue really is continuous or noncontinuous."). In addition to this disagreement, the parties had originally also disputed whether the term "data channel" referred to a conduit or to a signal. *See* Docket Nos. 273 at 12; 274 at 13–14.

[75] Docket No. 274 at 13–14.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

through which data may be carried, but rather "the manner (continuous during a stream) that data in fact is carried by a channel."[76]

For the reasons set forth below, the court construes "data" channel as "a communication channel able to carry data."

The starting point for the court's analysis is again the basic presumption that "claim terms must be given their plain and ordinary meaning to one of skill in the art."[77] Apple contends that "data channel" should be given its plain and ordinary meaning, which does not require that data be continuously carried on the channel.[78] According to Apple, the ordinary meaning of channel is a "conduit or pathway that carries something."[79] Apple argues that the '793 Patent recites the ordinary definition of "channel," and the '793 Patent does not disclaim non-continuous data transmission or define "channel" as limited to continuous transmissions.[80] In other words, data channels, as the term is used by the '793 Patent, may contain breaks or idle periods.

By contrast, GBT argues that "data channel" must mean a "continuous stream of data bits during a frame, that carries a data-sequence signal."[81] GBT makes several arguments in support of its position, and cites to Figures 1 and 2 of the '793 patent.[82] The thrust of this argument resembles that for "multichannel spread-spectrum transmitter" above: consistent usage of the term "data channel" as representing a continuous stream of data bits indicates the patentee's intent to so define the term. To overcome the presumption in favor of plain and ordinary meaning, a patentee must either act as his own lexicographer or disavow the full scope of a claim term in the specification or during prosecution.[83] Like with the term "multichannel spread-spectrum transmitter," GBT appears

---

[76] Docket Nos. 273 at 12; 275 at 5–7.

[77] *Thorner*, 669 F.3d at 1365.

[78] Docket No. 274 at 14.

[79] *Id.*

[80] *Id.*

[81] Docket No. 273 at 12.

[82] *See* Docket No. 275 at 6.

[83] *See Thorner*, 669 F.3d at 1365.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1    not to argue disavowal, so the court's analysis focuses on whether the inventor of the '793 patent

2    evinced a clear intent to define the term "data channel" in a way other than its plain and ordinary

3    meaning to one skilled in the relevant art.

4         Because the claim terms themselves shed little light on how "data channel" should be

5    construed, the court turns to the specification. Figure 1, which is the inventor's representation of

6    the prior art, shows "[a] typical frame of the spread-spectrum signal, transmitted as a packet or

7    frame of a continuous signal. . . ."[84] GBT contends that Figure 1 depicts a channel as a continuous

8    stream of alternating headers and fields, without any breaks or idle periods.[85] Figure 2 "shows a

9    spread-spectrum signal employing multiple parallel spread-spectrum channels, having a header for

10   timing on only the first spread-spectrum channel."[86] GBT notes that like Figure 1, Figure 2 does

11   not depict any breaks or idle periods in the different channels.[87] The specification states that

12   "instead of replicating the frame format shown in FIG. 1 for each spread-spectrum channel," in the

13   present invention "only one frame contains headers while the other spread-spectrum channels sent

14   in parallel with different chip-sequence signals devote their entire time for data, as shown in FIG.

15   2." GBT argues that the phrase "devote their entire time for data" precludes idle periods or breaks

16   on the spread-spectrum channels depicted in Figure 2.[88]

17        GBT contends that if the patentee wanted channels to support idle periods or breaks, he

18   would have shown breaks in Figure 2. Apple argues that the patentee did just this in Figure 2. Each

19   block representing a spread-spectrum data channel in Figure 2 contains the label "Data + FEC +

20   CRC + APC + . . ."[89] Apple asserts that the ellipses on each channel indicate that the channels

---

[84] '793 Patent at col.1 ll.20–22.

[85] Docket No. 275 at 6.

[86] '793 Patent at col.3 ll.5–7.

[87] Docket No. 275 at 6.

[88] *Id.*

[89] '793 Patent at Fig. 2.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

1    could include information other than the data and three listed control information types—such as

2    breaks or idle periods.[90]

3            As with "multichannel spread-spectrum transmitter," the specification does not demonstrate

4    clear intent on the part of the patentee to impose a continuous limitation on "data channels." GBT's

5    argument that Figure 2 shows continuous data carried in each channel is unconvincing. As Apple

6    notes, the ellipses in each data channel could well represent idle periods or breaks. GBT's response

7    is to state, without any evidentiary support, that "the ellipses do not indicate breaks or idle periods

8    within a frame."[91] GBT argues that "it is plain that the ellipses indicate that the data channels can

9    include other types of control information associated the data like the FEC, CRC, and APC bits

10   listed."[92] But again, GBT cites nothing that would make it plain that this must be the case. GBT's

11   argument that the phrase "devote their entire time for data" precludes idle periods or breaks on the

12   spread-spectrum channels depicted in Figure 2 is similarly unconvincing. Reading the phrase in

13   context suggests that GBT's reading is incorrect. The specification states that "instead of

14   replicating the frame format shown in FIG. 1 for each spread-spectrum channel, only one frame

15   contains headers while the other spread-spectrum channels sent in parallel with different chip-

16   sequence signals devote their entire time for data, as shown in FIG. 2."[93] Whereas the prior art

17   included header information on every channel, the patented invention includes header on less than

18   all the channels, which naturally would leave the channels without header free to devote all their

19   time to data. It does not follow, however, that because the data channels are header-less, and thus

20   free to devote their entire time for data, that the data channels must necessarily be continuously

21   carrying data.

22           GBT also argues that although the prior art may disclose idle periods in data channels, the

23   inclusion of breaks or idle periods would defeat the purpose of this invention—increasing data

24   _____

25   [90] Docket No. 274 at 16.

26   [91] Docket No. 275 at 7.

27   [92] *Id.*

28   [93] '793 Patent at col.3 ll.26–31.

19

1    transmission efficiency over the prior art.[94] This argument is unavailing. The patented invention

2    purports to increase efficiency by transmitting a multichannel spread-spectrum signal configured

3    such that "fewer than all of the channels include header information."[95] GBT offers no reason to

4    think that the efficiency gains of including header on less than all the channels would somehow be

5    completely offset by the inclusion of idle periods or breaks.

6          In summary, the court finds that the specification does not contain any implicit requirement

7    that the data contained in a "data channel" be continuous, without idle periods or breaks. The court

8    finds that Apple's proposed construction is more descriptive and consistent with the specification

9    than GBT's proposed construction. Specifically, Apple's construction clarifies that a "data

10   channel" is capable of carrying data, but need not do so at all times—that is, it need not

11   continuously carry data. Accordingly, the term "data channel" is construed "a communication

12   channel able to carry data."

| CLAIM TERM #3 | |
|---|---|
| "spread-spectrum-data channel" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "A continuous stream of data bits during a frame, generated by processing a data-sequence signal (other than a header frame) with a chip-sequence signal."[96] | "A channel, without a header, that is generated by processing a data-sequence signal by a respective chip-sequence signal." |
| **CONSTRUCTION** | |
| "A channel, without a header, that is generated by processing data-sequence signal by a respective chip-sequence signal." | |

---

[94] Docket No. 273 at 12–13.

[95] '793 Patent at col.1 l.66–col.2 l.2 ("A general object of the invention is to increase data transmission efficiency by sending data through parallel spread-spectrum channels while including headers in fewer than all of the channels.").

[96] In its claim construction brief, GBT originally proposed that "spread-spectrum-data channel" be given the following construction: "a continuous data stream during a frame, generated by processing a data-sequence signal (other than a header frame) with a chip-sequence signal." Docket No. 273 at 13. At the Markman hearing, GBT replaced "a continuous data stream" with "a continuous stream of data bits." *See* Docket No. 284 at 74:7–13.

**United States District Court**
For the Northern District of California

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

1    The term "spread-spectrum-data channel" appears in claims 5, 6, and 7 of the '793 Patent.

2    The parties' dispute over this term mirrors that over "data channel," and the parties' constructions

3    both agree that a "spread-spectrum-data channel" is generated by processing a data-sequence signal

4    with a chip-sequence signal.

5    Accordingly, for the reasons given above in the construction of "data channel," the court

6    construes "spread-spectrum-data channel" as "a channel, without a header, that is generated by

7    processing data-sequence signal by a respective chip-sequence signal."

| CLAIM TERM #4 | |
|---|---|
| "spread-spectrum header channel" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "A continuous stream of header and data bits during a frame, generated by processing the header frame with a first chip-sequence signal."[97] | "A channel generated by processing the header frame with a first chip-sequence signal." |
| **CONSTRUCTION** | |
| "A channel generated by processing the header frame with a first chip-sequence signal." | |

16    The term "spread-spectrum-header channel" appears in claims 5, 6, and 7 of the '793

17    Patent.

18    For the reasons given above in the construction of "data channel" and "spread-spectrum-

19    data channel," the court construes "spread-spectrum-header channel" as "a channel generated by

20    processing the header frame with a first chip-sequence signal."

---

[97] In its claim construction brief, GBT originally proposed that "spread-spectrum-header channel" be given the following construction: "a continuous data stream during a frame, generated by processing the header frame with a first chip-sequence signal." Docket No. 273 at 13. In its reply brief and at the Markman hearing, GBT replaced "a continuous data stream" with "a continuous stream of header and data bits." *See* Docket No. 284 at 74:15–19.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

**C.      Dispute #3: Chip Sequence Signals**

| CLAIM TERM #5 | |
| --- | --- |
| "chip sequence signals" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "Signals or codes, processed with a data-sequence signal to generate a spread-spectrum channel."[98] | "A signal that is a sequence of chips." |
| **CONSTRUCTION** | |
| Plain and ordinary meaning. | |

The term "chip sequence signals" appears in claims 5, 6, and 7 of the '793 Patent. For example, Claim 5 recites a "multichannel spread-spectrum transmitter" comprised of, in part, "spread-spectrum means" which, coupled to the plurality of data channels, processes data-sequence signals by "a plurality of chip-sequence signals" to generate spread-spectrum channels.[99]

The parties originally disputed whether "chip sequence signals" must be orthogonal to other chip sequence signals.[100] However, GBT modified its construction at the Markman hearing to exclude this requirement, which significantly reduced the dispute.[101] Apple's proposed construction for "chip sequence signals" essentially amounts to a reordering of the term: "a signal that is a sequence of chips." GBT asks the court to define "chip sequence signals" as "signals or codes, processed with a data-sequence signal to generate a spread-spectrum channel."

Neither party provides adequate justification for departing from the plain and ordinary meaning of "chip sequence signals." Apple's construction—"a signal that is a sequence of chips"—is essentially a restatement of the term itself: "chip sequence signal." Apple devoted its briefing,

---

[98] In its claim construction brief, GBT originally proposed that "chip sequence signal" be given the following construction: "Signals or codes, which are orthogonal to other signals or codes, processed with a data-sequence signal to generate a spread-spectrum channel." Docket No. 273 at 13–14. At the Markman hearing, GBT modified its proposed construction to drop the phrase "which are orthogonal to other signals or codes." *See* Docket No. 284 at 97:18–99:3.

[99] '793 Patent at col.11 ll.14–18.

[100] Docket No. 273 at 13–14.

[101] *See* Docket No. 284 at 97:18–99:3.

1   and limited argument at the Markman hearing, to criticizing GBT's construction, and GBT's now-

2   dropped requirement that the signal be orthogonal to other chip sequence signals.[102] Accordingly,

3   the court sees no compelling reason to adopt Apple's definition, which seems likely to add little, if

4   anything, to the term itself.[103]

5           GBT's proposed construction specifies that "chip sequence signals" must be "signals or

6   codes," and that they must be processed with a data-sequence signal to generate a spread-spectrum

7   channel. Like Apple's, this construction has little to recommend it. Much of the specificity GBT's

8   proposed construction provides is already present in the language that accompanies "chip sequence

9   signal" in the '793 patent claims and specification. The specification states that chip sequences

10  signals are generated from respective codes,[104] and both the specification and the claims provide

11  that "chip sequence signals" are processed with data-sequence signals to generate a spread-

12  spectrum channel.[105] Moreover, GBT's proposed construction, which states that "chip sequence

13  signals" are processed with data-sequence signals, is too narrow as the invention specifically

14  requires that a spread-spectrum-header channel is generated by multiplying a chip-sequence signal

15  with the header frame, not a data-sequence signal.[106]

16          Because claim terms are presumptively given their plain and ordinary meaning to one

17  skilled in the relevant art,[107] and the parties have provided no reason to depart from such definition,

18  the court gives the term "chip sequence signals" its plain and ordinary meaning.

19

20

21  [102] *See* Docket No. 274 at 18–19.

22  [103] GBT also argues that Apple's construction would permit essentially any sequence, which would
    be unhelpful to a jury trying to understand what the term "chip sequence signal" means. *See*

23  Docket No. 284 at 100:4–7.

24  [104] '793 Patent col.4 ll.14–20.

25  [105] *See, e.g.*, *id*. at col.11 ll.15–17.

26  [106] *See id*. at col.11 ll.19–21; col.12 ll.36–38.

27  [107] *Phillips*, 415 F.3d at 1312-13 ("Words of a claim are generally given their ordinary and
    customary meaning, which is the meaning a term would have to a person of ordinary skill in the art

28  after reviewing the intrinsic record at the time of the invention.").

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

| CLAIM TERM #6 | |
| --- | --- |
| "parallel chip sequence signals" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| No construction necessary due to GBT's proposed construction of "chip sequence signals," and because "parallel" has an ordinary and customary meaning.<br><br>However, if construed:<br><br>"Signals or codes, processed with data-sequence signals to generate spread-spectrum channels that can each be sent simultaneously."[108] | "Chip-sequence signals that can be used to distinguish channels from each other." |
| **CONSTRUCTION** | |
| Plain and ordinary meaning. | |

The term "parallel chip sequence signals" appears in claims 5, 6, and 7 of the '793 Patent. The parties addressed "parallel chip sequence signals" with the previous term, "chip sequence signals," and accordingly the discussion of "chip sequence signals" above applies equally to "parallel chip sequence signals."

In its brief, GBT argues that no construction is needed for this term because "parallel" has an ordinary and customary meaning, and "chip sequence signal" is being construed on its own.[109] Alternatively, GBT proposes the following construction should the court decide to construe the term: "signals or codes, processed with data-sequence signals to generate spread-spectrum channels that can each be sent simultaneously."[110] For its part, Apple proposes the construction "chip-sequence signals that can be used to distinguish channels from each other," but provides no reasoning in support other than to note that perfect orthogonality is not required.[111] Neither party provided any argument specific to "parallel chip sequence signals" at the Markman hearing.

---

[108] As with "chip sequence signals," GBT modified its proposed construction of "parallel chip sequence signals" at the Markman hearing to remove the requirement that such signals be "orthogonal to other signals or codes." *See* Docket No. 284 at 97:18–99:3.

[109] Docket No. 283 at 14–15.

[110] *Id.* at 15.

[111] Docket No. 274 at 18–19.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

The court finds "parallel" requires no additional construction. Accordingly, as with "chip sequence signals," the court gives the term "parallel chip sequence signals" its plain and ordinary meaning.

**D.     Dispute #4: "Synchronizing the plurality of data channels"**

| CLAIM TERM #7 | |
| --- | --- |
| "Synchronizing the plurality of data channels" | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| "aligning in time two or more data channels." | "Timing the two or more data channels using the header." |
| **CONSTRUCTION** | |
| "Timing the two or more data channels using timing data from the header and timing and control signals from the processor." | |

The term "parallel chip sequence signals" appears in claims 5 and 7 of the '793 Patent. Both claims recite a "multichannel spread-spectrum transmitter" that is comprised of, in part, "a processor, coupled to the header device and to the plurality of data channels, for synchronizing the plurality of data channels."[112]

The parties' positions on this term substantially converged at the Markman hearing. The parties both agreed that the following language in the specification explains what is required for synchronization in the '793 Patent:

> The header device 46 concatenates the header with data using a first data channel of a plurality of data channels. The header device 46 is necessary for timing of data from different data channels. From timing the data from the header in a single channel, data in all channels are timed. A plurality of synchronization devices, which may be embodied as buffer memories 32–38, receive timing and control signals from the processor 27 to synchronize the plurality of data channels to the header on the first data channel.[113]

Based on this language, GBT agreed to Apple's proposed phrase "*the* two or more data channels" as opposed to simply "two or more data channels" because GBT agrees that all of the plurality of

---

[112] '793 Patent at col.11 ll.10–12; col.12 ll.21–23.

[113] *Id*. at col.6 ll.14–22.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

**United States District Court**
For the Northern District of California

1    data channels must be synchronized, rather than simply two or more.[114] GBT and Apple also

2    agreed that it is proper to say that synchronization is accomplished by "using timing data from the

3    header."[115] Finally, the parties also agreed that synchronization involves "timing and control

4    signals from the processor."[116]

5         Accordingly, the only remaining dispute concerns whether synchronization is properly

6    construed as aligning "aligning" (GBT) or "timing" (Apple) "the two or more data channels," using

7    "timing data from the header" and "timing and control signals from the processor." As Apple

8    points out, the term "align" does not appear in the '793 Patent.[117] On the other hand, "timing" is

9    frequently used in describing synchronization of the plurality of data channels.

10        For example, the specification explains the synchronization process as follows. The header

11   device first "concatenates the header with data using a first data channel of a plurality of data

12   channels."[118] "Timing is keyed from the header. The processor generates control and timing signals

13   for synchronization of the [other] data-sequence channels to the header."[119] "A plurality of

14   synchronization devices," then "receive timing and control information from the processor to

15   synchronize the plurality of data channels to the header on the first data channel."[120]

16

17   _____

      [114] *See* Docket No. 284 at 122:20–123:3.

18
      [115] *Id*. at 128:8–11; *see also id*. at 125:3–7 (". . . from timing the data from the header in a single
19   channel, all the channels are timed, and that's certainly true. And that *particular timing information
      does come from the header* . . . .") (emphasis added); 119:8–11 ("[Apple's] construction [is] saying
20   basically and exactly what the patent says. From timing the data in the header in a single channel
      data in all the channels is timed. That's the idea.").

21   [116] *See id*. at 126:7–11 ("We [GBT] are talking about synchronizing, and it is more than just the
22   header that does the synchronizing. It's *the processor sending control and timing signals* that does
      the synchronization.") (emphasis added); 127:24–128:4 ("Okay. If [GBT] want[s] to say that
23   *synchronizing means sending timing and control signals from a processor based on timing the data
      in the header*, which is what [the specification] says . . . that's all true. [Apple doesn't] dispute any
24   of that. We're not trying to somehow read all that out.") (emphasis added).

25   [117] Docket No. 274 at 20.

26   [118] '793 Patent at col.6 ll.14–15; *see also id*. at col.2 ll.13–15.

27   [119] *Id*. at col.2 ll.18–21.

28   [120] *Id*. at col.6 ll.18–22.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The specification notes that the first step of concatenating header with data is "necessary for timing of data from different data channels."[121] It is "[f]rom timing the data from the header in a single channel, [that] data in all channels are timed."[122] Likewise, the specification explains that the control and timing signals generated by the processor "are used for controlling sequences and timing of the invention."[123] In short, the specification is clear that "synchronization" of data channels means "timing" such channels using data from the header and timing and control signals from the processer. In light of the specification, the

Because the patentee repeatedly equates synchronization of the data channels with *timing* the data channels in the specification, the court concludes that read in the light of the specification, the term "synchronizing" is best construed as "timing." Accordingly, the court construes the term "synchronizing the plurality of data channels" as follows: "timing the two or more data channels using timing data from the header and timing and control signals from the processor."

---

[121] *Id*. at col.6 ll.14–17.

[122] *Id*. at col.6 ll.17–18.

[123] *Id*. at col.5 ll.36–38.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

E.      Dispute #5: "Spread spectrum means . . ."

| CLAIM TERM #8 |
| --- |
| "spread spectrum means coupled to the plurality of data channels for spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively thereby generating a plurality of spread spectrum channels the plurality of spread spectrum channels including a spread spectrum header channel generated by processing the header frame with a first chip sequence signal and a plurality of spread spectrum data channels" |

| GBT's Preferred Construction | Apple's Preferred Construction |
| --- | --- |
| *Function:*<br><br>"spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively."<br><br>*Corresponding Structure:*<br><br>"Product devices 51–58 and equivalents thereof." | *Function:*<br><br>"spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel generated by processing the header frame with a first chip-sequence signal, and a plurality of spread-spectrum-data channels."<br><br>*Corresponding Structure:*<br><br>"Chip sequence generator 39, product devices 51, 52, 53, and 58, processor 27, sync blocks 32, 33, and 38, header device block 46, and lines connecting them." |

| CONSTRUCTION |
| --- |
| *Function:*<br>"Spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively."<br><br>*Structure:*<br>"Product devices and equivalent thereof." |

The term "spread spectrum means . . ." appears in claim 5 of the '793 Patent. The parties

agree that this claim term is a means-plus-function term under 35 U.S.C. § 112(f). A means-plus-

function claim must be construed as follows. First, the court identifies the function described by the

claim.[124] Second, the court looks to the specification and identifies "the corresponding structure,

material, or acts that perform that function."[125] "A structure in the specification qualifies as a

corresponding structure if the specification or the prosecution history clearly links or associates

---

[124] *See HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 127, 1278 (Fed. Cir. 2012).

[125] *Id.*

1    that structure to the function recited in the claim."[126] "Even if the specification discloses a

2    corresponding structure, the disclosure must be adequate" in showing what is meant by the claim

3    language.[127]

    **i. Function**

5        The parties dispute whether the claimed function is limited to "spread spectrum processing

6    the plurality of data sequence signals by a plurality of chip sequence signals respectively" (GBT's

7    position), or whether the claimed function also includes "generating a plurality of spread-spectrum

8    channels, the plurality of spread-spectrum channels including a spread-spectrum-header channel

9    generated by processing the header frame with a first chip-sequence signal, and a plurality of

10   spread-spectrum-data channels" (Apple's position).[128]

11       GBT argues that its proposed function follows from the claim language itself, which recites

12   "a spread-spectrum means . . . for spread-spectrum processing the plurality of data-sequence

13   signals by a plurality of chip sequence signals, respectively . . . ."[129] According to GBT, Apple's

14   proposed construction incorrectly encompasses more than the claimed function by including not

15   only what the spread-spectrum means processes, but also both: (1) the result of the processing (a

16   plurality of spread-spectrum data channels); and (2) how the spread-spectrum header channel is

17   generated. GBT contends that the result of the processing (a plurality of spread-spectrum data

18   channels) is not part of the processing itself, and is therefore not properly part of the claimed

19   function of the spread-spectrum means.[130]

20       Apple asserts that GBT seeks to truncate the claimed function to omit the "generating"

21   function expressly recited in Claim 5.[131] According to Apple, GBT has no basis for excluding the

[126] *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).

[127] *Id.* at 1311–12.

[128] *See* Docket Nos. 273 at 16–17; 274 at 20–21.

[129] '793 Patent at col.11 ll.13–16.

[130] Docket No. 273 at 17.

[131] Docket No. 274 at 21.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

functional limitation of "generating a plurality of spread spectrum channels." What GBT sees as the result of the processing performed by the spread spectrum means—generating a plurality of spread-spectrum signals—Apple sees as "a functional activity that the recited 'means' performs."[132]

The court agrees with GBT that the claimed function is "spread spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals respectively." First, the claim language supports GBT's construction. Claim 5 recites a "multichannel-spread-spectrum transmitter" comprised of, in part:

> spread-spectrum means, coupled to the plurality of data channels, for spread-spectrum processing the plurality of data-sequence signals by a plurality of chip-sequence signals, respectively, thereby generating a plurality of spread-spectrum channels, the plurality of spread-spectrum channels including a spread spectrum-header channel generated by processing the header frame With a first chip-sequence signal, and a plurality of spread-spectrum-data channels.[133]

The claim language plainly states that the spread-spectrum means are *for* spread-spectrum processing the data-sequence signals with chip-sequence signals. The word "thereby" separates this first clause of the spread-spectrum means element from the language that follows, which Apple argues should constitute part of the claimed function. The court agrees with GBT that the use of the word "thereby" indicates that the limitations which follow are what results when the spread-spectrum means perform the claimed function; that is, spread-spectrum processing data-sequence and chip-sequence signals.

**ii. Structure**

The parties' dispute as to the appropriate structure flows from their proposed functions. GBT asserts that the structure for "spread-spectrum processing the plurality of data sequence signals by a plurality of chip sequence signals" is limited to product devices 51–58 and equivalents thereof.[134] Apple's proposed structure includes not only the product devices 51–58 identified by

---

[132] *Id.*

[133] '793 Patent at col.11 ll.13–21.

[134] Docket No. 273 at 17.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1  GBT, but also the chip sequence generator 39, processor 27, sync blocks 32, 33, and 38, header

2  device block 46, and the lines connecting them.[135] Apple argues that even under GBT's identified

3  function, which the court adopts, the appropriate corresponding structure includes all of the

4  components listed above.[136]

5      Apple argues that the specification teaches that product devices 51–58, chip sequence

6  generator 39, processor 27, sync blocks 32, 33, and 38, header device block 46, and the lines

7  connecting them all work together to perform the recited function.[137] In Apple's view, GBT's

8  proposed structure is incomplete because the product devices, alone, could not achieve the recited

9  function of "spread spectrum processing and generating multiple spread spectrum channels with

10 the specific recited characteristics."[138] Additionally, Apple contends that the lines depicted in

11 Figure 3 do not merely illustrate how the product devices get their inputs and where they send their

12 outputs, but rather are "necessary for communication between the structures so they can perform

13 the recited function."[139]

14     GBT asserts that all that is required to perform the claimed function are the product devices

15 51–58 and equivalents thereof.[140] GBT argues that the additional structures identified by Apple all

16 serve other functions. For example, in GBT's view the processor, sync blocks, and header device

17 are all "components for *providing* the data sequence signals, not for spread-spectrum *processing*

18 the data sequence signals."[141]

19     The court thus finds that the structure identified to perform the function "spread spectrum

20 processing the plurality of data sequence signals by a plurality of chip sequence signals

---

[135] Docket No. 274 at 21.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] Docket No. 273 at 16–18.

[141] *Id.* at 17.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1   respectively" is "product devices and equivalent thereof." This reading of Claim 5 is supported by

2   the specification and by Figure 3, which shows that the recited function is performed by the

3   product devices. Figure 3 depicts product devices 51–58 receiving inputs from sync blocks 31–38

4   and the header device 46, as well as from a chip-sequence generator. The specification states that

5   "[t]he plurality of product devices 51–58, for example, may be embodied as a plurality of

6   EXCLUSIVE-OR gates coupled between the incoming data channels and chip sequence generator

7   39. Each EXCLUSIVE-OR gate multiplies a respective data-sequence signal by a respective chip-

8   sequence signal from the chip sequence generator 39."[142] The specification explains that "[a]t the

9   output of the plurality of product devices 51–58 is a plurality of spread-spectrum channels,

10   respectively."[143] Thus according to the specification it is the product devices which multiply data-

11   sequence signals by chip-sequence signals, the result of which process is to generate spread-

12   spectrum channels.

13        The specification further states that "the transmitter-spread-spectrum means, as

14   illustratively shown in FIG. 3, is embodied as a chip-sequence means and a plurality of product

15   devices."[144] The block representing the chip-sequence generator 39 generates chip-sequence

16   signals, and is recited as a separate means in dependent claim 6.[145] Accordingly, the chip-sequence

17   generator 39 is properly construed as an input to the processing means, and does not itself perform

18   the claimed function of spread spectrum processing data sequence signals and chip sequence

19   signals.

20        The court also agrees with GBT that the lines connecting the various components in Figure

21   3 do not perform the claimed function. Apple admitted as much in its claim construction brief

22   when it stated that "the lines are necessary for communication between the structures so that they

23   can perform the recited function."[146] Whether or not the lines are necessary for *communication*

---

[142] '793 Patent at col.6 ll.32–37.

[143] *Id*. at col.6 ll.38–41.

[144] *Id*. at col.5 ll.43–45.

[145] *Id*. at col.11 ll.32–33.

[146] Docket No. 274 at 21.

United States District Court
For the Northern District of California

1   between the various components, it is clear that the lines themselves do not perform the claimed

2   function. Apple appears to be arguing that the appropriate structure should include all that which is

3   necessary for the structure to perform the claimed function. But Apple provides no authority for

4   this proposition. In short, the lines "simply illustrate how the product devices receive their inputs

5   and where their outputs are sent," and as such should not be included as additional structure for

6   spread spectrum processing the data-sequence and chip-sequence signals.[147] Finally, this

7   conclusion is buttressed by Apple's agreement with GBT's proposed construction for the "means

8   for generating the plurality of chip sequence signals."[148] Whereas Apple had originally included

9   lines in its proposed structure for that term, it agreed to GBT's proposed construction, which is

10  limited to "a combiner 45 and equivalents thereof."[149]  Apple provides no reason to think that the

11  lines are different in this context.

12        The court thus finds that the structure identified to perform the claimed function for the

13  term "spread-spectrum means" is "product devices and equivalent thereof."

---

[147] Docket No. 275 at 12.

[148] *See* Docket Nos. 274 at 23 n.4; 275 at 12.

[149] Docket No. 275 at 12.

33

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

**F.      Dispute #6: "Combiner means . . ."**

| CLAIM TERM #9 | |
|---|---|
| "combiner means coupled to said spread spectrum means for algebraically combining the plurality of spread spectrum channels as a  multichannel spread signal." | |
| **GBT's Preferred Construction** | **Apple's Preferred Construction** |
| *Function:* | *Function:* |
| "algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum signal." (agreed) | "algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum signal." (agreed) |
| *Corresponding Structure:* | *Corresponding Structure:* |
| "A combiner 45 and equivalents thereof." | "Lines from product devices 51, 52, 53, 58 to combiner block 45, and line to product device 48." |
| CONSTRUCTION | |
| *Function:* "Algebraically combining the plurality of spread spectrum channels as a multichannel spread spectrum channel." (agreed)<br><br>*Structure:* "An adder and equivalents thereof." | |

The term "combiner means . . ." appears in claim 5 of the '793 Patent. The parties agree that this claim term is a means-plus-function term under 35 U.S.C. § 112(f). Because the parties agree on the function, the only issue before the court is the corresponding structure.

GBT asserts that the corresponding structure to "combining means" is "a combiner 45 and equivalents thereof."[150] Apple argues that the appropriate structure is "lines from product devices 51, 52, 53, 58 to combiner block 45, and line to product device 48."[151] At the Markman hearing, Apple changed tack, changed its position to argue that the appropriate structure is "an adder."[152]

---

[150] Docket No. 273 at 18.

[151] Docket No. 274 at 22.

[152] *See* Docket No. 284 at 144:18–21 ("Where we [Apple] stand now, [and] apparently their expert agrees with us, but they [GBT] don't, . . . according to persons skilled in the art, the combiner really is an adder."); 143:12–13 ("We should have said it's an adder."); 144:10–14 ("What we [Apple] should have done . . . just [say] hey, we're talking about an adder. It's an adder, adder 45.").

1    The court finds that the structure identified to perform the claimed function of

2   "algebraically combining the plurality of spread spectrum channels as a multichannel spread

3   spectrum channel" is "an adder and equivalents thereof." GBT resists limiting the structure to an

4   adder, but cannot point to any other identified structure in the '793 Patent. As GBT notes, the

5   specification states that the "combiner 45 algebraically combines the plurality of spread-spectrum

6   channels, and outputs the combined signal as a multichannel-spread-spectrum signal. Preferably,

7   the combiner 45 combines the plurality of spread-spectrum channels linearly, although some

8   nonlinear process may be involved without degradation in system performance."[153] The parties

9   appear to agree that linear algebraic combination means an adder, but dispute whether "some

10  nonlinear process" is sufficiently definite to preclude limiting the structure to an adder.[154]

11    GBT argues that the structure need not be limited to an adder because the specification

12  discloses "some nonlinear process" as an alternative to linear algebraic combination.[155] According

13  to GBT, a person skilled in the relevant art would understand "some non-linear process" as

14  disclosing that there may be other ways of performing the claimed function in the '793 Patent.[156]

15  However, in this context, "[t]he question not whether one of skill in the art would be capable of

16  implementing a structure to perform the function, but whether that person would understand the

17  written description itself to disclose such a structure."[157] While specification sufficiently discloses

18  an adder as a structure corresponding to the term "combining means" by describing the combiner

19

20

21  ───────────────
    [153] '793 Patent at col.6 ll.54–60.

22  [154] *See* Docket No. 284 at 142:17–19 ("[W]hat GBT says now is well, the combiner is not limited
23  to an adder and it can cover some nonlinear process . . . ."). *See also* Docket No. 275 at 13 (noting
    that "some non-linear process may be involved" and concluding that "[t]hus, the combiner is not
24  limited to an adder.").

    [155] Docket No. 275 at 13. *See also* Docket No. 284 at 151:18–24.
25
    [156] *See* Docket No. 284 at 151:10–17.
26
    [157] *Telecordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010)
27  (quoting *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir.2008)) (internal
    quotation marks omitted).
28
                                              35

    Case No. 5:12-cv-04882-PSG
    CLAIM CONSTRUCTION ORDER

in Figure 3 as performing linear algebraic combination, a vague reference to "some nonlinear process" is not.[158]

Finally, although GBT seeks not to have the corresponding structure to "combining means" limited to an adder, GBT itself acknowledged at the Markman hearing that construing the structure as "an adder and equivalents thereof" would likely capture any equivalents known to persons skilled in the art or future innovations that perform algebraic combination within the scope of a "combiner."[159]

The court therefore construes "combining means" to have the structures "an adder and equivalents thereof."

---

[158] *See Noah Sys.*, 675 F.3d at 1311–1312 ("Even if the specification discloses a corresponding structure, the disclosure must be adequate" in showing what is meant by the claim language).

[159] *See* Docket No. 284 at 152:4–6:

> The Court: "My understanding . . . was always that the equivalence thereof kind of captured that possibility [of future innovations or other undisclosed equivalents to an adder that might be known to persons skilled in the relevant art]."
>
> Mr. Hadley: "And that's an excellent point. I mean, you're absolutely right. The equivalence thereof does capture that . . . .").

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

### G.    Dispute #7: "Carrier means . . ."

| CLAIM TERM #10 |
| --- |

| "carrier means coupled to said combiner means for transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency." |
| --- |

| GBT's Preferred Construction | Apple's Preferred Construction |
| --- | --- |
| *Function:*<br>"transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency." (agreed)<br><br>*Corresponding Structure:*<br>"A transmitter-carrier subsystem 50 and equivalents thereof." | *Function:*<br>"transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency." (agreed)<br><br>*Corresponding Structure:*<br>"Transmitter-carrier subsystem 50 comprised of oscillator 49 and multiplier device 48 for shifting a signal to a carrier frequency, a filter 58 for filtering the shifted signal, a power amplifier 59, and antenna 60." |

| CONSTRUCTION |
| --- |
| *Function:*<br>"Transmitting the multichannel spread spectrum signal over a communications channel at a carrier frequency." (agreed)<br><br>*Structure:*<br>"Transmitter-carrier subsystem comprised of appropriate filters, power amplifiers, and matching circuits coupled to an antenna, with or without a hard limitation, and equivalents thereof." |

The term "carrier means . . ." appears in claim 5 of the '793 Patent. The parties agree that this claim term is a means-plus-function term under 35 U.S.C. § 112(f). Because the parties agree on the function, the only issue before the court is the corresponding structure.

The parties' dispute over the appropriate structure for "carrier means" centers on whether the structure may be "summarized" as a "transmitter-carrier subsystem," or whether the structure must be identified more specifically.[160] GBT argues that the corresponding structure that performs the carrier means function is the "transmitter-carrier subsystem 50," which can be configured in various disclosed ways, and the details of which will be known to those skilled in the art.[161] Apple

---

[160] *See id.* at 157:12–15 ("We [GBT] think that it would be appropriate to summarize [the structure for "carrier means"] as a carrier transmitter subsystem, and that is a term that connotes structure."); 159:12–14 ("We [Apple] just need some structure because it's a means plus function claim. We need some structure, like an anchor to the claim.").

[161] Docket No 275 at 14.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

1    argues that the structure must be limited to that which is specifically disclosed in the specification,

2    namely, an "oscillator 49 and multiplier device 48 for shifting a signal to a carrier frequency, a

3    filter 58 for filtering the shifted signal, a power amplifier 59, and antenna 60."[162]

4          Neither party's position is quite on the mark: GBT's position is too vague, and Apple's

5    unnecessarily limiting. Apple is correct that "'where the specification simply recites that a claimed

6    function can be performed by known methods or using known equipment,' the specification does

7    not disclose corresponding structure."[163] In order for a means plus function claim to be valid, "the

8    corresponding structure of the limitation must be disclosed in the written description in such a

9    manner that one skilled in the art will know and understand what structure corresponds to the

10   means limitation."[164] Limiting the structure to "transmitter-carrier subsystem 50" does little more

11   than add the word "subsystem" to the term "carrier" and does not disclose what structure

12   corresponds to the means. However, GBT is equally correct that the specification states that the

13   carrier means *may* include the specific components identified by Apple, and that the structure need

14   not be so limited.

15         The specification contains two relevant descriptions of the structure corresponding to

16   "carrier means." First:

17            The transmitter-carrier means is embodied as a transmitter-carrier
                subsystem 50. The transmitter-carrier subsystem 50 may include an
18            oscillator 49 and multiplier device 48 for shifting a signal to a carrier
                frequency, a filter 58 for filtering the shifted signal, and a power
19            amplifier 59 and/or other circuitry as is well known in the art for
                transmitting a signal over a communications channel. The signal is
20            transmitted using an antenna 60.[165]

21   And second:

22            The transmitter-carrier subsystem 50 transmits, at a carrier frequency, the
                multichannel spread-spectrum signal using radio waves over a
23            communications channel. The transmitter-carrier subsystem 50 of the

---

24   [162] *See* Docket No. 274 at 23–24; '793 Patent at col.5 l.66–col.6 l.7.

25   [163] Docket No. 274 at 24 (citing *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 952
26   (Fed. Cir. 2007)).

27   [164] *Biomedino*, 490 F.3d at 950.

28   [165] '793 Patent at col.5 l.66–col.6 l.7.

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

multichannel spread-spectrum transmitter includes appropriate filters, power amplifiers and matching circuits coupled to an antenna 60. The transmitter-carrier subsystem 50 also may include a hard limiter, for hard limiting the multichannel spread spectrum signal before transmitting.[166]

Unlike the specific components Apple proposes in its construction, which the specification clearly states "may" be a part of the transmitter-carrier subsystem, the subsystem "*includes* appropriate filters, power amplifiers and matching circuits coupled to an antenna 60."[167] Apple argues that "such vague statements [like appropriate filters, power amplifiers and matching circuits coupled to an antenna] do not disclose any corresponding structure."[168] However, "all one needs to do in order to obtain the benefit of [35 U.S.C. § 112(f)] is to recite some structure corresponding to the means in the specifications, as the statute says, so that one can readily ascertain what the claim means and comply with the particularity requirement of [§ 112(b)]."[169] The specification plainly does so by disclosing "appropriate filters, power amplifiers, and matching circuits coupled to an antenna." In addition, the specification goes on to say that the transmitter-carrier subsystem may be configured with or without a "hard limitation."[170] Taken together, these statements in the specification adequately disclose the structure corresponding to the carrier means function claimed in the '793 Patent.

Accordingly, the court construes the structure corresponding to the carrier means function as "transmitter-carrier subsystem comprised of appropriate filters, power amplifiers, and matching circuits coupled to an antenna, with or without a hard limitation, and equivalents thereof."

**IT IS SO ORDERED.**

Dated: December 18, 2014

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[166] *Id*. at col.6 l.61–col.7 l.2.

[167] *Id.* at col.6 ll.63–66 (emphasis added).

[168] Docket No. 274 at 24.

[169] *Biomedino*, 490 F.3d at 950. (internal quotation marks and citation omitted).

[170] '793 Patent at col.6 l.67–col.7 l.2 ("The transmitter-carrier subsystem 50 also may include a hard limiter, for hard limiting the multichannel spread spectrum signal before transmitting.").

Case No. 5:12-cv-04882-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California